# Exhibit 1

|  | : |  |
| --- | --- | --- |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, PARK PLACE COMMERCE INVESTMENTS, LLC, PRU ALPHA FIXED INCOME OPPORTUNITY MASTER FUND I, L.P., PRUDENTIAL TRUST COMPANY, and THE GIBRALTAR LIFE INSURANCE COMPANY, LTD., | : : : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ESSEX COUNTY  Civil Action  DOCKET NO: ESX-L-6206-12 |

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, PARK PLACE COMMERCE INVESTMENTS, LLC, PRU ALPHA FIXED INCOME OPPORTUNITY MASTER FUND I, L.P., PRUDENTIAL TRUST COMPANY, and THE GIBRALTAR LIFE INSURANCE COMPANY, LTD.,

           Plaintiffs,

      -against-

RBS FINANCIAL PRODUCTS, INC. (f/k/a GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.), RBS ACCEPTANCE, INC. (f/k/a GREENWICH CAPITAL ACCEPTANCE, INC.), FINANCIAL ASSET SECURITIES CORP., and RBS SECURITIES, INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.),

           Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, ESSEX COUNTY

Civil Action

DOCKET NO: ESX-L-6206-12

**ACKNOWLEDGEMENT OF SERVICE**

Defendants RBS FINANCIAL PRODUCTS INC. (f/k/a GREENWICH CAPITAL

FINANCIAL PRODUCTS, INC.), RBS ACCEPTANCE INC. (f/k/a GREENWICH CAPITAL

ACCEPTANCE, INC.), FINANCIAL ASSET SECURITIES CORP., and RBS SECURITIES

INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.) (collectively, "Defendants"), hereby

accept service and acknowledge receipt of the filed Complaint and Jury Demand, Summons,

Case Information Statement and Track Assignment Notice in accordance with R. 4:4-6.

Defendants do not waive and hereby expressly preserve any and all defenses, including, without limitation, for lack of personal jurisdiction and as to venue.

Dated:   October 5, 2012

SIMPSON THACHER & BARTLETT LLP

By:_____

Alan C. Turner
425 Lexington Avenue
New York, New York10010-1601
Telephone:  (212) 455-2000
Fax:  (212) 455-2502
aturner@stblaw.com

*Attorneys for Defendants RBS Financial
Products Inc. (F/K/A Greenwich Capital
Financial Products, Inc.), RBS Acceptance
Inc. (F/K/A Greenwich Capital Acceptance,
Inc.), Financial Asset Securities Corp., and
RBS Securities Inc. (F/K/A Greenwich
Capital Markets, Inc.)*

# Exhibit 2

| Attorney(s) | ROBIN H. ROME, ESQ. |
|---|---|
| Office Address | NUKK-FREEMAN & CERRA, P.C. |
| | 636 MORRIS TURNPIKE, SUITE 2F |
| Town, State, Zip Code | SHORT HILLS, NJ 07078 |
| Telephone Number | (973) 564-9100 |
| Attorney(s) for Plaintiff | All Plaintiffs - See Exhibit A |

THE PRUDENTIAL INSURANCE COMPANY

OF AMERICA, et al.

     Plaintiff(s)

Vs.

RBS FINANCIAL PRODUCTS, INC., et al.

     Defendant(s)

# Superior Court of New Jersey

| Essex | COUNTY |
|---|---|
| LAW | DIVISION |

Docket No: _L-6206-12_

# CIVIL ACTION SUMMONS

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiffs attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

Jennifer M. Perez
.Clerk of the Superior Court

DATED:   08/21/2012

Name of Defendant to Be Served:   See Exhibit A.

Address of Defendant to Be Served:   See Exhibit A.

NOTE: The Case Information Statement is available at www.njcourts.com.

## Directory of Superior Court Deputy Clerk's Offices
## County Lawyer Referral and Legal Services Offices

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401

LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Room 115
Justice Center, 10 Main St.
Hackensack, NJ 07601

LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08060

LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(800) 496-4570

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
Hall of Justice
1st Fl., Suite 150
101 South 5th Street
Camden, NJ 08103

LAWYER REFERRAL
(856) 964-4520
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
9 N. Main Street
Cape May Court House, NJ 08210

LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
60 West Broad Street
P.O. Box 10
Bridgeton, NJ 08302

LAWYER REFERRAL
(856) 696-5550
LEGAL SERVICES
(856) 691-0494

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
Civil Customer Service
Hall of Records, Room 201
465 Dr. Martin Luther King Jr. Blvd.
Newark, NJ 07102

LAWYER REFERRAL
(973) 622-6204
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn: Intake
First Fl., Court House
1 North Broad Street
Woodbury, NJ 08096

LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House--1st Floor
583 Newark Ave.
Jersey City, NJ 07306

LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 08822

LAWYER REFERRAL
(908) 735-2611
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad Street, P.O. Box 8068
Trenton, NJ 08650

LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court,
Middlesex Vicinage
2nd Floor - Tower
56 Paterson Street, P.O. Box 2633
New Brunswick, NJ 08903-2633

LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
Court House
P.O. Box 1269
Freehold, NJ 07728-1269

LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY:**
Morris County Courthouse
Civil Division
Washington and Court Streets
P. O. Box 910
Morristown, NJ 07963-0910

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
118 Washington Street, Room 121
P.O. Box 2191
Toms River, NJ 08754-2191

LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

Revised 11/14/2011, CN 10792-English (Appendix XII-A)
Directory of Superior Court Deputy Clerk's Offices / County Lawyer Referral and Legal Services
Revised 11/2010, CN 10153-English

Page 3 of 4

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton Street
Paterson, NJ 07505

LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 523-2900

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
Attn: Civil Case Management Office
92 Market Street
Salem, NJ 08079

LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 451-0003

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
P.O. Box 3000
40 North Bridge Street
Somerville, N.J. 08876

LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073

LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500

LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(908) 475-2010

Revised 11/14/2011, CN 10792-English (Appendix XII-A)
Directory of Superior Court Deputy Clerk's Offices / County Lawyer Referral and Legal Services
Revised 11/2010, CN 10153-English

Page 4 of 4

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, PARK
PLACE COMMERCE INVESTMENTS,
LLC, PRU ALPHA FIXED INCOME
OPPORTUNITY MASTER FUND I, L.P.,
PRUDENTIAL TRUST COMPANY, and
THE GIBRALTAR LIFE INSURANCE
COMPANY, LTD.,

              Plaintiffs,

        -against-

RBS FINANCIAL PRODUCTS, INC.
(f/k/a GREENWICH CAPITAL
FINANCIAL PRODUCTS, INC.), RBS
ACCEPTANCE, INC. (f/k/a
GREENWICH CAPITAL
ACCEPTANCE, INC.), FINANCIAL
ASSET SECURITIES CORP., and RBS
SECURITIES, INC. (f/k/a GREENWICH
CAPITAL MARKETS, INC.),

              Defendants.

: : : : : : : : :

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, ESSEX COUNTY
Civil Action

DOCKET NO. L-6206-12

**"EXHIBIT A" TO CIVIL ACTION
SUMMONS**

## I. ATTORNEYS FOR PLAINTIFFS

*The Prudential Insurance Company of America, Park Place Commerce Investments, LLC, Pru
Alpha Fixed Income Opportunity Master Fund I, L.P., Prudential Trust Company, and The
Gibraltar Life Insurance Company, Ltd.:*

> Robin H. Rome, Esq.
> NUKK-FREEMAN & CERRA, P.C.
> 636 Morris Turnpike, Suite 2F
> Short Hills, NJ 07078
> Telephone: (973) 564-9100
> Fax: (973) 564-9112
> rrome@nfclegal.com

Daniel L. Brockett, Esq. (*pro hac vice* application forthcoming)
David D. Burnett, Esq. (*pro hac vice* application forthcoming)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100


Jeremy D. Andersen, Esq. (*pro hac vice* application forthcoming)
Chris Barker, Esq. (*pro hac vice* application forthcoming)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Fax: 213-443-3100

## II.   NAMES AND ADDRESSES OF DEFENDANTS TO BE SERVED

RBS FINANCIAL PRODUCTS, INC. (f/k/a GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.)

> c/o The Corporation Trust Company
>  820 Bear Tavern Road
> West Trenton, NJ 08628
>
> Attn: Litigation Department
> 600 Washington Boulevard
> Stamford, CT 06901


RBS ACCEPTANCE, INC. (f/k/a GREENWICH CAPITAL ACCEPTANCE, INC.)

> c/o The Corporation Trust Company
>  820 Bear Tavern Road
> West Trenton, NJ 08628
>
> Attn: Litigation Department
> 600 Washington Boulevard
> Stamford, CT 06901

FINANCIAL ASSET SECURITIES CORP

    c/o The Corporation Trust Company
    820 Bear Tavern Road
    West Trenton, NJ 08628

    Attn: Litigation Department
    600 Washington Boulevard
    Stamford, CT 06901


RBS SECURITIES, INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.)

    c/o The Corporation Trust Company
    820 Bear Tavern Road
    West Trenton, NJ 08628

    Attn: Litigation Department
    600 Washington Boulevard
    Stamford, CT 06901

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, COMMERCE STREET INVESTMENTS, LLC, PRU ALPHA FIXED INCOME OPPORTUNITY MASTER FUND I, L.P., PRUCO LIFE INSURANCE COMPANY, PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY, and PRUDENTIAL TRUST COMPANY, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ESSEX COUNTY

Civil Action

DOCKET No. ESX-L-6206-12

**FIRST AMENDED COMPLAINT** |

Plaintiffs,

-against-

RBS FINANCIAL PRODUCTS, INC. (f/k/a GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.), RBS ACCEPTANCE, INC. (f/k/a GREENWICH CAPITAL ACCEPTANCE, INC.), FINANCIAL ASSET SECURITIES CORP., and RBS SECURITIES, INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.),

Defendants.

2012 SEP 14 P 3: 36
FINANCE DIVISION
RECEIVED/FILED
34
SUPERIOR COURT OF NJ
CIVIL DIVISION
ESSEX VICINAGE

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ...................................................................................................1

PARTIES .......................................................................................................................5

JURISDICTION AND VENUE ..................................................................................10

BACKGROUND .........................................................................................................10

    A.    Mechanics of Mortgage Securitization ................................................10

    B.    Securitization of Mortgage Loans:  The Traditional Model ................13

    C.    The Systemic Violation of Underwriting Standards in the Mortgage
        Securitization Industry .........................................................................15

    D.    Defendants' Integrated, Vertical RMBS Operations ............................17

SUBSTANTIVE ALLEGATIONS ..............................................................................20

I.    DEFENDANTS' FALSE STATEMENTS OF MATERIAL FACT ...............20

    A.    Defendants' Misrepresentations Regarding Compliance With the Stated
        Underwriting Guidelines .......................................................................20

        (1)    Defendants' Misrepresentations Regarding Underwriting Standards ........21

        (2)    Defendants' Omissions Regarding Due Diligence Results ......................22

    B.    Defendants' Misrepresentations Regarding Owner-Occupancy Rates .................23

    C.    Defendants' Misrepresentations Regarding the Appraisal Process .......................24

    D.    Defendants' Misrepresentations Regarding LTV Ratios and CLTV Ratios .........25

    E.    Defendants' Failure to Assign Mortgages to the Trusts .......................................26

    F.    Defendants' Misrepresentations Regarding Credit Ratings....................................30

II.    EVIDENCE THAT DEFENDANTS' REPRESENTATIONS WERE FALSE
        AND MISLEADING ......................................................................................31

    A.    An Analysis of the Mortgage Loans and Certificates Directly at Issue ................31

        (1)    A forensic analysis of the mortgaged properties' true occupancy
                status revealed a systemic misrepresentation problem ..............................31

(2)    A forensic analysis of the Mortgage Loans' true LTV and CLTV ratios revealed a systemic misrepresentation problem................................35

(3)    A forensic analysis of the Mortgage Loans' title transfers revealed a systemic misrepresentation problem ........................................42

(4)    The dismal performance of these Mortgage Loans and Certificates confirms they were infected by Defendants' and the Originators' systemic underwriting problems ................................................46

B.    In-Depth Reports on Individual Mortgage Loans Confirm the Systemic Violation of Stated Underwriting Standards ........................................48

(1)    Loans Underlying EMLT 2004-2 ........................................50

(2)    Loans Underlying EMLT 2004-3 ........................................51

(3)    Loans Underlying EMLT 2005-1 ........................................52

(4)    Loans Underlying FHLT 2004-1 ........................................53

(5)    Loans Underlying FHLT 2004-2 ........................................54

(6)    Loans Underlying FHLT 2004-D ........................................55

(7)    Loans Underlying MMLT 2005-2 ........................................56

(8)    Loans Underlying SVHE 2004-WMC1 ........................................57

(9)    Loans Underlying SVHE 2006-EQ2 ........................................58

(10)    Loans Underlying SVHE 2006-NLC1 ........................................59

(11)    Loans Underlying SVHE 2006-OPT1 ........................................61

(12)    Loans Underlying SVHE 2006-OPT2 ........................................62

(13)    Loans Underlying SVHE 2006-OPT3 ........................................63

(14)    Loans Underlying SVHE 2006-OPT4 ........................................64

(15)    Loans Underlying SVHE 2006-OPT5 ........................................66

C.    The Results of Defendants' Third-Party Due Diligence Confirms They Were Systematically Securitizing Defective Loans ................................67

D.    The Systemic Abandonment of the Third-Party Originators Confirms the Mortgage Loans Were Misrepresented ................................................69

(1) Third-party Originator Option One Mortgage Corporation systematically abandoned its underwriting guidelines ............................71

(2) Third-party Originator Fremont Investment & Loan systematically abandoned its underwriting guidelines ......................................74

(3) Third-party Originator WMC Mortgage Corporation systematically abandoned its underwriting guidelines ......................................79

(4) Third-party Originator First NLC systematically abandoned its underwriting guidelines ................................................84

(5) Third-party Originator EquiFirst systematically abandoned its underwriting guidelines ................................................86

(6) Third-party Originator PHH systematically abandoned its underwriting guidelines ................................................87

(7) Third-party Originator GreenPoint systematically abandoned its underwriting guidelines ................................................88

(8) Third-party Originator First National Bank of Nevada systematically abandoned its underwriting guidelines ............................90

E. Additional Evidence That Defendants Systematically Misrepresented The Quality of Their Securitizations..................................................90

III. DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE AND MISLEADING............................................................99

IV. PRUDENTIAL'S DETRIMENTAL RELIANCE AND DAMAGES ...........................113

A. Prudential's Reasonable Reliance ......................................113

B. Prudential's Damages .................................................118

V. DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT ...............................123

FIRST CAUSE OF ACTION ...............................................................125

SECOND CAUSE OF ACTION ..............................................................126

THIRD CAUSE OF ACTION ...............................................................128

FOURTH CAUSE OF ACTION ..............................................................131

PRAYER FOR RELIEF ...................................................................141

JURY TRIAL DEMANDED .................................................................141

Plaintiffs The Prudential Insurance Company of America, Commerce Street Investments, LLC, Pru Alpha Fixed Income Opportunity Master Fund I, L.P., Pruco Life Insurance Company, Prudential Retirement Insurance and Annuity Company, and Prudential Trust Company (collectively, "Prudential"), by and through their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP and Nukk-Freeman and Cerra, P.C. bring this action against RBS Financial Products, Inc. (f/k/a Greenwich Capital Financial Products, Inc.), RBS Acceptance, Inc. (f/k/a Greenwich Capital Acceptance, Inc.), Financial Asset Securities Corp., and RBS Securities, Inc. (f/k/a Greenwich Capital Markets, Inc.) (collectively, "RBS" or "Defendants"), and allege as follows:

## NATURE OF ACTION

1.     Prudential seeks to recover damages it suffered as a result of Defendants' fraudulent sale of over $477 million in mortgage-backed securities (the "Certificates").[1] Prudential made its purchases in reliance on Defendants' misrepresentations regarding the quality of the Certificates and the residential mortgages underlying them (the "Mortgage Loans"). Prudential has undertaken its own analysis of the specific loans backing the Certificates, and found them not to comply with Defendants' representations. Prudential's loan-level analysis has revealed systematic failures in Defendants' loan underwriting and assignment practices that caused Prudential's Certificates to be backed by countless Mortgage Loans that have since defaulted, been foreclosed upon, and for which Defendants lack proper title to seek recourse.

2.     In addition, recent governmental, regulatory, and civil investigations into Defendants' operations, as well as those of the third-party lenders that contributed mortgages to Defendants (the "Originators"), have made public a flood of previously hidden information.

---

[1]   The securitizations at issue (collectively, the "Securitizations" or the "Offerings") are described in the Exhibits to this First Amended Complaint, which are all incorporated as if set forth fully herein.

Multiple investigators have reached the same conclusion:  Defendants and other Wall Street Banks were engaged in a wide-ranging fraud.

3.     To induce investors like Prudential to purchase their Certificates, Defendants provided investors with information about the Certificates through Offering Materials, including registration statements, prospectuses, prospectus supplements, free writing prospectuses, term sheets, and other draft and final written materials (the "Offering Materials").  Prudential's loan-level analysis has revealed that many of the representations Defendants made to investors about the underlying collateral were false, and Defendants knew it.

4.     ***The Offering Materials falsely represented that a stated set of underwriting guidelines would be followed.***  Underwriting guidelines set the rules used to decide whether to grant, or securitize, a given loan.  Though "exceptions" can be made, Defendants represented these would be limited to loans where "compensating factors" were present.  If the underwriting guidelines are not actually followed—or if "exceptions" are granted where there are no compensating factors—the quality of the collateral underlying the Certificates is badly compromised.  Contrary to Defendants' representations, Defendants and the Originators systematically abandoned their stated guidelines and repeatedly granted exceptions on loans that had no compensating factors.  This is confirmed by Prudential's forensic analysis of ***12,417*** of the Mortgage Loans at issue here, and many other facts discussed below.

5.     ***Defendants fraudulently omitted their "waiver" of loans flagged as being defective.***  Recently released reports confirm that Defendants' due diligence processes were consistently flagging numerous loans that were both outside the guidelines and that did not show signs of any purported "compensating factors."  These same reports show that Defendants nonetheless provided "waivers" of over a quarter of these defective loans.  Defendants

2

fraudulently omitted the high rate to which they were providing such "waivers," rendering the Offering Materials even more misleading.

6. ***The Offering Materials falsely represented that a specific number of properties would be owner-occupied.*** Whether or not a borrower is living at a mortgaged house is important, because borrowers are less likely to default on their primary residence. At the time Prudential made its investments, there was no way for investors to "test" Defendants' representations about owner-occupancy. However, recent advancements allowed Prudential to analyze the tax and property records for ***12,417*** of the Mortgage Loans. This analysis revealed that the Offering Materials for each Certificate inflated owner-occupancy statistics. For example, Prudential's forensic analysis revealed that, for the EMLT 2004-3 Securitization, the Offering Materials overstated the percentage of owner-occupied properties by over 12%.

7. ***The Offering Materials misrepresented the appraisal process, and presented false and misleading loan-to-value statistical data.*** The Offering Materials state that the mortgaged properties would be appraised using a particular process, such as the Uniform Standards of Professional Appraisal Practice. These appraisals were then used to calculate important statistics about the Mortgage Loans, such figures as their loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios. These representations were material because they tell investors how much of an equity "cushion" the borrower has, and the likely recovery in the event of foreclosure.

8. The falsity of these representations is confirmed by Prudential's forensic analysis. Using an unbiased, industry-standard, automated valuation model, Prudential was recently able to test the reasonableness of Defendants' appraisal values. Across every Certificate, Defendants

3

consistently inflated the property values.  The consistency and size of the "gap" confirms that the appraisal process was being rigged, and that Defendants knew it.

9.     ***The Offering Materials falsely represented that the credit ratings would reasonably relate to Certificates being offered.***  Defendants fed the rating agencies the same false data discussed herein.  Because the quality of the credit ratings is only as good as the quality of the data given to the agencies, this rendered Defendants' representations regarding the credit ratings false and misleading.

10.     ***Assignment of Mortgage Loans to the Trusts***.  The Offering Materials represented (a) that the underlying Mortgage Loans had been validly assigned to the RMBS trusts (the "Trusts") that issued the Certificates (or to MERS), and (b) that the Trusts, acting through loan servicers or the trustees, would have the ability to foreclose in the event of borrower defaults on the loans.  But in fact, as reflected in Prudential's loan-level analysis of the chain of title of ***12,417*** Mortgage Loans underlying its securities, Defendants did not actually assign over ***35%*** of these Mortgage Loans to either the Trusts or to MERS.  And of the Mortgage Loans that were assigned to the Trusts, over ***66%*** were *not properly* assigned, as represented in the Offering Materials.  Defendants' misrepresentations and failures related to the transfer of title have harmed Prudential.

11.     ***Defendants knew the representations were false.***  Defendants knew that large quantities of loans were defective, but securitized them anyway.

12.     Defendants used a third-party due diligence firm, Clayton Holdings, Inc. ("Clayton"), to pre-screen the loans they were securitizing.  They were told that many of these loans were defective but securitized them anyway and sold the securities to Prudential and other investors.  Specifically, Clayton gave loans that failed to meet the guidelines *and* lacked any

"compensating factors" a failing grade of "3." These grades—and the reasoning for them—were given to Defendants on a *daily* basis. Defendants could see in real time how many defective loans they were purchasing. Defendants were told that *18%* of the loans failed to meet the guidelines and lacked any "compensating factors," yet they "waived" in *53%* of these loans into its securitizations.

13. Testimony from Clayton's representatives confirms that Defendants were using the defect information to negotiate a lower price with the Originators. In other words, Defendants used their due diligence processes not as a way to ensure the accuracy of the Offering Materials, but merely as bargaining leverage to increase their own profits.

14. As detailed below, numerous sources show a *systemic* underwriting breakdown. Prudential's forensic analysis of *12,417* Mortgage Loans confirms those systemic problems infected the Certificates at issue. It is not surprising, then, that the Mortgage Loans have performed terribly. Overall, *over 26%* of the Mortgage Loans have had to be written off at a loss already. And the situation will only get worse—of the remaining Loans, *over 41%* are themselves currently delinquent. The Certificates' credit ratings have also plummeted. Even though all started out with high, "investment-grade" ratings, almost all are now rated as "junk bonds." With the underlying loans performing so poorly, the value of Prudential's Certificates has plummeted, causing Prudential to incur significant losses. These losses were not caused by the housing market downtown, but by Defendants' knowing failure to originate and securitize these Mortgage Loans in accordance with the stated underwriting guidelines.

**PARTIES**

***Plaintiffs***

15. Plaintiff The Prudential Insurance Company of America ("Prudential Insurance") is an insurance company formed under the laws of, and domiciled in, the State of New Jersey,

with its principal place of business at 751 Broad Street, Newark, New Jersey 07102.  Prudential Insurance is a wholly owned subsidiary of Prudential Holdings, LLC, and ultimately Prudential Financial, Inc.

16.     Plaintiff Commerce Street Investments, LLC ("Commerce Street") is a company formed under the laws of, and domiciled in, the State of Delaware, with its principal place of business in Newark, New Jersey.  Commerce Street is a wholly-owned subsidiary of Prudential Financial, Inc.

17.     Plaintiff Pru Alpha Fixed Income Opportunity Master Fund I, L.P. ("Pru Alpha") is a Cayman Islands Exempted Limited Partnership, with its principal place of business at 2 Gateway Center, Third Floor, Newark, New Jersey 07102.  Pru Alpha is a wholly-owned subsidiary of Prudential Investment Management, Inc., and ultimately Prudential Financial, Inc.

18.     Plaintiff Pruco Life Insurance Company ("Pruco") is an insurance company formed under the laws of Arizona, with its principal place of business in Newark, New Jersey. Pruco is a wholly owned subsidiary of Prudential Insurance.

19.     Plaintiff Prudential Retirement Insurance and Annuity Company ("PRIAC") is an insurance company formed under the laws of Connecticut, with its principal place of business in Hartford, Connecticut.  PRIAC is a wholly-owned subsidiary of The Prudential Insurance Company of America, and ultimately Prudential Financial, Inc.

20.     Plaintiff Prudential Trust Company is a corporation formed under the laws of Pennsylvania, with its principal place of business at 30 Scranton Office Park, Scranton, Pennsylvania 18507.  Prudential Trust Company is a wholly-owned subsidiary of Prudential Investment Management, Inc., and ultimately Prudential Financial, Inc.

21.     The plaintiffs made the purchases described in Exhibit B.  These purchases were all made from New Jersey, and the decisions to purchase, including reliance on the Offering Materials, also took place in New Jersey.

### ***The Defendants***

22.     At all relevant times, Defendants committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this First Amended Complaint. Any allegations about acts of the corporate Defendants means that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

23.     *The Underwriter.*  Defendant RBS Securities, Inc. ("RBS Securities") is an SEC-registered broker-dealer.  RBS Securities is principally located at 600 Washington Boulevard, Stamford, CT 06901.  Prior to April 2009, RBS Securities was known as Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital).  It is primarily engaged in the business of investment banking.   It, or its predecessor, was the underwriter for each of the Certificates as issue here.

24.     RBS Securities participated in structuring the Securitizations, including by participating in the preparation of the Offering Materials and in the active marketing of the securitizations to investors.  RBS Securities is prominently identified on the first page of the Prospectus Supplements for each of the Securitizations.  The solicitation of Prudential was the result of the underwriter, depositor, and seller/sponsor's joint effort to market the Certificates through the creation and distribution of the Offering Materials.  Thus, RBS Securities made, authorized, or caused the relevant misrepresentations alleged herein.

25.  *The Sponsor.*  Defendant RBS Financial Products is a Delaware corporation incorporated in 1990, and is principally located at 600 Washington Boulevard, Stamford, CT 06901.  Prior to April 2009, RBS Financial Products was known as Greenwich Capital Financial Products, Inc.  RBS Financial Products acted as the sponsor for twelve of the offerings of mortgage-backed securities at issue in this case.[2]

26.  RBS Financial Products structured the transactions in which it participated.  This includes working on the Securitizations through their control of the depositor-defendants (who were special-purpose entities used to merely carry out the transactions).  RBS Financial Products, along with the depositors and the underwriters, participated in the preparation of the Offering Materials, and are identified prominently on the front page of the Prospectus Supplements for the transactions in which it participated.  Thus, it made, authorized, or caused the relevant misrepresentations alleged herein.

27.  *The Depositors.*  Defendant Financial Asset Securities Corp. ("FAS Corp.") is a Delaware corporation with its principal place of business in at 600 Washington Boulevard, Stamford, CT 06901.  It is an affiliate of RBS.  It was the depositor for seventeen of the Securitizations, as set forth in Exhibit A.

28.  Defendant RBS Acceptance, Inc. ("RBS Acceptance") is located at 600 Washington Boulevard, Stamford, CT 06901.  Prior to August 2009, RBS Acceptance was known as Greenwich Capital Acceptance, Inc.  It was the depositor for the RBSGC 2005-A Securitization, as set forth in Exhibit A.

29.  The depositors are considered issuers of the Certificates within the meaning of Section 2(a)(4) of the Securities Act of 1933, 15 U.S.C. § 77b(a)(4), and in accordance with

---

[2]  Five of the eleven remaining offerings were sponsored by Option One Mortgage Corp, which also originated or acquired the loans for those five offerings.  The other six remaining offerings were sponsored by Fremont Investment & Loan, which also originated or acquired the loans for those offerings.

Section 11(a), 15 U.S.C. § 77k(a), and filed the relevant registration statements with the Securities and Exchange Commission ("SEC"). The depositors, in conjunction with the sponsors/sellers and the underwriter, directly made the relevant misrepresentations alleged herein. They are prominently identified on the front page of the Prospectus Supplements for the Securitizations in which they participated. Thus, the depositors made, authorized, or caused the relevant misrepresentations alleged herein.

30.     *Relevant Non-Parties.* The loans underlying the Certificates were acquired by the sponsor for each Securitization from non-party mortgage originators. The Originators at issue here include Fremont Investment & Loan, First National Bank of Nevada, PHH Mortgage Corp., GreenPoint Mortgage Funding, Inc., WMC Mortgage Corp., First NLC Financial Services, LLC, and Option One.

31.     Each of the Certificates was issued by a trust, most of which were established by RBS. The Trusts are managed by trustees. The trustees for the Securitizations are Deutsche Bank National Trust Company, HSBC Bank USA, N.A., and U.S. Bank, N.A.

32.     Non-party Royal Bank of Scotland Group PLC is a multi-national corporation that delivers banking and financial services throughout the world. Its principal office in the United States is located at 600 Washington Boulevard, Stamford, CT 06901. Royal Bank of Scotland Group PLC is the sole owner of RBS Holdings USA, Inc.

33.     Non-party RBS Holdings USA, Inc. is a wholly owned subsidiary of Royal Bank of Scotland Group PLC and is located at 600 Washington Boulevard, Stamford, CT 06901. Prior to April 2009, it was known as Greenwich Capital Holdings, Inc. RBS Holdings USA, Inc. is the parent of defendants RBS Securities, RBS Financial Products, RBS Acceptance, and an affiliate of defendant FAS Corp.

## JURISDICTION AND VENUE

34.     Pursuant to R. 4:4-4(a)(6), this Court has jurisdiction over Defendants because Defendants transact business in New Jersey and because Defendants committed acts in New Jersey causing injury to plaintiffs.

35.     Venue is proper in this County pursuant to R. 4:3-2(a) because each cause of action arose, in part, in Essex County, because Prudential resides within this county and has its principal places of business here, and because the causes of action set forth in this First Amended Complaint arose in New Jersey.

## BACKGROUND

### A.     Mechanics of Mortgage Securitization

36.     Mortgage pass-through securities, or certificates, represent interests in a pool of mortgage loans.  Although the structure and underlying collateral may vary by offering, the basic principle of pass-through securities is that the cash flow from the pool of mortgages is "passed through" to the certificateholders when payments are made by the underlying mortgage borrowers.

37.     The initial step in creating a mortgage pass-through security is the origination or acquisition of an inventory of loans by a "seller" or "sponsor."  The sponsor either originates the loans itself (by giving mortgage loans to borrowers) or acquires them from third-party lenders. The sponsor is often an affiliate of a bank, like the seller/sponsor defendant here.  In order to ensure that Defendants had access to sufficient numbers of loans to feed its securitization machine, on information and belief, in many cases Defendants and their affiliates would provide a warehouse line of credit to the loan originator, with the warehouse line providing the funds that were loaned to the ultimate borrower.  For instance, RBS provided a $1 billion line of credit to

Fremont General Corporation, whose subsidiary Fremont Investment & Loan originated all of the loans underlying ten of the Securitizations.

38. After pooling the loans, the sponsor transfers them to the "depositor." The depositor is typically a special-purpose affiliate of the sponsor, and exists solely to receive and pass on the rights to the pools of loans. It is also often controlled directly by the same officers and directors who run the sponsor. Here, the depositors are primarily special-purpose entities that are affiliates of the sponsors.

39. Upon acquisition of the loans, the depositor transfers (or "deposits") the acquired loan pool to an "issuing trust." The depositor then securitizes the loan pool in the issuing trust so that the rights to the cash flows from the pool can be sold to investors. The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Tranches consist of multiple series of related securities offered as part of the same offering, each with a different level of risk and reward. Any losses on the underlying loans are generally applied in reverse order of seniority. As such, the most senior tranches of pass-through securities receive the highest credit ratings. Junior tranches, being less insulated from risk, typically obtain lower credit ratings.

40. Once the tranches are established, the issuing trust passes the certificates back to the depositor, who becomes the issuer of the securities. The depositor then passes the securities to one or more underwriters, who offer and sell the securities to investors in exchange for cash that is passed back to the depositor, minus any fees owed to the underwriters. Alternatively, the underwriters sometimes make a "firm commitment" to purchase the securities, keeping any proceeds they obtain by re-selling them to investors.

41.     Because the cash flow from the underlying loans is the source of payments to holders of the securities issued by the trust, the credit quality of the securities depends upon the credit quality of the loans in the collateral pool.  The most important information about the credit quality of the loans is contained in the "loan files" that the mortgage originators develop while assessing loan applications, and which securitizers review as part of their "due diligence" in purchasing and securitizing the loans.

42.     For residential mortgage loans, a loan file generally contains the borrower's application for the loan; documents relating to verification of the borrower's income, assets, and employment; references; credit reports on the borrower; an appraisal of the property that will secure the loan and provide the basis for measures of credit quality, such as loan-to-value ratios; and a statement of the occupancy status of the property.  The loan file also typically contains the record of the investigation by the loan originator of the documents and information provided by the borrower, as well as detailed notes of the underwriter setting forth the rationale for the making of each loan.

43.     Investors like Prudential were not given (and still do not have) access to these loan files.  Rather, investors must rely on representations Defendants made in the Offering Materials about the quality and nature of the loans that form the security for their investments.

44.     The collateral pool for each securitization usually includes thousands of loans. The sponsor, depositor, and underwriter are responsible for gathering, verifying, and presenting to potential investors accurate and complete information about the credit quality and characteristics of the loans that are deposited in the trust.  In accordance with industry standards, this involves performing due diligence on the loan pool and the originators to ensure the representations being made to investors are accurate.

45.     The *Wall Street Journal* has summarized the securitization process as follows:



## B.     Securitization of Mortgage Loans:  The Traditional Model

46.     Traditionally, mortgage originators financed their mortgage business through customer deposits, retained ownership of the loans they originated, and directly received the mortgage payment streams.  When an originator held a mortgage through the term of the loan, it bore the risk of loss if the borrower defaulted and if the value of the collateral was insufficient to repay the loan.  As a result, the originator had a strong economic incentive to verify the borrower's creditworthiness through prudent underwriting, and to obtain an accurate appraisal of the value of the underlying property.

47.     Mortgage loan securitization, however, shifted the traditional "originate to hold" model to an "originate to distribute" model, in which originators sell residential mortgages and transfer credit risk to investors through the issuance and sale of securities.  Under the new model, originators no longer hold the mortgage loans to maturity.  Instead, by selling the mortgages to trusts, which provide their securities to investors, the originators obtain the funds to make more loans.  Securitization also enables originators to earn most of their income from transaction and loan-servicing fees, rather than from the "spread" between interest rates paid on deposits and

interest rates received on mortgage loans, as in the traditional model. Thus, the "originate to distribute" model gives originators an incentive to increase the number of mortgages they issue regardless of credit quality. However, contractual terms, adherence to solid underwriting standards, and sound business practices obligate originators to underwrite loans in accordance with their stated policies and to obtain accurate appraisals of the mortgaged properties.

48.     Most mortgage securitizations were traditionally conducted through the major Government Sponsored Enterprises (the "Agencies"), i.e., the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae"). The Agencies purchased loans from originators and securitized the loans. These Agency securitizations had high credit quality because the Agencies required the underlying loans to be originated in accordance with strict underwriting guidelines.

49.     During the 1980s and 1990s, the mortgage securitization business grew rapidly, making it possible for mortgage originators to make more loans than would have been possible using only the traditional primary source of funds from deposits. Originators during that period generally made loans in accordance with their stated underwriting and appraisal standards and provided accurate information about the loans, borrowers, and mortgaged properties to the Wall Street banks that securitized the loans. Most non-Agency mortgage securitizations also had relatively high credit quality because they typically complied with the Agencies' underwriting standards. In turn, the banks generally provided accurate information about the loans, borrowers, and properties to investors.

### C.    The Systemic Violation of Underwriting Standards in the Mortgage Securitization Industry

50.    Unbeknownst to investors, the game fundamentally changed in the early 2000s. While both originators and banks, through the 1990s, generally played by the rules and complied with their obligations to underwrite loans responsibly and provide accurate information to investors, this ceased to be the case in the following decade.

51.    With historically low interest rates decreasing the profits of traditional lending and securitization through Fannie Mae or Freddie Mac, banks looked for new ways to increase fees.  Banks began to focus on creating products outside the traditional lending guidelines and expanding the number of borrowers who could purportedly qualify for loans, while also charging those borrowers higher fees than they would have paid on conforming loans.

52.    The shift towards non-traditional loans sparked a growing focus on the "originate to distribute" model.  Originators, underwriters, and others in the securitization chain were incentivized to pump out as many loans as possible, as long as they could transfer the risk of non-payment to investors.  According to an April 2010 report by the Financial Crisis Inquiry Commission ("FCIC"), loans that did not conform to Fannie Mae and Freddy Mac underwriting guidelines grew from around $670 billion in 2004 to over $2 trillion in 2006.  Originators and securitizers, like Defendants, were willing to abandon sound underwriting practices and to misrepresent the loan collateral to ensure the securities' marketability.

53.    The history of this disastrous change in the market was investigated by the FCIC, created by the Fraud Enforcement and Recovery Act of 2009, which "reviewed millions of pages of documents, interviewed more than 700 witnesses, and held 19 days of public hearings," and which issued a report in January 2011 (the "FCIC Report").  The FCIC Report concluded that, as a result of the practices such as Defendants', "[t]rillions of dollars in risky mortgages had

become embedded throughout the financial system." (FCIC Report at xi, xvi.) As the FCIC also concluded: "The originate-to-distribute model undermined responsibility and accountability for the long-term viability of the mortgages and mortgage-related securities and contributed to the poor quality of mortgage loans." (*Id.* at 125.)

54.    The underwriters of the offerings and originators of the underlying mortgage loans make large amounts of money from the fees and other transaction revenues associated with their efforts to create and sell mortgage-backed securities. These fees and revenues are generally calculated as a percentage of the securitization's principal balance, and can amount to millions of dollars in large transactions. From 2000 through 2008, Wall Street banks learned that they could earn much more from arranging and selling residential mortgage-backed securities ("RMBS") than by selling mortgage loans to borrowers. The securitization business was a gold mine for investment banks able to control significant market share.

55.    Underwriters of RMBS offerings like those at issue here typically would collect between 0.2% to 1.5% in discounts, concessions, or commissions. These commissions would have yielded Defendants millions of dollars in underwriting fees. By providing warehouse loans and serving as a sponsor and depositor in some of the offerings, Defendants earned even more. The fees Defendants were receiving for their promised underwriting, diligence, and oversight kept Defendants in the business of acquiring mortgage loans from originators for securitization, even while Defendants knew the loans did not comport with basic underwriting practices.

56.    Spurred on by the economic incentives behind the originate-to-distribute model, Defendants securitized ever-increasing volumes of residential mortgage loans. RBS Financial Products initially securitized a relatively small volume of mortgage loans—less than $1 billion in 2000, less than $1 billion in 2001, and $2.4 billion in 2002. In 2003, however, the volume of

mortgage loans that RBS Financial Products securitized more than quadrupled to $10.7 billion. In 2004, the volume tripled from to $30.4 billion, a number that rose to $47.9 billion in 2005, and almost $40 billion in 2006.

57.     To accomplish this tremendous volume growth, Defendants misrepresented the nature of the loans they securitized.  Since the payment streams from borrowers ultimately fund the return to investors, if enough loans in the pool default, investors will not be paid the interest returns promised and may even lose their principal.  Any representation bearing on the riskiness of the underlying mortgage loans was thus highly material.  By misrepresenting the true risk profile of the underlying loan pools, Defendants defrauded Prudential.  The Certificates' market value has declined substantially as the true risk profile of the underlying mortgage pool has been revealed.

### D.     Defendants' Integrated, Vertical RMBS Operations

58.     RBS was a vertically integrated operation.  Indeed, in most of the Securitizations, RBS operated—and made huge profits—on multiple levels, acting as sponsors, depositors, and underwriter.  Defendants' vertical integration allowed them to control the securitization machine, and provided them many direct windows into the lax practices at issue here.

59.     On information and belief, and in accordance with industry standards, many of the Mortgage Loans were originated or acquired, in the first instance, by mortgage lenders that received substantial lines of credit from RBS (the so-called "warehouse lender") to finance the loan origination.  For example, RBS had a billion-dollar warehouse lending relationship with Fremont, which originated all of the Mortgage Loans underlying five of the Securitizations.

60.     RBS Financial Products acted as the sponsor in many of the Securitizations.  As sponsor, it was responsible for structuring the Securitizations, including transferring the

Mortgage Loans to the depositor and using and controlling the depositor in carrying out the transactions and participating in the preparation of the offering materials.

61. FAS Corp. and RBS Acceptance—special-purpose vehicles created by RBS— acted as depositor in most of the Securitizations. The depositor is the "issuer" of the securities, and works, along with the sponsor, underwriter, and trust, to securitize the loan pools through the use of the Offering Materials.

62. RBS Securities was the sole underwriter in many of the Securitizations, and at least a co-underwriter in all of the Securitizations. RBS and the originators used two methods to securitize mortgages for sale to investors. The originators would either (1) sell the loans to an investment bank like RBS, which would act as the sponsor and/or depositor and transfer the loans into a trust that would issue securities backed by the loans ("principal securitization") or (2) directly deposit the loans into a trust of its own creation that would issue securities backed by the loans, with an investment bank like RBS acting as underwriter ("originator securitization"). Eighteen of the Securitizations were securitized through principal securitization, and five were securitized through originator securitization. In originator securitizations, the investment bank is the key drafter of the offering materials and typically has final authority over many sections of the offering materials. The investment bank underwriter serves an essential role as a "buffer" between the originators and public investors.

63. In both types of securitization, RBS Securities, as underwriter, was responsible for underwriting and managing the sale of the Certificates to Prudential and other investors, including screening the mortgage loans for compliance with stated underwriting guidelines. RBS Securities: (a) worked with the depositor and sponsor affiliates to structure the transactions; (b) took the lead in coordinating the flow of documents and information among the

rating agencies and parties to the transactions; (c) purchased the mortgage-backed securities issued in the transactions on a firm commitment basis pursuant to written agreements with the depositor(s); and (d) offered and sold certificates to investors, such as Prudential. RBS Securities also made decisions on the volume of the securitizations to effectuate, and their executives made decisions regarding the due diligence, quality control, and repurchase protocols to be followed by their other affiliates.

64.     The Defendants, in their relevant securitizations, thus exercised complete control over virtually every step of the securitization process. This provided them with unique and intimate knowledge of the quality of the individual mortgage loans underlying the pertinent Certificates, as well as the quality of the loan pools supporting each offering at issue.

65.     European regulators have said that a "series of 'very poor decisions'" by executives at RBS lead to the bank's near-collapse. The head of the Financial Services Authority in the United Kingdom found that these failings were "demonstrated over a prolonged period," and there was a "clear track record of a series of misjudgments by executives at RBS."

66.     In November of 2011, RBS agreed to pay $52 million to settle allegations that it financed, purchased, and securitized subprime loans that were "presumptively unfair" under Massachusetts state law. The state had alleged that RBS bundled loans despite the lenders not "reasonably believing" the borrowers could meet their obligations. The Massachusetts Attorney general at the time of the settlement concluded that "The securitization of subprime loans by investment banks is a major cause of the economic crisis. The only way we are going to return to a healthy economy is to hold these banks accountable in order to achieve real relief for homeowners."

## SUBSTANTIVE ALLEGATIONS

### I.    DEFENDANTS' FALSE STATEMENTS OF MATERIAL FACT

67.    Below is just a sample of the misrepresentations Defendants made.  The Offering Materials all contain substantially similar, or identical, statements of material fact.  Additional example misrepresentations for each Certificate are detailed in the Exhibits.  In addition to the affirmative misrepresentations discussed herein, Defendants' Offering Materials were replete with fraudulent omissions relating to the same topics.  For instance, it is misleading to provide statistical information about the loan pool without simultaneously disclosing that there had been a systemic abandonment of the underwriting standards, that loans were knowingly given based on falsified information, and that the statistical descriptors themselves were baseless.

### A.    Defendants' Misrepresentations Regarding Compliance With the Stated Underwriting Guidelines

68.    The underwriting process used to originate the pools of mortgage loans underlying the Certificates was a critical factor in Prudential's decision to purchase securities.  The underwriting process is designed to ensure loan quality; loan quality in turn determines the risk of the certificates backed by those loans.  If the stated guidelines are not actually followed, then the underlying loans will be of lesser quality than represented, increasing the probability of defaults by borrowers and shortfalls in principal and interest payments to investors.

69.    Defendants' representations regarding their own and the Originators' underwriting practices were false and misleading.  The Mortgage Loans underlying Prudential's Certificates did not, in fact, comply with the underwriting standards described in the Offering Materials, because those standards were systematically abandoned.  Loans were offered with virtually no regard for borrowers' actual repayment ability or for the value and adequacy of mortgaged property that was used as collateral.  This is confirmed by Prudential's loan-level

analysis of the specific Mortgage Loans at issue here, the collateral pools' dismal performance, and other facts set forth below.

70. Subsections (1) and (2) below highlight just a sample of the representations Defendants made to Prudential and other investors about underwriting standards.

### (1) Defendants' Misrepresentations Regarding Underwriting Standards

71. The Offering Materials for the Securitizations all confirm that the Mortgage Loans would be generated in accordance with the described set of underwriting guidelines. For instance, the Prospectus Supplement for the EMLT 2004-2 Securitization represented that "[a]ll of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described herein." (EMLT 2004-2 Prospectus Supplement, dated June 28, 2004, at S-48.) The stated goal of these guidelines was "intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan." (*Id.* at S-49.)

72. The Offering Materials also described how the underwriting programs would operate to reach these goals. For instance, in EMLT 2004-2, "[t]he Originator considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio ('Debt Ratio'), as well as the value, type and use of the mortgaged property" and "[t]he Originator's underwriting staff fully reviews each loan to determine whether the Originator's guidelines for income, assets, employment and collateral are met." (*Id.* at S-49.)

73. The Offering Materials also detailed the verifications that would be performed:

> As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer. The verification reports the borrower's length of employment with its employer,

21

current salary, and expectations of continued employment. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.

(EMLT 2004-2 Prospectus, dated April 23, 2004, at 34.)

74. The Offering Materials also represented that the originators used extensive quality control procedures:

The Originator conducts a number of quality control procedures, including a post-funding audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the audit, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random and targeted selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is provided to the underwriters and reviewed monthly by senior management. Adverse findings are tracked monthly. This review procedure allows the Originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training.

(EMLT 2004-2 Prospectus Supplement, at S-50.)

75. The Offering Materials represented that exceptions to the underwriting guidelines would be allowed only in specific circumstances:

On a *case by case basis*, the Originator may determine that, *based upon compensating factors*, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described within warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is not expected that a substantial portion of the Mortgage Loans may represent such underwriting exceptions.

(*Id.* at S-49, 50 (emphasis added).)

### (2)     Defendants' Omissions Regarding Due Diligence Results

76. Defendants' representations were understood reasonably by investors, including Prudential, to mean that Defendants had taken appropriate measures to ensure that non-compliant

loans would not be included in the mortgage pools.  For example, in the Prospectus for the

SVHE 2006-EQ2 offering, Defendants stated:

> All loans acquired by the sponsor are subject to due diligence prior to purchase.
> Portfolios are reviewed for issues including, but not limited to, credit,
> documentation, litigation, default and servicing related concerns as well as a
> thorough compliance review with loan level testing.  Broker Price Opinions
> (BPOs) are also obtained on a selective basis.

(SVHE 2006-EQ2 Prospectus, August 10, 2006.).  Defendants made similar representations in

the Offering Materials for many of the Securitizations.

77.    Just the opposite was true.  Defendants concealed that:  (1) they were

manipulating their review processes not to ensure quality, but to gain market share through

increased volume, whether or not the loans met underwriting standards; (2) Defendants were

informed by their quality review process that a substantial percentage of loans were defective,

but Defendants "waived" the defects on a substantial percentage of these loans; (3) rather than

excluding defective loans, Defendants kept these loans in the Securitizations, but used the

knowledge force a lower sales price, leaving themselves a larger profit margin in the

Securitizations; and (4) Defendants improperly failed to adjust their review practices when their

due diligence identified a high number of non-conforming loans being issued by originators.

78.    This is confirmed by recently released reports from Defendants' third-party due

diligence provider, related governmental testimony, and other facts set forth herein.

**B.    Defendants' Misrepresentations Regarding Owner-Occupancy Rates**

79.    Homeowners who reside in mortgaged properties pose less risk of default than

owners of investment properties or vacation homes.  Therefore, owner-occupancy statistics were

material to Prudential because high owner-occupancy rates would make the Certificates safer

investments than certificates backed by second homes or investment properties.

80.     The Offering Materials each contain detailed statistics regarding the owner-occupancy characteristics of the Mortgage Loans in the collateral pools.  For example, the Offering materials for EMLT 2004-3 represent that 97.54% of the properties would be owner-occupied.  And those for EMLT 2005-1 Offering represented that 97.76% were.

81.     These representations were false and misleading.  In truth, a much lower percentage of the loans were owner-occupied.  For instance, the true rate of occupancy for the Mortgage Loans in the EMLT 2004-3 Offering was only 84.74%, and that for the Mortgage Loans in EMLT 2005-1 was only 85.04%, i.e., Defendants had overstated the number of owner-occupied properties in both deals by over 11%.  The falsity of the Offering Materials' representations as to the Certificates is confirmed by Prudential's loan-level analysis of the Mortgage Loans at issue, and other facts set forth below.

**C.     Defendants' Misrepresentations Regarding the Appraisal Process**

82.     Defendants represented that the properties being mortgaged would be subject to particular appraisal practices.  Such representations are material, because the reliability of the process used to value the property bears directly on the reliability of the valuation itself.

83.     For example, the Offering Materials for SVHE 2004-WMC1 represented that all appraisals would comply with:

> applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by an originator-approved appraiser or by the originator's in-house collateral auditors (who are typically licensed appraisers), which audit may in certain circumstances consist of a second appraisal, a field review or a desk review.

(SVHE 2004-WMC1 Prospectus Supplement dated December 20, 2004, at S-46, 47.)

84.     Similarly, the Prospectus Supplement for SVHE 2006-OPT1 represented:

> Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  Such appraisers inspect and appraise the subject

24

property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.

(Prospectus Supplement dated March 7, 2006.)

85.     Defendants knew that the appraisals underlying the Mortgage Loans did not follow the processes disclosed in the Offering Materials. Instead, the appraisals were designed merely to generate a value high enough to justify loan approval. This is confirmed by a loan-level analysis of the specific Mortgage Loans at issue here, and other facts set forth below.

**D.      Defendants' Misrepresentations Regarding LTV Ratios and CLTV Ratios**

86.     An LTV ratio is the ratio of the original principal balance of the mortgage loan to the appraised value of the mortgaged property. The related CLTV ratio takes into account other liens on the property (such as "second" mortgages, and home equity loans). These ratios were material to Prudential and other investors because higher ratios are correlated with a higher risk of default. A borrower with a small equity position in a property has less to lose if he or she defaults on the loan. There is also a greater likelihood a foreclosure will result in a loss for the lender if the borrower fully leverages the property. Analysts and investors commonly use these metrics to evaluate the price and risk of RMBS.

87.     The Offering Materials contain detailed statistics regarding these ratios for the Mortgage Loans in the collateral pool. These representations were false and misleading. For example, while the Defendants represented that ***none*** of the Mortgage Loans had LTV ratios above 100% (i.e., the property was worth less than the loan amount), in some cases ***over 50%*** of the relevant Loans were underwater, with LTV ratios above 100%.

88. Defendants, as well as the Originators and appraisers, knew that the appraisals being used were inflated. They thus also knew the LTV and CLTV ratio statistics—derived from and dependent on the (baseless) appraisal values—were false and misleading because they did not reasonably relate to the true value of the underlying properties. The CLTV ratios also omitted the effect of additional liens on the underlying properties, rendering them even further from the truth. That the LTV and CLTV statistics were false and misleading is confirmed by a loan-level analysis of the specific Mortgage Loans at issue here, and other facts set forth below.

**E.      Defendants' Failure to Assign Mortgages to the Trusts**

89. A fundamental step in the mortgage securitization process is the transfer of title to the mortgage loans that collateralize each securitization. Title is transferred from the loan originator, to the depositor, and then to the issuing trust for the securitization. This transfer is necessary for the trust to be entitled to enforce the mortgage loans if a borrower defaults. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

90. Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process—a promissory note and a security instrument (either a mortgage or a deed of trust). Generally, state laws and Pooling and Servicing Agreements ("PSAs"), which are contracts that govern the administration of RMBS trusts, require the promissory note and security instrument to be transferred by endorsement, in the same way that a check can be transferred by endorsement, or by sale. In addition, state laws generally require that the trustee have physical possession of the original, manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

91. Defendants represented that they would properly transfer title to the Mortgage Loans to each Trust. For example, in the Offering Materials for SVHE 2006-OPT2, Defendants

26

represented that "[o]n the Closing Date, the Depositor will transfer to the Trust all of its right,

title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage,

assignment of mortgage in recordable form in blank or to the Trustee and other related

documents (collectively, the 'Related Documents'), including all scheduled payments with

respect to each such Mortgage Loan due after the Cut-off Date."  (SVHE 2006-OPT2 Prospectus

Supplement, March 14, 2006.)  The corresponding PSA likewise provided that:

> The Depositor, concurrently with the execution and delivery hereof, does hereby
> transfer, assign, set over and otherwise convey in trust to the Trustee without
> recourse for the benefit of the Certificateholders all the right, title and interest of
> the Depositor, including any security interest therein for the benefit of the
> Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan
> Schedule, including the related Cut-off Date Principal Balance, all interest
> accruing thereon on and after the Cut-off Date and all collections in respect of
> interest and principal due after the Cut-off Date; (ii) property which secured each
> such Mortgage Loan and which has been acquired by foreclosure or deed in lieu
> of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage
> Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase
> Agreement; (v) the right to receive any amounts payable under the Cap Contract;
> (vi) all other assets included or to be included in the Trust Fund; and (vii) all
> proceeds of any of the foregoing.  Such assignment includes all interest and
> principal due and collected by the Depositor or the Servicer after the Cut-off Date
> with respect to the Mortgage Loans.

(SVHE 2006-OPT2 PSA, April. 1, 2006, at § 2.01.)  The Offering Materials and PSAs for each

of the Securitizations at issue here had the same or similar representations.

92.     Defendants made detailed representations about the documents that would be

transferred to the Trustees in connection with the transfer and assignment of the Mortgage

Loans.  For example, in the FHLT 2004-1 Offering Materials, Defendants stated:

> [T]he depositor will deliver to the trustee or a custodian the following items in
> connection with each loan in the related trust fund: the original mortgage note or
> contract, endorsed without recourse in blank or to the order of the trustee; in the
> case of Single Family Loans, Home Equity Loans or Multifamily Loans, the
> mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence
> of recording indicated on the mortgage; however, in the case of any mortgage not
> returned from the public recording office, the depositor will deliver or cause to be
> delivered a copy of the mortgage together with a certificate stating that the

27

original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property.

(FHLT 2004-1 Prospectus, April 23, 2004, at 62, 63.)  The Offering Materials and/or PSAs for

most of the securitizations at issue here had the same or similar representations.

93.     PSAs generally require the transfers of mortgage loans to the trust to be

completed within a strict time limit after formation of the trust in order to ensure that the trust is

properly formed.  For example, the PSA for SVHE 2006-EQ2 represented that Defendants would

deliver the Mortgage Loan files to the trustee "concurrently with the execution and delivery" of

the PSA.  (SVHE 2006-EQ2 PSA, December 1, 2006, § Section 2.01.)   Similarly, the Prospectus

Supplement for SVHE 2006-EQ2 represented that Defendants would deliver the Mortgage Loan

files "On the Closing Date."  (SVHE 2006-EQ2 Prospectus Supplement, December 20, 2006.)

The PSAs and/or Offering Materials for each of the securitizations at issue here had the same or

similar representations.

94.     Applicable state trust law generally requires strict compliance with the trust

documents, including the PSA, and failure to comply strictly with the timeliness, endorsement,

physical delivery and other requirements of the PSA with respect to the transfers of notes and

mortgages results in void transfers and lack of good title.

95.     In the Offering Materials, Defendants also represented that each Mortgage Loan

represented a valid lien such that the Trust could foreclose upon the mortgage in the event of a

borrower's default.  For example, the Offering Materials for EMLT 2004-2 represented that

"Each loan constituted a valid lien on, or a perfected security interest with respect to, the related

mortgaged property." (EMLT 2004-2 Prospectus, April 23, 2004, at 36.) The Offering

Materials for each of the Securitizations at issue here had the same or similar representations.

96.     The Offering Materials noted that, in some cases, "assignments of the mortgages

for some or all of the mortgage loans in the related trust will be registered electronically through

the MERS(R) System" rather than the mortgages being assigned directly to the trustee. (FHLT

2004-2 Prospectus, April 23, 2004, at 62.) Nonetheless, Defendants assured investors that the

transfer of mortgages through the MERS system was sufficient to ensure that the Mortgage

Loans could be foreclosed upon in the event of a borrower's default. For example, the FHLT

2004-2 Prospectus states that, "[w]ith respect to mortgage loans registered through the MERS(R)

System, MERS shall serve as mortgagee of record solely as a nominee in an administrative

capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans."

(*Id*.) The Offering Materials for most of the securitizations at issue here had the same or similar

representation.

97.     Defendants knew that the assignments of title of the underlying the Mortgage

Loans did not follow the process disclosed in the Offering Materials. Many of the titles were

never assigned to either the Trusts nor to MERS—and many of those that have been nominally

so assigned are defective, given the title chain is missing key intervening assignments. Given the

ownership of title is a fundamental part of the securitization process, this was a material

omission. But it also rendered affirmatively false many of Defendants' representations above.

For instance, the assignments were often incomplete and did not result in the Trusts possessing

"all of its right, title and interest in and to each Initial Mortgage Loan." (MMLT 2005-2

Prospectus Supplement, June 17, 2005, at S-55.) This is confirmed by a loan-level analysis of

the specific Mortgage Loans at issue here, as set forth below.

### F.   **Defendants' Misrepresentations Regarding Credit Ratings**

98.   Credit ratings are assigned to RMBS tranches by the credit rating agencies.  Each credit rating agency uses its own scale with letter designations to designate various levels of risk.  In general, AAA ratings (or Aaa rating from Fitch) are at the top of the credit rating scale and are intended to designate the safest investments.

99.   Credit ratings have been one tool among many for investors, including Prudential, to gauge risk.  Almost every residential mortgage-backed security transaction requires, as a condition to the issuance of the securities, that the offered securities be rated in one of the four highest rating categories.

100.   Credit ratings were a material factor to Prudential because (1) they were necessary for its regulatory reserve requirements and (2) they provided greater comfort that Prudential would receive the expected interest and principal payments.

101.   The Offering Materials represented that the ratings were based upon an assessment of the likelihood of delinquencies and defaults in the underlying mortgage pools:

> A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the mortgage loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates.

(MMLT 2005-2 Prospectus Supplement dated June 2, 2005, at S-113.)  Each Certificate did, in fact, receive a rating, which is set forth further below.

102.   These representations were false and misleading.  Defendants fed the rating agencies the same false data regarding underwriting guidelines, debt-to-income ratios, loan-to-value ratios, owner-occupancy status, and home values that they provided in the Offering Materials.  The rating agencies then input this false data into their models to determine the ratings on the Securitizations.  As a result, Defendants pre-determined the ratings by feeding bad

30

data into the ratings system.  This not only rendered false and misleading the Defendants'

representations that the ratings process would "tak[e] into consideration the characteristics of the

Mortgage Loans," but also assured that the ratings themselves in no way reflected the actual risk

underlying the Certificates.  Defendants knew the ratings did not reasonably relate to the

Certificates delivered to Prudential, and fraudulently omitted that the ratings process was being

rigged with false data.

## II.     EVIDENCE THAT DEFENDANTS' REPRESENTATIONS WERE FALSE AND MISLEADING

### A.     An Analysis of the Mortgage Loans and Certificates Directly at Issue

#### (1)     A forensic analysis of the mortgaged properties' true occupancy status revealed a systemic misrepresentation problem

103.    Although Prudential still does not have access to the loan files for the Mortgage

Loans, Prudential was recently able to test Defendants' representations regarding the

Certificates.  Using methodologies that were previously unavailable, Prudential sought to test

12,417 of the underlying Mortgage Loans.

104.    For the 16 Offerings Prudential tested, Prudential attempted to analyze 400

defaulted loans and 400 randomly sampled loans.  This sample size is more than sufficient to

provide statistically significant data to demonstrate the degree of Defendants'

misrepresentations.

105.    Statistical sampling is an accepted method of establishing reliable conclusions

about broader data sets, and is routinely used by courts, government agencies, scholars, and

private businesses.  As the size of a sample increases, the reliability of its estimations of the total

population's characteristics increases as well.  Experts in RMBS cases have found a sample size

of just 400 loans can provide statistically significant data, regardless of the size of the actual loan

pool, because it is unlikely so large a sample would yield results vastly different from results for the entire population.

106.    Prudential's loan-level analysis of the Mortgage Loans at issue here shows the owner-occupancy statistics Defendants provided to investors were false.  Across all the tested Offerings, Defendants significantly overstated the number of owner-occupied properties, thus *understating* the true riskiness of the loans.

107.    To determine whether a borrower actually occupied the property as claimed, Prudential investigated tax information for the sampled loans.  One would expect a borrower residing at a property to have the tax bills sent to that address, and would take applicable tax exemptions available to residents of that property.  A borrower sending tax records to another address is evidence that the borrower is not actually residing at the mortgaged property.  A borrower declining to make certain tax exemption elections that depend on living at the property is also strong evidence the borrower is living elsewhere.

108.    A review of credit records was also conducted.  People generally have bills sent to their primary address.  If a borrower had creditors send bills to another address, even six months after buying the property, such conduct is good evidence the borrower was living elsewhere.

109.    Prudential also conducted a review of property records.  It is less likely a borrower lives in any one property if that borrower owns multiple properties.  It is even less likely the borrower resides at the mortgaged property if a concurrently owned, separate property did not have its own tax bills sent to the property included in the mortgage pool.

110.    A review of other lien records was also conducted.  A property being subject to additional liens, but those materials being sent elsewhere, is good evidence a borrower is not

living at the mortgaged property. If the other lien involved a conflicting declaration of residency, that, too, would be good evidence a borrower is not living in the subject property.

111.    Although the methodologies that enable investors like Prudential to perform these analyses on the large volume of data were not available until recently (*see* Section IV.A), these tests draw from data largely contemporaneous with the transactions at issue. Thus, though Prudential could not have run these tests at the time of its purchases (or any other time until within the last few years), the results are thus evidence that a then-existing fact—owner-occupancy—was misrepresented. Even though this recently available technique draws on contemporaneous information, and provides a robust test of Defendants' representations for pleading purposes, it still does not contain the level of information that was uniquely in Defendants' control, such as the loan files. Prudential still does not have access to those files.

112.    Failing more than one of the above tests is strong evidence the borrower did not in fact reside at the mortgaged properties. The results of Prudential's loan-level analysis are set forth below, which compares the percentage of Mortgage Loans for owner-occupied properties as represented in the Defendants' Offering Materials, with the actual percentage of loans for owner-occupied properties for each Trust. Defendants consistently overstated these percentages for the Mortgage Loans underlying the Certificates Prudential purchased:

| Trust | Tranche(s) | Loan Pool | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Overstatement of Owner-Occupied Properties |
|---|---|---|---|---|---|
| EMLT 2004-2 | M5 | Aggregate | 96.49% | 85.24% | 11.25% |
| EMLT 2004-3 | M2, M4, M5, M6, M7 | All loans (no groups) | 97.54% | 84.74% | 12.80% |
| EMLT 2005-1 | M2, M3, M4, M5, M6 | All loans (no groups) | 97.76% | 85.04% | 12.72% |
| FHLT 2004-1 | M1, M6 | Aggregate | 90.58% | 80.95% | 9.63% |
| FHLT 2004-2 | M2 | Aggregate | 92% | 81.68% | 10.32% |

33

| Trust | Tranche(s) | Loan Pool | Represented Percentage of Owner-Occupied Properties | Actual Percentage of Owner-Occupied Properties | Overstatement of Owner-Occupied Properties |
|---|---|---|---|---|---|
| FHLT 2005-C | M1, M3 | Aggregate | 90.10% | 76.57% | 13.53% |
| FHLT 2005-D | M1 | Aggregate | 93.60% | 80.08% | 13.52% |
| MMLT 2005-2 | M2 | Aggregate | 94.77% | 83.24% | 11.53% |
| RBSGC 2005-A | 3A | Group 3 | 49.82% | 41.06% | 8.77% |
| SVHE 2004-WMC1 | M2, M3, M4 | Aggregate | 92.39% | 81.76% | 10.63% |
| SVHE 2006-EQ2 | A4 | All loans (no groups) | 93.67% | 85.24% | 8.43% |
| SVHE 2006-OPT1 | 2A4 | Group 2 | 87.42% | 77.38% | 10.04% |
| SVHE 2006-OPT2 | A4 | All loans (no groups) | 88.87% | 78.75% | 10.12% |
| SVHE 2006-OPT3 | 2A4 | Group 2 | 92.97% | 83.04% | 9.93% |
| SVHE 2006-OPT4 | 2A4 | Group 2 | 92.43% | 81.81% | 10.62% |
| SVHE 2006-OPT5 | 2A4 | Group 2 | 91.88% | 82.47% | 9.41% |

113.    The consistency of these results shows that the divergence between Defendants' representations and reality was not due to phenomena such as borrowers changing their mind about where to live.  Instead, these results reflect the fact that Defendants and their Originators knew borrowers were misrepresenting their intent to live at the property.  Defendants and their Originators allowed the falsification of these statistics in order to maneuver the loans through the approval and securitization process.  They knew, but fraudulently omitted to disclose, that those statistics were baseless.

114.    The consistency and scale of these misrepresentations also confirms that the abandonment of sound underwriting practices was systematic.  Loans actually put through the underwriting processes stated in the Offering Materials would not so consistently emerge on the other end mis-described.

115.    The facts alleged in this First Amended Complaint show Defendants' problems were systemic, and such is confirmed by the consistency of the results set forth above—the results of reviewing 12,417 Mortgage Loans across 16 offerings.  The seven Offerings (FHLT

2004-D, FHLT 2006-1, FHLT 2006-2, FHLT 2006-A, FHLT 2006-B, FHTL 2006-D and SVHE

2006-NLC1) for which Prudential did not test involved many of the same affiliated parties,

nearly identical disclosures, and both the underlying loans and the Certificates themselves were

being generated around the same time and purportedly according to the same processes.  As

such, on information and belief, the Offering Materials for FHLT 2004-D, FHLT 2006-1, FHLT

2006-2, FHLT 2006-A, FHLT 2006-B, FHTL 2006-D and SVHE 2006-NLC1 and SVHE 2006-

NLC1, and the aggregate loans for SVHE 2006-OPT4 also misrepresented the owner-occupancy

information at approximately the same, material rate as seen in the large sample of Certificates

and Mortgage Loans discussed above.

### (2)    A forensic analysis of the Mortgage Loans' true LTV and CLTV ratios revealed a systemic misrepresentation problem

116.    Prudential also had a sample of the Mortgage Loans valued by an industry-

standard automated valuation model ("AVM").  AVMs are routinely used in the industry as a

way of valuing properties during prequalification, origination, portfolio review, and servicing.

AVM use is specifically outlined in regulatory guidance and discussed in the Dodd-Frank Act.

117.    AVMs employ data similar to what appraisers use—primarily, county assessor

records, tax rolls, and data on comparable properties.  AVMs produce independent, statistically

derived valuation estimates by applying modeling techniques to this data.  The AVM Prudential

used incorporates a database of 500 million mortgage transactions covering zip codes

representing more than 97% of the homes, occupied by more than 99% of the population, in the

United States.  Independent testing services have determined that this AVM is the most accurate

of all such models.

118.    The results of this analysis are set forth in the Exhibits.  Applying the AVM to the

available data for the loans underlying these Certificates shows the appraisal values used by

Defendants were materially and consistently inflated. This caused the disclosed ratios to be lower than they really were, i.e., Defendants represented that borrowers had more of an equity "cushion" than really existed, and that prospects for recovery of funds upon a foreclosure were much greater than accurate data supported.

119.    As noted, although the methodologies that enable investors like Prudential to gather the information and run these analyses did not exist until recently (see Section IV.A), these analyses draw from data contemporaneous with the transactions at issue. These results thus confirm that the LTV and CLTV ratios were misrepresented at the time the representations were made. Further, as with the owner-occupancy data, though this recently available technique draws on contemporaneous information, and provides a robust test of Defendants' representations for pleading purposes, it still does not contain the level of information that was uniquely in Defendants' control, such as the loan files.

120.    In certain of the Offerings, Defendants provided information regarding the Mortgage Loans' LTV ratios (that is, the ratios not taking into account any second liens). Specifically, Defendants made representations about the percent of loans that had LTV ratios above 80%. LTV ratios in excess of 80% provide the lender little value cushion to protect against borrower default and loss upon foreclosure. Consequently, an accurate disclosure is important to investors in assessing the security's riskiness. But a much greater percentage than what Defendants represented actually had LTVs higher than 80%:

| Trust | Tranche(s) | Loan Pool | Percentage of Loans Represented to Have LTVs of Greater Than 80% | Actual Percentage of Loans With LTVs of Greater Than 80% | Understatement of Percentage of Loans With LTVs of Greater Than 80% |
|---|---|---|---|---|---|
| EMLT 2004-2 | M5 | Aggregate | 76.55% | 84.00% | 7.45% |
| EMLT 2004-3 | M2, M4, M5, M6, M7 | All loans (no groups) | 76.46% | 79.06% | 2.60% |

| Trust | Tranche(s) | Loan Pool | Percentage of Loans Represented to Have LTVs of Greater Than 80% | Actual Percentage of Loans With LTVs of Greater Than 80% | Understatement of Percentage of Loans With LTVs of Greater Than 80% |
|---|---|---|---|---|---|
| EMLT 2005-1 | M2, M3, M4, M5, M6 | All loans (no groups) | 72.60% | 76.83% | 4.23% |
| FHLT 2004-1 | M1, M6 | Aggregate | 48.69% | 52.75% | 4.06% |
| FHLT 2004-2 | M2 | Aggregate | 49.94% | 51.65% | 1.71% |
| FHLT 2005-C | M1, M3 | Aggregate | 42.34% | 64.37% | 22.03% |
| FHLT 2005-D | M1 | Aggregate | 39.99% | 63.15% | 23.16% |
| RBSGC 2005-A | 3A | Group 3 | 11.88% | 50.48% | 38.6% |
| SVHE 2006-EQ2 | A4 | All loans (no groups) | 57.06% | 65.7% | 8.64% |

121.   The Offering Materials also misrepresented the number of the Mortgage Loans in the subject loan pools had LTV ratios greater than 90%. LTV ratios in excess of 90% provide the lender even less cushion to protect against borrower default and loss upon foreclosure.

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have LTVs of Greater Than 90% | Actual Percentage of Loans With LTVs of Greater Than 90% | Understatement of Percentage of Loans With LTVs of Greater Than 90% |
|---|---|---|---|---|---|
| EMLT 2004-2 | M5 | Aggregate | 49.17% | 68.37% | 19.20% |
| EMLT 2004-3 | M2, M4, M5, M6, M7 | All loans (no groups) | 52.58% | 64.40% | 11.82% |
| EMLT 2005-1 | M2, M3, M4, M5, M6 | All loans (no groups) | 48.05% | 60.20% | 12.15% |
| FHLT 2004-1 | M1, M6 | Aggregate | 26.98% | 28.50% | 1.52% |
| FHLT 2004-2 | M2 | Aggregate | 24.48% | 32.09% | 7.61% |
| FHLT 2005-C | M1, M3 | Aggregate | 18.21% | 34.97% | 16.76% |
| FHLT 2005-D | M1 | Aggregate | 19.27% | 36.06% | 16.79% |
| RBSGC 2005-A | 3A | Group 3 | 4.26% | 25.24% | 20.98% |
| SVHE 2006-EQ2 | A4 | All loans (no groups) | 46.46% | 48.11% | 1.65% |

122.   The Offering Materials also misrepresented how many loans were underwater. Loans that are underwater are inherently very risky given that they afford the lender no equity cushion and leave the lender with inadequate collateral from the outset of the loan.

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have LTVs of Greater Than 100% | Actual Percentage of Loans With LTVs of Greater Than 100% | Understatement of Percentage of Loans With LTVs of Greater Than 100% |
|-------|---------|-----------|------|------|------|
| EMLT 2004-2 | M5 | Aggregate | 0% | 51.51% | 51.51% |
| EMLT 2004-3 | M2, M4, M5, M6, M7 | All loans (no groups) | 0% | 43.19% | 43.19% |
| EMLT 2005-1 | M2, M3, M4, M5, M6 | All loans (no groups) | 0% | 41.56% | 41.56% |
| FHLT 2004-1 | M1, M6 | Aggregate | 0% | 15.25% | 15.25% |
| FHLT 2004-2 | M2 | Aggregate | 0% | 16.26% | 16.26% |
| FHLT 2005-C | M1, M3 | Aggregate | 0% | 17.37% | 17.37% |
| FHLT 2005-D | M1 | Aggregate | 0% | 18.73% | 18.73% |
| RBSGC 2005-A | 3A | Group 3 | 0% | 10.00% | 10.00% |
| SVHE 2006-EQ2 | A4 | All loans (no groups) | 0% | 30.51% | 30.51% |

123.    While some of the Offering Materials here provided LTV ratios, many instead provided information regarding CLTV ratios.  An accurate CLTV ratio not only takes into account the value of the property, but also takes into account the total value of liens on the property, including any pre-existing "senior" lien on the property, as such additional liens diminishes the owner's equity and has to be paid first upon foreclosure.  As with the LTV statistics, Defendants significantly understated the CLTV ratios and thus again understated the riskiness of the Mortgage Loans.

124.    Just as with LTVs, loans with CLTV ratios in excess of 80% provide the lender little value cushion to protect against borrower default and loss upon foreclosure.  Defendants again misrepresented this risk feature:

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have CLTVs of Greater Than 80% | Actual Percentage of Loans With CLTVs of Greater Than 80% | Understatement of Percentage of Loans With CLTVs of Greater Than 80% |
|-------|---------|-----------|------|------|------|
| MMLT 2005-2 | M2 | Aggregate | 62.65% | 87.71% | 25.06% |
| SVHE 2004-WMC1 | M2, M3, M4 | Aggregate | 46.26% | 82.17% | 35.91% |
| SVHE 2006-OPT1 | 2A4 | Group 2 | 62.27% | 81.47% | 19.2% |

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have CLTVs of Greater Than 80% | Actual Percentage of Loans With CLTVs of Greater Than 80% | Understatement of Percentage of Loans With CLTVs of Greater Than 80% |
|---|---|---|---|---|---|
| SVHE 2006-OPT2 | A4 | All loans (no groups) | 32% | 71.17% | 39.17% |
| SVHE 2006-OPT3 | 2A4 | Group 2 | 63.23% | 83.72% | 20.49% |
| SVHE 2006-OPT4 | 2A4 | Group 2 | 60.41% | 87.91% | 27.5% |
| SVHE 2006-OPT5 | 2A4 | Group 2 | 56.62% | 83.74% | 27.12% |

125.  Defendants also misrepresented how many Mortgage Loans had CLTV ratios in excess of 90%:

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have CLTVs of Greater Than 90% | Actual Percentage of Loans With CLTVs of Greater Than 90% | Understatement of Percentage of Loans With CLTVs of Greater Than 90% |
|---|---|---|---|---|---|
| MMLT 2005-2 | M2 | Aggregate | 52.56% | 78% | 25.44% |
| SVHE 2004-WMC1 | M2, M3, M4 | Aggregate | 29.06% | 69.88% | 40.82% |
| SVHE 2006-OPT1 | 2A4 | Group 2 | 42.51% | 69.12% | 26.61% |
| SVHE 2006-OPT2 | A4 | All loans (no groups) | 17.75% | 55.89% | 38.14% |
| SVHE 2006-OPT3 | 2A4 | Group 2 | 44.04% | 71.83% | 27.79% |
| SVHE 2006-OPT4 | 2A4 | Group 2 | 44.14% | 78.3% | 34.16% |
| SVHE 2006-OPT5 | 2A4 | Group 2 | 42.18% | 74.14% | 31.96% |

126.  As was the case with LTVs, Defendants dramatically understated the number of Mortgage Loans with a CLTV ratio in excess of 100%:

| Trust | Tranche | Loan Pool | Percentage of Loans Represented to Have CLTVs of Greater Than 100% | Actual Percentage of Loans With CLTVs of Greater Than 100% | Understatement of Percentage of Loans With CLTVs of Greater Than 100% |
|---|---|---|---|---|---|
| MMLT 2005-2 | M2 | Aggregate | 0% | 54.86% | 54.86% |
| SVHE 2004-WMC1 | M2, M3, M4 | Aggregate | 0% | 44.34% | 44.34% |
| SVHE 2006-OPT1 | 2A4 | Group 2 | 0% | 48.69% | 48.69% |
| SVHE 2006-OPT2 | A4 | All loans (no groups) | 0% | 38.85% | 38.85% |
| SVHE 2006-OPT3 | 2A4 | Group 2 | 0% | 49.87% | 49.87% |
| SVHE 2006-OPT4 | 2A4 | Group 2 | 9.13% | 56.59% | 47.46% |
| SVHE 2006-OPT5 | 2A4 | Group 2 | 0% | 50.49% | 50.49% |

39

127.    Prudential also analyzed the weighted average CLTV ratio of the Mortgage Loans in these pools and found that these, too, were understated:

| Trust | Tranche | Loan Pool | Represented Weighted Average CLTV | Actual Weighted Average CLTV | Understatement of Weighted Average CLTV |
|-------|---------|-----------|-----------------------------------|------------------------------|------------------------------------------|
| MMLT 2005-2 | M2 | Aggregate | 86.58% | 98.82% | 12.24% |
| SVHE 2004-WMC1 | M2, M3, M4 | Aggregate | 81.76% | 93.91% | 12.15% |
| SVHE 2006-OPT1 | 2A4 | Group 2 | 82.03% | 94.03% | 12.00% |
| SVHE 2006-OPT2 | A4 | All loans (no groups) | 77.7% | 90.74% | 13.04% |
| SVHE 2006-OPT3 | 2A4 | Group 2 | 82.79% | 94.00% | 11.21% |
| SVHE 2006-OPT4 | 2A4 | Group 2 | 82.71% | 93.39% | 10.68% |
| SVHE 2006-OPT5 | 2A4 | Group 2 | 82.48% | 93.02% | 10.54% |

128.    The consistency and scale of these misrepresentations confirms that the abandonment of sound underwriting practices was systematic.  The consistency and size of these misrepresentations also confirms that the appraisers, Originators, and Defendants knew the appraisals being used were not reasonable indicators of the properties' value, but were inflated figures generated to shepherd the loans through the approval and securitization process.  These results (and other facts discussed herein) thus also demonstrate that the factual representations relating to appraisal practices were false.  Independent appraisers following the stated practices would not consistently generate appraisals that deviate so significantly (and so consistently upward) from the values found using an industry-standard AVM.  Instead of following the disclosed appraisal processes, the appraisers worked with Defendants and other mortgage loan Originators to generate appraisal values that were not meant to approximate the actual value of the property, but to justify issuance of the mortgage loan.

129.    The facts alleged in this First Amended Complaint show Defendants' problems were systemic, and the systemic nature of the problems is confirmed by the consistency of the results set forth above—the results of reviewing 12,417 Mortgage Loans across 16 offerings.

The seven Offerings (FHLT 2004-D, FHLT 2006-1, FHLT 2006-2, FHLT 2006-A, FHLT 2006-B, FHTL 2006-D and SVHE 2006-NLC1) and one relevant loan group (the aggregate loans for SVHE 2006-OPT4) for which Prudential did not test involved many of the same affiliated parties, nearly identical disclosures, and both the underlying loans and the Certificates themselves were being generated around the same time and purportedly according to the same processes. As such, on information and belief, the Offering Materials for FHLT 2004-D, FHLT 2006-1, FHLT 2006-2, FHLT 2006-A, FHLT 2006-B, FHTL 2006-D and SVHE 2006-NLC1 and SVHE 2006-NLC1, and the aggregate loans for SVHE 2006-OPT4 also likely misrepresented the LTV and CLTV ratio information at approximately the same, material rate as seen in the large sample of Certificates and Mortgage Loans discussed above.

130. The consistency of Defendants' misrepresentations also supports the conclusion that Defendants *knew* the appraisals were being intentionally inflated. Such is confirmed by the statements provided by former employees, as discussed below. It is also confirmed by Congressional testimony and other statements made by those in the industry about the widespread corruption in the appraisal processes during all times relevant to this First Amended Complaint.

131. For instance, Richard Bitner, a former executive of a subprime lender for 15 years, testified in April 2010 that "the appraisal process [was] highly susceptible to manipulation," and that the rise in property values was in part due to "the subprime industry's acceptance of overvalued appraisals." Similarly, Patricia Lindsay, a former wholesale lender, testified in April 2010 that in her experience appraisers were "often times pressured into coming in "at value," i.e., at least the amount needed for the loan to be approved. The appraisers "fearing" their "future business and their livelihoods" would choose properties "that would help

support the needed value rather than finding the best comparables to come up with the most accurate value."

132.    Jim Amorin, President of the Appraisal Institute, testified in April 2009 that "in many cases, appraisers are ordered or severely pressured to doctor their reports to convey a particular, higher value for a property, or else never see work from those parties again . . . [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'"

133.    The FCIC's January 2011 report recounts the similar testimony of Dennis J. Black, an appraiser with 24 years of experience who held continuing education services across the country.  "He heard complaints from appraisers that they had been pressured to ignore missing kitchens, damaged walls, and inoperable mechanical systems.  Black told the FCIC, 'The story I have heard most often is the client saying he could not use the appraisal because the value was [not] what they needed.'  The client would hire somebody else."

### (3)    A forensic analysis of the Mortgage Loans' title transfers revealed a systemic misrepresentation problem

134.    Defendants' representations about the valid transfer of title to the Mortgage Loans to the Trusts were false.  In many instances, the collateral did not properly secure the underlying Mortgage Loans and the Trusts could not foreclose on delinquent borrowers because Defendants either lost, failed to timely create, or failed to timely deliver the paperwork necessary to prove title to the mortgages.

135.    Contrary to their representations, Defendants did not properly assign large numbers of the Mortgage Loans to the Trusts.  In their rush to securitize loans and thereby offload risky collateral onto investors such as Prudential, Defendants did not comply with the strict rules governing assignment of mortgages and the transfer of promissory notes and loan files.  Defendants lost much of the paperwork relating to the Loans underlying the

securitizations, or made no attempt to assign the Mortgage Loans and deliver the original mortgage notes to the issuing trusts, as represented.

136.    As part of its loan-level forensic analysis of the Mortgage Loans underlying its Certificates, Prudential also examined whether the chain of mortgage assignments was complete with respect to the Mortgage Loans.  The review demonstrates that Defendants' representations regarding the title for the Mortgage Loans were false and misleading, and that Defendants fraudulently failed to disclose problems in the chain of title for the Mortgage Loans.

137.    As discussed above, and further in Section IV(A), this analysis could not have been performed by investors before 2010, because investors were not able to identify the specific properties at issue at the time.  Nor was it industry practice for investors to do an independent loan-level assessment of the accuracy of the representations made in the Offering Materials— Prudential reasonably relied upon Defendants to represent the Mortgage Loans correctly in the Offering Materials.

138.    The review demonstrates, for the 16 Securitizations Prudential tested:  (a) how many Mortgage Loans are currently held by the RMBS trust; (b) how many are held in the MERS electronic-recording system; (c) how many are still held in the originator's name; and (d) how many were assigned to a third party.  Loans that are still held by the originator, or were assigned to a third party other than the Trust or MERS, violate Defendants' representations that the loans would be assigned to the Trust (or, in some cases, would be held by MERS).

| Securitization | Tranche | Number of Loans Assigned to a Third Party (not including MERS) | Number of Loans Still Held in the Originator's Name | Percentage of Sampled Loans Assigned to a Third Party or Still Held in the Originator's Name[3] |
|---|---|---|---|---|
| EMLT 2004-2 | M5 | 5 | 232 | 34.55% |
| EMLT 2004-3 | M2, M4, M5, M6, M7 | 5 | 47 | 7.67% |

---

[3]  This percentage was calculated by omitting those loans in the samples for which no data was available.

| | | | | |
|---|---|---|---|---|
| EMLT 2005-1 | M2, M3, M4, M5, M6 | 17 | 32 | 7.06% |
| FHLT 2004-1 | M1, M6 | 11 | 579 | 88.13% |
| FHLT 2004-2 | M2 | 30 | 113 | 19.38% |
| FHLT 2005-C | M1, M3 | 16 | 51 | 10.49% |
| FHLT 2005-D | M1 | 21 | 58 | 11.84% |
| MMLT 2005-2 | M2 | 4 | 14 | 3.06% |
| RBSGC 2005-A | 3A | 38 | 27 | 16.54% |
| SVHE 2004-WMC1 | M2, M3, M4 | 46 | 34 | 12.76% |
| SVHE 2006-EQ2 | A4 | 214 | 20 | 37.44% |
| SVHE 2006-OPT1 | 2A4 | 33 | 332 | 77.17% |
| SVHE 2006-OPT2 | A4 | 38 | 227 | 64.16% |
| SVHE 2006-OPT3 | 2A4 | 39 | 298 | 67.81% |
| SVHE 2006-OPT4 | 2A4 | 33 | 317 | 68.9% |
| SVHE 2006-OPT5 | 2A4 | 51 | 320 | 68.83% |

139. Even among Loans that were assigned to the Trusts, a large number were still missing intervening assignments:

| Securitization | Tranche | Number of Loans Assigned To a Trust (not including MERS) | Number of Loans Assigned To a Trust But Missing Intervening Assignments | Percentage Loans Assigned To a Trust But Missing Intervening Assignments |
|---|---|---|---|---|
| EMLT 2004-2 | M5 | 58 | 39 | 67.24% |
| EMLT 2004-3 | M2, M4, M5, M6, M7 | 36 | 32 | 88.89% |
| EMLT 2005-1 | M2, M3, M4, M5, M6 | 72 | 50 | 69.44% |
| FHLT 2004-1 | M1, M6 | 8 | 5 | 62.5% |
| FHLT 2004-2 | M2 | 22 | 17 | 77.27% |
| FHLT 2005-C | M1, M3 | 138 | 104 | 75.36% |
| FHLT 2005-D | M1 | 145 | 116 | 80% |
| MMLT 2005-2 | M2 | 61 | 33 | 54.1% |
| RBSGC 2005-A | 3A | 24 | 8 | 33.33% |
| SVHE 2004-WMC1 | M2, M3, M4 | 16 | 14 | 87.5% |
| SVHE 2006-EQ2 | A4 | 391 | N/A | N/A |
| SVHE 2006-OPT1 | 2A4 | 103 | 50 | 48.54% |
| SVHE 2006-OPT2 | A4 | 141 | 88 | 48.54% |
| SVHE 2006-OPT3 | 2A4 | 158 | 95 | 62.41% |
| SVHE 2006-OPT4 | 2A4 | 154 | 94 | 61.04% |
| SVHE 2006-OPT5 | 2A4 | 165 | 116 | 70.3% |

140. In sum, among the 9,422 Loans for which sufficient data is available to conduct this analysis, 601 were improperly assigned to a third party (other than MERS) and 2,701 were

44

still held in the originator's name—an over *35*% defect rate. Further, of the loans that were nominally assigned to the Trust, over *66*% are missing necessary intervening assignments. Each of these loans also represent breaches of Defendants' representations.

141. As with the occupancy and appraisal analysis discussed above, the consistency and size of Defendants' title-related misrepresentations confirms that the abandonment of sound underwriting practices with Defendants' entire operation was systemic.

142. The facts alleged in this First Amended Complaint show Defendants' problems were systemic, and the systemic nature of the problems is confirmed by the consistency of the results set forth above—the results of reviewing 12,417 Mortgage Loans across 16 offerings. The seven Offerings (FHLT 2004-D, FHLT 2006-1, FHLT 2006-2, FHLT 2006-A, FHLT 2006-B, FHTL 2006-D and SVHE 2006-NLC1) for which Prudential did not run these tests involved many of the same affiliated parties, nearly identical disclosures, and both the underlying loans and the Certificates themselves were being generated around the same time and purportedly according to the same processes. As such, on information and belief, the Offering Materials for FHLT 2004-D, FHLT 2006-1, FHLT 2006-2, FHLT 2006-A, FHLT 2006-B, FHTL 2006-D and SVHE 2006-NLC1 and SVHE 2006-NLC1, and the aggregate loans for SVHE 2006-OPT4 also misrepresented the title-transfer information at approximately the same, material rate as seen in the large sample of Certificates and Mortgage Loans discussed above.

143. Defendants also defrauded Prudential by stating that an assignment to MERS ensured that each Trust could foreclose upon the underlying collateral. As multiple courts have held, because the actual mortgage note is typically not transferred to MERS, MERS is a nullity. *See*, *e.g.*, *Bank of New York v. Silverberg*, 86 A.D.3d 274 (N.Y. App. Div. 2d Dep't 2011). In February 2011, MERS instructed its lender members to stop foreclosing in the name of MERS in

light of overwhelming authority that beneficial ownership of an underlying mortgage cannot be transferred to MERS. Defendants' representations in the Offering Materials that MERS would be the "beneficial owner" of each Mortgage were false. As MERS Recommended Foreclosure Procedure 8 provides, "MERS does not create or transfer beneficial interests in mortgage loans or create electronic assignments of the mortgage."

> **(4)** **The dismal performance of these Mortgage Loans and Certificates confirms they were infected by Defendants' and the Originators' systemic underwriting problems**

144. The extremely high default rates of the Mortgage Loans and the precipitous drop in the credit ratings of the Certificates are themselves evidence that the investments at issue were infected by a systemic underwriting problem.

145. Prudential's Certificates were supposed to be long-term, stable investments; yet they have already experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten and which contained loans that actually had the characteristics Defendants' Offering Materials claim. Overall, over *26%* of the Mortgage Loans have had to be written off at a loss already. For instance, in each of the FHLT 2005-D, FHLT 2006-1, FHLT 2006-2, FHLT 2006-A, FHLT 2006-B, FHLT 2006-D, SVHE 2006-EQ2, SVHE 2006-OPT1, SVHE 2006-OPT2, SVHE 2006-OPT3, SVHE 2006-OPT4, SVHE 2006-OPT5, and MMLT 2005-02 Securitizations, at least *25%* of the Mortgage Loans have been written off for a loss. By way of further examples:

| Trust | Tranche | Loan Pool | Written-Off or Delinquent Loans as a Percentage of Original Loans |
|-------|---------|-----------|-------------------------------------------------------------------|
| EMLT 2004-2 | M5 | Aggregate | 17.81% |
| EMLT 2004-3 | M2, M4, M5, M6, M7 | All loans (no groups) | 17.60% |
| EMLT 2005-1 | M2, M3, M4, M5, M6 | All loans (no groups) | 19.24% |
| FHLT 2004-1 | M1, M6 | Aggregate | 7.90% |
| FHLT 2004-2 | M2 | Aggregate | 10.52% |
| FHLT 2004-D | M1 | Aggregate | 13.93% |

46

| Trust | Tranche | Loan Pool | Written-Off or Delinquent Loans as a Percentage of Original Loans |
|---|---|---|---|
| FHLT 2005-C | M1, M3 | Aggregate | 31.46% |
| FHLT 2005-D | M1 | Aggregate | 40.01% |
| FHLT 2006-1 | 2A4 | Group 2 | 56.71% |
| FHLT 2006-2 | M1 | Aggregate | 44.48% |
| FHLT 2006-A | 2A4 | Group 2 | 57.35% |
| FHLT 2006-B | 2A3 | Group 2 | 72.83% |
| FHLT 2006-D | 2A4 | Group 2 | 67.41% |
| MMLT 2005-2 | M2 | Aggregate | 30.84% |
| RBSGC 2005-A | 3A | Group 3 | 21.10% |
| SVHE 2004-WMC1 | M2, M3, M4 | Aggregate | 15.15% |
| SVHE 2006-EQ2 | A4 | All loans (no groups) | 49.01% |
| SVHE 2006-NLC1 | A2, A3 | All loans | 33.33% |
| SVHE 2006-OPT1 | 2A4 | Group 2 | 40.79% |
| SVHE 2006-OPT2 | A4 | All loans (no groups) | 38.40% |
| SVHE 2006-OPT3 | 2A4 | Group 2 | 46.51% |
| SVHE 2006-OPT4 | 2A4 | Group 2 | 44.14% |
| SVHE 2006-OPT4 | M1 | Aggregate | 41.80% |
| SVHE 2006-OPT5 | 2A4 | Group 2 | 50.24% |

146. Not only have the Certificates experienced extraordinary rates of delinquency and default, their ratings have significantly deteriorated. Many initially received the highest possible rating and *all* were initially investment-grade certificates—but almost all have now been downgraded to "junk-bond" status by at least one agency:[4]

| Certificate | Tranche | Ratings at Issuance (Fitch/Moody's/S&P) | Current Ratings (Fitch/Moody's/S&P)[5] |
|---|---|---|---|
| EMLT 2004-2 | M5 | -/A2/A | -/Ba3-(sf)/BB+(sf) |
| EMLT 2004-3 | M2 | AAsf/Aa1/AA | AA-sf/A1(sf)/AA(sf) |
| EMLT 2004-3 | M4 | A+sf/Aa3/A+ | BBBsf/Ba1-(sf)/A+(sf) |
| EMLT 2004-3 | M5 | A/A1/A | Bsf/Ba3-(sf)/A(sf) |
| EMLT 2004-3 | M6 | A-/A2/A- | CCCsf/B2-(sf)/A-(sf) |
| EMLT 2004-3 | M7 | BBB+/A3/BBB+ | CCsf/Caa3(sf)/BBB+(sf) |
| EMLT 2005-1 | M2 | AAsf/AA2/Aa(sf) | AA-sf/A2(sf)/AA(sf) |
| EMLT 2005-1 | M3 | AA-sf/Aa3/AA-(sf) | AA-sf/A2(sf)/AA(sf) |
| EMLT 2005-1 | M4 | A+/A1/A+ | Bsf/Caa1(sf)/BBB(sf) |
| EMLT 2005-1 | M5 | A/A2/A | CCCsf/Ca(sf)/BB-(sf) |
| EMLT 2005-1 | M6 | A-/A3/A- | CCsf/Ca(sf)/B-(sf) |
| FHLT 2004-1 | M1 | AA+sf/Aa1/AAA(sf) | BBBsf/A1-(sf)/* |
| FHLT 2004-1 | M6 | A-/A3/A | Csf/Ca(sf)/B-(sf) |
| FHLT 2004-2 | M2 | AA/Aa2/AA | Bsf/Ba2-(sf)/AA+(sf) |

---

[4] Any instrument rated lower than BBB (or Baa for ratings provided by Moody's) is considered below investment-grade.

[5] The symbol "*" represents the fact that the credit rating given to the particular tranche/loan group has not been updated since issuance.

| Certificate | Tranche | Ratings at Issuance (Fitch/Moody's/S&P) | Current Ratings (Fitch/Moody's/S&P)[5] |
|---|---|---|---|
| FHLT 2004-D | M1 | -/Aa1/- | -/Ba1(sf)/AA+ |
| FHLT 2005-C | M1 | AA+/Aa1/AA+ | BBsf/Baa2(sf)/AA+*-(sf) |
| FHLT 2005-C | M3 | AA-/Aa3/AA | CCsf/C(sf)/BB*-(sf) |
| FHLT 2005-D | M1 | -/Aa1/AA+ | -/C(sf)/B-*(sf) |
| FHLT 2006-1 | 2A4 | -/Aaa/AAA | -/Ca(sf)/B-*(sf) |
| FHLT 2006-2 | M1 | -/Aa2/AA | -/C(sf)/CC(sf) |
| FHLT 2006-A | 2A4 | AAA/Aaa/AAA | Csf/C(sf)/CCC(sf) |
| FHLT 2006-B | 2A3 | AAA/Aaa/AAA | C*(sf)/Csf/CCC(sf) |
| FHLT 2006-D | 2A4 | AAA/Aaa/AAA | Csf/Ca(sf)/CCC(sf) |
| MMLT 2005-2 | M2 | AA/Aa2/AA+ | Bsf/Caa1(sf)/B-(sf) |
| RBSGC 2005-A | 3A | -/Aaa/AAA | -/Caa2(sf)/CCC(sf) |
| SVHE 2004-WMC1 | M2 | -/Aa2/AA | -/B3+(sf)/A-(sf) |
| SVHE 2004-WMC1 | M3 | -/Aa3/AA | -/Ca+(sf)/B+(sf) |
| SVHE 2004-WMC1 | M4 | -/A1/AA- | -/Ca+(sf)/B-(sf) |
| SVHE 2006-EQ2 | A4 | AAA/Aaa/AAA | Csf/Caa(sf)/CCC(sf) |
| SVHE 2006-NLC1 | A2 | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |
| SVHE 2006-NLC1 | A3 | -/Aaa/AAA | -/Ca(sf)/CCC(sf) |
| SVHE 2006-OPT1 | 2A4 | AAA/Aaa/AAA | CCCsf/Caa2(sf)/A-(sf) |
| SVHE 2006-OPT2 | A4 | -/Aaa/AAA | -/Caa2(sf)/BBB(sf) |
| SVHE 2006-OPT3 | 2A4 | -/Aaa/AAA | -/Caa2(sf)/A(sf) |
| SVHE 2006-OPT4 | 2A4 | -/Aaa/AAA | -/C(sf)/CCC(sf) |
| SVHE 2006-OPT4 | M1 | -/Aa2/AA | -/C(sf)/CC(sf) |
| SVHE 2006-OPT5 | 2A4 | -/Aaa/AAA | Caa3(sf)/B-(sf) |

147.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools.  Loan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.

**B.    In-Depth Reports on Individual Mortgage Loans Confirm the Systemic Violation of Stated Underwriting Standards**

148.    As described above in Section II(A), Prudential carried out a forensic analysis of 12,417 Mortgage Loans that collateralize its Certificates.  The analysis demonstrates that Defendants misrepresented the owner-occupancy status, LTV ratios, CLTV ratios, and transfer-of-title process for the specific Mortgage Loans underlying Prudential's Certificates.

149.    Prudential also commissioned a second, separate loan-level analysis of the Mortgage Loans.  Like the forensic analysis discussed previously, this too depended on the identification of the exact properties underlying Prudential's Certificates.  As discussed above, Prudential does not and did not have the loan files for the Mortgage Loans—the files containing the backup documentation.  The proprietary databases and methodologies required to "reverse engineer" the identity of the collateral properties were not available to investors until well after July 2008.

150.    Prudential's second loan-level analysis was focused on investigating specific documents relating to specific Loans and borrowers.  For instance, while both the analysis above and that discussed below used an "AVM" to judge the reasonableness of Defendants' LTV ratio representations, this second analysis also dives into records such as bankruptcy filings.  Such records require the borrowers to make representations to the bankruptcy court regarding their income and assets.  A review of such records thus provides a way to test Defendants' representations regarding such key risk features as the borrowers' income, assets, and debt-to-income ("DTI") ratios.

151.    Defendants' misrepresentations of borrowers' income, assets, and DTI ratios were material because low income and assets, and a high DTI ratio, create an increased risk for investors such as Prudential.  Borrowers that owe more on their property, relative to their other assets, are less able to repay the loan that a borrower who owes less on the property, compared to their income.  A DTI ratio over 100% means the borrower spends more each month simply paying down debt than that borrower takes in in income—calling into serious question the borrower's ability to make timely payments on a consistent, long-term basis.

152.    Prudential's analysis focused on 34 Mortgage Loans underlying 15 of the Securitizations.  The following subheadings summarize the findings for each of the sampled Mortgage Loans.[6]  These individual reports are a representative sample that illustrate the broader, systemic breakdown in underwriting standards and misrepresentations of statistical data that affected the Mortgage Loans underlying each of the Securitizations.  A broader analysis of additional loans underlying the Securitizations would show the same misrepresentations on a broader scale.

### (1)    Loans Underlying EMLT 2004-2

153.    Prudential commissioned in-depth reports on 2 loans that collateralized its investments in EMLT 2004-2.

154.    Loan A was issued to Borrower 1 on a property in Georgia ("Subject Property A") in March 2004.  The borrower subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI and LTV ratios for Subject Property 1 were misrepresented in the Offering Materials.  The EMLT 2004-2 Prospectus provided maximum DTI ratios of 50% and 55%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $2,598* in 2004.  The bankruptcy filing also showed that the borrower had a second lien loan on Subject Property A and an auto loan, and owed alimony payments and back taxes.  Factoring in his combined monthly income and monthly debt payments, Borrower 1's actual DTI ratio was likely *138%*.  Property A's actual value prior to closing was *$63,900 less* than its appraised value.  Based on the AVM analysis, the actual LTV ratio on Loan A was 128%, rather than the 85% represented in the Offering Materials—*a difference of 43%*.

---

[6]  Prudential has withheld borrower names, property addresses, and other identifying information from the descriptions below to protect their privacy.

155.     Loan B was issued to Borrower 2 on a property in Colorado ("Subject Property B") in March 2004.  The borrower subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI and LTV ratios for Subject Property B were misrepresented in the Offering Materials.  The EMLT 2004-2 Prospectus provided maximum DTI ratios of 50% and 55%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $1,227.17* in 2004.  Factoring in his combined monthly income and monthly debt payments, which included a second lien loan on Subject Property B, Borrower 2's actual DTI ratio was likely *175%*.  Property B's actual value prior to closing was *$89,800 less* than its appraised value.  Based on the AVM analysis, the actual LTV ratio on Loan B was 119%, rather than the 80% represented in the Offering Materials—*a difference of 39%*.

### (2)     Loans Underlying EMLT 2004-3

156.     Prudential commissioned in-depth report on 2 loans that collateralized its investments in EMLT 2004-3.

157.     Loan C was issued to Borrower 3 on a property in Illinois ("Subject Property C") in September 2004.  The borrower subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property C was misrepresented in the Offering Materials.  The EMLT 2004-3 Prospectus provided maximum DTI ratios of 50%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $2,666.67* in 2004.  The bankruptcy filing also showed that the borrower had a second lien loan on Subject Property C, and a mortgage loan on another property.  Factoring in his combined monthly income and monthly debt payments, Borrower 3's actual DTI ratio was likely *135%*.

158.     Loan D was issued to Borrower 4 on a property in Texas ("Subject Property D") in August 2004.  The borrower subsequently filed for bankruptcy.  The EMLT 2004-3 mortgage loan schedule stated that Subject Property D was owner occupied.  But the borrower's bankruptcy filing listed another property in Texas as his home address, and listed Subject Property D as a rental property.  The DTI and LTV ratios for Subject Property D were also misrepresented in the Offering Materials.  The EMLT 2004-3 Prospectus provided maximum DTI ratios of 50%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $2,316.25* in 2004.  The bankruptcy filing also shows that the borrower had a second lien loan on Subject Property D, an auto loan, and a mortgage loan on the property that the borrower actually occupied.  Factoring in his combined monthly income and monthly debt payments, which included a second lien loan on Subject Property D, Borrower 4's actual DTI ratio was likely *167%*.  Property D's actual value prior to closing was *$30,800 less* than its appraised value.  Based on the AVM analysis, the actual LTV ratio on Loan 4 was 87%, rather than the 80% represented in the Offering Materials—*a difference of 7%*.

### (3)     Loans Underlying EMLT 2005-1

159.     Prudential commissioned in-depth report on 2 loans that collateralized its investments in EMLT 2005-1.

160.     Loan E was issued to Borrowers 5 and 6 on a property in Tennessee ("Subject Property E") in December 2004.  The borrowers subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property E was misrepresented in the Offering Materials.  The EMLT 2005-1 Prospectus provided maximum DTI ratios of 50% and 55%.  Contrary to these representations, in their bankruptcy filing, the borrowers listed combined monthly income of *only $1,750* in 2004 and *$1,934* in 2005.  Factoring in their combined monthly income and monthly debt payments,

which included two auto loans, the borrowers' actual DTI ratio was likely between **97% and 107%**.

161.    Loan F was issued to Borrowers 7 and 8 on a property in North Carolina ("Subject Property F") in January 2005.  The borrowers subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property F was misrepresented in the Offering Materials.  The EMLT 2005-1 Prospectus provided maximum DTI ratios of 50% and 55%.  Contrary to these representations, in their bankruptcy filing, the borrowers listed combined monthly income of **only $2,438.33** in 2004 and **$1,385.00** in 2005.  Factoring in their combined monthly income and monthly debt payments, the borrowers' actual DTI ratio was likely between **103% and 182%**.

       **(4)**    **Loans Underlying FHLT 2004-1**

162.    Prudential commissioned in-depth report on 2 loans that collateralized its investments in FHLT 2004-1.

163.    Loan G was issued to Borrower 9 on a property in Texas ("Subject Property G") in December 2003.  The borrower subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property G was misrepresented in the Offering Materials.  The FHLT 2004-1 Prospectus provided maximum DTI ratios of 50% and 55%.  Contrary to these representations, in his bankruptcy filing, Borrower 9 listed combined monthly income of **only $1,000** in 2003.  Factoring in his monthly income and monthly debt payments, the borrower's actual DTI ratio was likely **104%**.

164.    Loan H was issued to Borrowers 10 and 11 on a property in California ("Subject Property H") in December 2003.  The borrowers subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI and LTV ratios for Subject Property 8 were misrepresented in the Offering Materials.  The FHLT

2004-1 Prospectus provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in their bankruptcy filing, the borrowers listed combined monthly income of *only $1,411.67* in 2004. Factoring in their combined monthly income and monthly debt payments, which included a second lien loan on Subject Property 8, the borrowers' actual DTI ratio was likely *188%*. Property H's actual value prior to closing was *$51,300 less* than its appraised value. Based on the AVM analysis, the actual LTV ratio on Loan H was 94%, rather than the 80% represented in the Offering Materials—*a difference of 14%.*

### (5)     Loans Underlying FHLT 2004-2

165.     Prudential commissioned in-depth report on 2 loans that collateralized its investments in FHLT 2004-2.

166.     Loan I was issued to Borrower 12 on a property in Texas ("Subject Property I") in May 2004. The borrower subsequently filed for bankruptcy. Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property I was misrepresented in the Offering Materials. The FHLT 2004-1 Prospectus provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in his bankruptcy filing, the borrower listed combined monthly income of *only $2,065.75* in 2004. Factoring in his monthly income and monthly debt payments, Borrower 12's actual DTI ratio was likely between *113%*.

167.     Loan J was issued to Borrower 13 on a property in New Jersey ("Subject Property J") in May 2004. The borrower subsequently filed for bankruptcy. Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property J was misrepresented in the Offering Materials. The FHLT 2004-2 Prospectus provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in his bankruptcy filing, the borrower listed combined monthly income of *only $971.08* in 2004. Factoring in his combined monthly income and monthly debt payments, Borrower 13's actual DTI ratio was likely *239%*.

54

### (6) Loans Underlying FHLT 2004-D

168.    Prudential commissioned in-depth report on 2 loans that collateralized its investments in FHLT 2004-D.

169.    Loan K was issued to Borrower 14 on a property in Oregon ("Subject Property K") in August 2004.  The borrower subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI and LTV ratios for Subject Property K were misrepresented in the Offering Materials.  The FHLT 2004-D Prospectus provided maximum DTI ratios of 50% and 55%.  Contrary to these representations, in his bankruptcy filing, the borrower listed combined monthly income of *only $1,854.08* in 2004.  Factoring in his monthly income and monthly debt payments, Borrower 14's actual DTI ratio was likely *111%*.  Property K's actual value prior to closing was *$18,000 less* than its appraised value.  Based on the AVM analysis, the actual LTV ratio on Loan K was 91%, rather than the 86.35% represented in the Offering Materials—*a difference of 4.65%.*

170.    Loan L was issued to Borrower 15 on a property in Illinois ("Subject Property L") in July 2004.  The borrower subsequently filed for bankruptcy.  The FHLT 2004-D mortgage loan schedule stated that Subject Property L was owner occupied.  But the borrower's bankruptcy filing listed another property in Illinois as his home address.  The DTI and LTV ratios for Subject Property L were also misrepresented in the Offering Materials.  The FHLT 2004-D Prospectus provided maximum DTI ratios of 50% and 55%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $4,791.67* in 2004.  Factoring in his monthly income and monthly debt payments, which included two auto loans and two mortgage loans on his actual residence, Borrower 15's actual DTI ratio was  likely *149%*.  Property L's actual value prior to closing was *$178,221 less* than its appraised value.

Based on the AVM analysis, the actual LTV ratio on Loan L was 132%, rather than the 90% represented in the Offering Materials—*a difference of 42%.*

### (7)     Loans Underlying MMLT 2005-2

171.     Prudential commissioned in-depth reports on 3 loans that collateralized its investments in MMLT 2005-2.

172.     Loans M and N were issued to Borrower 16 on a property in California ("Subject Property M") in April 2005. The borrower subsequently filed for bankruptcy. Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property M was misrepresented in the Offering Materials. The MMLT 2005-2 Prospectus Supplement (at S-27) stated that most of the Mortgage Loans had a DTI of 50% of less, and that none of the Mortgage Loans had a DTI greater than 65%. Contrary to these representations, in her bankruptcy filing, the borrower listed yearly income of *only $37,046* in 2005, surrounding the closing on Subject Property M. Factoring in her monthly income and monthly debt payments from two auto loans, a student loan, credit card debt, and other expenses, the borrower's actual DTI ratio was likely *89%*. The Offering Materials also misrepresented the CLTV ratios for Loans M and N. Property M's actual value prior to closing was *$47,000 less* than its appraised value. Based on the AVM analysis, the actual LTV ratio on Loan M was 94.3%, rather than the 80% represented in the Offering Materials—*a difference of 14.3%*. Similarly, the actual CLTV ratio on Loans M and N was 117%, not the 100% that was represented in the Offering Materials—*a difference of 17%.*

173.     Loan O was issued to Borrower 17 on a property in Indiana ("Subject Property N") in May 2005. The borrower subsequently filed for bankruptcy. Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property N was misrepresented in the Offering Materials. The MMLT 2005-2 Prospectus Supplement (at S-27)

stated that most of the Mortgage Loans had a DTI of 50% of less, and that none of the Mortgage Loans had a DTI greater than 65%. Contrary to these representations, in his bankruptcy filing, the borrower listed a ***total loss of $40,000*** in 2005 from a construction and remodeling business. the borrower also listed monthly debt payments on an auto loan, boat loan, appliance loan, and spousal support. Factoring in his complete lack of monthly income and high monthly debt payments, Borrower 17's actual DTI ratio ***cannot even be calculated***.

### (8)  Loans Underlying SVHE 2004-WMC1

174.  Prudential commissioned in-depth reports on 2 loans that collateralized its investments in SVHE 2004-WMC1.

175.  Loan P was issued to Borrower 18 on a property in California ("Subject Property O") in October 2004. The borrower subsequently filed for bankruptcy. The SVHE 2004-WMC1 mortgage loan schedule stated that Subject Property O was owner occupied. But the borrower's bankruptcy filing listed another property in California as his home address, and listed Subject Property O as his mailing address. The DTI and LTV ratios for Subject Property O were also misrepresented in the Offering Materials. The SVHE 2004-WMC1 Prospectus provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of only $3,000 in 2004, surrounding the closing on Subject Property O. Factoring in his monthly income and monthly debt payments, Borrower 18's actual DTI ratio was likely a ***132%***. Property O's actual value prior to closing was ***$64,000 less*** than its appraised value. Based on the AVM analysis, the actual LTV ratio on Loan P was 107%, rather than the 95% represented in the Offering Materials—***a difference of 12%***.

176.  Loan Q was issued to Borrowers 19 and 20 on a property in Illinois ("Subject Property P") in October 2004. The borrowers subsequently filed for bankruptcy. The DTI ratio for Subject Property P was misrepresented in the Offering Materials. The SVHE 2004-WMC1

Prospectus provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in their bankruptcy filing, the borrowers listed combined monthly income of *only $7,666.67* in 2004, surrounding the closing on Subject Property P. The bankruptcy filing also shows that the borrowers had two auto loans, and furniture loans. Factoring in their monthly income and monthly debt payments, the borrowers' actual DTI ratio was likely *77%*.

          **(9)**     **Loans Underlying SVHE 2006-EQ2**

177.     Prudential commissioned in-depth reports on 2 loans that collateralized its investments in SVHE 2006-EQ2.

178.     Loan R was issued to Borrower 21 on a property in California ("Subject Property Q") in September 2006. The borrower subsequently filed for bankruptcy. The SVHE 2006-EQ2 mortgage loan schedule stated that Subject Property Q was owner occupied. But the borrower's bankruptcy filing listed another property in California as his home address. The DTI ratio for Subject Property Q was also misrepresented in the Offering Materials. The SVHE 2006-EQ2 Prospectus provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in her bankruptcy filing, the borrower listed monthly income of *only $$876.76* in 2006, surrounding the closing on Subject Property Q. The bankruptcy filing also shows that the borrower had a second lien loan on Subject Property Q and a mortgage loan on the property that the borrower Q actually occupied. Factoring in her monthly income and monthly debt payments, Borrower 21's actual DTI ratio was likely a staggering *846%*.

179.     Loan S was issued to Borrowers 22 and 23 on a property in North Carolina ("Subject Property R") in October 2006. The borrowers subsequently filed for bankruptcy. The SVHE 2006-EQ2 mortgage loan schedule stated that Subject Property R was owner occupied. But the borrowers' bankruptcy filing listed another property in North Carolina as their home address, and yet another property in North Carolina as their prior address. The DTI ratio for

Subject Property R was also misrepresented in the Offering Materials. The SVHE 2006-EQ2 mortgage loan schedule stated that the borrowers' DTI was 48.41%, and the SVHE 2006-EQ2 Prospectus provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in their bankruptcy filing, the borrowers listed combined monthly income of *only $2,500* in 2006, surrounding the closing on Subject Property R. The bankruptcy filing also shows that the borrowers had a second lien loan on Subject Property 18, two auto loans, and a mortgage loan on the property that they actually occupied. Factoring in their monthly income and monthly debt payments, the borrowers' actual DTI ratio was likely *289%*.

### (10)    Loans Underlying SVHE 2006-NLC1

180.    Prudential commissioned in-depth reports on 5 loans that collateralized its investments in SVHE 2006-NLC1.

181.    Loan T was issued to Borrowers 24 and 25 on a property in Texas ("Subject Property S") in August 2006. The borrowers subsequently filed for bankruptcy. Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property S was misrepresented in the Offering Materials. The SVHE 2006-NLC1 Offering Circular (at 42-45) provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in their bankruptcy filing, the borrowers listed combined monthly income of *only $1,787* in 2006, surrounding the closing on Subject Property S. Factoring in their monthly income and monthly debt payments, the borrowers' actual DTI ratio was likely *101%*.

182.    Loan U was issued to Borrower 26 on a property in California ("Subject Property T") in September 2006. The borrower subsequently filed for bankruptcy. Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property T was misrepresented in the Offering Materials. The SVHE 2006-NCL1 Offering Circular (at 42-45) provided maximum DTI ratios of 50% and 55%. Contrary to these

59

representations, in his bankruptcy filing, the borrower listed monthly income of *only $4,085.74* in 2006, surrounding the closing on Subject Property T. The bankruptcy filing also shows that the borrower had a second lien loan on Subject Property T and an auto loan. Factoring in his monthly income and monthly debt payments, Borrower 26's actual DTI ratio was likely *89%*.

183.    Loan V was issued to Borrower 27 on a property in California ("Subject Property U") in July 2006. The borrower subsequently filed for bankruptcy. Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property U was misrepresented in the Offering Materials. The SVHE 2006-NCL1 Offering Circular (at 42-45) provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in her bankruptcy filing, the borrower listed monthly income of *only $383.75* in 2006, surrounding the closing on Subject Property U. Factoring in her monthly income and monthly debt payments, Borrower 27's actual DTI ratio was likely a staggering *781%*.

184.    Loan W was issued to Borrower 28 on a property in Arizona ("Subject Property V") in September 2006. The borrower subsequently filed for bankruptcy. Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject Property 22 was misrepresented in the Offering Materials. The SVHE 2006-NCL1 Offering Circular (at 42-45) provided maximum DTI ratios of 50% and 55%. Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $1,250* in 2006, surrounding the closing on Subject Property V. Factoring in his monthly income and monthly debt payments, which included a second lien loan on Subject Property V, an auto loan, and home owner's association fees, Borrower 28's actual DTI ratio was likely *142%*.

185.    Loan X was issued to Borrower 29 on a property in California ("Subject Property W") in September 2006. The borrower subsequently filed for bankruptcy. Discrepancies

between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject

Property W was misrepresented in the Offering Materials.  The SVHE 2006-NCL1 Offering

Circular (at 42-45) provided maximum DTI ratios of 50% and 55%.  Contrary to these

representations, in his bankruptcy filing, the borrower listed *zero monthly income* in 2006,

surrounding the closing on Subject Property W.  The bankruptcy filing also showed that the

borrower had a second lien loan on Subject Property W, and an auto loan.  Factoring in his

complete lack of monthly income and multiple monthly debt payments, Borrower 29's actual

DTI ratio *cannot even be calculated*.

### (11)    Loans Underlying SVHE 2006-OPT1

186.    Prudential commissioned in-depth reports on 2 loans that collateralized its

investments in SVHE 2006-OPT1.   Prudential's Certificates are backed by loans from the Group

II loan pool in the Securitization, and the two loans analyzed below are likewise drawn from the

Group II loan pool.

187.    Loan Y was issued to Borrower 30 on a property in Colorado ("Subject Property

X") in December 2005.  The borrower subsequently filed for bankruptcy.  Discrepancies

between the bankruptcy filing and the Offering Materials show that the DTI ratio for Subject

Property X was misrepresented in the Offering Materials.  The SVHE 2006-OPT1 Prospectus

provided maximum DTI ratios of 55% and 60%.  Contrary to these representations, in her

bankruptcy filing, the borrower listed *zero income* in 2006, surrounding the closing on Subject

Property X.  Factoring in her complete lack of monthly income and monthly debt payments,

which included a motorcycle loan, property taxes, and insurance, the borrower's actual DTI ratio

*cannot even be calculated*.  The LTV ratio for Loan Y was also misrepresented.  Property X's

actual value prior to closing was *$182,100 less* than its appraised value.  Based on the AVM

analysis, the actual LTV ratio on Loan Y was 144%, not the 94.87% represented in the Offering Materials—a difference of *49.13%*.

188.    Loan Z was issued to Borrower 31 on a property in Virginia ("Subject Property Y") in January 2006.  The borrower subsequently filed for bankruptcy.  Discrepancies between the bankruptcy filing and the Offering Materials show that the DTI and LTV ratios for Subject Property Y were misrepresented in the Offering Materials.  The SVHE 2006-OPT1 Prospectus provided maximum DTI ratios of 55% and 60%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of only *$5,413.16* for 2005 and *$7,525* for 2006.  Factoring in his monthly income and monthly debt payments, the borrower's actual DTI ratio was between *114% and 159%.*  Subject Property Y's actual value prior to closing was *$188,200 less* than its appraised value.  Based on the AVM analysis, the actual LTV ratio on Loan Z was 95%, not the 79.96% represented in the Offering Materials—a difference of *15.04%*.

### (12)    Loans Underlying SVHE 2006-OPT2

189.    Prudential commissioned in-depth reports on 2 loans that collateralized its investments in SVHE 2006-OPT2.

190.    Loan AA was issued to Borrower 32 on a property in Massachusetts ("Subject Property Z") in March 2006.  The borrower subsequently filed for bankruptcy.  The SVHE 2006-OPT2 mortgage loan schedule stated that Subject Property Z was owner occupied.  But Borrower 32's bankruptcy filing listed another property in Massachusetts as the borrower's home address.  The DTI and LTV ratios for Subject Property Z were also misrepresented in the Offering Materials.  The SVHE 2006-OPT2 mortgage loan schedule stated that the borrower's DTI was only 46.95%%, and the SVHE 2006-OPT2 Prospectus provided maximum DTI ratios of 55% and 60%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $355* from social security in 2006.  Factoring in his monthly income and monthly

62

debt payments, including from a second lien loan on Subject Property Z, Borrower 32's actual DTI ratio was likely a staggering *977%*. Property Z's actual value prior to closing was *$47,000 less* than its appraised value. Based on the AVM analysis, the actual LTV ratio on Loan AA was 90%, not the 79.95% represented in the Offering Materials—a difference of *10.05%*.

191. Loan BB was issued to Borrower 33 on a property in California ("Subject Property AA") in February 2006. The borrower subsequently filed for bankruptcy. The SVHE 2006-OPT2 mortgage loan schedule stated that Subject Property AA was owner occupied. But the borrower's bankruptcy filing listed another property in California as her home address. The DTI and LTV ratios for Subject Property AA were also misrepresented in the Offering Materials. The SVHE 2006-OPT2 mortgage loan schedule stated that the borrower's DTI was only 38.92%, and the SVHE 2006-OPT2 Prospectus provided maximum DTI ratios of 55% and 60%. Contrary to these representations, in her bankruptcy filing, the borrower listed monthly income of *only $333* in 2006. Factoring in her monthly income and monthly debt payments, including a mortgage loan on the property that she actually occupied, the borrower's actual DTI ratio was likely *982%*. Property AA's actual value prior to closing was *$47,000 less* than its appraised value. Based on the AVM analysis, the actual LTV ratio on Loan BB was *115%,* not the 100% represented in the Offering Materials—a difference of *15%*.

### (13)   Loans Underlying SVHE 2006-OPT3

192. Prudential commissioned in-depth reports on two loans that collateralized its investments in SVHE 2006-OPT3. Prudential's Certificates are backed by loans from the Group II loan pool in the Securitization, and the loan analyzed below is likewise drawn from the Group II loan pool.

193. Loan CC was issued to Borrower 34 on a property in California ("Subject Property BB") in January 2006. The borrower subsequently filed for bankruptcy. Discrepancies

between the bankruptcy filing and the Offering Materials show that the DTI and LTV ratio for Subject Property BB was misrepresented in the Offering Materials. The SVHE 2006-OPT3 Prospectus provided maximum DTI ratios of 55% and 60%. Contrary to these representations, in his bankruptcy filing, the borrower listed *zero monthly income* at the time Loan CC closed in 2006, and *only $1,696* of monthly income later in 2006. Factoring in his monthly income and monthly debt payments, the borrower's actual DTI ratio was likely *either 397%, or cannot be calculated at all*. Property BB's actual value prior to closing was *$333,000 less* than its appraised value. Based on the AVM analysis, the actual LTV ratio on Loan CC was 84%, not the 63% represented in the Offering Materials—a difference of *21%*.

194.     Loan DD was issued to Borrower 35 on a property in Nevada ("Subject Property CC") in March 2006. The borrower subsequently filed for bankruptcy. The DTI ratio for Subject Property CC was misrepresented in the Offering Materials. The SVHE 2006-OPT3 Prospectus provided maximum DTI ratios of 55% and 60%. Contrary to these representations, in her bankruptcy filing, the borrower stated that she was a homemaker, and listed *zero monthly income* for 2006. Factoring in her complete lack of monthly income and high monthly debt payments, the borrower's actual DTI ratio *cannot even be calculated*. The LTV ratio for Loan DD was also misrepresented. Property CC's actual value prior to closing was *$451,000 less* than its appraised value. Based on the AVM analysis, the actual LTV ratio on Loan DD was *111%*, not the 74.98% represented in the Offering Materials—a difference of *36.02%*.

### (14)     Loans Underlying SVHE 2006-OPT4

195.     Prudential commissioned in-depth reports on 2 loans that collateralized its investments in SVHE 2006-OPT4. Prudential's Certificates are backed by loans from the Group II and aggregate loan pools in the Securitization, and the loans analyzed below are drawn from the Group II loan pool.

196.    Loan EE was issued to Borrower 36 on a property in Ohio ("Subject Property DD") in March 2006.  The borrower subsequently filed for bankruptcy.  The DTI and LTV ratios for Subject Property DD were misrepresented in the Offering Materials.  The SVHE 2006-OPT2 mortgage loan schedule stated that the borrower's DTI was only 41.82%, and the SVHE 2006-OPT2 Prospectus provided maximum DTI ratios of 55% and 60%.  Contrary to these representations, in her bankruptcy filing, the borrower listed monthly income of *only $2,772.68* in 2006.  Factoring in her monthly income and monthly debt payments, including on an auto loan and a piano loan, Borrower 36's actual DTI ratio was likely *238%*.  Property DD's actual value prior to closing was only $289,400—*less than half* of its appraised value.  Based on the AVM analysis, the actual LTV ratio on Loan EE was 190%, not the 74.97% represented in the Offering Materials—a difference of *115.03%*.

197.    Loan FF was issued to Borrower 37 on a property in California ("Subject Property EE") in March 2006.  The borrower subsequently filed for bankruptcy.  The DTI and LTV ratios for Subject Property EE were misrepresented in the Offering Materials.  The SVHE 2006-OPT4 mortgage loan schedule stated that the borrower's DTI was only 53.97%, and the SVHE 2006-OPT4 Prospectus provided maximum DTI ratios of 55% and 60%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $6,459.66* in 2006.  Factoring in his monthly income and monthly debt payments, which included two auto loans and a furniture loan, Borrower 37's actual DTI ratio was likely *118%*.  Property EE's actual value prior to closing was *$162,000 less* than its appraised value.  Based on the AVM analysis, the actual LTV ratio on Loan FF was 115%, not the 95% represented in the Offering Materials—a difference of *20%*.

### (15)    Loans Underlying SVHE 2006-OPT5

198.    Prudential commissioned in-depth reports on 2 loans that collateralized its investments in SVHE 2006-OPT5.  Prudential's Certificates are backed by loans from the Group II loan pool in the Securitization, and the loans analyzed below are likewise drawn from the Group II loan pool.

199.    Loan GG was issued to Borrower 37 on a property in Colorado ("Subject Property FF") in March 2006.  The borrower subsequently filed for bankruptcy.  The DTI ratio for Subject Property FF was misrepresented in the Offering Materials.  The SVHE 2006-OPT5 mortgage loan schedule stated that the borrower's DTI was only 39%, and the SVHE 2006-OPT5 Prospectus provided maximum DTI ratios of 55% and 60%.  Contrary to these representations, in her bankruptcy filing, the borrower listed monthly income of *only $3,285* in 2006.  Factoring in her monthly income and monthly debt payments, which included an auto loan and a student loan, the borrower's actual DTI ratio was likely *95%*.  The LTV ratio for Loan GG was also misrepresented.  Property FF's actual value prior to closing was *$51,000 less* than its appraised value.  Based on the AVM analysis, the actual LTV ratio on Loan GG was 116%**,** not the 96.89% represented in the Offering Materials—a difference of *19.11%*.

200.    Loan HH was issued to Borrower 38 on a property in Georgia ("Subject Property GG") in April 2006.  The borrower subsequently filed for bankruptcy.  The SVHE 2006-OPT5 mortgage loan schedule stated that Subject Property GG was owner occupied.  But the borrower's bankruptcy filing listed another property in Georgia as his home address.  The DTI and LTV ratios for Subject Property GG were also misrepresented in the Offering Materials.  The SVHE 2006-OPT5 Prospectus provided maximum DTI ratios of 55% and 60%.  Contrary to these representations, in his bankruptcy filing, the borrower listed monthly income of *only $2,666.66* in 2006.  The bankruptcy filing also shows that the borrower had an auto loan, a

66

student loan, and mortgage loans on two other properties in Georgia. Factoring in his monthly income and monthly debt payments, Borrower 38's actual DTI ratio was likely *219%*. Property GG's actual value prior to closing was only $110,000—*less than half* of its appraised value. Based on the AVM analysis, the actual LTV ratio on Loan HH was 195%, not the 99.96% represented in the Offering Materials—a difference of *95.04%*.

### C. The Results of Defendants' Third-Party Due Diligence Confirms They Were Systematically Securitizing Defective Loans

201. As discussed above, Defendants purchased many of the Mortgage Loans from unaffiliated Originators to fuel their securitization machines. Prior to a loan auction, the Originators would provide Defendants with bid sheets, which, among other things, dictated: (1) the percentage of the pool on which the investment banks would be permitted to conduct due diligence; and (2) the number of loans Defendants could "kick out" due to borrower deficiencies, payment delinquencies, early payment defaults, lack of documentation, and other problems. Prior to bid submission, Originators also send Defendants spreadsheets known as loan tapes, which contained various loan data. Defendants were supposed to "crack" the loan tapes, analyze them, and determine what prices to bid for the loan pools. Once this "bid package" analysis was complete, Defendants submitted their bids.

202. If the Originator accepted a bid, Defendants typically had a defined period of time prior to the settlement date to conduct due diligence on the loans. Defendants had their own due diligence teams, and also sometimes hired third-party due diligence firms such as Clayton or the Bohan Group ("Bohan") to conduct this review under their supervision. If an investment bank chose to kick out a large number of loans from a pool (e.g., because the loans failed to conform to the mortgage originator's guidelines), it risked being excluded from future loan purchases. As

a result, the banks, including Defendants, performed increasingly cursory due diligence on the loans they securitized.

203. As described by the FCIC's January 2011 report, reviews conducted by such entities as Clayton were intended to cover three areas: "credit, compliance, and valuation." (FCIC Report at 166.) This included answering such questions as whether the "loans meet the underwriting guidelines," "comply with federal and state laws, notably predatory-lending laws and truth-in-lending requirements," and "were the reported property values accurate." (*Id.*) The review also analyzed whether, to the extent a loan was deficient, there were any "compensating factors." (*Id.*)

204. Once Clayton identified deviations, the seller had the option to attempt to cure them by providing missing documentation or otherwise explaining to Clayton why a loan complied with the underwriting standards. If additional information was provided, Clayton re-graded the loan.

205. During 2006 and the first half of 2007, Clayton reviewed 911,039 loans issued by originators for securitization by its clients (including Defendants). According to the FCIC Report, only 54% of the nearly one-million loans reviewed by Clayton Holdings "met guidelines." (FCIC Report at 166.)

206. Each day, Clayton generated reports for RBS, as well as the loan seller, that summarized Clayton's review findings, including summaries of the loan files that suffered from exceptions to the relevant underwriting standards. Clayton provided its findings in exceptional detail, and despite the restrictions put on Clayton's activities, Clayton managed to identify a stunningly high number of defective loans.

207.    For instance, the FCIC found that from the first quarter of 2006 to the first quarter of 2007, *18% of the mortgages RBS submitted to Clayton for review were rejected as outside underwriting guidelines.*  RBS did not reject non-compliant loans, nor did it look to undertake additional diligence with respect to those faulty loans.  Instead, the FCIC showed that *RBS "waived" 53% of those rejected loans into securitizations.*

208.    That Defendants were providing so many "waivers" as a matter of course during the period at issue in this case confirms that Defendants were systematically securitizing defective loans—and, thus, confirms the Certificates here were similarly defective.  On information and belief, these high percentages of non-compliant loans were identified despite Defendants pressuring Clayton and other third-party due-diligence firms to provide reports in a very short time frame, with only limited re-verification of data, and to approve as many loans as possible.  (*See* Section III below.)  Thus, on information and belief, the percentage of loans securitized by Defendants that were truly problematic was in fact much higher than the astounding rates Clayton's reports indicate these firms managed to discover despite the limitations placed on its activities.

## D.    The Systemic Abandonment of the Third-Party Originators Confirms the Mortgage Loans Were Misrepresented

209.    As set forth below, the loans in the Securitizations were initially originated by third parties.

| Trust | Tranche | Group | Originator(s) | % of Origination |
|---|---|---|---|---|
| EMLT 2004-2 | M5 | Aggregate | EquiFirst Corp. | 100% |
| EMLT 2004-3 | M2, M4, M5, M6, M7 | All loans (no groups) | EquiFirst Corp. | 100% |
| EMLT 2005-1 | M2, M3, M4, M5, M6 | All loans (no groups) | EquiFirst Corp. | 100% |
| FHLT 2004-1 | M1, M6 | Aggregate | Fremont Investment & Loan | 100% |
| FHLT 2004-2 | M2 | Aggregate | Fremont Investment & Loan | 100% |

| FHLT 2004-D | M1 | Aggregate | Fremont Investment & Loan | 100% |
|---|---|---|---|---|
| FHLT 2005-C | M1, M3 | Aggregate | Fremont Investment & Loan | 100% |
| FHLT 2005-D | M1 | Aggregate | Fremont Investment & Loan | 100% |
| FHLT 2006-1 | 2A4 | Group 2 | Fremont Investment & Loan | 100% |
| FHLT 2006-2 | M1 | Aggregate | Fremont Investment & Loan | 100% |
| FHLT 2006-A | 2A4 | Group 2 | Fremont Investment & Loan | 100% |
| FHLT 2006-B | 2A3 | Group 2 | Fremont Investment & Loan | 100% |
| FHLT 2006-D | 2A4 | Group 2 | Fremont Investment & Loan | 100% |
| MMLT 2005-2 | M2 | Aggregate | Meritage Mortgage Corp. | 100% |
| RBSGC 2005-A | 3A | Group 3 | First National Bank of Nevada | 52.69% |
| | | | PHH Mortgage Corp. | 17.49% |
| | | | GreenPoint Mortgage Funding, Inc. | 14.16% |
| SVHE 2004-WMC1 | M2, M3, M4 | Aggregate | WMC Mortgage Corp. | 100% |
| SVHE 2006-EQ2 | A4 | All loans (no groups) | EquiFirst Corp. | 100% |
| SVHE 2006-NLC1 | A2, A3 | All loans (no groups) | First NLC Financial Services, LLC | 100% |
| SVHE 2006-OPT1 | 2A4 | Group 2 | Option One Mortgage Corp. | 100% |
| SVHE 2006-OPT2 | A4 | All loans (no groups) | Option One Mortgage Corp. | 100% |
| SVHE 2006-OPT3 | 2A4 | Group 2 | Option One Mortgage Corp. | 100% |
| SVHE 2006-OPT4 | 2A4 | Group 2 | Option One Mortgage Corp. | 100% |
| SVHE 2006-OPT4 | M1 | Aggregate | Option One Mortgage Corp. | 100% |
| SVHE 2006-OPT5 | 2A4 | Group 2 | Option One Mortgage Corp. | 100% |

210. The systemic breakdown of Defendants' own processes outlined above, showing a breakdown in the quality-control processes that should have prevented the securitization of defective loans, supports the conclusion that, in fact, Defendants routinely securitized defective loans, regardless of originator. That the Mortgage Loans initiated by the third-party Originators is also supported Prudential's loan-level analysis of the Mortgage Loans' misrepresented features and their recent dismal performance. But the defective nature of the third-party originated loans

is further confirmed by recent revelations about the Originators themselves. It has recently come to light that the third-party Originators had themselves systematically abandoned the stated underwriting guidelines. A sample of the governmental, documentary, and testimonial evidence of the third-party Originator's abandonment is summarized below.

      **(1)    Third-party Originator Option One Mortgage Corporation systematically abandoned its underwriting guidelines**

211.    Option One Mortgage Corporation ("Option One") originated all of the Mortgage Loans underlying the SVHE 2006-OPT1, SVHE 2006-OPT2, SVHE 2006-OPT3, SVHE 2006-OPT4, and SVHE 2006-OPT5 Securitizations.

212.    Option One was a national mortgage lender formerly owned by H&R Block, Inc., until its assets were sold to American Home Mortgage Servicing, Inc., in April 2008. According to the Comptroller of the Currency's "Worst Ten in the Worst Ten" list, a compilation of the worst mortgage originators in the ten metropolitan areas with the highest foreclosure rates, Option One was ranked as the sixth-worst mortgage originator by number of foreclosures as of March 22, 2010.

213.    Confidential witnesses confirm Option One's systemic abandonment of underwriting guidelines. Confidential Witness 1 ("CW1") was the Post-Closing Team Lead at Option One from December 2002 until 2007, when Option One shut down. CW1 stated that, during the appraisal process, mortgage loan underwriters at Option One would call their "appraiser friends" and communicate to the appraiser the requisite appraisal value for approval of the mortgage loan being underwritten.

214.    Confidential Witness 2 ("CW2") was a National Credit Underwriting Manager at Option One from 2001 to 2004. According to CW2, the institutions that purchased loans from

Option One "didn't care" about underwriting guidelines and only cared about the FICO scores of the borrowers.

215.    CW2 often saw that loans he refused to underwrite were subsequently underwritten by his co-workers.  In addition, if an applicant had a FICO score within guidelines, CW2 was not empowered to reject the application, even if he did not think the borrower would be able to repay the loan.

216.    Confidential Witness 3 ("CW3") was a Mortgage Underwriter at Option One from 2004 to 2006.  CW3 stated that Option One's sales force was primarily paid on commission, so the volume of mortgage loans originated was critical to them.  According to CW3, there was no consequence, either to Account Executives or Underwriters, if a borrower defaulted on his or her first mortgage payment.  In addition, Account Executives often went behind the backs of Underwriters who rejected a loan and would simply seek approval from management.

217.    According to CW3, stated income loans were difficult, and at times, impossible to verify.  Loans that met the guidelines but looked dubious, such as a cosmetologist or landscaper making an annual income of over $100,000, were made every day.  In spite of the fact that CW3 felt that the cosmetologist likely was not earning the income stated on the application, CW3 did not have discretion to reject the loan.  According to CW3, numerous loans with such misrepresentations were approved on a daily basis.  As to owner-occupancy fraud, CW3 estimated that approximately one loan file a day had a misrepresentation regarding owner occupancy status, and several such loans were funded every week.

218.    Confidential Witness 4 ("CW4") was an Underwriting Project Lead at Clayton, who oversaw third party due diligence of sample pools of loans, including those originated by

Option One.  CW4 discovered that Option One loans were exceptionally "bad loans . . . about as bad as could be."  According to CW4, Option One employed a practice known as "rugging."  This meant attributing purported "compensating factors" to loan applicants that bore no logical relationship to a lower credit risk.  Consequently, borrowers would be upgraded into products they could not afford based on what CW4 stated could, at best, be considered "wishful thinking."  CW4 also noted that Option One made loans with DTIs as high as 60% and relied on appraisals that were "real goofy."  In addition, according to CW4, Option One frequently refinanced loans that were six to eight months old, a practice that produces loans that are inherently presumed to be high risk.

219.    On June 3, 2008, the Massachusetts Attorney General filed an action against Option One, and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans.  (*See* Complaint, *Commonwealth v. H&R Block, Inc.*, CV No. 08-2474-BLS (Mass. Super. Ct. June. 3, 2008) (the "Option One Complaint").)  According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards . . . and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market."  (*See* Option One Complaint at ¶4.)  The Massachusetts Attorney General alleged that Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home."  (*Id. at* ¶8.)  It also "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices."  (*Id.*)  Option One's "origination policies . . . . employed from 2004 through 2007 have resulted in an explosion of foreclosures."  (*Id.* at ¶1.)

220.     On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction in the case, which prevented Option One from foreclosing on thousands of loans issued to Massachusetts residents.  (*See Commonwealth v. H&R Block, Inc.*, No. 08-2474-BLS1, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008).)  On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction.  (*See Commonwealth v. Option One Mortgage Co.*, No. 09-P-134, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).)

221.     On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million.  (*See* Massachusetts Attorney General Press Release, "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions," Aug. 9, 2011.)

### (2)     Third-party Originator Fremont Investment & Loan systematically abandoned its underwriting guidelines

222.     Fremont Investment & Loan ("Fremont") originated all of the Mortgage Loans underlying the FHLT 2004-1, FHLT 2004-2, FHLT 2004-D, FHLT 2005-C, FHLT 2005-D, FHLT 2006-1, FHLT 2006-2, FHLT 2006-A, FHLT 2006-B, and FHLT 2006-D Securitizations.

223.     According to the Senate Permanent Subcommittee:

> Fremont Investment & Loan was once the fifth largest subprime mortgage lender in the United States.  At its peak in 2006, it had $13 billion in assets, 3,500 employees, and nearly two dozen offices.  Fremont Investment & Loan was neither a bank nor a thrift, but an "industrial loan company" that issued loans and held insured deposits. . . . .  In June 2008, Fremont General Corporation declared bankruptcy under Chapter 11 . . . .

SPSI Report at 237-38.

224.     Fremont was shuttered by the FDIC in March 2007.  In 2009, it was reported that the FDIC's move against Fremont, at the direction of Chairperson Sheila Bair, was the first government action against a subprime lender.  As reported in the *New Yorker*: "Fremont was among the worst of the subprime offenders, using all the now familiar practices:  targeting

people with bad credit, ignoring traditional standards for underwriting home loans, paying third-party brokers handsomely to bring in gullible customers, and then infecting the larger financial system by selling off the hazardous loans. 'We ordered them out of the business,' she said. 'And they weren't happy about it.'" (Ryan Lizza, *The Contrarian: Sheila Bair and the White House financial debate*, New Yorker, July 6, 2009.) On June 18, 2008, Fremont filed for bankruptcy.

225. The FDIC, in its Order to Cease and Desist in the action styled *In the Matter of Fremont Investment & Loan, Brea, California*, Docket No. FDIC-07-035b, concluded that Fremont had been, among other things: "engaging in unsatisfactory lending practices, . . . marketing and extending [ARM] products to subprime borrowers in an unsafe and unsound manner, . . . approving borrowers without considering appropriate documentation and/or verification of their income, . . . approving loans or 'piggyback' loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the collateral . . . [and] making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms."

226. On December 9, 2008, the Supreme Judicial Court of Massachusetts affirmed a preliminary injunction that prevented Fremont from foreclosing on thousands of loans issued to Massachusetts residents. As a basis for its unanimous ruling, the Supreme Judicial Court found that the record supported the conclusion that "Fremont made no effort to determine whether borrowers could 'make the scheduled payments under the terms of the loan,'" and that "Fremont knew or should have known that [its lending practices and loan terms] would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow."

75

(*Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556 (Mass. 2008).) The terms of the preliminary injunction were made permanent by the June 9, 2009 settlement.

227. On June 9, 2009, Massachusetts Attorney General Martha Coakley announced a $10 million settlement with Fremont that resolved charges "that the company was selling risky loan products that it knew was designed to fail, such as 100% financing loans and 'no documentation loans.'" As alleged in the Attorney General's complaint:

> Fremont issued thousands of subprime loans, with multiple layers of risk, through mortgage brokers who regularly provided Fremont with false information that Fremont intentionally, recklessly or negligently failed to verify or audit . . . . Fremont knew or should have known substantial numbers of its subprime loans, especially absent prompt refinancing, would foreseeably fail and result in foreclosure, but nonetheless made the loans to promptly package and sell to the secondary market.

(*Commonwealth of Massachusetts v. Fremont Investment & Loan,* Case No. SUCV 2007-4373, dated October 4, 2007, at ¶2.)

228. Roger Ehrnman, Fremont's former regulatory compliance and risk manager, substantiated the findings of the Massachusetts Attorney General and the FDIC when he told the FCIC that Fremont repeatedly attempted to place rejected loans into the pools of mortgages that were to be sold to investors and "had a policy of putting loans into subsequent pools until they were kicked out three times." (FCIC Report at 168.)

229. Fremont was singled out by Senator Carl Levin in his opening remarks to the Permanent Subcommittee and Investigations' hearing on Wall Street and the financial crisis, noting they are "known for loans with high rates of delinquency." In her testimony to the FCIC, Vicki Beal, Senior Vice President of the due-diligence firm Clayton, was asked whether there were "some loan originators who just weren't as good as [the] others." She identified, among others, Fremont.

230.     Confidential Witness 5 ("CW5") was a Senior Loan Processor at Fremont from 2001 through May 2007.  CW5's job was to gather the documents necessary to satisfy the "stipulations" required by Fremont's underwriters (such as paystubs, tax returns, and appraisals). CW5 felt a sense of urgency and a pressure to close loans, and to possibly compromise lending standards, because of the "catch-22" created by the fact that underwriters and loan processors were only given bonuses on how many loans were closed—not how many were reviewed.  In gathering documents, CW5 had suspicions about incomes being claimed, such as "a waitress [that] was making an obscene amount of money."  Nonetheless, "we had to accept it."  The high claims of income, according to CW5, became a joke amongst personnel in the lending center. According to CW5, another "joke" amongst Fremont's lending center personnel was inflated appraisals.  It was "obvious" that many appraisers were "not impartial" and engaged in "a lot of shady stuff."

231.     Confidential Witness 6 ("CW6") was a loan processor at Fremont from 2002 to 2004, and a Senior Account Manager for Fremont in 2006.  CW6's duties included ensuring that the needed documents were included in the loan file.  There was not only a quota of loans that the underwriters had to hit, but they were paid for every extra loan, and the entire team got paid even more if they collectively closed a given number of loans.  According to CW6, there were "some dubious loans" at the time, and underwriters would be "persuaded" to approve loans they were unsure about.  Appraisals could "get a little sticky," and CW6 had heard of instances where comparable sales were left off because they did not assist the needed appraisal.

232.     Confidential Witness 7 ("CW7") was a Compliance Analyst at Fremont in 2005 and 2006 that was responsible for investigating suspicious activity.  CW7 noted that Fremont had very high loan production goals for its lending centers, but its compliance staffing was "very

low." CW7 formed the conclusion that management's understanding and interest in risk and compliance matters was "fairly low." Overall, the percentage of files CW7 examined that had compliance-related shortcomings was "pretty high," suggesting a "structural process problem." He could not help but notice that many large loans were being granted to borrowers claiming assets in the form of automobiles and jewelry—yet, suspiciously, little cash in the bank.

233.     On information and belief, former Fremont employees will testify that:

- Fremont's Regulatory Risk Management group submitted numerous, repeated adverse written findings to senior Fremont executives in 2005 and 2006, which highlighted, among other things, unfair and deceptive acts, poor underwriting, and problematic incentive compensation.

- Fremont filed repeated Suspicious Activity Reports ("SARs") regarding broker fraud as to certain brokers, but Fremont executives would not end its relationships with the identified brokers.

- Fremont underwriters were instructed that Fremont's underwriting policies were merely a "guide," and broad use of exceptions to the policies was promoted in order to drive loan quantity. Indeed, between 2005 and 2007, an estimated 30% of Fremont's loans had some sort of exception, partly because anyone from an assistant manager on up had the authority to approve exceptions.

- Fremont would convert borrowers who were rejected under full documentation loan applications to "stated income" loans—with a higher reported income than previously documented—so that the loans were ultimately approved.

- Fremont underwriters would ignore obviously fraudulent documents when approving loans, and when information could not be falsified—such as pay stubs—Fremont underwriters would simply remove it from the application files.

- Fremont underwriters would call appraisers and directly request that they inflate their appraisal values in order to close a deal.

- Fremont experienced rampant fraud with regard to appraisals, such as appraisals that were incomplete, did not match the address of the property, or described the home as owner-occupied, when it was rented.

**(3)** **Third-party Originator WMC Mortgage Corporation systematically abandoned its underwriting guidelines**

234. WMC Mortgage Corporation ("WMC") originated all of the Mortgage Loans underlying the SVHE 2004-WMC1 Securitization.

235. WMC employed reckless underwriting standards and practices that resulted in a huge amount of foreclosures, ranking WMC fourth in the report presented to the FCIC in April 2010 identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. *See* OCC Press Release, "Worst Ten in the Worst Ten." General Electric, which had purchased WMC in 2004, closed down operations at WMC in late 2007 and took a $1.4 billion charge in the third quarter of that year. (*See, e.g.*, Diane Brady, Adventures of a Subprime Survivor, *Bloomberg Businessweek*, Oct. 29, 2007, *available at* http://www.businessweek.com/magazine /content/07_44/b4056074.htm.)

236. In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees against WMC Mortgage and its principal owners individually. (*See* Statement of Charges, No. C-07-557-08-SC01, Jun. 4, 2008.)

237. The Statement of Charges referenced a review of 86 loan files, which revealed that at least 76 of 86 loans originated by WMC as late as October 6, 2006 were defective or otherwise in violation of Washington state law. (*Id.*) Among other things, the investigation uncovered that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers, and committed many other violations of Washington State deceptive and unfair practices laws. (*Id.*)

79

238.     A review by a mortgage-backed securities trustee holding WMC loans—and thus, by someone who, unlike Prudential, has access to WMC's actual loan files—also found that many of them were defective.  The trustee found that WMC's such basic representations as that no fraud had taken place, and that the loans complied with WMC's underwriting guidelines, "were false when made."  A review of 200 loan files (some of which were from a co-originator, EquiFirst, also at issue in this case) found a 75% error rate.

239.     For example, the trustee's re-underwriting found that a Mortgage Loan originated by WMC was plagued with misrepresentations of the borrower's income, debt liabilities and occupancy status.  In particular, whereas the borrower stated on his loan application that he earned $14,782 per month performing "account analysis," the borrower's income tax returns for the 2005 and 2006 years made it unambiguously clear that he was a taxi driver with a monthly income of only $1,548.  Further, the borrower's credit report disclosed two additional mortgages in the amount of $435,000, or an additional monthly liability of $3,094, which the borrower failed to disclose on his loan application.  Finally, contrary to the borrower's representations, the property he sought to purchase with the loan in question was not the borrower's primary residence, and as a result, the rental obligations of the borrower's actual primary residence added another $2,200 of monthly debt liabilities.  In sum, if the borrower's characteristics were viewed in a true and accurate light, the borrower's debt to income ratio ("DTI") rose from an acceptable 34.9% to an incredible 761.7%.

240.     According to the trustee's review of the related loan file and other information, another Mortgage Loan originated by WMC likewise contained numerous misrepresentations of the borrower's income, the co-borrower's income, and the borrower's undisclosed debt liabilities. Specifically, instead of her stated $9,200 monthly income as a billing manager, the

borrower actually worked as an optometric technician, making $2,405 per month. Similarly, the co-borrower misrepresented his income and occupation to be $8,800, earned as a grade check, rather than the actual $2,843, earned as a laborer. Moreover, in the same month the borrower closed this loan, the borrower had also refinanced another, unrelated property, which increased her debt liabilities by over $100,000. The borrower's loan application did not reflect the refinancing and the associated DTI increase. Even without the additional debt obligation resulting from the refinancing, the borrower's actual DTI increased from a reasonable 31.7 percent to an impermissible 108.8%.

241. Based on the trustee's re-underwriting of a large sample of loans—the same type of loans, generated by the same originator, at the same time as at issue in this case—the trustee had "compelling reason to believe that the vast majority" of the WMC loans it held were infected with similar frauds. The consistency of the trustee's findings with Prudential's own loan-level analysis of the specific WMC loans at issue in this case, as well as its consistency with the findings of the Washington State Department of Financial Institutions, confirms that WMC's underwriting problems were systemic.

242. On January 20, 2012, the *L.A. Times* reported that the FBI and United States Department of Justice have been investigating possible mortgage origination fraud at WMC. According to the *L.A. Times*, "the government is asking whether WMC used falsified paperwork, overstated income and other tactics to push through questionable loans"; "the FBI's San Francisco office … has been looking into WMC's business practices for nearly two years"; and "the bureau has examined individual WMC loan files and has begun contacting former employees about how the lender handled the sales of mortgages to investors." (Michael Hudson and E. Scott Reckard, "GE Lending Unit Said to be Target of U.S. Probe," *L.A. Times* (January

20, 2012), *available at* http://articles.latimes.com/2012/jan/20/business/la-fi-mortgage-probe-20120120.)

243.    Former WMC employees have also provided first-hand evidence that WMC not only abandoned its underwriting standards and practices, but that WMC and its employees engaged in out-and-out fraud to increase profits and commissions.  These employees provided this evidence in interviews with *iWatch News,* which acts as an online publication dedicated to investigative and accountability reporting for the Center for Public Integrity, one of the oldest and largest non-partisan, non-profit investigative news organizations.  Dave Riedel, a former compliance manager at WMC who supervised a quality-control team of a dozen or more people in Southern California, told *iWatch News* that WMC "sales reps intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors."  (Michael Hudson, "Fraud and folly: The untold story of General Electric's subprime debacle," *iWatch News* (January 6, 2012, last updated January 23, 2012), *available at* http://www.iwatchnews.org/2012/01/06/7802/fraud-and-folly-untold-story-general-electric-s-subprime-debacle.)

244.    Reidel and his team uncovered numerous examples of fraud committed by WMC employees.  "These included faking proofs of loan applicants' employment and faking verifications that would-be home buyers had been faithfully paying rent for years rather than, say, living with their parents.  Some employees also fabricated borrowers' incomes by creating bogus W-2 tax forms …."  In 2005, Riedel and his team became particularly concerned about a sales manager who oversaw the funding of hundreds of loans each month.  Riedel told *iWatch News* that "[a]n audit of those loans… found that many of the deals showed evidence of fraud or other defects such as missing documents."  Riedel brought these concerns to WMC's

management, which took no disciplinary action against the sales manager.  Later, Riedel

informed a visiting GE compliance official of the audit and of WMC's failure to respond.  As

apparent payback for alerting management to the fraud he uncovered, Riedel lost his office and

staff and was demoted.

245.    In May of 2006, Riedel presented GE officials with results of an internal audit of

loans that investors had asked WMC to repurchase, which indicated that "78 percent of them had

been fraudulent" and "nearly four out of the five loan applications backing these mortgages had

contained misrepresentations about borrower's incomes or employment."  Upon information and

belief, WMC made no changes to its origination practices, procedures, or internal control in

response to Riedel's presentation.

246.    Gail Roman, a former loan auditor at WMC's regional offices in Orangeburg,

NY, informed *iWatch News* that she "dug up persuasive evidence of inflated borrower incomes

and other deceptions on loan applications," but "[m]anagement ignored [her] reports and

approved the loans anyway."  Roman reported that WMC "didn't want to hear what you found . .

. .[e]ven if you had enough documentation to show that there was fraud or questionable activity."

247.    Victor Argueta, a former risk analyst at WMC, told *iWatch News* that "one top

sales staffer escaped punishment even though it was common knowledge he was using his

computer to create fake documents to bolster applicants' chances of getting approved."  These

documents included bank statements, W-2s and "'[a]nything to make the loan look better than

what was the real story.'"  In another instance, Argueta reported to management that certain

salespeople "were putting down fake jobs on borrowers' loan applications" and "listing their

own cell phone numbers so they could pose as the borrowers' supervisors and 'confirm' that the

borrowers were working at the made-up employers." Despite's Argueta's report, WMC's management took no action against the offending salespeople.

### (4) Third-party Originator First NLC systematically abandoned its underwriting guidelines

248. First NLC Financial Services, Inc. ("First NLC") originated all of the Mortgage Loans underlying the SVHE 2006-NLC1 Securitization.

249. First NLC was one of the top subprime residential mortgage lenders in the United States. The company was sold in 2007 to an affiliate of the private equity firm Sun Capital Partners. In January of 2008, the company announced that it had ceased loan origination, and filed for bankruptcy later that month.

250. In 2000, First NLC's first full year of operations, its loan origination volume sat at $308.9 million. First NLC was able to expand its loan originations over the next six years, becoming one of the top subprime originators, accounting for over $7.4 billion in mortgage loans in 2006 alone.

251. First NLC accomplished this growth by abandoning its underwriting guidelines and sound business practices, as confirmed by numerous investigations, as well as its own bankruptcy filings.

252. For instance, First NLC settled accusations with the Pennsylvania Department of Banking, based on writing mortgages from an unlicensed location.

253. An investigation by the Washington Department of Financial Institutions, Division of Consumer Services found that First NLC did not maintain proper books and records, in violation of the state Consumer Loan Act. This was based on First NLC's repeated failures to locate loan files that the government had requested for examination. The failure to even be able

to produce loan files requested by a government agency evidences the complete breakdown that occurred within First NLC's operations.

254.    Of the loan files First NLC was able to actually produce, the Washington Department of Financial Institutions found that *22%* demonstrated on their face that lending-law violations had occurred.  Engaging in lending-law violations represent an obvious failure to generate loans within the stated guidelines.  Indeed, the Offering Materials for SVHE 2006-NLC1 confirmed that:  "The Originator [i.e., First NLC] will represent that as of the Closing Date, each Mortgage Loan originated by the Originator is in compliance with applicable federal, state and local laws and regulations."

255.    A final order was entered against First NLC, revoking its license to conduct business in the state of Washington, and prohibiting it from participating in any other consumer loan companies for a period of five years.

256.    A similar investigation by the California Department of Corporations also found that First NLC was "conducting residential mortgage lending and/or servicing business . . . in such an unsafe and injurious manner as to render further operations hazardous to the public or to customers."  The Department of Corrections also later found that First NLC had not maintained and filed the lending reports required by state law, such as an Independent Auditor's Report on Internal Controls.  The company was ordered to cease lending and servicing activities in the state, and later had its license revoked.

257.    Before closing, First NLC disclosed large loss provisions, and was increasing its reserves, in response to costs associated with the expected need for the company to buyback defective loans.  Nonetheless, First NLC was forced to close its doors after being asked by Wall Street banks that had securitized its loan to buy back millions of dollars worth loans due to

breaches of First NLC's representations and warranties. Indeed, the bankruptcy filings revealed that the top seven unsecured creditors—six of them, banks that were heavily involved in the securitization of mortgage loans, like Defendants here—all had claims arising out of breaches of First NLC's representations and warranties.

### (5) Third-party Originator EquiFirst systematically abandoned its underwriting guidelines

258. EquiFirst Corp. ("EquiFirst") originated all of the Mortgage Loans underlying the EMLT 2004-2, EMLT 2004-3, EMLT 2005-1, and SVHE 2006-EQ2 Securitizations.

259. EquiFirst was at one time the twelfth largest subprime mortgage wholesale originator in the United States. It used over 9,000 independent brokers, but had only 600 employees to oversee those brokers and ensure they were abiding by the stated underwriting standards. Months after being acquired by Barclays, the acquiring bank began slashing jobs, and eventually shut down the company's operations entirely less than a year later.

260. A review by a mortgage-backed securities trustee holding EquiFirst loans—and thus, by someone who, unlike Prudential, has access to EquiFirst's actual loan files—found that many of them were defective. The trustee found that EquiFirst's such basic representations as that no fraud had taken place, and that the loans complied with EquiFirst's underwriting guidelines "were false when made." A review of 200 loan files (some of which were from a co-originator, WMC, also at issue in this case) found a 75% error rate.

261. For example, the trustee's re-underwriting found that a Mortgage Loan originated by EquiFirst was afflicted with borrower misrepresentations as to income, undisclosed debt liabilities and occupancy status. In particular, the borrower's employment and income as stated on the original loan application, indicated that the borrower worked as a defense contract program director, earning total monthly income of $13,250. However, a subsequent verification

with the borrower's place of employment revealed that the borrower actually worked as an associate, earning a monthly income of $9,019. Further, the borrower was qualified for the loan based on his total housing expense of $4,771 and total monthly obligations of $1,710, resulting in total monthly liabilities of $6,481.37. However, according to his credit report and other public documents, the borrower had additional monthly debt obligations in the amounts of $1,764, $1,408, $2,976, $2,301, $4,227, $647, $1,025, and $1,190, which in aggregate added $15,538 to the borrower's debt obligations per month. As a result of his lower income and higher debt obligations, the borrower's DTI rose from an acceptable 48.9% to an unacceptable 244.1%. Finally, although the borrower had represented that the underlying property for the loan would be his primary residence, public records demonstrate that the borrower did not occupy the subject property as a primary residence and that two unrelated individuals had turned on the utilities at the property—an indicator that the borrower utilized the subject property as a rental.

262. Based on the trustee's re-underwriting of a large sample of loans—the same type of loans, generated by the same originator, at the same time as at issue in this case—the trustee had "compelling reason to believe that the vast majority" of the EquiFirst loans it held were infected with similar frauds. The consistency of the trustee's findings with Prudential's own loan-level analysis of the specific EquiFirst Mortgage Loans at issue in this case confirms that EquiFirst's underwriting problems were systemic.

### (6) Third-party Originator PHH systematically abandoned its underwriting guidelines

263. PHH Mortgage Corp. ("PHH") originated 17.49% of the Mortgage Loans underlying the RBSGC 2005-A Securitization. In its Form 10-Q filed on August 8, 2008, PHH admitted to "loans with origination flaws," and that the demand for its mortgages in the secondary market had therefore declined. Confidential Witness 8 ("CW8") was a Junior

Underwriter at PHH from 2005 until October 2007, and had been with PHH in other capacities since 1996.  CW8 noted that PHH approved anything when it came to stated income-stated asset loans because there was next to no documentation required.  Even when CW8 would submit possible fraudulent loans to PHH's fraud department, nearly all such loans were returned to her with approval.

264.    On information and belief, former PHH employees will confirm the breakdown of PHH's underwriting process.  For example, they will testify that:  (a) PHH employees faced intense pressure to close loans at any cost, primarily because their commissions were based on the number of loans they closed; (b) PHH employees manipulated data in order to close loans, and knowingly included false information and inflated values in loan applications; (c) PHH had a policy that prohibited underwriters from investigating the veracity of the income stated on loan applications; and (d) PHH increasingly approved risky, low- or no-documentation loans without adequate review.

### (7)    Third-party Originator GreenPoint systematically abandoned its underwriting guidelines

265.    GreenPoint originated 14.16% of the Mortgage Loans underlying the RBSGC 2005-A Securitization.

266.    In November 2008, Businessweek Magazine reported that GreenPoint's employees and independent mortgage brokers targeted borrowers who were less able to afford the loan payments they were required to make, and many had no realistic ability to pay back the loans.  GreenPoint Mortgage Funding, Inc.'s parent corporation, Capital One Financial Corp., eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

267.    GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California, 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California, 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada.

268.    GreenPoint is now a defendant in numerous lawsuits alleging misrepresentations regarding the quality of the loans GreenPoint underwrote and originated.  For example, in *U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc.,* No. 09-600352 (N.Y. Sup. Ct. filed Apr. 22, 2009), a consultant's investigation concluded that 93 percent of the loans that GreenPoint sold contained errors, omissions, misrepresentations, and negligence related to origination and underwriting.  The investigation found that GreenPoint loans suffered from serious defects including:

- Pervasive misrepresentations and/or negligence with respect to the statement of the income, assets or employment of the borrower.

- Violations of GreenPoint's own underwriting guidelines and prudent mortgage lending practices, including loans made to borrowers (i) who made unreasonable claims as to their income, (ii) with multiple, unverified social security numbers, (iii) with credit scores below the required minimum, (iv) with debt-to-income and/or loan-to-value ratios above the allowed maximum or (v) with relationships to GreenPoint or other non-arm's-length relationships.

- Misrepresentations of the borrower's intent to occupy the property as the borrower's residence and subsequent failure to so occupy the property.

- Inflated appraisal values.

269.    On March 3, 2010, the court denied GreenPoint's motion to dismiss this claim, holding that discovery would be required to determine whether GreenPoint would be required

under the parties' contract to repurchase all 30,000 loans based on the deficiencies in individual
loans identified by U.S. Bank.

### (8) Third-party Originator First National Bank of Nevada systematically abandoned its underwriting guidelines

270.    First National Bank of Nevada ("FNBN") originated 52.69% of the Mortgage
Loans underlying the RBSGC 2005-A Securitization.

271.    The Office of the Comptroller of the Currency closed the First National Bank of
Nevada; the Federal Deposit Insurance Corporation was appointed as its receiver.  According to
the Comptroller, the bank had engaged in "unsafe and unsound business practices."  Multiple
courts, including the First Circuit, have upheld allegations that First National Bank of Nevada
had engaged in a "wholesale abandonment of underwriting standards*." See Plumbers' Union
Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (6th Cir. 2011); *In
re Morgan Stanley Mortg. Pass-Through Cert. Litig.*, 810 F. Supp. 650 (S.D.N.Y. 2011).  These
courts' findings, as well as the statements of former insiders those courts relied, are confirmed by
Prudential's own loan-level analysis of the Mortgage Loans at issue here, showing that the loans
from the deal in which First National Bank of Nevada contributed were systematically
misrepresented.

### E.    Additional Evidence That Defendants Systematically Misrepresented The Quality of Their Securitizations

272.    Defendants' systematic misrepresentation of the quality of the RMBS that they
created and sold to investors like Prudential is further evidenced by numerous investigations and
lawsuits regarding Defendants' operations.

273.    For instance, the Federal Housing Finance Agency ("FHFA"), as conservator for
Fannie Mae and Freddie Mac, conducted a forensic review of 2,405 loans from the SVHE 2007-
OPT1 Securitization.  The forensic review—which, Prudential cannot do because it has not been

given access to the loan files like FHFA has—found that an astonishing **80%** of the loan files revealed that the mortgage had not been written within the stated guidelines, or otherwise breached RBS's representations. FHFA conducted a similar loan-file review for 200 loans in the OOMLT 2007-4 Securitization. The forensic review found that an astonishing **86%** of the loan files revealed that the mortgage had not been written within the stated guidelines, or otherwise breached RBS's representations.

274.    The Securitizations that FHFA analyzed are probative of problems underlying Prudential's Certificates because the defendants' problems were systemic, and because the collateral pools for the securitizations that FHFA investigated were composed of the same type of collateral underlying some of Prudential's Certificates. The SVHE 2007-OPT1 Securitization was in the same series of offerings, and featured the same parties (RBS Financial Products as sponsor, FAS Corp. as depositor and RBS Securities as underwriter), same originator (Option One), and nearly identical structure and disclosures as the as the SVHE 2006-OPT1, SVHE 2006-OPT2, SVHE 2006-OPT3, SVHE 2006-OPT4, and SVHE 2006-OPT5 Securitizations that Prudential purchased. Similarly, the OOMLT 2007-4 Securitization included Option One as the originator, and RBS Securities as the underwriter, as did the SVHE 2006-OPT1, SVHE 2006-OPT2, SVHE 2006-OPT3, SVHE 2006-OPT4, and SVHE 2006-OPT5 Securitizations that Prudential purchased. In addition, FHFA's findings are consistent with, and confirmed by, Prudential's statistical analyses of the Certificates here, discussed above. Thus, on information and belief, all of FHFA's findings , made upon a review of the defendants' own loan files, apply equally to all of the Certificates at issue here.

275.    FHFA's reviews consisted of an analysis of the loan file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as

well as an analysis of extrinsic information, such as a borrower's motor vehicle registration,

documents indicating a borrower's assets or residence, and other information that was available

at the time of the loan application.  It also included documents drawn from the borrowers' filings

in bankruptcy proceedings, and other sources of information.

276.    Contrary to representations regarding the loans' adherence to a given set of

underwriting guidelines, purportedly designed to assess the borrowers' ability to repay, FHFA's

loan-file review found such pervasive problems as:  (a) failure to test the reasonableness of the

borrower's stated income, resulting in a material misrepresentation of income; (b) failure to

investigate the intention to occupy the property, despite red flags existing in the loan files that

the borrower never intended to occupy the property; (c) failure to calculate properly the

borrower's outstanding debts, causing such statistics as the debt-to-income ratio to exceed the

maximum allowed under the guidelines; and (d) failure to investigate red flags on the borrower's

credit reports that should have alerted the underwriter to misrepresentations of outstanding debt.

277.     For example, according to FHFA, in the following loans there was no evidence in

the loan file that the underwriter tested the reasonableness of the borrower's stated income for

the employment listed on the application, as required by the applicable guidelines.  A forensic

review by FHFA confirmed that, in fact, the income for the following example loans were

misrepresented:

- A loan that closed in March 2007 with a principal amount of $71,400 was
  originated under Option One's Stated Income loan program and included in the
  SVHE 2007-OPT1 Securitization.  The loan application stated that the borrower
  was an account representative earning $20,000 per month.  The borrower's stated
  income exceeded Payscale.com's 90th percentile salary for an account
  representative in the same geographic region, which should have put a reasonably
  prudent underwriter on notice for potential misrepresentation.  There is no
  evidence in the file that the underwriter tested the reasonableness of the stated
  income.  Had the underwriter done so, the misrepresentation of income would
  have been uncovered.  Moreover, in a Statement of Financial Affairs filed by the

borrower as part of a Chapter 7 bankruptcy proceeding, the borrower reported an income in 2007 of $3,500 per month. A recalculation of DTI based on the borrower's verified income yields a DTI of 234.97 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $43,762.78, which is over 61 percent of the original loan amount.

- A loan that closed in February 2007 with a principal amount of $270,505 was originated under Option One's Low Documentation Program and included in the SVHE 2007-OPT1 Securitization. The loan application stated that the borrower was employed as a truck driver earning $9,653.00 per month. The borrower's stated income exceeded CBSalary.com's 90th percentile salary for a truck driver in the same geographic region, which should have put a reasonably prudent underwriter on notice for potential misrepresentation. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. Had the underwriter done so, the misrepresentation of income would have been uncovered. Moreover, in a Statement of Financial Affairs filed by the borrower as part of a Chapter 7 bankruptcy proceeding, the borrower reported a 2006 income of $2,055 per month. A recalculation of DTI based on the borrower's verified same year income yields a DTI of 219.29 percent which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $251,800.59, which is 93 percent of the original loan amount.

- A loan that closed in February 2007 with a principal amount of $285,000 was originated under Option One's Low Documentation loan program and included in the SVHE 2007-OPT1 Securitization. The loan application stated that the borrower was a refrigeration technician for 26 years, earning $15,000 per month. The borrower's stated income exceeded the U.S. Bureau of Labor Statistics's 90th percentile salary for a refrigeration technician in the same geographic region, which should have put a reasonably prudent underwriter on notice for potential misrepresentation. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. Had the underwriter done so, the misrepresentation of income would have been uncovered. Moreover, in a Statement of Financial Affairs filed by the borrower as part of a Chapter 13 bankruptcy proceeding, the borrower reported an income in 2007 of $5,229 per month. A recalculation of DTI based on the borrower's verified income yields a DTI of 120.56 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $217,393.96, which is 76 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $214,200 was originated under Option One's Low Documentation loan program. The loan application stated that the borrower was a clinical auditor earning $8,258 a month. The borrower's stated income exceeded CBSalary.com's 90th percentile salary

for a clinical auditor in the same geographic region, which should have put a reasonably prudent underwriter on notice for potential misrepresentation. Moreover, in a Statement of Financial Affairs filed by the borrower as part of a Chapter 7 bankruptcy proceeding, the borrower reported an income in 2007 of $1,062 per month. A recalculation of DTI based on the borrower's verified income yields a DTI of 549.3 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $92,172.92, which is over 43 percent of the original loan amount.

- A loan that closed in December 2006 with a principal balance of $288,000 was originated under Option One's Stated Income Loan Program and included in the OOMLT 2007-4 Securitization. The loan application stated that the borrower was employed as a medical administrator earning $6,675 per month. The borrower's stated income exceeded Payscale.com's 90th percentile salary for a medical administrator in the same geographic region. Moreover, in the Statement of Financial Affairs filed January 15, 2008 by the borrower as part of a Chapter 7 bankruptcy proceeding, the borrower reported total income of $23,985 for 2006, resulting in an average monthly income of $1,999. There is no evidence in the file that the underwriter tested the reasonableness of the stated income. Had the underwriter done so, the misrepresentation of income would have been uncovered. A recalculation of DTI based on the borrower's verified income yields a DTI of 157.32 percent, which exceeds the guideline maximum allowable DTI of 50 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $221,801, which is 77 percent of the original loan amount.

278. By way of further examples, FHFA reviewed the loan files and other evidence to whether there were red flags regarding the purported intent of the borrower to occupy the mortgaged properties. FHFA found that, for many properties, such red flags were simply ignored:

- A loan that closed in March 2007 with a principal amount of $171,000 was originated under Option One's Low Documentation Program. The loan was a rate and term refinance transaction. The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner occupied. The home owner's insurance policy for the subject property has a different mailing address for the borrower than the subject property. No evidence in the file indicates that the underwriting process addressed this inconsistency, and the loan was underwritten as if the property was owner occupied. The loan defaulted and the property was liquidated in a

foreclosure sale, resulting in a loan loss of $190,507.37, which is more than 100 percent of the original loan amount.[7]

- A loan that closed in March 2007 with a principal amount of $235,000 was originated under Option One's Full Documentation Program. The loan was a cash out refinance. The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner-occupied. The loan application reflected the borrowers' mailing address as being different than the subject property. One of the borrowers provided a current pay stub for primary and secondary employment and six 2006 W-2 forms that all listed a different address than the subject property. The co-borrower provided a current Social Security award letter with a different address than the subject property. At closing, the borrowers completed an "Address and Phone Number Certification" that listed the borrowers' nearest relative, who was not living with the borrowers, as the occupant of the subject property. No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loan loss of $173,112.57, which is more than 73 percent of the original loan amount.

- A loan that closed in December 2006 with a principal amount of $61,200 was originated under Option One's Full Documentation Program. The loan was a refinance. The underwriting guidelines for this loan required that at least one of the borrowers occupy the subject property and the loan was represented as owner occupied. The loan file contained income documentation, hazard insurance, origination credit report, payoff statements and 2005 tax returns that each reflected the borrowers' rental property address in Florida as their primary residence, and not the subject property's address, which is in Pennsylvania. No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied. The borrowers have filed for bankruptcy and the loan is delinquent, with a current unpaid balance of $60,243.08, which is more than 98 percent of the original loan amount.

- A loan that closed in November 2006 with a principal balance of $120,000 was originated under Option One's Stated Income Loan Program and included in the OOMLT 2007-4 Securitization. The underwriting guidelines for this loan required that the borrower occupy the subject property, and the loan was represented as owner occupied. However, a forensic review of the loan file reveals that the borrower did not reside at the subject property. Although the loan was approved as a re-finance of an owner-occupied residence, the tax bill for the subject property, which appeared in the origination loan file, shows that there was no homestead exemption, i.e., a tax exemption for primary residences, taken for taxes due in October 2006. At the time of closing, county tax records indicated

---

[7] Loan losses may amount to more than 100 percent of the original loan amount due to loan service costs and costs incurred in the course of foreclosure and liquidation of the property.

that the borrower had previously purchased another property, and Department of Motor Vehicle records reflected that the borrower had resided at the other address from June 1988 through May 2007. No evidence in the file indicates that the underwriting process addressed these inconsistencies, and the loan was underwritten as if the property was owner occupied. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $58,568.91, which is more than 48 percent of the original loan amount.

279. FHFA provided more examples of loan files that revealed that the loans had been generated far outside the guidelines, despite clear red flags:

- A loan that closed in March 2007 with a principal amount of $53,400 was originated under Option One's Full Documentation Program. A credit report included in the origination loan file dated prior to closing showed additional liabilities totaling $59,330. In addition, the borrower's pay stub dated prior to closing revealed deductions for court-ordered child support totaling $444 per month. A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 42.32 percent to 61.13 percent, which exceeds the applicable underwriting guideline maximum of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $54,642.76, which is more than 100 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $205,485 was originated under Option One's Full Documentation Program. A credit report included in the origination loan file dated prior to closing shows 15 inquiries within the prior 90 days, including numerous inquiries from mortgage lenders and servicers. In the two months prior to the closing of the subject loan, the borrowers obtained three undisclosed mortgages totaling $614,725. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrowers. A recalculation of DTI based on the borrowers' undisclosed debt yielded a DTI of 108.73 percent, which grossly exceeds the applicable underwriting guideline maximum of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $222,500.76, which is more than 100 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $220,575 was originated under Option One's Full Documentation Program. A credit report included in the origination loan file dated prior to closing shows 29 inquiries within the prior 90 days, including numerous inquiries from mortgage lenders and servicers. In the six months prior to the closing of the subject loan, the borrowers obtained three undisclosed mortgages totaling $742,500. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrowers. A recalculation of DTI based on the

borrowers' undisclosed debt yields a DTI of 119.07 percent, which grossly exceeds the applicable underwriting guideline maximum of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $165,518.85, which is 75 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $130,500 was originated under Option One's Low Documentation Program. A credit report included in the origination loan file dated prior to closing shows 16 inquiries within the prior 90 days, including numerous inquiries from mortgage lenders and servicers. In the month prior to the closing of the subject loan, the borrowers obtained an undisclosed mortgage in the amount of $486,400 and in the month after the closing of the subject loan, the borrowers obtained an undisclosed mortgage in the amount of $394,250, totaling $880,650 in undisclosed mortgages. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrowers. A recalculation of DTI based on the borrowers' undisclosed debt yielded a DTI of 123.11 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $95,233.28, which is more than 72 percent of the original loan amount.

- A loan that closed in March 2007 with a principal amount of $198,000 was originated under Option One's Low Documentation Program. A credit report included in the origination loan file dated prior to closing shows 17 inquiries within the prior 90 days, including numerous inquiries from mortgage lenders and servicers. Around three months prior to the closing of the subject loan, the borrower obtained an undisclosed mortgage in the amount of $713,124. There was no evidence in the origination loan file that the loan underwriter researched these credit inquiries or took any action to verify that such inquiries were not indicative of undisclosed liabilities of the borrower. A recalculation of DTI based on the borrower's undisclosed debt yields a DTI of 143.39 percent, which grossly exceeds the guideline maximum allowable DTI of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $164,494.75, which is 83 percent of the original loan amount.

- A loan that closed in October 2006 with a principal balance of $79,000 was originated under Option One's Stated Income Loan Program and included in the OOMLT 2007-4 Securitization. A credit report included in the loan origination file and dated prior to closing showed that in October 2006 the borrower obtained an auto loan with a $385 monthly payment and refinanced a second home with a $3,101 monthly payment. There is no evidence in the file that the loan underwriter took these additional debt obligations into account in originating the loan despite being on notice of them through the credit report. Moreover, the credit report included in the loan origination file and dated prior to closing showed a credit inquiry from the lender that listed the auto loan as well as an additional eight credit inquiries over the previous 90 days. There is no evidence

in the file that the loan underwriter took these nine credit inquiries into account in originating the loan. A recalculation of the DTI that includes the borrower's undisclosed debt (auto loan and second home refinance) results in an increase from 31.68 percent to 69.94 percent, which exceeds the guideline maximum of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $83,101.85, which is more than 100 percent of the original loan amount.

- A loan that closed in January 2007 with a principal balance of $193,500 was originated under Option One's Full Documentation Loan Program and included in the OOMLT 2007-4 Securitization. A forensic review of the loan file reveals that the borrower obtained a mortgage for a different property prior to the closing of the subject loan, which resulted in an additional monthly payment of $4,090. This loan was not listed on the application for the subject loan. There is no evidence in the file that the loan underwriter took this additional loan into account in originating the loan. A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 43.91 percent to 378.67 percent, which exceeds the guideline maximum of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $253,041.66, which is more than 100 percent of the original loan amount.

- A loan that closed in January 2007 with a principal balance of $79,000 was originated under Option One's Full Documentation Loan Program and included in the OOMLT 2007-4 Securitization. A forensic review of the loan file reveals that the borrower obtained two mortgages on two other properties prior to the closing of the subject loan, which resulted in additional monthly obligations of $1,113. These loans were not listed on the application for the subject loan. There is no evidence in the file that the loan underwriter took these two additional loans into account in originating the loan. The loan application was approved despite the borrower having a DTI based on disclosed debt which exceeded the guideline maximum of 55 percent. A recalculation of the DTI that includes the borrower's undisclosed debt results in an increase from 55.46 percent to 72.88 percent, which also exceeds the guideline maximum of 55 percent. The loan defaulted and the property was liquidated in a foreclosure sale, resulting in a loss of $70,761, which is more than 89 percent of the original loan amount.

- A loan that closed in February 2007 with an original balance of $68,400 was originated under Option One's Full Documentation Loan Program and included in the OOMLT 2007-4 Securitization. A credit report included in the origination file dated prior to closing shows 15 credit inquiries in the previous 60 days, including numerous inquiries from mortgage lenders and servicers, and three undisclosed mortgage loans obtained by the borrower before the closing date. There was no evidence in the file that the loan underwriter researched these credit inquiries. Had the loan underwriter investigated the 15 credit inquiries in the previous 60 days reflected on the origination credit report, the undisclosed mortgage debts would have been discovered. The mortgages on the three non-disclosed

properties totaled an additional $4,171 monthly payment.  These debts were not included in the calculation of the borrower's total debt or DTI ratio during the loan underwriting process.  A recalculation of the DTI based on these undisclosed debts is 192.79 percent, which exceeds the guideline allowable maximum DTI of 50 percent.  The subject loan defaulted without a single payment, and the property was liquidated in a foreclosure sale, resulting in a loss of $86,384.64, which is more than 100 percent of the original loan amount.

## III.   DEFENDANTS KNEW THEIR REPRESENTATIONS WERE FALSE AND MISLEADING

280.    The same evidence discussed above demonstrating the consistent and pervasive falsity of Defendants' representations also supports the conclusion Defendants' *knew* their Offering Materials were false.  For instance, Prudential's analysis found not just that the Mortgage Loans were misrepresented—but were *consistently* misrepresented.  Occupancy rates were misrepresented across the Offerings, by as much as *13.53%*.  The number of loans with LTV and CLTV ratios above 100% was misrepresented across the Offerings, by as much as *54.86%*.

281.    The average LTV and CLTV ratios were misrepresented across the Offerings, by as much as *12.24%*.  Improperly assigned loans account for over *35%* of the Mortgage Loans at issue.

282.    Such problems have manifested themselves in skyrocketing default rates— overall, *over 26%* of the Mortgage Loans have already had to be written off for a loss.  The problems are only going to get worse.  *Over 41%* of the remaining Mortgage Loans are themselves currently delinquent.

283.    The consistency of these findings go beyond the numerous Offerings Prudential analyzed.  As discussed above, evidence exists that these problems infected even more of Defendants' securitizations.  As described above, a loan-file review performed by FHFA (which Prudential could not do, given it does not have access to the loan files) found an astonishing *80%*

defect rate based on the loan files it re-underwrote.  It found evidence of owner-occupancy and appraisal fraud in connection with over *68* different RBS offerings.

284.    The remarkable default and delinquency rates, understated LTV and CLTV ratios, overstated owner-occupancy rates, and consistently botched chains of title are not only evidence that the Mortgage Loans underlying the Offerings were defective.  They are strong evidence that Defendants *knew* they were defective.  Simply put, Defendants could not have purchased, pooled, and securitized so many defective Mortgage Loans without knowing that, contrary to their representations, the Loans had vastly different features than what they were claiming.  Courts have repeatedly recognized that a *consistent pattern* of *large* misstatements can itself be strong evidence of scienter.  *See generally, e.g.*, *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 881 (3d Cir. 2000) ("[W]e believe that when multiple promised events fail to occur, there is a point where a strong inference of fraud can be made.").

285.    That Defendants could not have (and did not) securitize so many Mortgage Loans without gaining knowledge of, or being reckless as to, the fact that the Loans did not have the stated features is confirmed by the multiple rounds of due diligence that Defendants conducted, the vertically integrated nature of Defendants' operations, and their prominence and experience in this marketplace.  Defendants' unique position in the market gave them a direct window into the lax underwriting practices at issue here.

286.    In connection with its purchase of the Mortgage Loans from the non-affiliated originators, and consistent with industry practice, Defendants performed due diligence to determine the quality of the loans they were originating, purchasing, and securitizing.  Defendants operated quality assurance and risk management departments tasked with discovering whether the loans met the stated standards.  They conducted due diligence on the

originators it was purchasing loans from.  Defendants also conducted due diligence on the loans

included in each offering to ensure compliance with the approved underwriting guidelines.  To

make a determination about the quality of the loans and of the originators, Defendants employed

a team of underwriters who reviewed a sample of the purchased loans to confirm that they both

conformed to the representations made by the originators and complied.

287.    The Offering Materials confirm such reviews, consistent with industry practice,

were performed.  For instance, those for SVHE 2006-EQ2 represented that "[a]ll loans acquired

by the sponsor are subject to due diligence prior to purchase.  Portfolios are reviewed for issues

including, but not limited to, credit, documentation, litigation, default and servicing related

concerns as well as a thorough compliance review with loan level testing."  (SVHE 2006-OPT3

Prospectus April 26, 2006.)  Other of the Offering Materials at issue here contain the same or

similar confirmations of Defendants' due diligence practices.

288.    Such practices included, consistent with industry practice, participation in loan

auctions.  Prior to the auction, originators provided bid sheets that would specify, among other

things, the percentage of loans on which Defendants would be permitted to conduct due

diligence.  The originators also provided a loan tape that described characteristics of the loan

pool.  Based upon this information, Defendants prepared their bid.  If they won, they were

allowed to conduct additional due diligence prior to the settlement date.  As successful

purchasers of the loans, and consistent with industry practice and in line with Defendants'

extensive business relationships, this due diligence benefitted from Defendants' access to the

Originators' personnel and internal information.  This included access to information, personnel,

and documents not just regarding the Originators' operations and procedures in general, but also

access to information, personnel, and documents regarding the specific loans being offered for

sale.  As would-be-securitizers, Defendants' motives at this point were also skewed.  Rejecting

loans would leave a smaller pool to securitize—meaning smaller fees for Defendants'

securitization efforts.  And rejecting too many loans could even convince originators to stop

selling loans to them, cutting off Defendants' pipeline entirely.

289.    Defendants' access to information—and its skewed motives—was heightened by

the fact they also provided "warehouse" lines of credit to originators of subprime loans.  In such

a relationship, a bank provides money to an originator, who uses the money to fund mortgages.

The originator then sells the loan to the warehouse-provider, essentially paying the warehouse

loan back by delivering the loans for securitization.  RBS had warehouse lending commitments

to subprime lenders totaling billions of dollars.  For instance, RBS provided a $1 billion line of

credit to Fremont, which originated all of the loans underlying five of the Securitizations.

290.    Entering into warehouse lending relationships helps the warehouse lender secure a

pipeline of mortgages for its securitization machine.  Warehouse loans give the warehouse lender

the ability to control the practices of the originator, and give it an even more in-depth look at the

true quality of that originator's operations.  As one industry publication explained, warehouse

lenders have "detailed knowledge of the lender's operations."  (Kevin Connor, *Wall Street and

the Making of the Subprime Disaster*, November 2007 at 11.)  RBS became intimately familiar

with the lending practices of its warehouse lending originators through extensive due diligence

on their business operations.  For example, Fremont's standard mortgage loan purchase

agreement gives purchasers the right to conduct extensive due diligence on the mortgage loans

for sale and on Fremont itself.  Prior to the closing date, a purchaser may examine the mortgage

file for each mortgage loan and reject any loans that do not conform to the purchaser's

underwriting standards.  A purchaser also has the opportunity to conduct corporate due diligence

of Fremont, including an on-site review of Fremont's facilities, and discussions with Fremont's management. RBS took full advantage of those opportunities, and was intimately familiar with the operations of Fremont and the other originators that it had warehouse lending relationships with.

291. The presence of a warehouse lending relationship also perverts the lender's due-diligence incentives. Refusing to buy the proffered loans—funded with the warehouse line of credit—risked the system collapsing, as it could leave the originator unable to pay the warehouse loan.

292. That Defendants, occupying the privileged positions described above, and conducting due diligence at so many different stages, were able to (and did) uncover the misrepresented nature of these Mortgage Loans is confirmed by government-released data, showing Defendants were *consistently* able to uncover loan defects—but just as consistently were willing to securitize the defective loans anyway.

293. As discussed above, Defendants often engaged third-party due diligence firms, such as Clayton or Bohan, to conduct some of the due diligence steps discussed above. These firms gave Defendants *daily* reports indicating exactly how many loans failed to meet the guidelines—*and* which lacked any purported "compensating factors." Documents that were made public by the government's investigation confirmed that Defendants were being informed that many of the loans they had reviewed were defective—but Defendants knowingly approved them for use in securitizations anyway. That Defendants were receiving *daily* reports regarding how many loans were defective confirms they acted knowingly in securitizing the defective Mortgage Loans at issue here.

294.     Clayton prepared a wide range of reports for banks such as Defendants.   These reports generally took the form of:  (i) daily reports, which contain a variety of information regarding the characteristics of a particular mortgage loan on a daily basis; (ii) final reports, which reflect all of the information contained in the daily reports for a mortgage loan, including any grade changes, waivers, and comments; and (iii) trending reports, which track the performance and treatment of a mortgage loan over time.  The information contained in the daily, final, and trending reports includes, but is not limited to, information regarding:  (i) whether a loan complied with the applicable underwriting guidelines; (ii) whether a loan was eligible for an exception to the applicable underwriting guidelines, including whether any compensating factors applied, and any comments; (iii) the borrower's assets; (iv) documentation missing from the loan application; (v) the status and condition of the underlying property; (vi) the disposition of the loan, including any transfers or foreclosure; and (vii) whether the loan complied with applicable laws and regulations.  Clayton made each of these types of reports, as well as any other loan-specific information, available at the request of its clients, such as Defendants.

295.     Clayton's clients were generally only given read access to Clayton's reports.  An exception was made for waivers.  Clients such as Defendants were given passwords to access Clayton's reports in order to waive loans that did not meet the applicable underwriting standards into securitizations.  If a client made a waiver call, the date and time on which it was made would be reflected in Clayton's reports.

296.     As discussed above, the FCIC found that *18%* of the loans reviewed by Clayton for Defendants both failed to meet the stated guidelines, and were not subject to any "compensating factors" justifying the use of an "exception."  RBS nonetheless securitized *53%*

of these flagged loans. Based on the systemic nature of the problems that have been uncovered, the overlap in time with the Securitizations at issue, and Prudential's loan-level forensic analysis of the Mortgage Loans, on information and belief, Defendants' internal and third-party due diligence processes here similarly caught high numbers of defective loans—and yet Defendants fraudulently "waived" them into the Securitizations at issue here anyway.

297. Further, on information and belief, the "waiver" rate revealed by the FCIC's investigation understates the number of defective loans allowed into the Securitizations. Firms such as Clayton were put under extreme pressure to give as many loans as possible a pass, and conducted increasingly cursory reviews. Thus, Defendants knew the true rates of defects were actually much higher, and that they were allowing in even more defective loans than Clayton's data have since revealed. This is confirmed by the testimony of numerous confidential witnesses.

298. Confidential Witness 9 ("CW9") was an Underwriting Project Lead at Clayton from 2003 until October 2006. According to CW9, the task of a Project Lead included having direct dealings with representatives from clients, such as Defendants. At various times, CW9 also worked as a QC Underwriter, reviewing the work conducted by other underwriters.

299. In CW9's view, the quality and experience of Clayton's underwriters decreased as Clayton hired more and more underwriters during the real estate boom. Many underwriters were in their 20s, and some even in their late teens, without much, if any, underwriting experience.

300. According to CW9, the review process typically began with receipt of a "loan tape," which contained data on what the loans features were supposed to be, i.e., whether they were owner-occupied or not, what their LTV ratios were, the documentation process used to grant the loan, etc. The purpose of Clayton's diligence, in CW9's view, was to ensure that the

actual loan files supported the descriptions of the loans contained in the "loan tapes," and to evaluate the loans to ensure that the loan fell within the underwriter's guidelines. Loans graded as "3s" were to be kicked from the loan pools.

301. During CW9's tenure at Clayton, "a lot of 3s were changed to 2s and 1s." Loans that were missing documentation that was later supplied by the lender or the client could be re-graded during a "stip clearing" process—but sometimes this new documentation appeared as if by "miracle." According to CW9, others were simply waived in. And, even when "compensating" factors were purportedly found to justify a "2" grade, rather than a "3" grade, CW9 characterized many of these factors as "almost wishful thinking" and "pretty weak." CW9 estimates that 80% of loans initially graded "3" were ultimately re-graded.

302. CW9 understood that Clayton was not supposed to assign too many failing grades to loans so as not to "upset" the client (such as Defendants) and the lender that was selling the loans, which could lead to business being taken to Clayton's competitors. This was conveyed to Clayton by the clients, the lenders which had originated the loans, and even by other Project Leads. This point was made explicitly by one client, which told CW9 to "get this [expletive] guy out of here," after a Clayton underwriter who was an expert on appraisals was kicking out too many loans based on problems with the appraisals.

303. From CW9's perspective, representatives of the purchasers saw Clayton as irrelevant, given the larger objective of securitizing the loans. As such, they were not interested in the real quality of the loans being reviewed. In fact, one client representative colorfully admitted that he did not "give a flying [expletive] about DTI [debt-to-income ratios]" and other characteristics of the loans. Another client similarly told Clayton to "get this [expletive] done

and get out of here, and don't make a big deal" about any issues, even though CW9 had found problems such as inflated appraisals and missing documents.

304.    While at Clayton, CW9 typically reviewed 8 to 10 loans a day.  Later, CW9 was pressured to increase that to 21 loans per day.  CW9 protested that this afforded an insufficient amount of time to review each loan.  CW9 was further instructed to simply "get the deal done." This made CW9 feel that the due diligence reviews were "just going through the motions," performing only a cursory review of loans.  CW9 admitted that Clayton "did a bad job on stated incomes," as borrowers with "average jobs" were approved based on claims of making $300,000 to $400,000 per year.  CW9 also admitted that many of the appraisals suffered from "bad comps."

305.    CW9 singled out a borrower's debt profile as something that was only given a cursory review.  For instance, when it came to detailing a borrower's history of late payments, Clayton personnel were told to just "ballpark it."  And aspects of a borrower's debt—such as car payments—were simply ignored based on assumptions about the borrower's behavior.

306.    Other former Clayton and Bohan employees have confirmed that the high rejection and waiver rates just scratched the surface of the problems in the origination pipeline. For instance, according to Confidential Witness 10 ("CW10"), who worked at Clayton reviewing loans from 2003 to 2006, reviewers were not given much time to review loan files—as little as half an hour for home equity loans and only 40 to 60 minutes for standard mortgages.  Further limiting CW10's review (and thus making the high rejection rates all the more astounding) was the fact that CW10 was not authorized to conduct any independent outside confirmation, but only to mechanically check to see that the files contained, for example, a list of three other properties.  According to CW10, Clayton's analysis was further handicapped by the fact that

reviewers were expected to know how to apply differing guidelines depending on the client. In addition, a loan file had to have four deviations from the applicable guidelines before it was even considered for rejection. And even then, the loan was not immediately rejected, but rather simply elevated for further review.

307.    Confidential Witness 11 ("CW11") was a Contract Underwriter at Clayton from 2003 to 2004, and a Transaction Specialist there from 2005 to 2007. CW11's team would underwrite loans, including by visiting a client's offices to conduct the review. CW11 confirmed that reports were run daily that would provide notes on the reasons for low grades, and that these reports were usually sent to the client. According to CW11, clients sometimes would call to discuss low grades given to certain loans. If the client still wanted to buy the loan, the grade would sometimes be changed, sometimes based on the receipt of additional documents that supposedly cured the deficiency, but also sometimes merely by agreement.

308.    Similarly, Confidential Witness 12 ("CW12") worked for Clayton as a Contract Underwriter. Like CW10, CW12 stated that reviewers were only given 45 minutes to an hour to approve or reject a loan file. Also like CW10, CW12 recalled a lot of pressure to approve loans. According to CW12, Clayton's team leaders had the ability to "fix" CW12's findings, and CW12 was told to keep CW12's mouth shut rather than raising questions.

309.    Another former Clayton Contract Underwriter, Confidential Witness 13 ("CW13"), further confirmed that unreasonable loans were regularly included in loan pools under clients' directions. CW13 recalled instances in which borrowers working at fast food chains claimed to have incomes as high as $10,000 a month. Even though underwriters "kicked" these patently unreasonable loans, according to CW13, the clients would still purchase them.

CW13 explained that the attitude toward stated income loans was that the asserted incomes "*could* be true," and thus were acceptable.

310.    CW13, who had previously worked as an appraiser earlier in his career, also stated that he regularly encountered what he believed to be inflated appraisals in the loans he reviewed.  Thus, when he reviewed a loan with a particularly high LTV ratio, he "always kicked it."  Invariably, however, the Project Lead at Clayton informed him that the high LTV ratio was fine and instructed him not to reject the loan.

311.    Confidential Witness 14 ("CW14") was a Senior Project Lead at Clayton from 2004 to 2009.  In this role, CW14 oversaw teams of underwriters assigned to review samples of loan pools being considered for purchase by clients.  CW14's due diligence teams reviewed loan pools originated by, among others, Fremont.  CW14 again confirmed that Clayton's clients received daily reports on the progress of reviews, as well as a final report summarizing the total results at the end of a project.  CW14 even stated that certain clients could access the reports in real-time using Clayton's software application.  The reports reflected the results of CW14's teams' review of the loans as against the underwriting guidelines they were given to apply.  The reviews CW14 supervised sometimes would take place at the client's location, because some clients did not want the loan files to leave their premises.  CW14 also confirmed that Clayton was asked to review only a sample of the loans—and often the client dictated what loans made up that "sample."

312.    According to CW14, at the end of a review, a "stipulation clearing" process was undertaken in which loans were re-reviewed to see if grade "3s" could be promoted to grade "2s" or grade "1s," such as through the provision of supplemental documentation in the loan file.  In other situations, however, clients simply waived the requirements that necessitated the "3" grade,

and the loan was re-graded. According to CW14, there was often "no rhyme or reason" offered

by the client as to why the waivers were being provided. Rather, underwriters would simply

make the grade change in the system. CW14 harbored doubts about whether the borrowers could

and would repay the loans. CW14 stated that loans were approved of by way of accepting

clearly unreasonable income claims.

313.    Confidential Witness 15 ("CW15") was the Director of Client Service

Management at Clayton from October 2001 until December 2005, and a Vice President of

Business Development from December 2005 until October 2007. In these roles, CW15 oversaw

due diligence on both conduit and bulk loan pools that Clayton reviewed.

314.    CW15 recalled several instances in which loan originators would progressively

apply pressure up the hierarchy until either Clayton or the banks yielded and accepted loans that

had been graded as non-compliant. According to CW15, if the originator could not persuade the

Clayton Team Lead to re-grade a defective loan, the originator would contact CW15. If CW15

resisted, the originator would contact the bank's asset manager, who would apply pressure on

CW15 to re-grade the rejected loan. Frequently, the pressure to accept a rejected loan would

come directly from a bank's trading desk, which needed a certain number of loans to complete a

deal it had structured. If Clayton refused to re-grade the loan, the bank's traders would "flip

their lid." On numerous occasions, CW15 was directly contacted by asset managers and traders

from banks who would "pound" on him until he re-graded a loan.

315.    While noting that pressure from the originator or bank representative often caused

Clayton to re-grade a rejected loan, CW15 explained that even loans that received the highest

grade were suspect because the lender's or bank's guidelines were extremely loose. As such,

borrowers with credit scores as low as 560 met the guidelines, despite no verifiable source of

income.  According to CW15, the banks were "buying [expletive] loans because the guidelines allowed [expletive] loans."

316.    Confidential Witness 16 ("CW16") worked as a Contract Underwriter at another third party due diligence firm, the Bohan Group ("Bohan"), from 2004 until 2006.  CW16 described a similar fast-pace review process as discussed above with Clayton.  Specifically, underwriters were expected to review 10 to 12 loans per day, which meant that the reviewers "didn't get into the meat of the loan."  Indeed, the time constraints often meant that the review was limited to "data entry" because the reviewers had to take everything at "face value."  CW16 said that Team Leads instructed reviewers not to look closely at appraisals, credit reports, asset or income documents, or at the reasonableness of stated income or assets.

317.    According to CW16, Bohan Team Leads and Quality Control Underwriters could change loan scores without the underwriter's knowledge.  When CW16 would bring discrepancies to a Team Lead's attention, CW16 would sometimes be told "not to worry" because the "loans were pretty much purchased" already, and thus the reviewers "just need[ed] to get the audit done."  The most common problems CW16 could recall were FICO scores that were lower than guidelines required, DTI and LTV ratios higher than the guidelines allowed, suspect income calculations, and Truth-in-Lending Disclosure violations.  The loans looked like "garbage" to CW16.

318.    Confidential Witness 17 ("CW17") worked as a Deal Manager at Bohan during the 1990s and into 2006.  In that role, CW17 communicated with clients to help determine how to configure the Bohan Risk Analysis Information Network ("BRAIN") to reflect the underwriting parameters the client wanted tested, and would communicate with the underwriters on how to run those tests.  Clients often gave Bohan looser guidelines than used by the

originators, and on top of that would instruct Bohan not to give a "3" grade unless the loan failed the applicable guidelines by a certain margin of error.

319.    CW17 would email the day's results to the client nightly.  According to CW17, clients would change grade "3" loans to grade "2" loans "constantly."  An example that CW17 had "no doubt" happened, or certainly something similar, was that a housekeeper might claim an income of $100,000 and Bohan would grade the loan "3" because of the income's unreasonableness.  Nonetheless, the client would change it to a "2."  A review with 40 percent grade "3" loans was not abnormal, according to CW17.  The reasons why a loan was given a "3" grade was to be noted in the reports, so that the client could see why a given loan failed.

320.    Despite all of these limitations and pressures placed on the third-party due diligence firms, and the opportunities to cure or otherwise change the grades from fail to pass, the third party reports still showed high numbers of loans that were identified by the due diligence firms as failing the given underwriting guidelines.  These numbers show that Defendants regularly securitized large numbers of defective loans, including in all of Defendants' Offerings at issue here, contrary to Defendants' representations.

321.    The proper response to Clayton's conclusions would have been to refuse to buy a loan pool, or to use the findings of the due diligence firm to probe the loans' quality more deeply.  Instead, Defendants used the deficiencies in the loan pool to increase their own profit margins on the Securitizations.  According to the September 2010 testimony before the Federal Crisis Inquiry Commission by Clayton's former president, D. Keith Johnson, the purchasing banks, like Defendants, would use the exception reports to force a lower price.  In other words, rather than reject defective loans from collateral pools, or cease doing business with consistently failing originators, Defendants would instead use the Clayton Holdings data simply to insist on a

lower price from the loan originators, leaving more room for their own profits when the problem loans were hidden in securitization pools.

322.     Defendants' hidden "waiver" of rejected loans into the securitizations was a fraudulent omission and rendered Defendants' disclosures even more misleading.  As the FCIC report concluded:

> [M]any prospectuses indicated that the loans in the pool either met guidelines outright or had compensating factors, even though Clayton's records show that only a portion of the loans were sampled, and that of those that were sampled, a substantial percentage of Grade 3 loans were waived in.
>
> . . .
>
> [O]ne could reasonably expect [the untested loans] to have many of the same deficiencies, at the same rate, as the sampled loans.  ***Prospectuses for the ultimate investors in the mortgage-backed securities did not contain this information, or information on how few of the loans were reviewed, raising the question of whether the disclosures were materially misleading, in violation of the securities laws.***

(FCIC Report at 167, 170 (emphasis added).)

## IV.     PRUDENTIAL'S DETRIMENTAL RELIANCE AND DAMAGES

### A.     Prudential's Reasonable Reliance

323.     Prudential typically purchased senior or highly rated mezzanine classes of mortgage-backed securities.  Prudential purchased the Certificates to generate income and total return through safe investments.  Prudential also purchased these securities with the expectation that the investments could be—and indeed some were—purchased and sold on the secondary market.

324.     Prudential invested in the Certificates as part of a broader plan to invest in a diverse array of carefully underwritten mortgage-backed securities.  Its purchase decisions were based on due diligence done on multiple levels.  For instance, Prudential's investment manager has credit research analysts specifically tasked with analyzing potential risks.  The research

analysts' recommendations have never been overridden with respect to residential mortgage-backed securities.

325. In making the investments, Prudential relied upon Defendants' representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of the underwriting processes related to the underlying Mortgage Loans. Prudential received, reviewed, and relied upon the Offering Materials, which described in detail the Mortgage Loans underlying each offering. Offering Materials containing the representations outlined above and in the Exhibits (or materially similar counterparts thereto) were obtained, reviewed, and relied upon in making the purchase.

326. As part of its business practice, Prudential reviewed draft Offering Materials and term sheets as well as the final Offering Materials. Prudential also reviewed other materials such as the related Pooling and Servicing Agreements, and any documents related to insurance-based credit enhancements on the securities. Such materials (or materially similar counterparts thereto) were made available prior to purchase.

327. Specifically, but without limitation, prior to purchasing mortgage-backed securities Prudential reviewed and considered the underwriting guidelines of the originators or conduits involved. Prudential gained an understanding of the purported processes in the Offering Materials at issue here, and also understood them from its review of similar offering materials issued by and about Defendants and the Originators over the course of the many years Prudential has been purchasing residential mortgage backed securities. For instance, representations such as that the guidelines would be followed, that the guidelines were intended to in some reasonable way assess the borrower's capacity for repayment, and that "exceptions" would only be made when "compensating factors" exist are common to many of Defendants' securitizations,

including those at issue here. The consistency of these core representations reinforces the reasonability of Prudential's actual reliance on the Offering Materials at issue here, as well as the fraudulent nature of Defendants' key omission of facts regarding its systemic underwriting abandonment.

328.   Prudential would also review, prior to purchase, the specific representations made about the Mortgage Loans—such as whether the loans were backed by owner-occupied properties, and the loan's LTV and CLTV ratios. At no point did Defendants disclose to Prudential that these statistics were misrepresented, and indeed, baseless.

329.   Prudential fully explored all information made available to investors before purchasing residential mortgage-backed securities. Indeed, Prudential also often visited originators' offices on-site. Prudential also regularly attended industry conferences and met with originators and underwriters who attended.

330.   Prudential continued to monitor its investments after purchase, including with respect to the Certificates here. However, Prudential did not and could not have uncovered the misrepresentations at issue here prior to purchase—and, indeed, did not know of the wrongdoing alleged herein until recently. For similar reasons, Prudential did not and could not have discovered the losses caused by the misrepresentations—i.e., its injuries—at issue here until recently. Indeed, as noted below, nearly all of Prudential's Certificates retained strong credit ratings through at least mid-2009, and Prudential did not take any material credit-related "write-downs" on these securities until after July 2008.

331.   As discussed above, the Offering Materials contained certain information purporting to describe the Mortgage Loans. More detailed information was contained in "loan tapes," but these loan tapes were often not made available to investors. Even if they were, such

would still not provide investors with the information necessary to discover the fraud. This is because the loan tapes are simply rows of numerical data—data that, as alleged above, was itself false. Thus, without the loan *files* containing the backup materials standing behind those numerical descriptions—documents that were never made available to investors, and which could not have been given to Prudential without violating rules regarding the selective dissemination of material, non-public information—even having the loan *tapes* full of (false) data would not have revealed the fraud.

332. Still without access to the loan files, investors such as Prudential have only recently been able to test representations about the risk attributes of the underlying loans. For instance, investors might be provided a table claiming that one property was owner-occupied, had an LTV ratio of 75%, and the borrower had a debt-to-income ratio of 30%. Simply seeing that loan-by-loan breakdown, however, in no way informed investors that the originators had disregarded their guidelines or were making underwriting "exceptions" (such as those for high-LTV loans) without regard to whether there were "compensating factors."

333. Investors like Prudential were not given loan files containing full documentation that would have shed light on whether Defendants' representations had a reasonable basis in fact. Indeed, the materials provided to investors often did not even include the specific property addresses, nor did it identify the consumers tied to the loans. There was thus no practical way, until recently, for investors to "look behind" the tables of numbers in order to assess whether those numbers were actually reflective of the mortgage loans being securitized. Thus, prior to May 2009, as explained below, the only information investors could obtain on the nature of the mortgage loans was what they were told in the Offering Materials.

334.    As noted above, using currently available technology, Prudential has used a "loan-level analysis" for the purposes of this First Amended Complaint that tests the representations at issue.  However, it was not until well after the purchases at issue here that investors were offered the ability to access proprietary databases, developed by a data vendor over the course of many years and at a significant cost, that would allow them to determine the accuracy of the loan-level information provided in the Offering Materials.  It was only through such databases that enough data could be linked together, through the use of proprietary algorithms, that investors could even identify the specific loans underlying offerings.  Without knowing a property's address, investors obviously could not know anything about the property's actual value other than what they were told in the Offering Materials.  Thus, prior to the development of these informational services, there was no publicly available means of consistently identifying the specific loans underlying mortgage-backed securities offerings, and thus no way of verifying the representations made to investors about the features of those loans.

335.    In May 2009, an early form of informational service, called TrueLTV, was first made public.  It allowed investors, for the first time (but even then, at a significant cost) to determine what specific properties were actually being included in a collateral pool.  For instance, the database compares the property zip code, loan amount, and date of origination (high-level information provided in the Offering Materials) and compares those points across other databases to see if there is a "match" in the same zip code.  This is a simplified explanation; the actual algorithm used is proprietary.  But the point is that it typically takes an enormous database to even identify the property included in the collateral pool.

336.    Investors like Prudential would need the specific property address in order to verify representations made in the Offering Materials, such as the LTV ratios.  Prudential is not

aware of any other similar service or process that could have reasonably provided this information prior to May 2009.  Though the identification of the property addresses was available in May 2009 through the TrueLTV service, that service did not have the data elements necessary to evaluate owner occupancy claims.  The data sets necessary to test occupancy claims were added in 2010 and included in a new service called Reps and Warranties.  Only through the Reps and Warranties service, released in 2010, was it possible to compare the property addresses against other borrower information to validate the occupancy claims made in the Offering Materials.  Prudential is not aware of any other similar service or process that could have reasonably provided this information prior to 2010.

337.    In purchasing the Certificates, Prudential justifiably relied on Defendants' misrepresentations and omissions of material facts detailed above, including the misstatements and omissions in the Offering Materials.  But for the misrepresentations and omissions in the Offering Materials, Prudential would not have purchased or acquired the Certificates as it ultimately did, because those representations and omissions were material to its decision to acquire the Certificates.

**B.**    **Prudential's Damages**

338.    The false and misleading statements of, and omissions of, material facts in the Offering Materials directly caused Prudential damage, because the Certificates were in fact far riskier than Defendants had described them to be.  The Mortgage Loans underlying the Certificates experienced defaults and delinquencies at very high rates due to Defendants' abandonment of the disclosed underwriting guidelines.  Again, however, it was not until much later that Prudential could have known it was injured, and not until much later that it could have known they were caused by Defendants' misrepresentations.   The poor collateral performance resulted in downgrades to the Certificates' ratings, which made them unmarketable at anywhere

near the prices Prudential paid, thus confirming that Prudential paid far more for the Certificates than the value it actually received.

339.   Even in the context of the housing downturn, the Certificates would have held much higher value had the securities been as represented in the Offering Materials, because their mortgage pools would not have defaulted at nearly the same high rate.  This decreased value is evidenced collectively by, but need not be measured solely by:  (a) the high rates of default and delinquency of the Mortgage Loans; (b) the Certificates' plummeting ratings; (c) lower-than-expected past and projected cash flow; and (d) lower market value.

340.   Prudential has incurred substantial losses due to the poor quality of the collateral underlying the Certificates and Defendants' failure to properly transfer title to the Loans. Because of the declining collateral base, it is likely that Prudential will not realize the full payments it expected.  This is reflected in the significantly diminished market value for these securities, which, again, is a strong indicator that the true value of the Certificates was far less than what Prudential paid.

341.   The disclosure of irregularities in the underwriting practices actually used with respect to the Mortgage Loans, the increased risk regarding future cash flow, and problems with transfer of title, have further fed the substantial decline in market value of the Certificates. Prudential purchased the Certificates not only for their income stream, but also with an expectation of possibly reselling the Certificates on the secondary market.  Prudential thus viewed market value as a critical aspect of the Certificates it purchased.  Prudential incurred substantial losses on the Certificates due to a drastic decline in market value attributable to the misrepresentations.  Prudential has already incurred losses on the Certificates it has sold on the secondary market.

342. The loans underlying the Certificates have experienced default and delinquency at extraordinarily high rates due to the abandonment of the disclosed underwriting guidelines. These rates of default are much higher than what a pool of loans that had the features Defendants described would have experienced in the same economic conditions—and thus, Prudential's losses have been much greater than they would have been if the Certificates and the loans underlying them were as Defendants described them to be. For example, the fact that the loans were not backed by owner-occupied properties at their claimed rate made them more prone to default, thus making the Certificates poorer investments, accelerating their decline in value. The diminished prospect of continued cash flows dictates that the Certificates are less valuable than they would have been but for the misrepresentations. Prudential is seeking recovery for past and current damages either through a damage award or rescission.

343. As the court explained in *In re Countrywide*, the failure to properly transfer title to the mortgage loans that collateralized investors' securities also harmed Prudential because such a failure can reduce the securities' cash flow and decrease their market value:

> If title is not transferred properly, then the trustee cannot foreclose on a defaulted loan. An RMBS purchaser may be harmed either directly or indirectly in such a scenario. First, an RMBS purchaser may be directly harmed if the trustee is unable to foreclose on a loan and the trust therefore receives nothing (rather than the foreclosure value). Second, if the market realizes that, due to title transfer problems, RMBS that contain defaulted loans will pay less than anticipated, the market should discount RMBS containing defaulted or likely-to-default loans by an appropriate amount. In either event, a purchaser would not have become aware of the damages portion of its claim until it became clear that title transfer problems were widespread and preventing foreclosures.

(*In re Countrywide*, No. 11-ML-02265 (C.D. Cal. Mar. 9, 2012), Order at 11.)

344. Upon information and belief, Prudential's securities have been affected by problems with transfers of title, with reductions in payment streams on the securities and their market value. The failure to assign the Mortgage Loans to each Trust in a manner sufficient to

allow the Trust to foreclose upon the underlying property in the event of a default, has affected the flow of funds into the RMBS Trusts and thus to Prudential. Those payment problems have also reduced the price that other investors are willing to pay for the securities.

345. Prudential's damages can be quantified using secondary-market pricing. Though the secondary market may have temporarily "seized up" during the height of the financial crisis, today there is a functioning, liquid, secondary market for mortgage-backed securities such as the Certificates. Numerous brokers are active in, and have trading desks specifically dedicated to, the secondary market for residential mortgage-backed securities, including without limitation Barclays, Bank of America, Citigroup, Deutsche Bank, Goldman Sachs, Royal Bank of Scotland, JPMorgan, Nomura, and Morgan Stanley.

346. In April 2011, the *Wall Street Journal* reported that "AIG Bonds are in Demand," finding that the Federal Reserve Bank of New York's "much anticipated" auction of $1.5 billion in subprime bonds was "deemed successful by industry participants." (Anusha Shrivastava, AIG Bonds Are in Demand, Investors Line Up for Fed's First Auction of Subprime Debt, WALL ST. J. (Apr. 7, 2011), http://online.wsj.com/article/SB10001424052748704101604576 2 4725063 8752780.html.) "Industry participants said dealers saw solid interest from investors." (*Id.*) According to a CEO quoted by the article, "[t]he overwhelming majority of the list [of bonds] traded at more than the estimated price, indicating healthy demand by dealers and investors." (*Id.*)

347. The liquidity of the market has continued since then, with the *Wall Street Journal* reporting in March 2012 that investors were "[b]ullish" on subprime mortgage bonds. According to the report, in the first two months of 2012, "investors bought $42.4 billion and sold more than $50 billion [of RMBS] through dealers." (Al Yoon, Investors Bullish On Subprime, Nonagency

Mortgage Bonds, Survey, WALL ST. J. SMART MONEY, (Mar. 30, 2012), http://www.smart
money.com/news/on/?story=ON-20120330-000647&cid=1259.) Those numbers continued in
March 2012, when "[i]nvestors bought $21.3 billion in subprime and other risky residential
mortgage bonds through Wall Street dealers . . . , exceeding the $20.4 billion they sold." (*Id.*)
This data was released by the Financial Industry Regulatory Authority, or FINRA, which began
reporting data on the volume of RMBS trades in mid-2011.

348.    Prudential viewed market value as a critical aspect of the Certificates it
purchased.  Prudential has lost much of the market value in these securities—much more than it
would have lost if the Certificates had been backed by loans of the quality Defendants
represented.

349.    In short, defaults were much higher than they would have been if the Mortgage
Loans had been properly underwritten; this revealed that the true value of the Certificates was a
significant discount to what Prudential paid.  This is evidenced by the drop in market value of the
securities.  Loans which were properly underwritten would have withstood the same economic
conditions much better than those Defendants offloaded onto Prudential.  Securities backed by
loans with the features Defendants described would currently have a much higher value than
Prudential's Certificates, and thus Prudential was damaged by Defendants' wrongdoing.  That
this loss in the Certificates' value represents an actionable injury caused by Defendants'
misrepresentations, however, could not have been discovered by Prudential until relatively
recently.

350.    Prudential's damages here are separate and severable from any losses Prudential
may have sustained by the economic downturn, and such could be measured through the
discovery process.  For instance, but without limitation, upon discovery of the full extent of

Defendants' misrepresentations, expert testimony may compare the performance of the *actual* Certificates and/or loan pools here, with the performance of securities and/or loan pools that had the features described in the Offering Materials, as one potential measure of Prudential's damages. However, it is well beyond Prudential's pleading burden to perform such analysis here, and in any event the full extent of Defendants' misrepresentations is unknown.

## V.   DEFENDANTS' CONCEALMENT OF THEIR MISCONDUCT

351.   The key information cited and relied upon herein did not generally become available to Prudential until, at the earliest, mid-2009, and often later. This key information includes, for example, the FCIC report (January 2011), and information associated with the FCIC Report, such as documents and testimony relating to Clayton (September 2010-January 2011). Indeed, as noted above, Prudential could not have performed a loan-level analysis until 2010—which should have provided evidence of Defendants' misrepresentations regarding the specific Mortgage Loans at issue here.

352.   As discussed above, most of the Certificates that Prudential purchased from Defendants' Offerings now have been downgraded to non-investment grade by at least one rating agency. The following chart summarizes the dates of downgrade to below investment grade:

| Certificate | Tranche | Non-Investment Grade Downgrade Date(s) |
|---|---|---|
| EMLT 2004-2 | M5 | 4/8/2010 (Moody's)<br>3/3/2011 (Standard & Poor's) |
| EMLT 2004-3 | M4 | 3/7/2011 (Moody's) |
| EMLT 2004-3 | M5 | 3/22/2011 (Fitch)<br>3/7/2011 (Moody's) |
| EMLT 2004-3 | M6 | 5/14/2010 (Fitch)<br>4/8/2010 (Moody's) |
| EMLT 2004-3 | M7 | 7/2/2009 (Fitch)<br>4/8/2010 (Moody's) |
| EMLT 2005-1 | M3 | 7/18/2011 (Moody's) |
| EMLT 2005-1 | M4 | 1/19/2012 (Fitch)<br>1/13/2010 (Moody's)<br>5/11/2011 (Standard & Poor's) |
| EMLT 2005-1 | M5 | 6/12/2009 (Fitch)<br>3/13/2009 (Moody's) |

| Certificate | Tranche | Non-Investment Grade Downgrade Date(s) |
|---|---|---|
| | | 9/9/2008 (Standard & Poor's) |
| EMLT 2005-1 | M6 | 6/12/2009 (Fitch) |
| | | 2/26/2009 (Moody's) |
| | | 9/9/2008 (Standard & Poor's) |
| FHLT 2004-1 | M6 | 7/2/2009 (Fitch) |
| | | 3/21/2011 (Moody's) |
| | | 11/17/2009 (Standard & Poor's) |
| FHLT 2004-2 | M2 | 3/22/2011 (Fitch) |
| | | 3/21/2011 (Moody's) |
| FHLT 2004-D | M1 | 3/21/11 (Moody's) |
| FHLT 2005-C | M1 | 6/12/2009 (Fitch) |
| FHLT 2005-C | M3 | 6/12/2009 (Fitch) |
| | | 4/29/2010 (Moody's) |
| | | 3/2/2010 (Standard & Poor's) |
| FHLT 2005-D | M1 | 3/17/2009 (Moody's) |
| | | 8/4/2009 (Standard & Poor's) |
| FHLT 2006-1 | 2A4 | 3/17/2009 (Moody's) |
| | | 8/4/2009 (Standard & Poor's) |
| FHLT 2006-2 | M1 | 3/17/2009 (Moody's) |
| | | 9/25/2009 (Standard & Poor's) |
| FHLT 2006-A | 2A4 | 11/24/2008 (Fitch) |
| | | 3/17/2009 (Moody's) |
| | | 8/4/2009 (Standard & Poor's) |
| FHLT 2006-B | 2A3 | 2/15/2008 (Fitch) |
| | | 10/16/2008 (Moody's) |
| | | 5/4/2009) Standard & Poor's) |
| FHLT 2006-D | 2A4 | 2/15/2008 (Fitch) |
| | | 10/16/2008 (Moody's) |
| | | 8/4/2009 (Standard & Poor's) |
| MMLT 2005-2 | M2 | 1/10/2011 (Fitch) |
| | | 3/20/2009 (Moody's) |
| | | 8/4/2009 (Standard & Poor's) |
| RBSGC 2005-A | 3A | 1/14/2010 (Moody's) |
| | | 7/24/2009 (Standard & Poor's) |
| SVHE 2004-WMC1 | M2 | 3/13/2011 (Moody's) |
| SVHE 2004-WMC1 | M3 | 3/13/2011 (Moody's) |
| | | 9/30/2009 (Standard & Poor's) |
| SVHE 2004-WMC1 | M4 | 4/8/2010 (Moody's) |
| | | 9/30/2009 (Standard & Poor's) |
| SVHE 2006-EQ2 | A4 | 11/24/2008 (Fitch) |
| | | 2/26/2009 (Moody's) |
| | | 8/24/2009 (Standard & Poor's) |
| SVHE 2006-NLC1 | A2 | 10/23/2008 (Moody's) |
| | | 8/4/2009 (Standard & Poor's) |
| SVHE 2006-NLC1 | A3 | 10/23/2008 (Moody's) |
| | | 9/2/2008 (Standard & Poor's) |
| SVHE 2006-OPT1 | 2A4 | 6/12/2009 (Fitch) |
| | | 1/13/2010 (Moody's) |
| SVHE 2006-OPT2 | A4 | 3/17/2009 (Moody's) |
| | | 10/21/2011 (Standard & Poor's) |
| SVHE 2006-OPT3 | 2A4 | 1/13/2010 (Moody's) |
| SVHE 2006-OPT4 | 2A4 | 3/17/2009 (Moody's) |

| Certificate | Tranche | Non-Investment Grade Downgrade Date(s) |
|---|---|---|
| | | 8/4/2009 (Standard & Poor's) |
| SVHE 2006-OPT4 | M1 | 10/23/2008 (Moody's) |
| | | 8/19/2008 (Standard & Poor's) |
| SVHE 2006-OPT5 | 2A4 | 3/17/2009 (Moody's) |
| | | 8/4/2009 (Standard & Poor's) |

353.    As this chart reflects, nearly all of Prudential's Certificates retained strong credit ratings through at least mid-2009.  Several of the Certificates continued to receive investment grade ratings well into 2011.

354.    Thus, information that either put Prudential on actual notice of the legal violations at issue here, or was sufficient to lead to such actual knowledge in the exercise of reasonable diligence, was affirmatively concealed by Defendants and did not publicly emerge prior to mid-2009, if not even later.

## FIRST CAUSE OF ACTION
### (Common-Law Fraud/Fraudulent Inducement Against All Defendants)

355.    Prudential realleges each allegation above as if fully set forth herein.

356.    This count is against all Defendants.  It is against each Defendant only for those transactions in which it played a role, as set forth above and in Exhibit A.

357.    Each Defendant made, authorized or caused the representations at issue, which are identified and summarized in Section I above and further identified in the Exhibits.

358.    The material representations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.

359.    Each of the Defendants knew their representations and omissions were false and/or misleading at the time they were made.  Each made the misleading statements with an intent to defraud Prudential.

360. Defendants had reason to expect that Prudential was among the class of persons who would receive and rely on such representations, and intended that their misleading statements would induce Prudential to purchase the Certificates.

361. Prudential justifiably relied on Defendants' false representations and misleading omissions.

362. Had Prudential known the true facts regarding the Defendants' underwriting practices and quality of the loans making up the securitizations, it would not have purchased the Certificates as it ultimately did.

363. As a result of the foregoing, Prudential has suffered damages according to proof. In the alternative, Prudential hereby demands rescission and makes any necessary tender of the Certificates.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Common Law Fraud/Fraudulent Inducement Against All Defendants)

364. Prudential realleges each allegation above as if fully set forth herein.

365. This is a claim for aiding and abetting brought against all defendants arising from the intentional and substantial assistance each rendered to the others to advance the fraud on Prudential. It is against each Defendant only for those transactions in which it played a role, as set forth above and in Exhibit A.

366. Each of the defendants knew of the fraud perpetrated by the other defendants. Each knew of the representations and omissions made by the others. Each also knew that the representations and omissions made by each of the other defendants were false and/or misleading at the time they were made.

367. As discussed above, Defendants were all highly interdependent businesses with overlapping management and a constant flow of information among Defendants. All of the

defendants had actual knowledge of, and substantially assisted in, the fraudulent scheme to securitize each of the trusts at issue and market and sell the Certificates to investors, including Prudential, without disclosing the truth about those investments.

368.    All of the defendants, through their employees and representatives, substantially assisted in, among other things:  (a) acquiring the Mortgage Loans; (b) packaging up those loans into pools which were transferred to the depositor then the Trusts; (c) waiving into the collateral pools of the Trusts loans previously rejected by Clayton, despite the lack of compensating factors; (d) creating and structuring the Trusts whose Certificates would be sold to investors including Prudential; and (e) preparing the Offering Materials which would be used to market the Certificates to investors like Prudential.  Through overlapping personnel, strategies and intertwined business operations, and the fluid transfer of information among the defendants, each of the defendants knew of the fraud perpetrated on Prudential.  Each acted in concert to defraud Prudential.

369.    Each of the defendants provided each of the others with substantial assistance in making the fraudulent representations and omissions.  Specifically, but without limitation, RBS Financial Products acquired the Mortgage Loans and sponsored their securitization, assisted in preparation of the Offering Materials, transferred the loans to the depositor, and made representations regarding the quality of the loans.  Specifically, but without limitation FAS Corp. and RBS Acceptance, Inc. issued the securities, entered into agreements with the relevant trusts, filed and signed the registration statements, and assisted in the preparation of the Offering Materials.  Specifically, but without limitation, RBS Securities assisted in the preparation of the Offering Materials, and acted as broker-dealer with regard to the issuance and underwriting of the Certificates.

370.     Each of the defendants made representations regarding the characteristics of the Mortgage Loans, including applicable underwriting guidelines, due diligence results, owner-occupancy rates, loan-to-value and/or combined loan-to-value statistics, credit ratings, title-transfer process, and/or underwriting exceptions.

371.     Defendants could not have perpetrated their fraud without the substantial assistance of each other defendant, and they all provided financial, strategic, and marketing assistance for their scheme.  Defendants are highly intertwined and interdependent businesses and each benefited from the success of the scheme.  Through the fraudulent sale of the Certificates to Prudential, Defendants were able to materially improve their financial condition by reducing their exposure to declining subprime-related assets and garnering thousands of dollars in fees from the structuring and sale of the Certificates.

372.     As a direct, proximate, and foreseeable result of the Defendants' actions, Prudential has suffered damages according to proof.

### THIRD CAUSE OF ACTION
### (Negligent Misrepresentation Against All Defendants)

373.      Prudential realleges each allegation above as if fully set forth herein.

374.     This count is against all defendants.  It is against each Defendant only for those transactions in which it played a role, as set forth above and in Exhibit A.

375.     Because Defendants arranged the Securitizations, and originated or acquired, underwrote, and serviced most of the underlying Mortgage Loans, they had unique and special knowledge about the loans in the offerings.  In particular, they had unique and special knowledge and expertise regarding the quality of the underwriting of those loans, as well as the servicing practices employed as to such loans.

376.     Because Prudential could not evaluate the loan files for the Mortgage Loans underlying its Certificates, and because Prudential could not examine the underwriting quality or servicing practices for the Mortgage Loans in the offerings on a loan-by-loan basis, it was heavily reliant on Defendants' unique, special, and superior knowledge regarding the Mortgage Loans when determining whether to make each investment in the Certificates.  Prudential was entirely reliant on Defendants to provide accurate information regarding the loans in engaging in that analysis.  Accordingly, Defendants were uniquely situated to evaluate the economics of each offering.

377.     Going back over many years covering these numerous purchases, Prudential relied on Defendants' unique, special, and superior knowledge regarding the quality of the underlying Mortgage Loans and their underwriting when determining whether to invest in the Certificates at issue in this action.  Prudential's longstanding relationship with Defendants, coupled with Defendants' unique and special knowledge about the underlying loans, created a special relationship of trust, confidence, and dependence between Defendants and Prudential.

378.     Defendants were in the business of providing information for use by others, including Prudential.  Specifically, but without limitation, Defendants were in the business of providing information by way of the Offering Materials so that investors could rely on them in deciding whether to invest in the securities being offered.  This information was for the use of a small class of large, institutional investors.

379.     Defendants were aware that Prudential relied on their unique, special, and superior knowledge, expertise, and experience and depended upon them for accurate and truthful information in making the decision to invest in each of the Certificates.  Defendants were also aware that the representations regarding the underwriting standards, as well as those regarding

the characteristics of the Mortgage Loans, would be used for the particular purpose of deciding whether to invest in those Certificates. Defendants also knew that the facts regarding their compliance with their underwriting standards were exclusively within their knowledge.

380. Based on their expertise, superior knowledge, and relationship with Defendants, Defendants owed a duty to Prudential to provide complete, accurate, and timely information regarding the Mortgage Loans and the offerings. Defendants breached their duty to provide such information to Defendants.

381. Defendants breached their duty to provide such information to Prudential by making misrepresentations that induced Prudential's investment in the offerings. The misrepresentations are set forth in Section I above and in the Exhibits. At the time Defendants made these misrepresentations, they were, at a minimum, negligent in their due diligence and/or understanding of the extent to which the Mortgage Loans underlying the Certificates complied with the underwriting guidelines and had the characteristics represented in the Offering Materials. Thus, Defendants were at the very least negligent in making statements that were false, misleading, and incorrect. Such information was known or reasonably should have been known by Defendants, and was not known or readily knowable by Prudential. In addition, Defendants knew that Prudential was acting in reliance on that information.

382. Prudential reasonably relied on the information Defendants did provide and was damaged as a result of these misrepresentations. Had Prudential known the true facts regarding Defendants' underwriting practices and the quality of the loans making up the offerings, it would not have purchased the Certificates as it ultimately did.

383. As a result of the foregoing, Prudential has suffered damages according to proof.

## FOURTH CAUSE OF ACTION
### (New Jersey Civil RICO, N.J.S.A. 2C:41-1 *et seq.*, Against All Defendants)

384.    Prudential realleges each allegation above as if fully set forth herein.

385.    For the purposes of this Count Four, Prudential alleges that Defendants acted with the knowledge and intent required to violate the statutes identified as racketeering activity below and/or were willfully blind to or deliberately ignorant of the falsity of the information they conveyed to Prudential.

386.    Defendants violated the New Jersey Civil RICO statute by committing or conspiring amongst themselves and others to commit a pattern of racketeering activity in violation of N.J.S.A. 2C:41-2(c) and -2(d).

### *The Enterprise*

387.    Defendants have committed a pattern of racketeering activity through their agreement to participate in and actual participation in an association-in-fact enterprise comprised of the persons and entities that acquired thousands of residential mortgage loans and then processed the underlying loans into mortgaged-backed securities so that the Defendants could sell certificates at inflated values to investors such as Prudential on the basis of false and fraudulent Offering Materials (the "RBS Enterprise").

388.    The RBS Enterprise included at least the following persons, businesses, or other legal entities that played the following discrete and well-defined roles in RBS's carefully planned, highly organized scheme:

(a)    RBS Financial Products, which acted as the Seller and Sponsor in certain of the Securitizations purchased by Prudential, as set forth in Exhibit A;

(b)    FAS Corp., which acted as the depositor in certain of the Securitizations purchased by Prudential, as set forth in Exhibit A;

131

(c)     RBS Acceptance, Inc., which acted as the depositor in certain of the Securitizations purchased by Prudential, as set forth in Exhibit A;

(d)     RBS Securities, which sold unsuspecting investors various mortgaged-backed securities, including but not limited to the Certificates, on the basis of false and fraudulent misrepresentations of fact; and

(e)     Non-parties Royal Bank of Scotland Group PLC and RBS Holdings USA, Inc., which formed the other RBS Enterprise entities to perform specific tasks required to acquire mortgages, securitize those mortgages, and then sell securities to Prudential and other investors in order to maximize corporate profits.  These parent companies also had the ability to direct and did in fact direct, purposefully engage in, assist, and/or further the RBS Enterprise, as they funded the activities of the other members of the Enterprise, managed and supervised the operations of the Enterprise; set the methods for the Enterprise (including the intentional increase in the sale of residential mortgaged-backed securitizations and deliberate indifference to, or circumvention of, stated underwriting guidelines); directed the goals of the Enterprise, which included the maximization of short-term profits and fees from the sale of residential mortgaged-backed securities through the use of false and fraudulent Offering Materials; and received and consolidated the funds generated by the Enterprise's activities.

389.    The members of the RBS Enterprise played specific and well-defined roles in the process of originating and then securitizing loans into residential mortgage-backed securities, as described above, and, without limitation, in Section D of the "Background" section further above.

390.    The members of the RBS Enterprise shared the common purpose of obtaining pecuniary gain, including money, in connection with the fraudulent sale of inflated mortgaged-backed securities to investors, including Prudential.

391.    At all relevant times, the RBS Enterprise was and remains engaged in trade or commerce in activities affecting trade or commerce in connection with the sale and purchase of securities in the State of New Jersey.

392.    The RBS Enterprise is an enterprise within the meaning of N.J.S.A. 2C:41-1(c).

### The Pattern of Racketeering Activity

393.    Defendants, along with the other members of the RBS Enterprise, engaged in a pattern of racketeering activity consisting of two or more separate and distinct acts of racketeering activity.  Defendants committed this pattern of racketeering activity during at least 2004 to 2007 and beyond, and in connection with but not limited to the Securitizations in which Prudential purchased Certificates.  The acts of racketeering include, but are not limited to, those set forth below:

        **a.**     **Violations of the New Jersey Uniform Securities Act (N.J.S.A. 49:3-47 *et seq.*)**

394.    Under N.J.S.A. 49:3-52(b), it is "unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

395.    Similarly, under N.J.S.A. 49:3-52(a) and -52(c), it is unlawful for any person to offer, sell or purchase a security by employing "any device, scheme, or artifice to defraud" or by engaging "in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

396.    Defendants are "persons" within the meaning of N.J.S.A. 49:3-49(i).

397.    The Certificates purchased by Prudential are "securities" within the meaning of N.J.S.A. 49:3-49(m).

398.    Defendants and the Trusts (although not named as defendants) qualify as offerors or sellers of the Certificates in the Securitizations because they issued, marketed, and/or sold the Certificates to Prudential and other members of the public for their own financial benefit within the meaning of N.J.S.A. 49:3-49(j)(1)-(2).

399.    Defendants and the Trusts offered and sold the Certificates in the Securitizations to Prudential in the State of New Jersey within the meaning of N.J.S.A. 2C:1-3.

400.    As identified above in Sections I and II, and in the Exhibits, on two or more occasions, in violation of N.J.S.A. 49:52(a), (b), and (c), Defendants made numerous material misstatements in the Offering Materials used to sell Prudential the Certificates in Securitizations. In addition, Defendants made numerous omissions of fact that made the Offering Materials false and misleading.

401.    As alleged in detail above in Sections I and II, and in the Exhibits, the Offering Materials in the Securitizations created and utilized by Defendants and the Trusts were materially false and misleading because, among other things, they misrepresented the underwriting standards applicable to the mortgage loans backing the Certificates, misrepresented the owner-occupancy information for the loans, misrepresented the LTV and CLTV ratios and appraisal information for the loans, misrepresented the title-assignment process and status, and misrepresented information relevant to the credit ratings process for the Certificates.

402.    Defendants knew that the Offering Materials included untrue statements of material fact and misleading omissions.

403.     In the alternative, Defendants recklessly and consciously disregarded a substantial and unjustifiable risk that the Offering Materials in the Securitizations included untrue statements of material fact and misleading omissions.  Given the nature of this risk, the access of these Defendants to the loan files for the mortgages underlying the Certificates, and the central role each entity played in the mortgage securitization process, the disregard by these Defendants of the risk that the Offering Materials were materially misleading or fraudulent constituted a gross deviation from the standard of conduct that a reasonable person would observe in the same situation.

404.     Defendants made these misrepresentations and omissions with the purpose and intent of convincing Prudential to purchase the Certificates in the Securitizations.

405.     Prudential did not know, and in the exercise of due diligence could not have known, of the untruths and omissions.

406.     RBS Financial Products is not only liable as primary violator, it is also jointly and severally liable because they controlled one or more of the primary violators, including with respect to the Securitizations.

407.     FAS Corp. and RBS Acceptance are not only liable as primary violators, they also are jointly and severally liable because they controlled one or more of the primary violators, including with respect to the Securitizations.

408.     Defendants' violations of N.J.S.A. 49:3-52(a), -(b), and -(c), as well as 49:3-70(a) and -(b), constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(p).

### b. Deceptive Business Practices (N.J.S.A. 2C:21-7i)

409.     On two or more occasions, Defendants committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in intentional acts involving deceptive business practices.

410.     As alleged in detail above Sections I and II, and in the Exhibits, Defendants in the course of their business made false or misleading statements in the Offering Materials connected with the offer and sale of Certificates in the Securitizations, or omitted material information required by law to be disclosed therein.

411.     Defendants knew that the Offering Materials included those untrue statements of fact or material omissions.

412.     The Certificates offered by Defendants and purchased by Prudential on the basis of Defendants' false and misleading Offering Materials are "securities" within the meaning of N.J.S.A. 2C:21-7i.

413.     Defendants made these misrepresentations and omissions for the purpose of promoting the sale of securities to Prudential and other investors at inflated values for their own pecuniary gain.

414.     Defendants' violations of N.J.S.A. 2C:21-7i constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(o).

### c. Theft by Deception (N.J.S.A. 2C:20-4)

415.     On two or more occasions, Defendants purposefully committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in acts involving theft by deception by obtaining the property of another by deceitful means and artful practices with the intention of depriving Prudential and other investors of their property.

416.     As alleged in detail above in Sections I and II, and in the Exhibits, Defendants repeatedly used false and misleading Offering Materials in the Securitizations to induce Prudential to purchase the identified Certificates.  By this conduct, Defendants created or reinforced Prudential's false impression of existing facts, including facts relating and directly relevant to the value of the Certificates, which Defendants knew or believed to be false, in violation of N.J.S.A. 2C:20-4(a).

417.     Defendants also prevented Prudential from acquiring information pertinent to the disposition of its funds, including information that would have contradicted the false representations of fact in the Offering Materials in the Securitizations, in violation of N.J.S.A. 2C:20-4(b).

418.     By failing to amend the materially false and misleading Offering Materials and/or notify Prudential of the true underwriting standards, owner-occupancy statistics, LTV and CLTV ratios, title-transfer process, and credit ratings process relevant to the in the Securitizations, Defendants also failed to correct a false impression, which allowed Defendants to hide their enterprise from discovery by Prudential and other investors.  Defendants' failure to correct the false impression they created or reinforced in the Offering Materials was in violation of N.J.S.A. 2C:20-4(c).

419.     Defendants' repeated and related violations of N.J.S.A. 2C:20-4(a), -4(b), and -4(c) constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(n).

### d.      Falsifying Records (N.J.S.A. 2C:21-4(a))

420.     On two or more occasions, Defendants committed, attempted to commit, solicited another to commit, conspired to commit, or engaged in acts involving falsifying or tampering with records with the intention of deceiving or injuring Prudential and other investors.

421. As alleged in detail above in Sections I and II, and in the Exhibits, Defendants repeatedly used false and misleading Offering Materials in the Securitizations to knowingly falsify, remove, or conceal material facts relevant to the value of the securities they sold to investors such as Prudential, including but not limited to the pertinent underwriting guidelines, owner-occupancy statistics, LTV and CLTV ratios, due diligence process, title-transfer process, and credit ratings connected with the Certificates purchased by Prudential.

422. The Offering Materials created and utilized by Defendants constitute a "writing or record" within the meaning of N.J.S.A. 2C:21-4(a).

423. Defendants' violations of N.J.S.A. 2C:21-4(a) constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(o).

### e. Relatedness of the Acts of Racketeering Activity

424. The incidents of racketeering activity committed by the Defendant/members of the RBS Enterprises had, among other things, the same or similar intents, results, victims, and methods of commission.

425. The acts of racketeering activity committed by Defendants relating to the Securitizations involve transactions or purported transactions with or affecting Prudential.

426. The acts of racketeering activity committed by Defendants relating to the Securitizations have the same or similar intents in that they sought to obtain property, including but not limited to Prudential's money, through illegal means.

427. The acts of racketeering activity committed by Defendants relating to the Securitizations have the same or similar results, in that Defendants actually obtained personal property, including but not limited to Prudential's money, through illegal means.

428.     The acts of racketeering activity committed by Defendants relating to the Securitizations have the same or similar victims:  investors (including Prudential) in RBS's residential mortgage-backed securities, including the Certificates.

429.     The methods by which Defendants committed the incidents of racketeering activity relating to the Securitizations were the same or similar, including by way of example and not limitation, inducing Prudential to pay Defendants hundreds of millions of dollars to purchase residential mortgaged-backed securities on the basis of materially false and misleading Offering Materials.

430.     In the RBS Enterprise, the acts of racketeering committed by the Defendants serving as members thereto are interrelated by distinguishing characteristics and are not isolated incidents.  The acts involve the same or similar methods of commission, the same or similar types of misrepresentations or omissions, the same or similar benefits to Defendants, the same or similar injuries to Prudential, and the same or similar efforts by Defendants' to conceal their misconduct.

### *Defendants' Violations of the New Jersey RICO Statute*

431.     Defendants violated N.J.S.A. 2C:41-2(c) by associating with an enterprise and conducting or participating, indirectly or indirectly, in that enterprise through a pattern of racketeering activity.

432.     Defendants also violated N.J.S.A. 2C:41-2(d) by conspiring with others, including but not limited to the other members of the RBS Enterprises, to violate N.J.S.A. 2C:41-2(c).  In furtherance of that conspiracy, Defendants committed overt acts that include but are not limited to the racketeering activity alleged above.

### Proximate Cause of Injury to Prudential by
### Defendants' New Jersey RICO Violations

433. Defendants' behavior directly targeted Prudential, which purchased the Certificates in the Securitizations based on the false and fraudulent representations in the Offering Materials. As a result, Prudential purchased securities at falsely inflated values that have experienced significant downgrades, defaults, and delinquencies. Defendants' misrepresentations and omissions have adversely affected both the value of the securities purchased by Prudential and the income flow therefrom. As a result, Prudential's injuries flow directly from acts of racketeering activity committed by Defendants that constitute part of the pattern of racketeering activity.

434. Prudential has been injured by reason of these violations of N.J.S.A. 2C:41-2 and is entitled to recover three times the actual damages it has sustained pursuant to N.J.S.A. 2C:41-4(c).

435. Pursuant to N.J.S.A. 2C:41-4(c), Prudential is also entitled to recover its attorneys' fees in the trial and appellate courts, and its costs of investigation and litigation reasonably incurred.

436. Pursuant to N.J.S.A. 2C:41-4(a), Prudential is also entitled to such other and further relief that this Court may deem just and proper, including but not limited to the dissolution or reorganization of Defendants' RICO enterprise; the denial, suspension, or revocation of Defendants' licenses to do business in the State of New Jersey; and any and all appropriate cease and desist orders necessary to discontinue Defendants' acts or conduct.

## PRAYER FOR RELIEF

WHEREFORE Prudential prays for relief as follows:

An award in favor of Prudential against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

      a.      Prudential's monetary losses, including loss of market value and loss of principal and interest payments;

      b.      Treble damages;

      c.      Rescission and recovery of the consideration paid for the Certificates, with interest thereon; Prudential is prepared to tender the Certificates in the event the Court grants such relief;

      d.      Attorneys' fees and costs;

      e.      Prejudgment interest at the maximum legal rate; and

      g.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Prudential hereby demands a trial by jury on all issues triable by jury.

DATED:    September 14, 2012              NUKK-FREEMAN & CERRA, P.C.

By:    _____
       ROBIN H. ROME
       KIRSTEN MCCAW GROSSMAN
       636 Morris Turnpike, Suite 2F
       Short Hills, NJ 07078
       Telephone: (973) 564-9100
       Fax: (973) 564-9112
       rrome@nfclegal.com
       kgrossman@nfclegal.com
       *Attorneys for The Prudential Insurance*
       *Company of America, Commerce Street*
       *Investments, LLC, Pru Alpha Fixed Income*
       *Opportunity Master Fund I, L.P., Pruco Life*
       *Insurance Company, Prudential Retirement*
       *Insurance and Annuity Company, and*
       *Prudential Trust Company.*

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Daniel L. Brockett (*pro hac vice* application forthcoming)
David D. Burnett (*pro hac vice* application forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
daveburnett@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice* application forthcoming)
Chris Barker (*pro hac vice* application forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Fax: 213-443-3100
jeremyandersen@quinnemanuel.com
chrisbarker@quinnemanuel.com

## CERTIFICATION PURSUANT TO R. 4:5-1

I hereby certify that the matter in controversy is not the subject of any other action pending in any Court or of a pending arbitration proceeding and that no other action or arbitration proceeding is contemplated.

KIRSTEN MCCAW GROSSMAN

Dated: September 14, 2012

QUINN EMANUEL URQUHART & SULLIVAN, LLP

Daniel L. Brockett (*pro hac vice* application forthcoming)
David D. Burnett (*pro hac vice* application forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
daveburnett@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice* application forthcoming)
Chris Barker (*pro hac vice* application forthcoming)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213-443-3000
Fax: 213-443-3100
jeremyandersen@quinnemanuel.com
chrisbarker@quinnemanuel.com

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, COMMERCE STREET INVESTMENTS, LLC, PRU ALPHA FIXED INCOME OPPORTUNITY MASTER FUND I, L.P., PRUCO LIFE INSURANCE COMPANY, PRUDENTIAL RETIREMENT INSURANCE AND ANNUITY COMPANY, and PRUDENTIAL TRUST COMPANY,<br><br>Plaintiffs,<br><br>-against-<br><br>RBS FINANCIAL PRODUCTS, INC. (f/k/a GREENWICH CAPITAL FINANCIAL PRODUCTS, INC.), RBS ACCEPTANCE, INC. (f/k/a GREENWICH CAPITAL ACCEPTANCE, INC.), FINANCIAL ASSET SECURITIES CORP., and RBS SECURITIES, INC. (f/k/a GREENWICH CAPITAL MARKETS, INC.),<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ESSEX COUNTY<br><br>Civil Action<br><br>DOCKET No. ESX-L-6206-12<br><br>**CERTIFICATION OF SERVICE** |

I hereby certify that on September 14, 2012, the original and two (2) copies of the following documents are being filed *via hand delivery* with the Clerk of the Superior Court of New Jersey, Law Division, 50 West Market Street, Room 131, Newark, New Jersey 07102:

1. First Amended Complaint with Exhibits A-Y; and

2. Certification of Service.

Dated: September 14, 2012

Kirsten McCaw Grossman
Nukk-Freeman & Cerra, P.C.
636 Morris Turnpike, Suite 2F
Short Hills, New Jersey 07078
Tel: (973) 564-9100
Fax: (973) 564-9112
*Attorneys for Plaintiffs*

## Exhibit A:  Overview of Prudential's RBS RMBS Investments

| Offering and Class | Full Name of Offering | Issuer | Depositor | Sponsor/ Seller | Under-writers |
|---|---|---|---|---|---|
| EMLT 2004-2, M5 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2004-2 | Equifirst Mortgage Loan Trust 2004-2 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and WaMu Capital Corp. |
| EMLT 2004-3, M2 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2004-3 | Equifirst Mortgage Loan Trust 2004-3 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2004-3, M4 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2004-3 | Equifirst Mortgage Loan Trust 2004-3 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2004-3, M5 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2004-3 | Equifirst Mortgage Loan Trust 2004-3 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2004-3, M6 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2004-3 | Equifirst Mortgage Loan Trust 2004-3 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2004-3, M7 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2004-3 | Equifirst Mortgage Loan Trust 2004-3 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2005-1, M2 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2005-1 | Equifirst Mortgage Loan Trust 2005-1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2005-1, M3 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2005-1 | Equifirst Mortgage Loan Trust 2005-1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2005-1, M4 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2005-1 | Equifirst Mortgage Loan Trust 2005-1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2005-1, M5 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2005-1 | Equifirst Mortgage Loan Trust 2005-1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| EMLT 2005-1, M6 | Equifirst Mortgage Loan Trust Asset-Backed Certificates, Series 2005-1 | Equifirst Mortgage Loan Trust 2005-1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and |

| Offering and Class | Full Name of Offering | Issuer | Depositor | Sponsor/ Seller | Under-writers |
|---|---|---|---|---|---|
| | | | | | Sandler O'Neill & Partners, L.P. |
| FHLT 2004-1, M1 | Fremont Home Loan Trust Asset-Backed Certificates, Series 2004-1 | Fremont Home Loan Trust 2004-1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. |
| FHLT 2004-1, M6 | Fremont Home Loan Trust Asset-Backed Certificates, Series 2004-1 | Fremont Home Loan Trust 2004-1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. |
| FHLT 2004-2, M2 | Fremont Home Loan Trust Asset-Backed Certificates, Series 2004-2 | Fremont Home Loan Trust 2004-2 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. |
| FHLT 2004-D, M1 | Fremont Home Loan Trust Asset-Backed Certificates, Series 2004-D | Freemont Home Loan Trust 2004-D | Fremont Mortgage Securities Corp. | Fremont Investment & Loan | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital), Credit Suisse First Boston, Lehman Brothers, Goldman, Sachs & Co., Bear, Stearns & Co. Inc. |
| FHLT 2005-C, M1 | Fremont Home Loan Trust Mortgage-Backed Certificates, Series 2005-C | Fremont Home Loan Trust 2005-C | Fremont Mortgage Securities Corp. | Fremont Investment & Loan | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital), Barclays Capital, Credit Suisse First Boston, Goldman, Sachs & Co., Lehman Brothers |
| FHLT 2005-C, M3 | Fremont Home Loan Trust Mortgage-Backed Certificates, Series 2005-C | Fremont Home Loan Trust 2005-C | Fremont Mortgage Securities Corp. | Fremont Investment & Loan | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital), Barclays Capital, Credit Suisse First Boston, Goldman, Sachs & Co., Lehman Brothers |
| FHLT 2005-D, M1 | Fremont Home Loan Trust Mortgage-Backed Certificates, Series 2005-D | Fremont Home Loan Trust 2005-D | Fremont Mortgage Securities Corp. | Fremont Investment & Loan | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital), Barclays Capital, Bear, Stearns & Co. Inc., Credit Suisse First Boston, Goldman, Sachs & Co., UBS Investment Bank |
| FHLT 2006-1, 2A4 | Fremont Home Loan Trust Asset-Backed Certificates, Series 2006-1 | Fremont Home Loan Trust 2006-1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital), Wachovia Securities |
| FHLT 2006-2, M1 | Fremont Home Loan Trust Asset-Backed Certificates, Series 2006-2 | Fremont Home Loan Trust 2006-2 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital), Wachovia Securities |
| FHLT 2006-A, 2A4 | Fremont Home Loan Trust Asset-Backed Certificates, Series 2006-A | Fremont Home Loan Trust 2006-A | Financial Asset Securities Corp. | Fremont Investment & Loan | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital) (Lead Manager), Barclays Capital, Deutsche Bank Securities, |

A-2

| Offering and Class | Full Name of Offering | Issuer | Depositor | Sponsor/ Seller | Under-writers |
|---|---|---|---|---|---|
| | | | | | Goldman, Sachs & Co., JPMorgan (Co-Managers) |
| FHLT 2006-B, 2A3 | Fremont Home Loan Trust Mortgage-Backed Certificates, Series 2006-B | Fremont Home Loan Trust 2006-B | Fremont Mortgage Securities Corp. | Fremont Investment & Loan | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital), UBS Investment Bank, Barclays Capital, Deutsche Bank Securities, Lehman Brothers Inc., Keefe, Bruyette and Woods |
| FHLT 2006-D, 2A4 | Fremont Home Loan Trust Mortgage-Backed Certificates, Series 2006-D | Fremont Home Loan Trust 2006-D | Fremont Mortgage Securities Corp. | Fremont Investment & Loan | Greenwich Capital Markets, Inc. (aka RBS Greenwich Capital), Barclays Capital, Deutsche Bank Securities, Goldman, Sachs & Co., Keefe, Bruyette and Woods, Fox-Pitt, Kelton |
| MMLT 2005-2, M1 | Meritage Mortgage Loan Trust Asset-Backed Certificates, Series 2005-2 | Meritage Loan Trust 2005-2 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. and J.P. Morgan Securities Inc. |
| RBSGC 2005-A, 3A | RBSGC Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2005-A | RBSGC Mortgage Loan Trust 2005-A | Greenwich Capital Acceptance, Inc. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. |
| SVHE 2004-WMC1, M2 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2004-WMC1 | Soundview Home Loan Trust 2004-WMC1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. and Countrywide Securities Corporation |
| SVHE 2004-WMC1, M3 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2004-WMC1 | Soundview Home Loan Trust 2004-WMC1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. and Countrywide Securities Corporation |
| SVHE 2004-WMC1, M4 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2004-WMC1 | Soundview Home Loan Trust 2004-WMC1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. and Countrywide Securities Corporation |
| SVHE 2006-EQ2, A4 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-EQ2 | Soundview Home Loan Trust 2006-EQ2 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. and Morgan Keegan & Company, Inc. |
| SVHE 2006-NLC1, A2 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-NLC1 | Soundview Home Loan Trust 2006-NLC1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. |
| SVHE 2006-NLC1, A3 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-NLC1 | Soundview Home Loan Trust 2006-NLC1 | Financial Asset Securities Corp. | Greenwich Capital Financial Products, Inc. | Greenwich Capital Markets, Inc. |
| SVHE 2006-OPT1, 2A4 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT1 | Soundview Home Loan Trust 2006-OPT1 | Financial Asset Securities Corp. | Option One Mortgage Corp. | Greenwich Capital Markets, Inc. and WaMu Capital Corp. |
| SVHE 2006-OPT2, A4 | Soundview Home Loan Trust Asset- | Soundview Home Loan Trust 2006- | Financial Asset Securities Corp. | Option One Mortgage Corp. | Greenwich Capital Markets, Inc., Morgan |

A-3

| Offering and Class | Full Name of Offering | Issuer | Depositor | Sponsor/ Seller | Under-writers |
|---|---|---|---|---|---|
| | Backed Certificates, Series 2006-OPT2 | OPT2 | | | Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| SVHE 2006-OPT3, 2A4 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT3 | Soundview Home Loan Trust 2006-OPT3 | Financial Asset Securities Corp. | Option One Mortgage Corp. | Greenwich Capital Markets, Inc., Morgan Keegan & Company, Inc. and Sandler O'Neill & Partners, L.P. |
| SVHE 2006-OPT4, 2A4 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT4 | Soundview Home Loan Trust 2006-OPT4 | Financial Asset Securities Corp. | Option One Mortgage Corp. | Greenwich Capital Markets, Inc. and Wachovia Capital Markets, LLC |
| SVHE 2006-OPT4, M1 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT4 | Soundview Home Loan Trust 2006-OPT4 | Financial Asset Securities Corp. | Option One Mortgage Corp. | Greenwich Capital Markets, Inc. and Wachovia Capital Markets, LLC |
| SVHE 2006-OPT5, 2A4 | Soundview Home Loan Trust Asset-Backed Certificates, Series 2006-OPT5 | Soundview Home Loan Trust 2006-OPT5 | Financial Asset Securities Corp. | Option One Mortgage Corp. | Greenwich Capital Markets, Inc. and Wachovia Capital Markets, LLC |

### Exhibit B:  Purchase Information for Prudential's RBS RMBS Investments

| Asset | Purchaser | Purchase Price |
|---|---|---|
| EMLT 2004-2, M5 | The Prudential Insurance Company of America | $2,749,359.38 |
| EMLT 2004-3, M2 | The Prudential Insurance Company of America | $2,000,000.00 |
| EMLT 2004-3, M4 | The Prudential Insurance Company of America | $1,000,000.00 |
| EMLT 2004-3, M5 | The Prudential Insurance Company of America | $5,761,000.00 |
| EMLT 2004-3, M6 | The Prudential Insurance Company of America | $1,281,000.00 |
| EMLT 2004-3, M7 | The Prudential Insurance Company of America | $1,000,000.00 |
| EMLT 2005-1, M2 | The Prudential Insurance Company of America | $4,000,000.00 |
| EMLT 2005-1, M3 | The Prudential Insurance Company of America | $3,405,000.00 |
| EMLT 2005-1, M4 | The Prudential Insurance Company of America | $5,200,000.00 |
| EMLT 2005-1, M5 | The Prudential Insurance Company of America | $5,000,000.00 |
| EMLT 2005-1, M6 | The Prudential Insurance Company of America | $5,708,000.00 |
| FHLT 2004-1, M1 | The Prudential Insurance Company of America | $4,708,000.00 |
| FHLT 2004-1, M6 | The Prudential Insurance Company of America | $5,521,914.04 |
| FHLT 2004-1, M6 | Pru Alpha Fixed Income Opportunity Master Fund I, L.P. | $2,459,761.78 |
| FHLT 2004-2, M2 | The Prudential Insurance Company of America | $4,899,375.00 |
| FHLT 2004-2, M2 | Pru Alpha Fixed Income Opportunity Master Fund I, L.P. | $2,412,000.00 |
| FHLT 2004-D, M1 | Institutional Core Plus Bond Fund of the Prudential Trust Company Master Commingled Investment Fund for Tax Exempt Trusts | $250,996.10 |
| FHLT 2005-C, M1 | The Prudential Insurance Company of America | $7,366,406.25 |
| FHLT 2005-C, M1 | Prudential Retirement Insurance & Annuities Company | $7,366,406.25 |
| FHLT 2005-C, M3 | The Prudential Insurance Company of America | $3,000,937.50 |
| FHLT 2005-D, M1 | The Prudential Insurance Company of America | $8,213,625.00 |
| FHLT 2005-D, M1 | Prudential Retirement Insurance & Annuities Company | $8,201,891.25 |
| FHLT 2006-1, 2A4 | The Prudential Insurance Company of America | $10,000,000.00 |

B-1

| | | |
|---|---|---|
| FHLT 2006-2, M1 | Pru Alpha Fixed Income Opportunity Master Fund I, L.P. | $4,722,079.28 |
| FHLT 2006-A, 2A4 | Pru Alpha Fixed Income Opportunity Master Fund I, L.P. | $11,695,690.00 |
| FHLT 2006-B, 2A3 | The Prudential Insurance Company of America | $29,368,930.20 |
| FHLT 2006-B, 2A3 | The Prudential Insurance Company of America | $15,892,050.00 |
| FHLT 2006-B, 2A3 | Pruco Life Insurance Company | $10,993,984.40 |
| FHLT 2006-D, 2A4 | The Prudential Insurance Company of America | $16,341,880.00 |
| FHLT 2006-D, 2A4 | Prudential Trust Company, as Trustee for Prudential Merged Retirement Plan | $1,928,750.00 |
| MMLT 2005-2, M2 | The Prudential Insurance Company of America | $14,175,000.00 |
| RBSGC 2005-A, 3A | The Prudential Insurance Company of America | $30,262,499.99 |
| SVHE 2004-WMC1, M2 | The Prudential Insurance Company of America | $8,000,000.00 |
| SVHE 2004-WMC1, M3 | The Prudential Insurance Company of America | $4,000,000.00 |
| SVHE 2004-WMC1, M4 | The Prudential Insurance Company of America | $3,000,000.00 |
| SVHE 2006-EQ2, A4 | The Prudential Insurance Company of America | $22,600,000.00 |
| SVHE 2006-NLC1, A2 | The Prudential Insurance Company of America | $40,000,000.00 |
| SVHE 2006-NLC1, A3 | The Prudential Insurance Company of America | $37,607,821.41 |
| SVHE 2006-NLC1, A3 | Commerce Street Investments, LLC | $49,957,405.00 |
| SVHE 2006-OPT1, 2A4 | The Prudential Insurance Company of America | $9,093,000.00 |
| SVHE 2006-OPT2, A4 | The Prudential Insurance Company of America | $26,000,000.00 |
| SVHE 2006-OPT3, 2A4 | The Prudential Insurance Company of America | $8,000,000.00 |
| SVHE 2006-OPT4, 2A4 | The Prudential Insurance Company of America | $9,600,000.00 |
| SVHE 2006-OPT4, M1 | The Prudential Insurance Company of America | $15,000,000.00 |
| SVHE 2006-OPT5, 2A4 | The Prudential Insurance Company of America | $9,000,000.00 |

B-2

**Exhibit C:  Misrepresentations in the Offering Materials for EMLT 2004-2**

1.      **Collateral type:**  "[F]irst lien, fixed-rate and adjustable-rate residential mortgage loans."
(Prospectus Supplement Jun. 28, 2004 ("PS") at S-1; *see also* Preliminary Term Sheet
May 18, 2004  ("TS") at 4.)

2.      **Initial number of mortgage loans:**  Aggregate: 4,017 (PS at S-3), 4,050 (TS at 27).

3.      **Originators:**  "EquiFirst Corporation, a North Carolina corporation, and a wholly-owned
subsidiary of EFC Holdings Corporation originated or acquired the mortgage loans."  (PS
at S-2; *see also* TS at 3.)

4.      **Untrue and misleading statements concerning underwriting guidelines in the EMLT
2004-2 Offering Materials:**

      a.      "All of the Mortgage Loans were originated or acquired by the Originator,
          generally in accordance with the underwriting criteria described herein."  (PS
          at S-48.)

      b.      "The Originator's underwriting standards are primarily intended to assess the
          ability and willingness of the borrower to repay the debt and to evaluate the
          adequacy of the mortgaged property as collateral for the mortgage loan.  All of
          the Mortgage Loans were underwritten with a view toward the resale thereof in
          the secondary mortgage market.  The Originator considers, among other things,
          a mortgagor's credit history, repayment ability and debt service-to-income
          ratio ('Debt Ratio'), as well as the value, type and use of the mortgaged
          property."  (PS at S-49.)

      c.      "The Originator's underwriting staff fully reviews each loan to determine
          whether the Originator's guidelines for income, assets, employment and
          collateral are met."  (PS at S-49.)

d.   "The Originator conducts a number of quality control procedures, including a post-funding audit as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the audit, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random and targeted selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is provided to the underwriters and reviewed monthly by senior management.  Adverse findings are tracked monthly.  This review procedure allows the Originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."  (PS at S-50)

e.   "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's

C-2

credit history with local merchants and lenders and any record of bankruptcy.
Generally, an employment verification is obtained from an independent source,
which is typically the borrower's employer. The verification reports the
borrower's length of employment with its employer, current salary, and
expectations of continued employment. If a prospective borrower is self-
employed, the borrower may be required to submit copies of signed tax returns.
The borrower may also be required to authorize verification of deposits at
financial institutions where the borrower has demand or savings accounts.
Underwriting standards which pertain to the creditworthiness of borrowers
seeking Multifamily Loans will be described in the related prospectus
supplement." (Prospectus Apr. 23, 2004, at 34; Registration Statement Dec.
19, 2003 ("RS"), at 34.)

f.    "Once all applicable employment, credit and property information is received,
a determination generally is made as to whether the prospective borrower has
sufficient monthly income available to meet the borrower's monthly
obligations on the proposed loan, generally determined on the basis of the
monthly payments due in the year of origination, and other expenses related to
the mortgaged property such as property taxes and hazard insurance, and to
meet monthly housing expenses and other financial obligations and monthly
living expenses." (Prospectus at 35; RS at 35.)

g.    "The lender's credit application and review must determine whether the
borrower's income will be adequate to meet the periodic payments required by
the loan, as well as the borrower's other housing and recurring expenses, which

C-3

determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus at 102.)

h.    "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation." (Prospectus at 102; RS at 102.)

i.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.    **Untrue and misleading statements regarding case-by-case underwriting exceptions in the EMLT 2004-2 Offering Materials:**

a.    "On a case by case basis, the Originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described within warrants an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's

C-4

current address. It is not expected that a substantial portion of the Mortgage

Loans may represent such underwriting exceptions." (PS at 49-50.)

b.   "The lender's credit application and review must determine whether the

borrower's income will be adequate to meet the periodic payments required by

the loan, as well as the borrower's other housing and recurring expenses, which

determination must be made in accordance with the expense-to-income ratios

published by the Secretary of HUD unless the lender determines and

documents in the loan file the existence of compensating factors concerning the

borrower's creditworthiness which support approval of the loan." (Prospectus

at 102; RS at 102.)

c.   Defendants' statements concerning the use of exceptions to underwriting

guidelines were untrue and misleading for the reasons set forth in Section II of

the Complaint.  The "exceptions" became the rule, and were used without

regard to whether there were "compensating factors."  This is supported by a

statistical analysis of the Mortgage Loans at issue here, and other facts

referenced in the Complaint.

**6.   Untrue and misleading statements concerning owner-occupancy statistics in the**

**EMLT 2004-2 Offering Materials:**

a.   According to the Prospectus Supplement (at S-24), for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,878 | 97.73% | 96.54% |
| Investor | 139 | 2.27% | 3.46% |
| Second/Vacation | 0 | 0.0% | 0.0% |
| Total Mortgaged Properties | 4,017 | 100% | 100% |

C-5

b.     Similarly, according to the Preliminary Term Sheet (at 30), for the aggregate

loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,908 | 97.70% | 96.49% |
| Investor | 142 | 2.30% | 3.51% |
| Second/Vacation | 0 | 0.0% | 0.0% |
| Total Mortgaged Properties | 4,050 | 100% | 100% |

c.     Prudential's subsequent loan-level analysis has determined that Defendants

drastically overstated the percentage of owner-occupied properties securing

mortgage loans in the aggregate collateral pool.

    i.     Of **772** sampled mortgage loans allegedly secured by owner-occupied

properties, and for which recently available analytical procedures allowed

Prudential to gather data sufficient to perform this particular test, the

number of loans on which the owner of the property instructed tax

authorities to send property tax bills to a different address, or listed a

different address for the property owner's property tax exemption: **56**.

    ii.     Of **772** sampled mortgage loans allegedly secured by owner-occupied

properties, and for which recently available analytical procedures allowed

Prudential to gather data sufficient to perform this particular test, the

number of loans on which creditors reported a different property address

as the borrower's mailing address six months after the origination of the

securitized loan: **82**.

    iii.     Of **772** sampled mortgage loans allegedly secured by owner-occupied

properties, and for which recently available analytical procedures allowed

EMLT 2004-2

Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property:  **14**.

iv.   Of **772** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence:  **89**.

v.   Of **772** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence:  **103**.

vi.   In sum, of the **772** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests:  **90**, or **11.66**% of the allegedly owner-occupied properties in the test sample.

d.   Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint.  A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of

the underwriting standards) baseless. This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.   **Untrue and misleading statements concerning appraisals in the EMLT 2004-2 Offering Materials:**

   a.   "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home. In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home. In connection with a Multifamily Loan, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used. An appraisal employing the income approach to value analyzes a multifamily project's cashflow, expenses, capitalization and other operational information in determining the property's value. The market approach to value focuses its analysis on the prices paid for the purchase of similar properties in the multifamily project's area, with adjustments made for variations between these other properties and the multifamily project being appraised. The cost approach calls for the appraiser to make an estimate of land value and then

EMLT 2004-2

determine the current cost of reproducing the building less any accrued

depreciation.  In any case, the value of the property being financed, as

indicated by the appraisal, must be such that it currently supports, and is

anticipated to support in the future, the outstanding loan balance."  (Prospectus

at 34-35; RS at 34-35.)

b.　　"The Originator's guidelines comply with applicable federal and state laws and

regulations and generally require an appraisal of the mortgaged property which

conforms to Freddie Mac and/or Fannie Mae standards.  All loans are subject

to the Originator's appraisal review process.  Appraisals are provided by

qualified independent appraisers licensed in their respective states."  (PS at S-

50.)

c.　　"Qualified independent appraisers must meet minimum standards of licensing.

Each Uniform Residential Appraisal Report includes a market data analysis

based on recent sales of comparable homes in the area and, where deemed

appropriate, replacement cost analysis based on the current cost of constructing

a similar home.  The appraisal review process includes steps that may require

(but are not limited to) an enhanced desk review, a field review or an

automated valuation report that confirms or supports the original appraiser's

value of the mortgaged premises.  A second independent appraisal (ordered by

the Originator) is required for all loan amounts or collateral amounts equal to

or exceeding $500,000."  (PS at S-50.)

d.　　Defendants' statements concerning appraisals were untrue and misleading for

the reasons set forth in Section II of the Complaint.  The disclosed appraisal

standards and processes were not actually followed. Rather, appraisers,
originators, and Defendants all knowingly instead used whatever value was
needed to generate a loan approval. This is evidenced by a statistical analysis
of the Mortgage Loans at issue here, as described herein, and other facts
referenced in the Complaint.

8.   **Untrue and misleading statements concerning LTV ratios in the EMLT 2004-2
     Offering Materials:**

   a.   The information in the Prospectus Supplement and the Preliminary Term Sheet
        present the following untrue and misleading statements regarding LTV ratios
        for the Mortgage Loans. For the aggregate loans, the Prospectus Supplement
        (at S-25) states that:

      i.     The Weighted Average Original LTV ratio is 90.74%;

      ii.    76.55% of the Mortgage Loans have an Original LTV ratio greater than
             80%;

      iii.   Only 49.17% of the Mortgage Loans in the pool have an Original LTV
             ratio greater than 90%;

      iv.    No Mortgage Loans have an Original LTV ratio greater than 100%;

   b.   The Preliminary Term Sheet provides almost identical data. For the aggregate
        loans, the Preliminary Term Sheet (at 27, 30) states that :

      i.     The Weighted Average Original LTV ratio is 90.75%;

      ii.    76.59% of the Mortgage Loans have an Original LTV ratio greater than
             80%;

C-10

    iii.      Only 49.19% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

    iv.      No Mortgage Loans have an Original LTV ratio greater than 100%.

c.      Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that the LTV ratios are higher than the Offering Materials represent. Of the sampled loans that had sufficient data to test:

    i.      the weighted average initial LTV ratio was **94.79**%;

    ii.      **84.00**% of the loans tested had an LTV ratio greater than 80%;

    iii.      **68.37**% of the loans tested had an LTV ratio greater than 90%;

    iv.      **51.51**% of the loans tested had an LTV ratio greater than 100%;

    v.      **39.46**% of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

    vi.      **9.94**% of the loans had an actual LTV ratio that was more than 25% greater than the LTV ratios they purportedly had.

d.      Defendants' statements concerning LTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9. **Untrue and misleading statements concerning credit ratings in the EMLT 2004-2 Offering Materials:**

    a.    "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Moody's Investors Service, Inc. ('Moody's') and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'):"  (PS S-8.)

    b.    "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates."  (PS at S-107.)

    c.    "The ratings assigned by the rating agencies named above to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued.  The rating agencies' ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates."  (RS at 65-66.)

    d.    The initial ratings given to the Certificates are set forth in the Complaint.

    e.    Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint.  Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding

C-12

EMLT 2004-2

the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint. This rendered the ratings meaningless and misleading.

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the EMLT 2004-2 Offering Materials:**

    a.   "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage (in recordable form in blank or to the Trustee) and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date." (PS at S-52.)

    b.   "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date." (RS at S-34.)

    c.   "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off Date Principal Balance, all interest accruing thereon on and after the Cut-off Date and all collections in

respect of interest and principal due after the Cut-off Date; (ii) property which secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (EMLT 2004-2 Pooling and Servicing Agreement, Jun. 15, 2004 ("PSA"), at 64.)

d.  "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in

recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property." (Prospectus at 62, 63.)

e.     "In connection with such transfer and assignment, the Depositor, does hereby deliver to, and deposit with the Trustee, or its designated agent (the 'Custodian'), the following documents or instruments with respect to each Initial Mortgage Loan so transferred and assigned and shall, in accordance with Section 2.08, deliver or caused to be delivered to the Trustee with respect to each Subsequent Mortgage Loan, the following documents or instruments (with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage Loan is registered on the MERS(R) System, an original Assignment, in form and substance acceptable for recording. . . . ; (iv) an original copy of any intervening assignment of Mortgage showing a complete chain of assignments (or to MERS, if the Mortgage Loan is registered on the MERS(R) System and noting the presence of the MIN); (v) the original or a certified copy of lender's title insurance policy; and (vi) the original or copies of each assumption, modification, written assurance or substitution agreement, if any." (PSA at 64, 65.)

f.     "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title

EMLT 2004-2

insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement." (Prospectus at 36.)

g. "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System. With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans." (Prospectus at 62.)

h. Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

 i. For the **686** loans for which documentation was available, title to **5** Mortgage Loans were held by third parties (other than MERS), and title to **232** Mortgage Loans were still held by the Originators. In other words, **34.55**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

 ii. Of those Mortgage Loans that were assigned to the Trust, **67.24**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

Case 2:53-cv-00001-KM-MAH Document 16498-1 Filed 11/02/12 Page 183 of 505 PageID: 364448

    i.       Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

EMLT 2004-2

**Exhibit D: Misrepresentations in the Offering Materials for EMLT 2004-3**

1.    **Collateral type:** "[F]irst lien, fixed-rate and adjustable-rate residential mortgage loans." (Prospectus Supplement Nov. 24, 2004 ("PS"); Preliminary Term Sheet Nov. 12, 2004 ("TS").)

2.    **Initial number of mortgage loans:** 3,250 (PS at S-3), 3,248 (TS at 27).

3.    **Originators:** "EquiFirst Corporation, a North Carolina corporation, and a wholly-owned subsidiary of EFC Holdings Corporation originated or acquired the mortgage loans." (PS at S-3; *see also* TS at 3.)

4.    **Untrue and misleading statements concerning underwriting guidelines in the EMLT 2004-3 Offering Materials:**

      a.    "All of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described herein." (PS at S-28.)

      b.    "The Originator's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. All of the Mortgage Loans were underwritten with a view toward the resale thereof in the secondary mortgage market. The Originator considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio ('Debt Ratio'), as well as the value, type and use of the mortgaged property." (PS at S-28.)

      c.    "The Originator conducts a number of quality control procedures, including a post-funding audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the audit, all loans are reviewed to verify

credit grading, documentation compliance and data accuracy.  Under the asset

quality procedure, a random and targeted selection of each month's

originations is reviewed.  The loan review confirms the existence and accuracy

of legal documents, credit documentation, appraisal analysis and underwriting

decision. A report detailing audit findings and level of error is provided to the

underwriters and reviewed monthly by senior management.  Adverse findings

are tracked monthly.  This review procedure allows the Originator to assess

programs for potential guideline changes, program enhancements, appraisal

policies, areas of risk to be reduced or eliminated and the need for additional

staff training."  (PS at S-30.)

d.     "Underwriting standards are applied by or on behalf of a lender to evaluate a

prospective borrower's credit standing and repayment ability, and the value

and adequacy of the mortgaged property as collateral.  In general, a prospective

borrower applying for a loan is required to fill out a detailed application

designed to provide to the underwriting officer pertinent credit information,

including the principal balance and payment history of any senior lien loan on

the related mortgaged property.  As part of the description of the borrower's

financial condition, the borrower generally is required to provide a current list

of assets and liabilities and a statement of income and expenses, as well as an

authorization to apply for a credit report which summarizes the borrower's

credit history with local merchants and lenders and any record of bankruptcy.

Generally, an employment verification is obtained from an independent source,

which is typically the borrower's employer.  The verification reports the

borrower's length of employment with its employer, current salary, and
expectations of continued employment.  If a prospective borrower is self-
employed, the borrower may be required to submit copies of signed tax returns.
The borrower may also be required to authorize verification of deposits at
financial institutions where the borrower has demand or savings accounts.
Underwriting standards which pertain to the creditworthiness of borrowers
seeking Multifamily Loans will be described in the related prospectus
supplement."  (Prospectus Apr. 23, 2004 at 34.)

e.  "Once all applicable employment, credit and property information is received,
a determination generally is made as to whether the prospective borrower has
sufficient monthly income available to meet the borrower's monthly
obligations on the proposed loan, generally determined on the basis of the
monthly payments due in the year of origination, and other expenses related to
the mortgaged property such as property taxes and hazard insurance, and to
meet monthly housing expenses and other financial obligations and monthly
living expenses."  (Prospectus at 35; Registration Statement, Dec. 19, 2003
("RS"), at 35.)

f.  "The lender's credit application and review must determine whether the
borrower's income will be adequate to meet the periodic payments required by
the loan, as well as the borrower's other housing and recurring expenses, which
determination must be made in accordance with the expense-to-income ratios
published by the Secretary of HUD unless the lender determines and
documents in the loan file the existence of compensating factors concerning the

D-3

borrower's creditworthiness which support approval of the loan." (Prospectus at 102; RS at 102.)

g.  "[Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.]" (RS at S-30)

h.  "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation." (Prospectus at 102; RS at 102.)

i.  Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.  **Untrue and misleading statements regarding case-by-case underwriting exceptions in the EMLT 2004-3 Offering Materials:**

EMLT 2004-3

a.  "On a case by case basis, the Originator may determine that, based upon
    compensating factors, a prospective mortgagor not strictly qualifying under the
    underwriting risk category guidelines described within warrants an
    underwriting exception.  Compensating factors may include, but are not limited
    to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good
    credit history, stable employment and time in residence at the applicant's
    current address.  It is not expected that a substantial portion of the Mortgage
    Loans may represent such underwriting exceptions."  (PS at S-29.)

b.  "The lender's credit application and review must determine whether the
    borrower's income will be adequate to meet the periodic payments required by
    the loan, as well as the borrower's other housing and recurring expenses, which
    determination must be made in accordance with the expense-to-income ratios
    published by the Secretary of HUD unless the lender determines and
    documents in the loan file the existence of compensating factors concerning the
    borrower's creditworthiness which support approval of the loan."  (Prospectus
    at 102; RS at Prospectus 102.)

c.  Defendants' statements concerning the use of exceptions to underwriting
    guidelines were untrue and misleading for the reasons set forth in Section II of
    the Complaint.  The "exceptions" became the rule, and were used without
    regard to whether there were "compensating factors."  This is supported by a
    statistical analysis of the Mortgage Loans at issue here, and other facts
    referenced in the Complaint.

6. **Untrue and misleading statements concerning owner-occupancy statistics in the EMLT 2004-3 Offering Materials:**

    a.    According to the Prospectus Supplement (at S-22), for the Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,170 | 98.14% | 97.54% |
| Investor | 80 | 1.86% | 2.46% |
| Second/Vacation | 0 | 0.00% | 0.00% |
| Total Mortgaged Properties | 3,250 | 100% | 100% |

    b.    Similarly, according to the Preliminary Term Sheet (at 32), for the Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,157 | 97.85% | 97.20% |
| Investor | 91 | 2.15% | 2.80% |
| Second/Vacation | 0 | 0.00% | 0.00% |
| Total Mortgaged Properties | 3,248 | 100% | 100% |

    c.    Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the collateral pool.

        i.    Of **800** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **61**.

D-6

    ii.    Of **800** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan:  **90**.

    iii.    Of **800** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property:  **22**.

    iv.    Of **800** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence:  **102**.

    v.    Of **800** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence:  **111**.

vi.    In sum, of the **800** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests:  **105**, or **13.13**% of the allegedly owner-occupied properties in the test sample.

d.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint.  A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless.  This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the EMLT 2004-3 Offering Materials:**

a.    "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed.  The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home.  In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable

D-8

EMLT 2004-3

manufactured home. In connection with a Multifamily Loan, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used. An appraisal employing the income approach to value analyzes a multifamily project's cashflow, expenses, capitalization and other operational information in determining the property's value. The market approach to value focuses its analysis on the prices paid for the purchase of similar properties in the multifamily project's area, with adjustments made for variations between these other properties and the multifamily project being appraised. The cost approach calls for the appraiser to make an estimate of land value and then determine the current cost of reproducing the building less any accrued depreciation. In any case, the value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance." (Prospectus at 34-35; RS at 34-35.)

b.   "The Originator's guidelines comply with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards. All loans are subject to the Originator's appraisal review process. Appraisals are provided by qualified independent appraisers licensed in their respective states." (PS at S-29.)

c.   "Qualified independent appraisers must meet minimum standards of licensing. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed

appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The appraisal review process includes steps that may require (but are not limited to) an enhanced desk review, a field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.  A second independent appraisal (ordered by the Originator) is required for all loan amounts exceeding $500,000."  (PS at S-29.)

d.  Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8.  **Untrue and misleading statements concerning LTV ratios in the EMLT 2004-3 Offering Materials:**

a.  The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding LTV ratios for the Mortgage Loans.  For the Mortgage Loans, the Prospectus Supplement (at S-19, S-23) states that:

i.  The Weighted Average Original LTV ratio is 90.26%;

ii.  76.46% of the Mortgage Loans have an Original LTV ratio greater than 80%;

D-10

      iii.     Only 52.58% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

      iv.     No Mortgage Loans have an Original LTV ratio greater than 100%;

b.     The Preliminary Term Sheet (at 27) provides almost identical data:

      i.     The Weighted Average Original LTV ratio is 89.07%;

      ii.     72.78% of the Mortgage Loans have an Original LTV ratio greater than 80%;

      iii.     Only 58.65% of the Mortgage Loans in the pool have an Original LTV ratio greater than or equal to 90%; and

      iv.     No Mortgage Loans have an Original LTV ratio greater than 100%;

c.     Prudential's loan-level analysis of the mortgages in the collateral pool has determined that the LTV ratios are higher than the Offering Materials represent.  Of the sampled loans that had sufficient data to test:

      i.     the weighted average initial LTV ratio was **93.39**%;

      ii.     **79.06**% of the loans tested had an LTV ratio greater than 80%;

      iii.     **64.40**% of the loans tested had an LTV ratio greater than 90%;

      iv.     **43.19**% of the loans tested had an LTV ratio greater than 100%;

      v.     **33.51**% of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

      vi.     **10.73**% of the loans had an actual LTV ratio that was more than 25% greater than the LTV ratios they purportedly had.

d.     Defendants' statements concerning LTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal

EMLT 2004-3

standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9. **Untrue and misleading statements concerning credit ratings in the EMLT 2004-3 Offering Materials:**

   a. "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Moody's Investors Service, Inc. ('Moody's'), Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Fitch Ratings ('Fitch'):"  (PS at S-7.)

   b. "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates."  (PS at S-85.)

   c. "The ratings assigned by the rating agencies named above to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued.  The rating agencies' ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated

EMLT 2004-3

with such certificates, and the extent to which the payment stream on the

mortgage pool is adequate to make the payments required by such certificates."

(RS at S-64, 65.)

    d.    "The ratings on the offered certificates address the likelihood of the receipt by

the holders of the offered certificates of all distributions on the mortgage loans

to which they are entitled.  The ratings on the offered certificates also address

the structural, legal and issuer-related aspects of the offered certificates,

including the nature of the mortgage loans."  (RS at 66.)

    e.    The initial ratings given to the Certificates are set forth in the Complaint.

    f.    Defendants' statements concerning credit ratings were untrue and misleading

for the reasons set forth in Section II of the Complaint.  Unknown to

Prudential, the rating agencies were fed baseless and false statistics regarding

the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue

here, and other facts referenced in the Complaint.  This rendered the ratings

meaningless and misleading.

**10.**    **Untrue and misleading statements regarding Defendants' assignment of Mortgage**

    **Loans in the EMLT 2004-3 Offering Materials:**

    a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right,

title and interest in and to each Initial Mortgage Loan, the related mortgage

note, Mortgage, assignment of mortgage (in recordable form in blank or to the

Trustee) and other related documents (collectively, the 'Related Documents'),

including all scheduled payments with respect to each such Mortgage Loan due

after the Cut-off Date."  (PS at S-31.)

b.    "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS at S-34.)

c.    "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off Date Principal Balance, all interest accruing thereon on and after the Cut-off Date and all collections in respect of interest and principal due after the Cut-off Date; (ii) property which secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (EMLT 2004-3 Pooling and Servicing Agreement, Nov. 15, 2004 ("PSA"), at 55.)

D-14

d.    "In addition, the depositor will deliver to the trustee or a custodian the

following items in connection with each loan in the related trust fund:  the

original mortgage note or contract, endorsed without recourse in blank or to the

order of the trustee; in the case of Single Family Loans, Home Equity Loans or

Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a

'mortgage') with evidence of recording indicated on the mortgage; however, in

the case of any mortgage not returned from the public recording office, the

depositor will deliver or cause to be delivered a copy of the mortgage together

with a certificate stating that the original mortgage was delivered to the

recording office; in the case of a contract, other than an unsecured contract, the

security interest in the mortgaged property securing the contract; an assignment

of the mortgage or contract to the trustee, which assignment will be in

recordable form in the case of a mortgage assignment or evidence that the

mortgage is held for the trustee through the MERS(R) System; and any other

security documents as may be specified in the related prospectus supplement,

including those relating to any senior lienholder interests in the related

mortgaged property."  (Prospectus at 62, 63.)

e.    "In connection with such transfer and assignment, the Depositor, does hereby

deliver to, and deposit with the Trustee, or its designated agent (the

'Custodian'), the following documents or instruments with respect to each

Initial Mortgage Loan so transferred and assigned and shall, in accordance with

Section 2.08, deliver or caused to be delivered to the Trustee with respect to

each Subsequent Mortgage Loan, the following documents or instruments

(with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original

Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage

Loan is registered on the MERS(R) System, an original Assignment, in form

and substance acceptable for recording. . . . ; (iv) an original copy of any

intervening assignment of Mortgage showing a complete chain of assignments

(or to MERS, if the Mortgage Loan is registered on the MERS(R) System and

noting the presence of the MIN); (v) the original or a certified copy of lender's

title  insurance policy; and (vi) the original or copies of each assumption,

modification, written assurance or substitution agreement, if any."  (PSA at 55,

56.)

f.    "Each loan constituted a valid lien on, or a perfected security interest with

respect to, the related mortgaged property, subject only to permissible title

insurance exceptions, if applicable, and certain other exceptions described in

the related servicing agreement."  (Prospectus at 36.)

g.    "If so specified in the related prospectus supplement, and in accordance with

the rules of membership of Merscorp, Inc. and/or Mortgage Electronic

Registration Systems, Inc. (MERS), assignments of the mortgages for some or

all of the mortgage loans in the related trust will be registered electronically

through the MERS(R) System.  With respect to mortgage loans registered

through the MERS(R) System, MERS shall serve as mortgagee of record

solely as a nominee in an administrative capacity on behalf of the trustee and

shall not have any interest in any of those mortgage loans."  (Prospectus at 62.)

EMLT 2004-3

h.   Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

   i.   For the **678** loans for which documentation was available, title to **5** Mortgage Loans were held by third parties (other than MERS), and title to **47** Mortgage Loans were still held by the Originators.  In other words, **7.67**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

   ii.   Of those Mortgage Loans that were assigned to the Trust, **88.89**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

i.   Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

EMLT 2004-3

**Exhibit E:  Misrepresentations in the Offering Materials for EMLT 2005-1**

1.      **Collateral type:**  "[F]irst lien, fixed-rate and adjustable-rate residential mortgage loans."  (Prospectus Supplement Mar. 14, 2005 ("PS").)  "[P]rimarily first and second lien, fixed rate and hybrid adjustable rate loans."  (Preliminary Term Sheet Mar. 7, 2005 ("TS") at 4.)

2.      **Initial number of mortgage loans:**  4,916 (PS at S-4), 5,045 (TS at 26).

3.      **Originators:**  "EquiFirst Corporation, a North Carolina corporation, and a wholly-owned subsidiary of EFC Holdings Corporation originated or acquired the mortgage loans."  (PS at S-3; *see also* TS at 3.)

4.      **Untrue and misleading statements concerning underwriting guidelines in the EMLT 2005-1 Offering Materials:**

  a.      "All of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described herein."  (PS at S-29.)

  b.      "The Originator's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  All of the Mortgage Loans were underwritten with a view toward the resale thereof in the secondary mortgage market.  The Originator considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio ('Debt Ratio'), as well as the value, type and use of the mortgaged property."  (PS at S-30.)

  c.      "The Originator conducts a number of quality control procedures, including a post-funding audit as well as a full re-underwriting of a random selection of

E-1

loans to assure asset quality. Under the audit, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random and targeted selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is provided to the underwriters and reviewed monthly by senior management. Adverse findings are tracked monthly. This review procedure allows the Originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training." (PS at S-31.)

d.  "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. Generally, an employment verification is obtained from an independent source,

E-2

EMLT 2005-1

which is typically the borrower's employer. The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. Underwriting standards which pertain to the creditworthiness of borrowers seeking Multifamily Loans will be described in the related prospectus supplement." (Prospectus Feb. 22, 2005, at 34.)

e. "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses." (Prospectus at 35; Registration Statement Dec. 27, 2004 ("RS") at 35.)

f. "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and

E-3

documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus at 102; RS at 102.)

g.    "[Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer pertinent credit information.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.]"  (RS at PS S-31)

h.    "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation." (Prospectus at 102; RS at 102.)

i.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

E-4

5.    **Untrue and misleading statements regarding case-by-case underwriting exceptions in the EMLT 2005-1 Offering Materials:**

    a.    "On a case by case basis, the Originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described within warrants an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is not expected that a substantial portion of the Mortgage Loans may represent such underwriting exceptions."  (PS at S-31.)

    b.    "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus at 102; RS at 102.)

    c.    Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without regard to whether there were "compensating factors."  This is supported by a

statistical analysis of the Mortgage Loans at issue here, and other facts

referenced in the Complaint.

6.  **Untrue and misleading statements concerning owner-occupancy statistics in the**

**EMLT 2005-1 Offering Materials:**

    a.    According to the Prospectus Supplement (at S-23), for the Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,806 | 98.02% | 97.76% |
| Investor | 94 | 1.53% | 1.91% |
| Second/Vacation | 16 | 0.46% | 0.33% |
| Total Mortgaged Properties | 4,916 | 100% | 100% |

    b.    Similarly, according to the Preliminary Term Sheet (at 31), for the Mortgage

Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,929 | 98.01% | 97.70% |
| Investor | 100 | 1.55% | 1.98% |
| Second/Vacation | 16 | 0.45% | 0.32% |
| Total Mortgaged Properties | 5,045 | 100% | 100% |

    c.    Prudential's subsequent loan-level analysis has determined that Defendants

drastically overstated the percentage of owner-occupied properties securing

mortgage loans in the collateral pool.

    i.    Of **776** sampled mortgage loans allegedly secured by owner-occupied

properties, and for which recently available analytical procedures allowed

Prudential to gather data sufficient to perform this particular test, the

number of loans on which the owner of the property instructed tax

E-6

authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **59**.

ii.   Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **68**.

iii.  Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **29**.

iv.   Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence: **100**.

v.    Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens

that did not list the securitized property as the owner's primary residence:
**91**.

    vi.    In sum, of the **776** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests: **101**, or **13.02**% of the allegedly owner-occupied properties in the test sample.

    d.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint. A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless. This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the EMLT 2005-1 Offering Materials:**

    a.    "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home. In connection with a Manufactured Housing Contract, the appraisal is

E-8

based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home. In connection with a Multifamily Loan, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used. An appraisal employing the income approach to value analyzes a multifamily project's cashflow, expenses, capitalization and other operational information in determining the property's value. The market approach to value focuses its analysis on the prices paid for the purchase of similar properties in the multifamily project's area, with adjustments made for variations between these other properties and the multifamily project being appraised. The cost approach calls for the appraiser to make an estimate of land value and then determine the current cost of reproducing the building less any accrued depreciation. In any case, the value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance." (Prospectus at 34-35; RS at 34-35.)

b. "The Originator's guidelines comply with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards. All loans are subject to the Originator's appraisal review process. Appraisals are provided by qualified independent appraisers licensed in their respective states." (PS at S-31.)

E-9

c.  "Qualified independent appraisers must meet minimum standards of licensing. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The appraisal review process includes steps that may require (but are not limited to) an enhanced desk review, a field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises.  A second independent appraisal (ordered by the Originator) is required for all loan amounts exceeding $500,000."  (PS at 31.)

d.  Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8.  **Untrue and misleading statements concerning LTV ratios in the EMLT 2005-1 Offering Materials:**

a.  The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding LTV ratios for the Mortgage Loans.  For the Mortgage Loans, the Prospectus Supplement (at S-20, 24) states that:

      i.      The Weighted Average Original LTV ratio is 89.08%;

      ii.     72.60% of the Mortgage Loans have an Original LTV ratio greater than 80%;

      iii.    Only 48.05% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

      iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

b.    The Preliminary Term Sheet (at 26, 28) provides almost identical data:

      i.      The Weighted Average Original LTV ratio is 88.97%;

      ii.     72.35% of the Mortgage Loans have an Original LTV ratio greater than 80%;

      iii.    Only 59.07% of the Mortgage Loans in the pool have an Original LTV ratio greater than or equal to 90%; and

      iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

c.    Prudential's loan-level analysis of the mortgages in the collateral pool has determined that the LTV ratios are higher than the Offering Materials represent.  Of the sampled loans that had sufficient data to test:

      i.      the weighted average initial LTV ratio was **92.40**%;

      ii.     **76.83**% of the loans tested had an LTV ratio greater than 80%;

      iii.    **60.20**% of the loans tested had an LTV ratio greater than 90%;

      iv.    **41.56**% of the loans tested had an LTV ratio greater than 100%;

      v.     **34.26**% of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

EMLT 2005-1

vi. **12.59**% of the loans had an actual LTV ratio that was more than 25%
greater than the LTV ratios they purportedly had.

d. Defendants' statements concerning LTV ratios were untrue and misleading for
the reasons set forth in Section II of the Complaint. The disclosed appraisal
standards and processes were not actually followed. Rather, appraisers,
originators, and Defendants all knowingly instead used whatever value was
needed to generate a loan approval. The use of inflated appraisal values to get
more loans approved meant Defendants knew the statistical descriptions above
were baseless, false, and misleading. This is evidenced by a statistical analysis
of the Mortgage Loans at issue here, as described above, and other facts
referenced in the Complaint.

9. **Untrue and misleading statements concerning credit ratings in the EMLT 2005-1
Offering Materials:**

a. "It is a condition of the issuance of the Offered Certificates that they be
assigned the following ratings by Moody's Investors Service, Inc. ('Moody's'),
Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P')
and Fitch Ratings ('Fitch'):" (PS at S-7.)

b. "It is a condition to the issuance of the certificates of each series offered by this
prospectus and the accompanying prospectus supplement that they shall have
been rated in one of the four highest rating categories by the nationally
recognized statistical rating agency or agencies specified in the related
prospectus supplement." (RS at 162)

    c.     "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans. The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates." (PS at S-86.)

    d.     "The ratings assigned by the rating agencies named above to mortgage pass-through certificates address the likelihood of the receipt of all distributions by the related certificateholders under the agreements pursuant to which the certificates are issued. The ratings by the rating agencies take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by the certificates." (RS at S-52.)

    e.     "Ratings on mortgage pass-through certificates address the likelihood of receipt by securityholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with such certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any." (RS at 152)

    f.     The initial ratings given to the Certificates are set forth in the Complaint.

    g.     Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue

here, and other facts referenced in the Complaint.  This rendered the ratings

meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage**

   **Loans in the EMLT 2005-1 Offering Materials:**

   a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right,

   title and interest in and to each Initial Mortgage Loan, the related mortgage

   note, Mortgage, assignment of mortgage (in recordable form in blank or to the

   Trustee) and other related documents (collectively, the 'Related Documents'),

   including all scheduled payments with respect to each such Mortgage Loan due

   after the Cut-off Date."  (PS at S-33.)

   b.    "On the closing date the depositor will transfer to the trust fund all of its right,

   title and interest in and to each mortgage loan included in the pool, the related

   mortgage notes, mortgages and other related documents, including all

   scheduled payments with respect to each mortgage loan due after the cut-off

   date."  (RS at S-34.)

   c.    "The Depositor, concurrently with the execution and delivery hereof, does

   hereby transfer, assign, set over and otherwise convey in trust to the Trustee

   without recourse for the benefit of the Certificateholders all the right, title and

   interest of the Depositor, including any security interest therein for the benefit

   of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage

   Loan Schedule, including the related Cut-off Date Principal Balance, all

   interest accruing thereon on and after the Cut-off Date and all collections in

   respect of interest and principal due after the Cut-off Date; (ii) property which

secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (EMLT 2005-1 Pooling and Servicing Agreement, Mar. 15, 2005 ("PSA"), at 52.)

d.  "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the

mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property." (Prospectus at 62, 63.)

e.    "In connection with such transfer and assignment, the Depositor, does hereby deliver to, and deposit with the Trustee, or its designated agent (the 'Custodian'), the following documents or instruments with respect to each Initial Mortgage Loan so transferred and assigned and shall, in accordance with Section 2.08, deliver or caused to be delivered to the Trustee with respect to each Subsequent Mortgage Loan, the following documents or instruments (with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage Loan is registered on the MERS(R) System, an original Assignment, in form and substance acceptable for recording. . . . ; (iv) an original copy of any intervening assignment of Mortgage showing a complete chain of assignments (or to MERS, if the Mortgage Loan is registered on the MERS(R) System and noting the presence of the MIN); (v) the original or a certified copy of lender's title insurance policy; and (vi) the original or copies of each assumption, modification, written assurance or substitution agreement, if any." (PSA at 52, 53.)

f.    "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title

EMLT 2005-1

insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement." (Prospectus at 36.)

g.  "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System. With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans." (Prospectus at 62.)

h.  Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

i.  For the **694** loans for which documentation was available, title to **17** Mortgage Loans were held by third parties (other than MERS), and title to **32** Mortgage Loans were still held by the Originators. In other words, **7.06**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

ii.  Of those Mortgage Loans that were assigned to the Trust, **69.44**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

Case 2:93-cv-00001-KM   Document 16498-1   Filed 11/02/12   Page 216 of 505 PageID: 364431

     i.     Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

### Exhibit F:  Misrepresentations in the Offering Materials for FHLT 2004-1

1.  **Collateral type:**  "[F]irst lien and second lien, fixed-rate and adjustable-rate mortgage loans."  (Prospectus Supplement Apr. 27, 2004 ("PS"), at S-2.)  "[P]rimarily first lien and second lien fixed rate and hybrid adjustable rate, conforming and non-conforming mortgage loans."  (Preliminary Term Sheet Mar. 22, 2004 ("TS"), at 4.)

2.  **Initial number of mortgage loans:**  Aggregate:  3,736 (PS at S-2), 3,779 (TS at 22).

3.  **Originators**:  "Fremont Investment & Loan, a California state chartered industrial bank, originated or acquired the mortgage loans."  (PS at S-2; *see also* TS.)

4.  **Untrue and misleading statements concerning underwriting guidelines in the FHLT 2004-1 Offering Materials:**

   a.   "All of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described in this section. The following is a general summary of the underwriting guidelines believed by the Depositor to have been generally applied, with some variation, by the Originator."  (PS at S-44.)

   b.   "The Originator's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  All of the Mortgage Loans were underwritten with a view toward the resale thereof in the secondary mortgage market.  The Originator considers, among other things, a mortgagor's Credit Score, past payment history, repayment ability and debt service-to-income ratio, as well as the value, type and use of the mortgaged property."  (PS at S-44.)

c.  "The Originator conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by the Originator's senior management.  Adverse findings are tracked monthly.  This review procedure allows the Originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."  (PS at S-45.)

d.  "In some cases, the Originator relies on a statistical appraisal methodology provided by a third-party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with the Originator."  (PS at S-45.)

e.  "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application

F-2

designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer. The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. Underwriting standards which pertain to the creditworthiness of borrowers seeking Multifamily Loans will be described in the related prospectus supplement." (Prospectus Apr. 23, 2004, at 34.)

f.    "Each insured lender is required to use prudent lending standards in underwriting individual loans and to satisfy the applicable loan underwriting requirements under the Title I Program prior to its approval of the loan and disbursement of loan proceeds. Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on

FHLT 2004-1

the loan obligation.  The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus at 102; RS at 102.)

g.    "[Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer pertinent credit information.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.]"  (Registration Statement Jan. 9, 2004 ("RS") at S-31.)

h.    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the

FHLT 2004-1

monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses." (Prospectus at 35; RS at 35.)

    i.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5. **Untrue and misleading statements regarding case-by-case underwriting exceptions in the FHLT 2004-1 Offering Materials:**

    a.    "On a case by case basis, the Originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address." (PS at S-45.)

    b.    "Each insured lender is required to use prudent lending standards in underwriting individual loans and to satisfy the applicable loan underwriting requirements under the Title I Program prior to its approval of the loan and disbursement of loan proceeds. Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent

and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation.  The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus at 102; RS at 102.)

c.     Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without regard to whether there were "compensating factors."  This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.     **Untrue and misleading statements concerning owner-occupancy statistics in the FHLT 2004-1 Offering Materials:**

a.     According to the Prospectus Supplement (at S-22), for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,384 | 92.32% | 90.58% |
| Investor | 326 | 7.02% | 8.73% |
| Second/Vacation | 26 | 0.66% | 0.69% |
| Total Mortgaged Properties | 3,736 | 100% | 100% |

FHLT 2004-1

b.     Similarly, according to the Preliminary Term Sheet (at 24), for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,418 | 92.27% | 90.45% |
| Investor | 334 | 7.07% | 8.84% |
| Second/Vacation | 27 | 0.67% | 0.71% |
| Total Mortgaged Properties | 3,779 | 100% | 100% |

c.     Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the aggregate collateral pool.

    i.     Of **734** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **40**.

    ii.     Of **734** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **71**.

    iii.     Of **734** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed

F-7

Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property:  **24**.

iv.    Of **734** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence:  **73**.

v.    Of **734** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence: **108**.

vi.    In sum, of the **734** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests:  **78**, or **10.63**% of the allegedly owner-occupied properties in the test sample.

d.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint.  A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of

F-8

FHLT 2004-1

the underwriting standards) baseless. This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.      **Untrue and misleading statements concerning appraisals in the FHLT 2004-1 Offering Materials:**

    a.      "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home. In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home. In connection with a Multifamily Loan, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used. An appraisal employing the income approach to value analyzes a multifamily project's cashflow, expenses, capitalization and other operational information in determining the property's value. The market approach to value focuses its analysis on the prices paid for the purchase of similar properties in the multifamily project's area, with adjustments made for variations between these other properties and the multifamily project being appraised. The cost approach calls for the appraiser to make an estimate of land value and then

determine the current cost of reproducing the building less any accrued depreciation.  In any case, the value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance."  (Prospectus at 34-35; RS at 34-35.)

b.      "The Originator's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by the Originator.  In some cases, the Originator relies on a statistical appraisal methodology provided by a third-party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with the Originator.  Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises."  (PS at S-45.)

c.      Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal

FHLT 2004-1

standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8. **Untrue and misleading statements concerning LTV ratios in the FHLT 2004-1 Offering Materials:**

   a.   The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding LTV ratios for the Mortgage Loans. For the aggregate loans, the Prospectus Supplement (at S-23) states that:

      i.   The Weighted Average Original LTV ratio is 82.47%;

      ii.   48.69% of the Mortgage Loans have an Original LTV ratio greater than 80%;

      iii.   Only 26.98% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

      iv.   No Mortgage Loans have an Original LTV ratio greater than 100%.

   b.   The Preliminary Term Sheet (at 22, 25) provides almost identical data for the aggregate loans:

      i.   The Weighted Average Original LTV ratio is 82.48%;

      ii.   48.74% of the Mortgage Loans have an Original LTV ratio greater than 80%;

      iii.    Only 27.02% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

      iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

c.    Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that the LTV ratios are higher than the Offering Materials represent. Of the sampled loans that had sufficient data to test:

      i.    the weighted average initial LTV ratio was **81.77%**;

      ii.    **52.75%** of the loans tested had an LTV ratio greater than 80%;

      iii.    **28.5%** of the loans tested had an LTV ratio greater than 90%;

      iv.    **15.25%** of the loans tested had an LTV ratio greater than 100%;

      v.    **24.5%** of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

      vi.    **6.25%** of the loans had an actual LTV ratio that was more than 25% greater than the LTV ratios they purportedly had.

d.    Defendants' statements concerning LTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.  **Untrue and misleading statements concerning credit ratings in the FHLT 2004-1 Offering Materials:**

    a.    "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings by Fitch Ratings ('Fitch'), Moody's Investors Service, Inc. ('Moody's') and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'):"  (PS at S-7.)

    b.    "It is a condition to the issuance of the certificates of each series offered by this prospectus and the accompanying prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (RS at 165)

    c.    "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates."  (PS at S-102, 103.)

    d.    "The ratings on the offered certificates address the likelihood of the receipt by the holders of the offered certificates of all distributions on the mortgage loans to which they are entitled.  The ratings on the offered certificates also address the structural, legal and issuer-related aspects of the offered certificates, including the nature of the mortgage loans."  (RS at S-66)

    e.    "The ratings assigned by the rating agencies named above to mortgage pass-through certificates address the likelihood of the receipt of all distributions on

the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued." (RS at S-66)

    f.    The initial ratings given to the Certificates are set forth in the Complaint.

    g.    Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint. This rendered the ratings meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2004-1 Offering Materials:**

    a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage (in recordable form in blank or to the Trustee) and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date." (PS at S-49.)

    b.    "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date." (RS at S-34.)

Case 2:53-cv-00001-KM Document 16498-1 Filed 11/02/12 Page 233 of 505 PageID: 264498

c. "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus at 62, 63.)

d. "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement."  (Prospectus at 36.)

e. "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic

FHLT 2004-1

Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System.  With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans."  (Prospectus at 62.)

f.    Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

    i.    For the **657** loans for which documentation was available, title to **11** Mortgage Loans were held by third parties (other than MERS), and title to **579** Mortgage Loans were still held by the Originators.  In other words, **89.9**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

    ii.    Of those Mortgage Loans that were assigned to the Trust, **62.5**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

g.    Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

### Exhibit G:  Misrepresentations in the Offering Materials for FHLT 2004-2

1.  **Collateral type:**  "[F]irst lien and second lien, fixed-rate and adjustable-rate mortgage loans."  (Prospectus Supplement Sept. 8, 2004 ("PS") at S-2.)  "[P]rimarily first lien and second lien fixed rate and hybrid adjustable rate, conforming and non-conforming mortgage loans."  (Preliminary Term Sheet Aug. 3, 2004 ("TS") at 4.)

2.  **Initial number of mortgage loans:**  Aggregate:  5,040 (PS at S-3), 5,089 (TS at 22).

3.  **Originators:**  "Fremont Investment & Loan, a California state chartered industrial bank, originated or acquired the mortgage loans."  (PS at S-2; *see also* TS.)

4.  **Untrue and misleading statements concerning underwriting guidelines in the FHLT 2004-2 Offering Materials:**

    a.  "All of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described in this section. The following is a general summary of the underwriting guidelines believed by the Depositor to have been applied, with some variation, by the Originator. This summary does not purport to be a complete description of the underwriting standards of the Originator."  (PS at S-46.)

    b.  "The Originator conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error is sent monthly to each

G-1

loan production office for response. The review findings and branch responses are then reviewed by the Originator's senior management. Adverse findings are tracked monthly. This review procedure allows the Originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training." (PS at S-45.)

c. "The Originator's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assess the risk of default by using credit scores from third party credit repositories ('Credit Scores') along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratio as an aid to, not a substitute for, the underwriter's judgment. All of the Mortgage Loans were underwritten with a view toward the resale of the Mortgage Loans in the secondary mortgage market." (PS at S-46.)

d. "[Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a

G-2

FHLT 2004-2

credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.]"  (Registration Statement Jan. 9, 2004 ("RS") at S-31.)

e.  "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer.  The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment.  If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns.  The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.  Underwriting standards which pertain to the creditworthiness of borrowers

G-3

seeking Multifamily Loans will be described in the related prospectus supplement."  (Prospectus Apr. 23, 2004, at 34.)

f.    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses."  (Prospectus at 35; RS at 35.)

g.    "Each insured lender is required to use prudent lending standards in underwriting individual loans and to satisfy the applicable loan underwriting requirements under the Title I Program prior to its approval of the loan and disbursement of loan proceeds.  Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation.  The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating

G-4

factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus at 102; RS at 102.)

    h.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.    **Untrue and misleading statements regarding case-by-case underwriting exceptions in the FHLT 2004-2 Offering Materials:**

    a.    "On a case by case basis, the Originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."  (PS at S-47.)

    b.    "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the

borrower's creditworthiness which support approval of the loan." (Prospectus at 102; RS at 102.)

    c.    Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The "exceptions" became the rule, and were used without regard to whether there were "compensating factors." This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

**6.    Untrue and misleading statements concerning owner-occupancy statistics in the FHLT 2004-2 Offering Materials:**

    a.    According to the Prospectus Supplement (at S-23), for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,637 | 93.76% | 91.94% |
| Investor | 346 | 5.28% | 6.69% |
| Second/Vacation | 57 | 0.96% | 1.13% |
| Total Mortgaged Properties | 5,040 | 100% | 100% |

    b.    Similarly, according to the Preliminary Term Sheet (at 24), for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,680 | 93.74% | 91.96% |
| Investor | 351 | 5.26% | 6.90% |
| Second/Vacation | 58 | 0.99% | 1.14% |
| Total Mortgaged Properties | 5,089 | 100% | 100% |

G-6

c.      Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the aggregate collateral pool.

i.      Of **740** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption:  **34**.

ii.     Of **740** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan:  **87**.

iii.    Of **740** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property:  **29**.

iv.     Of **740** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the

FHLT 2004-2

number of loans on other properties owned by the borrower that did not

list the securitized property as the owner's primary residence:  **72**.

  v.  Of **740** sampled mortgage loans allegedly secured by owner-occupied

properties, and for which recently available analytical procedures allowed

Prudential to gather data sufficient to perform this particular test, the

number of loans on other properties owned by the borrower that had liens

that did not list the securitized property as the owner's primary residence:

**130**.

  vi.  In sum, of the **740** mortgage loans sampled that were allegedly secured by

owner-occupied properties, the non-duplicative number of loans that

appear not to be owner-occupied, based on their failure of at least two of

Prudential's analytical tests:  **83**, or **11.22**% of the allegedly owner-

occupied properties in the test sample.

 d. Defendants' statements concerning owner-occupancy statistics were untrue and

misleading for the reasons set forth in Section II of the Complaint.  A material

amount of the mortgaged properties were not in fact owner-occupied, and

Defendants omitted that the given statistics were (due to the abandonment of

the underwriting standards) baseless.  This is evidenced by the above statistical

analysis of the Mortgage Loans at issue here, and other facts referenced in the

Complaint.

7. **Untrue and misleading statements concerning appraisals in the FHLT 2004-2**

**Offering Materials:**

a.  "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed.  The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home.  In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home.  In connection with a Multifamily Loan, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used.  An appraisal employing the income approach to value analyzes a multifamily project's cashflow, expenses, capitalization and other operational information in determining the property's value.  The market approach to value focuses its analysis on the prices paid for the purchase of similar properties in the multifamily project's area, with adjustments made for variations between these other properties and the multifamily project being appraised.  The cost approach calls for the appraiser to make an estimate of land value and then determine the current cost of reproducing the building less any accrued depreciation.  In any case, the value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance."  (Prospectus at 34-35; RS at 34-35.)

FHLT 2004-2

b.   "The Originator's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by the Originator.  In some cases, the Originator relies on a statistical appraisal methodology provided by a third-party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with the Originator.  Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises."  (PS at S-47.)

c.   Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

G-10

FHLT 2004-2

8.  **Untrue and misleading statements concerning LTV ratios in the FHLT 2004-2 Offering Materials:**

   a.   The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding LTV and CLTV ratios for the Mortgage Loans.  For the aggregate loans, the Prospectus Supplement (at S-24) states that:

   i.    The Weighted Average Original LTV ratio is 81.93%;

   ii.   49.94% of the Mortgage Loans have an Original LTV ratio greater than 80%;

   iii.  Only 24.48% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%;

   iv.   No Mortgage Loans have an Original LTV ratio greater than 100%;

   b.   The Preliminary Term Sheet (at 22, 25) provides almost identical data for the aggregate loans:

   i.    The Weighted Average Original LTV ratio is 81.94%;

   ii.   50.01% of the Mortgage Loans have an Original LTV ratio greater than 80%;

   iii.  Only 24.54% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

   iv.   Only 0.02% Mortgage Loans have an Original LTV ratio greater than 100%;

G-11

    c.      Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that the LTV ratios are higher than the Offering Materials represent. Of the sampled loans that had sufficient data to test:

        i.      the weighted average initial LTV ratio was **80.88**%;

        ii.      **51.65**% of the loans tested had an LTV ratio greater than 80%;

        iii.      **32.09**% of the loans tested had an LTV ratio greater than 90%;

        iv.      **16.26**% of the loans tested had an LTV ratio greater than 100%;

        v.      **26.15**% of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

        vi.      **5.27**% of the loans had an actual LTV ratio that was more than 25% greater than the LTV ratios they purportedly had.

    d.      Defendants' statements concerning LTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.      **Untrue and misleading statements concerning credit ratings in the FHLT 2004-2 Offering Materials:**

a.  "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings by Fitch Ratings ('Fitch'), Moody's Investors Service, Inc. ('Moody's') and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'):"  (PS at S-7.)

b.  "It is a condition to the issuance of the certificates of each series offered by this prospectus and the accompanying prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (RS at 165)

c.  "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates."  (Prospectus at 103.)

d.  "The ratings on the offered certificates address the likelihood of the receipt by the holders of the offered certificates of all distributions on the mortgage loans to which they are entitled.  The ratings on the offered certificates also address the structural, legal and issuer-related aspects of the offered certificates, including the nature of the mortgage loans."  (RS at S-66.)

e.  "The ratings assigned by the rating agencies named above to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued."  (RS at S-66.)

f.  The initial ratings given to the Certificates are set forth in the Complaint.

g.    Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint.  Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.  This rendered the ratings meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2004-2 Offering Materials:**

a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage (in recordable form in blank or to the Trustee) and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date."  (PS at S-49.)

b.    "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS at S-34.)

c.    "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit

of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage
Loan Schedule, including the related Cut-off Date Principal Balance, all
interest accruing thereon on and after the Cut-off Date and all collections in
respect of interest and principal due after the Cut-off Date; (ii) property which
secured each such Mortgage Loan and which has been acquired by foreclosure
or deed in lieu of foreclosure; (iii) its interest in any insurance policies in
respect of the Mortgage Loans; (iv) the rights of the Depositor under the
Mortgage Loan Purchase Agreement; (v) the right to receive any amounts
payable under the Cap Contract; (vi) all other assets included or to be included
in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such
assignment includes all interest and principal due and collected by the
Depositor or the Servicer after the Cut-off Date with respect to the Mortgage
Loans."  (FHLT 2004-2 Pooling and Servicing Agreement, Sept. 1, 2004
("PSA"), at 63.)

d.  "In addition, the depositor will deliver to the trustee or a custodian the
following items in connection with each loan in the related trust fund:  the
original mortgage note or contract, endorsed without recourse in blank or to the
order of the trustee; in the case of Single Family Loans, Home Equity Loans or
Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a
'mortgage') with evidence of recording indicated on the mortgage; however, in
the case of any mortgage not returned from the public recording office, the
depositor will deliver or cause to be delivered a copy of the mortgage together
with a certificate stating that the original mortgage was delivered to the

G-15

recording office; in the case of a contract, other than an unsecured contract, the

security interest in the mortgaged property securing the contract; an assignment

of the mortgage or contract to the trustee, which assignment will be in

recordable form in the case of a mortgage assignment or evidence that the

mortgage is held for the trustee through the MERS(R) System; and any other

security documents as may be specified in the related prospectus supplement,

including those relating to any senior lienholder interests in the related

mortgaged property."  (Prospectus at 62, 63.)

e.    "In connection with such transfer and assignment, the Depositor, does hereby

deliver to, and deposit with the Trustee, or its designated agent (the

'Custodian'), the following documents or instruments with respect to each

Initial Mortgage Loan so transferred and assigned and shall, in accordance with

Section 2.08, deliver or caused to be delivered to the Trustee with respect to

each Subsequent Mortgage Loan, the following documents or instruments

(with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original

Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage

Loan is registered on the MERS(R) System, an original Assignment, in form

and substance acceptable for recording. . . . ; (iv) an original copy of any

intervening assignment of Mortgage showing a complete chain of assignments

(or to MERS, if the Mortgage Loan is registered on the MERS(R) System and

noting the presence of the MIN); (v) the original or a certified copy of lender's

title  insurance policy; and (vi) the original or copies of each assumption,

modification, written assurance or substitution agreement, if any." (PSA at 63, 64.)

f.    "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement." (Prospectus at 36.)

g.    "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System. With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans." (Prospectus at 62.)

h.    Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

    i.    For the **738** loans for which documentation was available, title to **30** Mortgage Loans were held by third parties (other than MERS), and title to **113** Mortgage Loans were still held by the Originators. In other words, **19.38**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

ii.      Of those Mortgage Loans that were assigned to the Trust, **77.27**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

i.      Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

FHLT 2004-2

<u>**Exhibit H: Misrepresentations in the Offering Materials for FHLT 2004-D**</u>

1.  **Collateral type:** "[F]irst lien and second lien, fixed-rate and adjustable-rate mortgage

    loans." (Prospectus Supplement Sept. 8, 2004 ("PS") at S-2).

2.  **Initial number of mortgage loans:** Aggregate: 3,229 loans (PS at S-3).

3.  **Originators:** "The mortgage loans in the trust were acquired by the depositor from

    Fremont, who originated them." (PS at S-24.)

4.  **Untrue and misleading statements concerning underwriting guidelines in the FHLT**

    **2004-D Offering Materials:**

    a.  "All of the mortgage loans were originated or acquired by Fremont, generally

        in accordance with the underwriting criteria described in this section. The

        following is a summary of the underwriting guidelines believed by the

        depositor to have been applied, with some variation, by Fremont." (PS at S-

        34.)

    b.  "Mortgage loans are underwritten in accordance with Fremont's current

        underwriting programs, referred to as the Scored Programs ('Scored

        Programs'), subject to various exceptions as described in this section.

        Fremont's underwriting guidelines are primarily intended to assess the ability

        and willingness of the borrower to repay the debt and to evaluate the adequacy

        of the mortgaged property as collateral for the mortgage loan. The Scored

        Programs assess the risk of default by using Credit Scores obtained from third

        party credit repositories along with, but not limited to, past mortgage payment

        history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratio as

        an aid to, not a substitute for, the underwriter's judgment. All of the mortgage

H-1

loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market."  (PS at S-34.)

c.   "The Scored Programs were developed to simplify the origination process.  In contrast to assignment of credit grades according to traditional non-agency credit assessment methods, i.e., mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's Credit Score, mortgage payment history and seasoning on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance.  Licensed mortgage brokers are able to access Credit Scores at the initial phases of the loan application process and use the Credit Score to determine the interest rates a borrower may qualify for based upon Fremont's Scored Programs risk-based pricing matrices.  Final loan terms are subject to approval by Fremont."  (PS at S-34.)

d.   "Under the Scored Programs, Fremont requires that the Credit Score of the primary borrower (the borrower with the highest percentage of total income) be used to determine program eligibility.  Credit Scores must be obtained from at least two national credit repositories, with the lower of the two scores being utilized in program eligibility determination.  If Credit Scores are obtained from three credit repositories, the middle of the three scores is utilized.  In all cases, a borrower's complete credit history must be detailed in the credit report that produces a given Credit Score or the borrower is not eligible for a Scored Program.  Generally, the minimum applicable Credit Scores allowed is 500." (PS at S-34.)

e.    "All of the mortgage loans were underwritten by Fremont's underwriters having the appropriate approval authority.  Each underwriter is granted a level of authority commensurate with their proven judgment, experience and credit skills."

f.    "Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by Fremont's senior management.  Adverse findings are tracked monthly.  This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."  (PS at S-35.)

g.    "Fremont Investment & Loan's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage

market.  Fremont Investment & Loan considers, among other things, a mortgagor's Credit Score, past payment history, repayment ability and debt service-to-income ratio, as well as the value, type and use of the mortgaged property. "  (Registration Statement Apr. 28, 2004 ("RS") at 78; Prospectus Jun. 23, 2004, at 68, 69.)

h.  "The mortgage loans were underwritten under one of two types of underwriting programs, either the Scored Programs ('Scored Programs') or the Traditional Program ('Traditional Program').  Fremont Investment & Loan no longer originates mortgage loans under the Traditional Program.  Within both types of underwriting programs, there are the three documentation types, Full Documentation, Easy Documentation, and Stated Income.  All of the mortgage loans were originated in accordance with Fremont Investment & Loan's underwriting guidelines, subject to various exceptions as described in this section.  While each underwriting program is intended to assess the risk of default, the Scored Programs make greater use of Credit Scores.  A Credit Score is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, loan-to-value ratio as an aid to, not a substitute for, the underwriter's judgment.  Fremont Investment & Loan's underwriting staff fully reviews each loan to determine whether it's underwriting guidelines for income, assets, employment and collateral are met."  (RS at 78; Prospectus at 69.)

i.  "The Scored Programs were developed to simplify the origination process. In contrast to assignment of credit grades according to traditional non-agency

H-4

Case 2:93-cv-00001-KM-MAH Document 16498-1 Filed 11/02/12 Page 257 of 505 PageID: 364320

credit assessment methods, i.e., mortgage and other credit delinquencies, the Scored Programs rely upon a borrower's Credit Score, mortgage payment history and seasoning on any bankruptcy/foreclosure initially to determine a borrower's likely future credit performance.  Licensed mortgage brokers are able to access Credit Scores at the initial phases of the loan application process and use the Credit Score to determine the interest rates a borrower may qualify for based upon Fremont Investment & Loan's Scored Programs risk-based pricing (matrices, Final loan terms are subject to approval by Fremont Investment & Loan)."  (RS at 78; Prospectus at 69.)

j.      "Under the Scored Programs and Traditional Program, Fremont Investment & Loan requires that the Credit Score of the primary borrower (the borrower with the highest percentage of total income) be used to determine program eligibility. Credit Scores must be obtained from at least two national credit repositories, with the lower of the two scores being utilized in program eligibility determination.  If Credit Scores are obtained from three credit repositories, the middle of the three scores can be utilized.  In all cases, a borrower's complete credit history must be detailed in the credit report that produces a given Credit Score or the borrower is not eligible for the Scored Program.  Generally, the minimum applicable Credit Scores allowed under a Scored Program and the Traditional Program is 500."  (RS at 78; Prospectus at 69.)

k.      "Fremont Investment & Loan's underwriters verify the income of each applicant under various documentation types as follows:  under Full

H-5

Documentation, applicants are generally required to submit verification of stable income for the periods of six months to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income Program; however, the income stated must be reasonable and customary for the applicant's line of work." (PS at 79; Prospectus at 70.)

l. "Fremont Investment & Loan conducts a number of quality control procedures, including a post-funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the compliance audit, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to each loan production office for response. The audit findings and branch responses are then reviewed by Fremont Investment & Loan's senior management. Adverse findings are tracked monthly. This review procedure allows Fremont Investment & Loan to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to

H-6

be reduced or eliminated and the need for additional staff training." (RS at 80; Prospectus at 70.)

m.  Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.  **Untrue and misleading statements regarding case-by-case underwriting exceptions in the FHLT 2004-D Offering Materials:**

a.  "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address." (PS at S-34.)

b.  On a case by case basis, Fremont Investment & Loan may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e. an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history,

stable employment and time in residence at the applicant's current address."

(RS at 79; Prospectus at 69, 70.)

c.  Defendants' statements concerning the use of exceptions to underwriting

guidelines were untrue and misleading for the reasons set forth in Section II of

the Complaint.  The "exceptions" became the rule, and were used without

regard to whether there were "compensating factors."  This is supported by a

statistical analysis of the Mortgage Loans at issue here, and other facts

referenced in the Complaint.

6.  **Untrue and misleading statements concerning owner-occupancy statistics in the**

**FHLT 2004-D Offering Materials:**

a.  According to the Prospectus Supplement (at A-6), for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,388 | 92.91% | 91.42% |
| Investor | 278 | 5.99% | 7.50% |
| Second/Vacation | 40 | 1.09% | 1.08% |
| Total Mortgaged Properties | 3,706 | 100% | 100% |

b.  Based on Prudential's analysis of **12,417** loans originated, acquired, and

securitized by the same parties at the same time using similar disclosures, on

information and belief the true rate of owner occupancy for the aggregate loans

was only approximately **79.32**%, i.e., the Offering Materials overstated the

amount of owner occupancy by approximately **10.83**%.

7.  **Untrue and misleading statements concerning appraisals in the FHLT 2004-D**

**Offering Materials:**

a.  "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by Fremont.  In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont.  Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises" (PS at S-35.)

b.  "Fremont Investment & Loan has established appraisal procedure guidelines, and all appraisers are typically licensed independent appraisers selected in accordance with those guidelines.  The appraisal procedure guidelines generally require the appraiser, or an agent on its behalf, to inspect the property personally and to verify whether the property is in good condition and that construction, if new, has been substantially completed.  The appraisal also considers a market data analysis of recent sales of comparable properties and

H-9

FHLT 2004-D

when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property."  (RS at 76; Prospectus at 67, 68.)

c.      "Fremont Investment & Loan's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by Fremont Investment & Loan.  In some cases, Fremont Investment & Loan relies on a statistical appraisal methodology provided by a third-party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont Investment & Loan.  Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises."   (RS at 79, 80; Prospectus at 70.)

d.      Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers,

H-10

FHLT 2004-D

originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8. **Untrue and misleading statements concerning LTV ratios in the FHLT 2004-D Offering Materials:**

   a. The information in the Prospectus Supplement (at A-1, A-4) presents the following untrue and misleading statements regarding LTV ratios for the aggregate loans:

      i. The Weighted Average Original LTV ratio is **80.51**%;

      ii. **35.91**% of the Mortgage Loans have an Original LTV ratio greater than 80%;

      iii. Only **4.24**% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

      iv. No Mortgage Loans have an Original LTV ratio greater than 100%.

   b. Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

      i. The weighted average LTV ratio was understated by approximately **3.19**%;

      ii. The number of loans that had an LTV higher than 80% was understated by approximately **11.67**%;

H-11

iii.  The number of loans that had an LTV higher than 90% was understated by approximately **12.05**%;

iv.  The number of loans that had an LTV higher than 100% was understated by approximately **27.15**%;

v.  Approximately **31.63**% of the loans had an LTV that was at least 10% higher than those loans supposedly had; and

vi.  Approximately **9.03**% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

9.  **Untrue and misleading statements concerning credit ratings in the FHLT 2004-D Offering Materials:**

a.  "The certificates at the time of acquisition by the Plan must generally be rated in one of the four highest generic rating categories by Standard & Poor's Ratings Services, a Division of the McGraw-Hill Companies, Inc. ('S&P'), Moody's Investors Service, Inc. ('Moody's') or Fitch Ratings ('Fitch')."  (PS at S-86.)

b.  "It is a condition to the issuance of the securities that they be rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization."  (Prospectus at 7; RS at 7.)

c.  "It is a condition to the issuance of any class of securities that they shall have been rated not lower than investment grade, that is, in one of the four highest rating categories, by at least one rating agency."  (Prospectus at 166; RS at 194.)

d. "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the mortgage loans. The rating takes into consideration the characteristics of the mortgage loans and the structural, legal and tax aspects associated with the certificates." (PS at S-89.)

e. "Any ratings on the securities address the likelihood of receipt by you of all collections on the underlying trust assets to which you are entitled. These ratings address the structural, legal and issuer-related aspects associated with your securities, the nature of the underlying trust assets and the credit quality of the guarantor, if any." (Prospectus at 194; RS at 166.)

f. The initial ratings given to the Certificates are set forth in the Complaint.

g. Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint. This rendered the ratings meaningless and misleading.

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2004-D Offering Materials:**

a. "Pursuant to the mortgage loan purchase agreement, Fremont will sell, transfer, assign, set over and otherwise convey the mortgage loans, including all principal outstanding as of, and interest due and accruing after the Cut-off Date, without recourse, to the depositor on the closing date." (PS at S-52.)

H-13

b.     "In connection with the sale, transfer, assignment or pledge of the mortgage

loans to the trust, the depositor will cause to be delivered to the trustee, or the

trust administrator on its behalf, on or before the closing date, the following

documents with respect to each mortgage loan which constitute the mortgage

file: (a) the original mortgage note . . . ; (b) the original of any guaranty

executed in connection with the mortgage note; (c) the related original

mortgage and evidence of its recording or, in certain limited circumstances, a

copy of the mortgage certified by the originator, escrow company, title

company, or closing attorney; (d) except with respect to each MERS

Designated Mortgage Loan, the intervening mortgage assignment(s), or copies

of them certified by the applicable originator, escrow company, title company,

or closing attorney, if any, showing a complete chain of assignment from the

originator of the related mortgage loan to the last endorsee – which assignment

may, at the originator's option, be combined with the assignment referred to in

clause (e) below; (e) except with respect to each MERS Designated Mortgage

Loan, a mortgage assignment in recordable form, which, if acceptable for

recording in the relevant jurisdiction, may be included in a blanket assignment

or assignments, of each mortgage from the last endorsee in blank; (f) originals

of all assumption, modification, consolidation and extension agreements, if

provided, in those instances where the terms or provisions of a mortgage or

mortgage note have been modified or such mortgage or mortgage note has

been assumed; (g) an original lender's title insurance policy or attorney's

opinion of title and abstract of title; and (h) the original of any security

H-14

agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided)." (PS at S-52, 53.)

c.   "The mortgage is a valid and subsisting first lien on the mortgaged property, including all buildings and improvements on the mortgaged property and all installations and mechanical, electrical, plumbing, heating and air conditioning systems located in or annexed to such buildings, and all additions, alterations and replacements made at any time with respect to the related mortgage loan." (PS at S-55.)

d.   "The mortgages or assignments of mortgage for substantially all of the mortgage loans have been or may be recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns. Subsequent assignments of those mortgages are registered electronically through the MERS® System." (PS at S-21.)

e.   Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

   i.   For the loans for which documentation was available, title to **6.38**% of the Mortgage Loans were held by third parties (other than MERS), and title to **28.67**% of the Mortgage Loans were still held by the Originators. In other words, **35.05**% of the Loans were not properly transferred to the Trust or to MERS, contrary to the representations in the Offering Materials.

Case 2:93-cv-00001-KM Document 16498-1 Filed 11/02/12 Page 268 of 505 PageID: 064331

    ii.      Of those Mortgage Loans that were assigned to the Trust, **66.18**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

f.      Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading. This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

**Exhibit I:  Misrepresentations in the Offering Materials for FHLT 2005-C**

1.  **Collateral type:**  "[F]ixed- and adjustable-rate sub-prime mortgage loans secured by first or second lien mortgages or deeds of trust on residential real properties."  (Prospectus Supplement June 7, 2005 ("PS") at 1)

2.  **Initial number of mortgage loans:**  Aggregate: 4,828 (PS at S-21)

3.  **Originators**:  "The mortgage loans in the trust were acquired by the depositor from Fremont, who originated or acquired them."  (PS at S-22)

4.  **Untrue and misleading statements concerning underwriting guidelines in the FHLT 2005-C Offering Materials:**

    a.  "All of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described in this section. The following is a general summary of the underwriting guidelines believed by the Depositor to have been generally applied, with some variation, by the Originator."  (PS at S-31)

    b.  "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment.  All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market."  (PS at S-31)

c.  "Under the Scored Programs, Fremont requires that the Credit Score of the primary borrower (the borrower with the highest percentage of total income) be used to determine program eligibility.  Credit Scores must be obtained from at least two national credit repositories, with the lower of the two scores being utilized in program eligibility determination.  If Credit Scores are obtained from three credit repositories, the middle of the three scores is utilized.  In all cases, a borrower's complete credit history must be detailed in the credit report that produces a given Credit Score or the borrower is not eligible for a Scored Program.  Generally, the minimum applicable Credit Scores allowed is 500." (PS at S-31).

d.  "Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by Fremont's senior management.  Adverse findings are tracked monthly.  This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies,

I-2

areas of risk to be reduced or eliminated and the need for additional staff

training." (PS at S-32)

e.    Defendants' statements concerning underwriting guidelines were untrue and

misleading for the reasons set forth in Section II of the Complaint. The

guidelines were systematically ignored. This is confirmed by a statistical

analysis of the Mortgage Loans at issue here, the rising delinquency rates for

the Mortgage Loans, and other facts referenced in the Complaint.

5.    **Untrue and misleading statements regarding case-by-case underwriting exceptions**

**in the FHLT 2005-C Offering Materials:**

a.    "On a case by case basis, Fremont may determine that, based upon

compensating factors, a prospective mortgagor not strictly qualifying under the

underwriting risk category guidelines described below is nonetheless qualified

to receive a loan, i.e., an underwriting exception. Compensating factors may

include, but are not limited to, low loan-to-value ratio, low debt to income

ratio, substantial liquid assets, good credit history, stable employment and time

in residence at the applicant's current address." (PS at S-31)

b.    Defendants' statements concerning the use of exceptions to underwriting

guidelines were untrue and misleading for the reasons set forth in Section II of

the Complaint. The "exceptions" became the rule, and were used without

regard to whether there were "compensating factors." This is supported by a

statistical analysis of the Mortgage Loans at issue here, and other facts

referenced in the Complaint.

FHLT 2005-C

6. **Untrue and misleading statements concerning owner-occupancy statistics in the FHLT 2005-C Offering Materials:**

    a.    According to the Prospectus Supplement (at A-I-3), for the aggregate Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,350 | 92.76% | 90.09% |
| Investor | 435 | 6.31% | 9.01% |
| Second/Vacation | 43 | 0.93% | 0.9% |
| Total Mortgaged Properties | 4,828 | 100% | 100% |

    b.    Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the collateral pool.

        i.    Of **726** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **59**.

        ii.    Of **726** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **88**.

iii.    Of **726** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property:  **29**.

iv.    Of **726** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence:  **114**.

v.    Of **726** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence:  **111**.

vi.    In sum, of the **726** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests:  **109**, or **15.01**% of the allegedly owner-occupied properties in the test sample.

FHLT 2005-C

    c.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint. A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless. This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the FHLT 2005-C Offering Materials:**

    a.    "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that

confirms or supports the original appraiser's value of the mortgaged premises."
(PS at S-32)

b.   "Fremont Investment & Loan has established appraisal procedure guidelines,
and all appraisers are typically licensed independent appraisers selected in
accordance with those guidelines. . . . The appraisal procedure guidelines
generally require the appraiser, or an agent on its behalf, to inspect the property
personally and to verify whether the property is in good condition and that
construction, if new, has been substantially completed.  The appraisal also
considers a market data analysis of recent sales of comparable properties and
when deemed applicable, an analysis based on income generated from the
property or replacement cost analysis based on the current cost of constructing
or purchasing a similar property."  (Prospectus at 69)

c.   Defendants' statements concerning appraisals were untrue and misleading for
the reasons set forth in Section II of the Complaint.  The disclosed appraisal
standards and processes were not actually followed.  Rather, appraisers,
originators, and Defendants all knowingly instead used whatever value was
needed to generate a loan approval.  This is evidenced by a statistical analysis
of the Mortgage Loans at issue here, as described herein, and other facts
referenced in the Complaint.

8.   **Untrue and misleading statements concerning LTV ratios in the FHLT 2005-C
Offering Materials:**

FHLT 2005-C

a.    The information in the Prospectus Supplement (at A-I-3) presents the following untrue and misleading statements regarding LTV ratios for the aggregate Mortgage Loans:

    i.    The Weighted Average Original LTV ratio is 81.21%;

    ii.    42.34% of the Mortgage Loans have an Original LTV ratio greater than 80%;

    iii.    Only 18.21% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

    iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

b.    Prudential's loan-level analysis of the mortgages in the collateral pool has determined that the LTV ratios are higher than the Offering Materials represent. Of the sampled loans that had sufficient data to test:

    i.    the weighted average initial LTV ratio was **87.35%**;

    ii.    **64.37%** of the loans tested had an LTV ratio greater than 80%;

    iii.    **34.97%** of the loans tested had an LTV ratio greater than 90%;

    iv.    **17.37%** of the loans tested had an LTV ratio greater than 100%;

    v.    **29.84%** of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

    vi.    **8.46%** of the loans had an actual LTV ratio that was more than 25% greater than the LTV ratios they purportedly had.

c.    Defendants' statements concerning LTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers,

I-8

originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9. **Untrue and misleading statements concerning credit ratings in the FHLT 2005-C Offering Materials:**

    a.    "In order to be issued, the Offered Certificates must be assigned ratings not lower than the following by S&P, Moody's and Fitch" (PS at S-89)

    b.    "The certificates at the time of acquisition by the Plan must generally be rated in one of the four highest generic rating categories by Standard & Poor's, a Division of the McGraw-Hill Companies, Inc. ('S&P'), Moody's Investors Service, Inc. ('MOODY'S') or Fitch Ratings ('FITCH') (each, a 'RATING AGENCY')" (PS at S-86)

    c.    "Any ratings on the securities address the likelihood of receipt by you of all collections on the underlying trust assets to which you are entitled. These ratings address the structural, legal and issuer-related aspects associated with your securities, the nature of the underlying trust assets and the credit quality of the guarantor, if any." (Prospectus at 175)

    d.    The initial ratings given to the Certificates are set forth in the Complaint.

    e.    Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to

Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint. This rendered the ratings meaningless and misleading.

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2005-C Offering Materials:**

    a. "Pursuant to the mortgage loan purchase agreement, Fremont will sell, transfer, assign, set over and otherwise convey the mortgage loans, including all principal outstanding as of, and interest due and accruing after the Cut-off Date, without recourse, to the depositor on the closing date. Such transfer will convey all right, title and interest in and to (a) principal outstanding as of the Cut-off Date (after giving effect to payments of principal due on that date, whether or not received) and (b) interest due and accrued on each such mortgage loan after the Cut-off Date." (PS at S-49.)

    b. "In connection with the sale, transfer, assignment or pledge of the mortgage loans to the trust, the depositor will cause to be delivered to the trustee, or the trust administrator on its behalf, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file: (a) the original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee (except with respect to no more than 1.00% of the mortgage loans for which there is a lost note affidavit and a copy of the note) . . . (b) the original of any guaranty

executed in connection with the mortgage note; (c) the related original mortgage and evidence of its recording . . . (d) except with respect to each MERS Designated Mortgage Loan, the intervening mortgage assignment(s) . . . (e) except with respect to each MERS Designated Mortgage Loan, a mortgage assignment in recordable form . . . (f) originals of all assumption, modification, consolidation and extension agreements . . . (g) an original lender's title insurance policy or attorney's opinion of title and abstract of title; and (h) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided)." (PS at S-49, 50)

c.  "The original Mortgages have been recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns, and subsequent assignments of those mortgages have been, or in the future will be, registered electronically through the MERS(R) System. In some other cases, the original Mortgage was recorded in the name of the originator of the mortgage loan, record ownership was later assigned to MERS, solely as nominee for the owner of the mortgage loan, and subsequent assignments of the Mortgage were, or in the future may be, at the sole discretion of the servicer, registered electronically through the MERS(R) System. For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan." (PS at S-25)

I-11

    d.    "Fremont Mortgage will deliver or cause to be delivered to your trustee or the issuer the mortgage note endorsed to the order of the trustee or the issuer, evidence of recording of the security instrument, an assignment of each security instrument in recordable form naming the trustee or the issuer as assignee (unless the mortgage loan is registered on the book-entry system of the Mortgage Electronic Registration Systems, Inc. (the 'MERS System'), and certain other original documents evidencing or relating to each mortgage loan. With respect to mortgage loans registered on the MERS System, Fremont Mortgage must deliver to MERS the original recorded assignment or assignments showing a complete claim of assignment. Within one year following the settlement date, Fremont Mortgage will cause the assignments of the mortgage loans (other than mortgage loans registered on the MERS System) to be recorded in the appropriate public office for real property records wherever necessary to protect the trustee's interest in the mortgage loans. In lieu of recording the assignments of mortgage loans in a particular jurisdiction, Fremont Mortgage may deliver or cause to be delivered an opinion of local counsel to the effect that recording is not required to protect the right, title and interest of the trustee or the issuer in the mortgage loans. The original mortgage documents other than the documents required to be held by MERS with respect to mortgage loans registered on the MERS System will be held by the trustee, the issuer or a custodian, except to the extent released to a servicer from time to time in connection with servicing the mortgage loan. The servicer, on behalf of the securityholders, will hold the original documents and

I-12

copies of other documents not delivered to the trustee or MERS and
instruments concerning your trust's assets." (Prospectus at 45)

e.   Prudential's loan-level analysis of the mortgages in the aggregate collateral
pool has determined that a large percentage of Mortgage Loans were not in fact
transferred as represented in the Offering Materials:

   i.   For the **639** loans for which documentation was available, title to **16**
   Mortgage Loans were held by third parties (other than MERS), and title to
   **51** Mortgage Loans were still held by the Originators.  In other words,
   **10.49**% of the Loans sampled were not transferred to the Trust or to
   MERS at all, contrary to the representations in the Offering Materials.

   ii.   Of those Mortgage Loans that were assigned to the Trust, **75.36**% were
   missing intervening assignments, rendering the transfer of the loans to the
   Trust incomplete, contrary to the representations in the Offering Materials.

   iii.   Defendants' statements concerning the assignment of Mortgage Loans
   were untrue and misleading.  This is evidenced by the above loan-level
   analysis, and other facts referenced in the Complaint.

FHLT 2005-C

## Exhibit J: Misrepresentations in the Offering Materials for FHLT 2005-D

1.  **Collateral type:** "[F]ixed- and adjustable-rate sub-prime mortgage loans secured by first or second lien mortgages or deeds of trust on residential real properties." (Prospectus Supplement June 7, 2005 ("PS") at 1).

2.  **Initial number of mortgage loans:** 4,686 (PS at S-23).

3.  **Originators:** "The mortgage loans in the trust were acquired by the depositor from Fremont, who originated or acquired them." (PS at S-23).

4.  **Untrue and misleading statements concerning underwriting guidelines in the FHLT 2005-D Offering Materials:**

    a.  "All of the mortgage loans were originated or acquired generally in accordance with the underwriting criteria described in this prospectus supplement. The following is a general summary of the underwriting guidelines believed by the Depositor to have been generally applied, with some variation, by the Originator." (PS at S-23).

    b.  "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market." (PS at S-33).

J-1

c.     "Under the Scored Programs, Fremont requires that the Credit Score for each

borrower, using the Credit Score of the primary borrower (the borrower with

the highest percentage of total income) to determine program eligibility. Credit

Scores must be obtained from each national credit repository . . . Generally, the

minimum applicable Credit Scores allowed is 500. . ."  (PS at S-33).

d.     "Fremont's underwriters verify the income of each applicant under various

documentation types as follows: under Full Documentation, applicants are

generally required to submit verification of stable income for the periods of

one to two years preceding the application dependent on credit profile; under

Easy Documentation, the borrower is qualified based on verification of

adequate cash flow by means of personal or business bank statements; under

Stated Income, applicants are qualified based on monthly income as stated on

the mortgage application.  The income is not verified under the Stated Income

program; however, the income stated must be reasonable and customary for the

applicant's line of work."  (PS at S-33).

e.     "Fremont conducts a number of quality control procedures, including a post-

funding review as well as a full re-underwriting of a random selection of loans

to assure asset quality.  Under the funding review, all loans are reviewed to

verify credit grading, documentation compliance and data accuracy.  Under the

asset quality procedure, a random selection of each month's originations is

reviewed.  The loan review confirms the existence and accuracy of legal

documents, credit documentation, appraisal analysis and underwriting decision.

A report detailing review findings and level of error is sent monthly to each

loan production office for response. The review findings and branch responses
are then reviewed by Fremont's senior management. Adverse findings are
tracked monthly. This review procedure allows Fremont to assess programs
for potential guideline changes, program enhancements, appraisal policies,
areas of risk to be reduced or eliminated and the need for additional staff
training." (PS at S-32).

f.  Defendants' statements concerning underwriting guidelines were untrue and
misleading for the reasons set forth in Section II of the Complaint. The
guidelines were systematically ignored. This is confirmed by a statistical
analysis of the Mortgage Loans at issue here, the rising delinquency rates for
the Mortgage Loans, and other facts referenced in the Complaint.

5.  **Untrue and misleading statements regarding case-by-case underwriting exceptions
in the FHLT 2005-D Offering Materials:**

a.  "On a case by case basis, Fremont may determine that, based upon
compensating factors, a prospective mortgagor not strictly qualifying under the
underwriting risk category guidelines described below is nonetheless qualified
to receive a loan, i.e., an underwriting exception. Compensating factors may
include, but are not limited to, low loan-to-value ratio, low debt to income
ratio, substantial liquid assets, good credit history, stable employment and time
in residence at the applicant's current address." (PS at S-33, 34)

b.  Defendants' statements concerning the use of exceptions to underwriting
guidelines were untrue and misleading for the reasons set forth in Section II of
the Complaint. The "exceptions" became the rule, and were used without

regard to whether there were "compensating factors."  This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.    **Untrue and misleading statements concerning owner-occupancy statistics in the FHLT 2006-2 Offering Materials:**

a.    According to the Prospectus Supplement (at A-I-3), for the aggregate Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,386 | 94.77% | 93.61% |
| Investor | 262 | 4.43% | 5.60% |
| Second/Vacation | 38 | 0.80% | 0.80% |
| Total Mortgaged Properties | 4,686 | 100% | 100% |

b.    Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the aggregate collateral pool.

i.    Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption:  **59**.

ii.    Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the

number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **68**.

iii.    Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **29**.

iv.    Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence: **100**.

v.    Of **776** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence: **91**.

vi.    In sum, of the **776** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of

Prudential's analytical tests: **101**, or **13.02**% of the allegedly owner-occupied properties in the test sample.

    c.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint. A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless. This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the FHLT 2005-D Offering Materials:**

    a.    "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis

J-6

based on the current cost of constructing a similar home.  The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises." (PS at S-34)

b.   "Fremont Investment & Loan has established appraisal procedure guidelines, and all appraisers are typically licensed independent appraisers selected in accordance with those guidelines. . . . The appraisal procedure guidelines generally require the appraiser, or an agent on its behalf, to inspect the property personally and to verify whether the property is in good condition and that construction, if new, has been substantially completed.  The appraisal also considers a market data analysis of recent sales of comparable properties and when deemed applicable, an analysis based on income generated from the property or replacement cost analysis based on the current cost of constructing or purchasing a similar property."  (Prospectus at 69, 70)

c.   Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8.  **Untrue and misleading statements concerning LTV ratios in the FHLT 2005-D Offering Materials:**

    a.      a.    The information in the Prospectus Supplement (at A-I-3) presents the following untrue and misleading statements regarding LTV ratios for the aggregate Mortgage Loans:

        i.    The Weighted Average Original LTV ratio is 80.47%;

        ii.    39.99% of the Mortgage Loans have an Original LTV ratio greater than 80%;

        iii.    Only 19.27% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

        iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

    b.    Prudential's loan-level analysis of the mortgages in the collateral pool has determined that the LTV ratios are higher than the Offering Materials represent.  Of the sampled loans that had sufficient data to test:

        i.    the weighted average initial LTV ratio was **88.41%**;

        ii.    **63.15%** of the loans tested had an LTV ratio greater than 80%;

        iii.    **36.06%** of the loans tested had an LTV ratio greater than 90%;

        iv.    **18.73%** of the loans tested had an LTV ratio greater than 100%;

        v.    **32.27%** of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

        vi.    **11.55%** of the loans had an actual LTV ratio that was more than 25% greater than the LTV ratios they purportedly had.

    c.    Defendants' statements concerning LTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.    **Untrue and misleading statements concerning credit ratings in the FHLT 2005-C Offering Materials:**

    a.    "In order to be issued, the Offered Certificates must be assigned ratings not lower than the following by Moody's, S&P, and DBRS" (PS at S-95)

    b.    "Your securities will be rated in one of the four highest rating categories by

    c.    one or more rating agencies." (Prospectus at 21)

    d.    "Any ratings on the securities address the likelihood of receipt by you of all collections on the underlying trust assets to which you are entitled. These ratings address the structural, legal and issuer-related aspects associated with your securities, the nature of the underlying trust assets and the credit quality of the guarantor, if any." (Prospectus at 175)

    e.    The initial ratings given to the Certificates are set forth in the Complaint.

    f.    Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to

Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint. This rendered the ratings meaningless and misleading.

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2005-C Offering Materials:**

g. "Pursuant to the mortgage loan purchase agreement, Fremont will sell, transfer, assign, set over and otherwise convey the mortgage loans, including all principal outstanding as of, and interest due and accruing after the Cut-off Date, without recourse, to the depositor on the closing date. Such transfer will convey all right, title and interest in and to (a) principal outstanding as of the Cut-off Date (after giving effect to payments of principal due on that date, whether or not received) and (b) interest due and accrued on each such mortgage loan after the Cut-off Date." (PS at S-54.)

h. "In connection with the sale, transfer, assignment or pledge of the mortgage loans to the trust, the depositor will cause to be delivered to the trustee, or the trust administrator on its behalf, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file: the original mortgage note, endorsed without recourse in blank by the last endorsee, including all intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee (except with respect to no more than 1.00% of the mortgage loans for which there is a lost note affidavit and a copy of the note) . . . the related original mortgage and evidence of its

recording or, in certain limited circumstances, a copy of the mortgage certified by the originator, escrow company, title company, or closing attorney; except with respect to each MERS Designated Mortgage Loan, the intervening mortgage assignment(s), or copies of them certified by the applicable originator, escrow company, title company, or closing attorney, if any, showing a complete chain of assignment from the originator of the related mortgage loan to the last endorsee." (PS at S-54)

i.    "The original Mortgages have been recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns, and subsequent assignments of those mortgages have been, or in the future will be, registered electronically through the MERS(R) System.  In some other cases, the original Mortgage was recorded in the name of the originator of the mortgage loan, record ownership was later assigned to MERS, solely as nominee for the owner of the mortgage loan, and subsequent assignments of the Mortgage were, or in the future may be, at the sole discretion of the servicer, registered electronically through the MERS(R) System.  For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan."  (PS at S-25)

j.    "Fremont Mortgage will deliver or cause to be delivered to your trustee or the issuer the mortgage note endorsed to the order of the trustee or the issuer, evidence of recording of the security instrument, an assignment of each

security instrument in recordable form naming the trustee or the issuer as
assignee (unless the mortgage loan is registered on the book-entry system of
the Mortgage Electronic Registration Systems, Inc. (the 'MERS System'), and
certain other original documents evidencing or relating to each mortgage loan.
With respect to mortgage loans registered on the MERS System, Fremont
Mortgage must deliver to MERS the original recorded assignment or
assignments showing a complete claim of assignment. Within one year
following the settlement date, Fremont Mortgage will cause the assignments of
the mortgage loans (other than mortgage loans registered on the MERS
System) to be recorded in the appropriate public office for real property
records wherever necessary to protect the trustee's interest in the mortgage
loans. In lieu of recording the assignments of mortgage loans in a particular
jurisdiction, Fremont Mortgage may deliver or cause to be delivered an opinion
of local counsel to the effect that recording is not required to protect the right,
title and interest of the trustee or the issuer in the mortgage loans. The original
mortgage documents other than the documents required to be held by MERS
with respect to mortgage loans registered on the MERS System will be held by
the trustee, the issuer or a custodian, except to the extent released to a servicer
from time to time in connection with servicing the mortgage loan. The
servicer, on behalf of the securityholders, will hold the original documents and
copies of other documents not delivered to the trustee or MERS and
instruments concerning your trust's assets." (Prospectus at 45)

k.      Prudential's loan-level analysis of the mortgages in the aggregate collateral

pool has determined that a large percentage of Mortgage Loans were not in fact

transferred as represented in the Offering Materials:

i.      For the **667** loans for which documentation was available, title to **21**

Mortgage Loans were held by third parties (other than MERS), and title to

**58** Mortgage Loans were still held by the Originators.  In other words,

**11.84**% of the Loans sampled were not transferred to the Trust or to

MERS at all, contrary to the representations in the Offering Materials.

ii.     Of those Mortgage Loans that were assigned to the Trust, **80**% were

missing intervening assignments, rendering the transfer of the loans to the

Trust incomplete, contrary to the representations in the Offering Materials.

iii.    Defendants' statements concerning the assignment of Mortgage Loans

were untrue and misleading.  This is evidenced by the above loan-level

analysis, and other facts referenced in the Complaint.

FHLT 2005-D

## Exhibit K:  Misrepresentations in the Offering Materials for FHLT 2006-1

1. **Collateral type:**  "[F]irst lien and second lien, fixed-rate and adjustable-rate mortgage loans."  (Prospectus Supplement Apr. 10, 2006 ("PS");  Free Writing Prospectus Mar. 24, 2006 ("FWP"))

2. **Initial number of mortgage loans:**  Group 2: 2,421 (PS; FWP)

3. **Originators**:  "Fremont Investment & Loan, a California state chartered industrial bank, originated or acquired the mortgage loans."  (PS; FWP)

4. **Untrue and misleading statements concerning underwriting guidelines in the FHLT 2006-1 Offering Materials:**

    a.    "All of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described in this section. The following is a general summary of the underwriting guidelines believed by the Depositor to have been generally applied, with some variation, by the Originator."  (PS; FWP)

    b.    "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment.  All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market."  (PS; FWP)

c.    "Under the Scored Programs, Fremont requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility. Credit Scores must be requested from each national credit repository." (PS; FWP)

d.    "Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error is sent monthly to each loan production office for response. The review findings and branch responses are then reviewed by Fremont's senior management. Adverse findings are tracked monthly. This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training." (PS; FWP)

e.    "All loans acquired by the Sponsor are subject to due diligence. Portfolios are reviewed for issues including, but not limited to, a thorough credit and compliance review with loan level testing." (PS; FWP)

K-2

FHLT 2006-1

f.    "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer.  The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment.  If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.."  (Prospectus, Apr. 4, 2006 ("Prospectus"); FWP)

g.    "Each insured lender is required to use prudent lending standards in underwriting individual loans and to satisfy the applicable loan underwriting requirements under the Title I Program prior to its approval of the loan and disbursement of loan proceeds.  Generally, the lender must exercise prudence

K-3

and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation. The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan." (Prospectus; FWP)

h.    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses." (Prospectus; FWP)

i.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

K-4

5.  **Untrue and misleading statements regarding case-by-case underwriting exceptions in the FHLT 2006-1 Offering Materials:**

    a.  "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address." (PS; FWP)

    b.  Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The "exceptions" became the rule, and were used without regard to whether there were "compensating factors." This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.  **Untrue and misleading statements concerning owner-occupancy statistics in the FHLT 2006-1 Offering Materials:**

    a.  According to the Prospectus Supplement and Free Writing Prospectus, for the Group 2 loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 2,253 | 95.90% | 93.06% |
| Investor | 159 | 3.55% | 6.57% |
| Second/Vacation | 9 | 0.55% | 0.37% |
| Total Mortgaged Properties | 2,421 | 100% | 100% |

FHLT 2006-1

b.   Based on Prudential's analysis of **12,417** loans originated, acquired, and
securitized by the same parties at the same time using similar disclosures, on
information and belief the true rate of owner occupancy for the aggregate loans
was only approximately **79.32**%, i.e., the Offering Materials overstated the
amount of owner occupancy by approximately **10.83**%.

7.   **Untrue and misleading statements concerning appraisals in the FHLT 2006-1**
**Offering Materials:**

a.   "In determining the adequacy of the mortgaged property as collateral, an
appraisal is made of each property considered for financing.  The appraiser is
required to inspect the property and verify that it is in good repair and that
construction, if new, has been completed.  The appraisal generally is based on
the market value of comparable homes, the estimated rental income (if
considered applicable by the appraiser) and the cost of replacing the subject
home.  In connection with a Manufactured Housing Contract, the appraisal is
based on recent sales of comparable manufactured homes and, when deemed
applicable, a replacement cost analysis based on the cost of a comparable
manufactured home.  In connection with a Multifamily Loan, the appraisal
must specify whether an income analysis, a market analysis or a cost analysis
was used.  An appraisal employing the income approach to value analyzes a
multifamily project's cashflow, expenses, capitalization and other operational
information in determining the property's value.  The market approach to value
focuses its analysis on the prices paid for the purchase of similar properties in
the multifamily project's area, with adjustments made for variations between

K-6

these other properties and the multifamily project being appraised. The cost approach calls for the appraiser to make an estimate of land value and then determine the current cost of reproducing the building less any accrued depreciation. In any case, the value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance." (Prospectus; FWP)

b.     "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises." (PS; FWP)

K-7

c. Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8. **Untrue and misleading statements concerning LTV ratios in the FHLT 2006-1 Offering Materials:**

a. The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding LTV ratios for the Mortgage Loans. For the Group 2 loans, the Prospectus Supplement and Free Writing Prospectus state that:

   i. The Weighted Average Original LTV ratio is 82.81%;

   ii. 47.21% of the Mortgage Loans have an Original LTV ratio greater than 80%;

   iii. Only 29.90% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

   iv. No Mortgage Loans have an Original LTV ratio greater than 100%.

b. Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

K-8

    i.        The weighted average LTV ratio was understated by approximately **3.19**%;

    ii.       The number of loans that had an LTV higher than 80% was understated by approximately **11.67**%;

    iii.     The number of loans that had an LTV higher than 90% was understated by approximately **12.05**%;

    iv.     The number of loans that had an LTV higher than 100% was understated by approximately **27.15**%;

    v.       Approximately **31.63**% of the loans had an LTV that was at least 10% higher than those loans supposedly had; and

    vi.     Approximately **9.03**% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

9.     **Untrue and misleading statements concerning credit ratings in the FHLT 2006-1 Offering Materials:**

    a.    "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings from Moody's Investors Service, Inc. ('Moody's'), Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'):" (PS; FWP)

    b.    "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans. The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates." (PS; FWP)

    c.    The initial ratings given to the Certificates are set forth in the Complaint.

d.    Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint. This rendered the ratings meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2006-1 Offering Materials:**

a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage (in recordable form in blank or to the Trustee) and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date." (PS; FWP)

b.    "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund: the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the

K-10

FHLT 2006-1

recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus; FWP)

c.    "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement."  (Prospectus; FWP)

d.    "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System.  With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans."  (Prospectus; FWP)

e.    Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

  i.  For the loans for which documentation was available, title to **6.38**% of the Mortgage Loans were held by third parties (other than MERS), and title to **28.67**% of the Mortgage Loans were still held by the Originators. In other words, **35.05**% of the Loans were not properly transferred to the Trust or to MERS, contrary to the representations in the Offering Materials.

  ii.  Of those Mortgage Loans that were assigned to the Trust, **66.18**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

 f. Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading. This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

FHLT 2006-1

**Exhibit L: Misrepresentations in the Offering Materials for FHLT 2006-2**

1.      **Collateral type:** "[F]irst lien and second lien, fixed-rate and adjustable-rate mortgage loans." (Prospectus Supplement Apr. 6, 2006 ("PS"); Free Writing Prospectus Apr. 6, 2006 ("FWP"))

2.      **Initial number of mortgage loans:** Aggregate: 4,445 (PS; FWP)

3.      **Originators**: "Fremont Investment & Loan, a California state chartered industrial bank, originated or acquired the mortgage loans." (PS; FWP)

4.      **Untrue and misleading statements concerning underwriting guidelines in the FHLT 2006-2 Offering Materials:**

   a.      "All of the Mortgage Loans were originated or acquired by the Originator, generally in accordance with the underwriting criteria described in this section. The following is a general summary of the underwriting guidelines believed by the Depositor to have been generally applied, with some variation, by the Originator." (PS; FWP)

   b.      "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market." (PS; FWP)

L-1

c.    "Under the Scored Programs, Fremont requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility. Credit Scores must be requested from each national credit repository." (PS; FWP)

d.    "Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error is sent monthly to each loan production office for response. The review findings and branch responses are then reviewed by Fremont's senior management. Adverse findings are tracked monthly. This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training." (PS; FWP)

e.    "All loans acquired by the Sponsor are subject to due diligence. Portfolios are reviewed for issues including, but not limited to, a thorough credit and compliance review with loan level testing." (PS; FWP)

FHLT 2006-2

f.    "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer. The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.." (Prospectus, Apr. 4, 2006 ("Prospectus"); FWP)

g.    "Each insured lender is required to use prudent lending standards in underwriting individual loans and to satisfy the applicable loan underwriting requirements under the Title I Program prior to its approval of the loan and disbursement of loan proceeds. Generally, the lender must exercise prudence

and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation.  The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus; FWP)

h.  "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses."  (Prospectus; FWP)

i.  Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

FHLT 2006-2

5. **Untrue and misleading statements regarding case-by-case underwriting exceptions in the FHLT 2006-2 Offering Materials:**

   a.  "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."  (PS; FWP)

   b.  Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without regard to whether there were "compensating factors."  This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6. **Untrue and misleading statements concerning owner-occupancy statistics in the FHLT 2006-2 Offering Materials:**

   a.  According to the Prospectus Supplement and Free Writing Prospectus, for the aggregate Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,058 | 93.26% | 91.29% |
| Investor | 360 | 6.05% | 8.10% |
| Second/Vacation | 27 | 0.69% | 0.61% |
| Total Mortgaged Properties | 4,445 | 100% | 100% |

FHLT 2006-2

b.  Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy for the aggregate loans was only approximately **79.32**%, i.e., the Offering Materials overstated the amount of owner occupancy by approximately **10.83**%.

7.  **Untrue and misleading statements concerning appraisals in the FHLT 2006-2 Offering Materials:**

a.  "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home. In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home. In connection with a Multifamily Loan, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used. An appraisal employing the income approach to value analyzes a multifamily project's cashflow, expenses, capitalization and other operational information in determining the property's value. The market approach to value focuses its analysis on the prices paid for the purchase of similar properties in the multifamily project's area, with adjustments made for variations between

L-6

these other properties and the multifamily project being appraised. The cost approach calls for the appraiser to make an estimate of land value and then determine the current cost of reproducing the building less any accrued depreciation. In any case, the value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance." (Prospectus; FWP)

b.   "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require an appraisal of the mortgaged property, and if appropriate, a review appraisal. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises." (PS; FWP)

L-7

c.    Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8.    **Untrue and misleading statements concerning LTV ratios in the FHLT 2006-2 Offering Materials:**

a.    The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding LTV ratios for the Mortgage Loans. For the aggregate Mortgage Loans, the Prospectus Supplement and Free Writing Prospectus state that:

i.    The Weighted Average Original LTV ratio is 82.26%;

ii.    42.35% of the Mortgage Loans have an Original LTV ratio greater than 80%;

iii.    Only 20.26% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

b.    Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

    i.    The weighted average LTV ratio was understated by approximately **3.19**%;

    ii.    The number of loans that had an LTV higher than 80% was understated by approximately **11.67**%;

    iii.    The number of loans that had an LTV higher than 90% was understated by approximately **12.05**%;

    iv.    The number of loans that had an LTV higher than 100% was understated by approximately **27.15**%;

    v.    Approximately **31.63**% of the loans had an LTV that was at least 10% higher than those loans supposedly had; and

    vi.    Approximately **9.03**% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

9.    **Untrue and misleading statements concerning credit ratings in the FHLT 2006-2 Offering Materials:**

    a.    "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings from Moody's Investors Service, Inc. ('Moody's'), Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'):"  (PS; FWP)

    b.    "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates."  (PS; FWP)

    c.    The initial ratings given to the Certificates are set forth in the Complaint.

    d.     Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint. This rendered the ratings meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2006-2 Offering Materials:**

    a.     "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage (in recordable form in blank or to the Trustee) and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date." (PS; FWP)

    b.     "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund: the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the

L-10

     recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus; FWP)

c.    "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement."  (Prospectus; FWP)

d.    "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System.  With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans."  (Prospectus; FWP)

e.    Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

L-11

     i.     For the loans for which documentation was available, title to **6.38**% of the Mortgage Loans were held by third parties (other than MERS), and title to **28.67**% of the Mortgage Loans were still held by the Originators.  In other words, **35.05**% of the Loans were not properly transferred to the Trust or to MERS, contrary to the representations in the Offering Materials.

     ii.     Of those Mortgage Loans that were assigned to the Trust, **66.18**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

f.     Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

FHLT 2006-2

## Exhibit M:  Misrepresentations in the Offering Materials for FHLT 2006-A

1.     **Collateral type:**  "[F]irst and second lien, fixed-rate and adjustable-rate residential

mortgage loans."  (Prospectus Supplement May 3, 2006 ("PS")).

2.     **Initial number of mortgage loans:**  Group 2: 2,401 (PS)

3.     **Originators:**  "All of the Mortgage Loans were originated or acquired by Fremont"  (PS)

4.     **Untrue and misleading statements concerning underwriting guidelines in the FHLT**

**2006-A Offering Materials:**

a.     "All of the Mortgage Loans were originated or acquired by Fremont generally

in accordance with the underwriting criteria described in this section.  The

following is a general summary of the underwriting guidelines believed by the

Depositor to have been applied, with some variation, by Fremont."  (PS).

b.     "Fremont's underwriting guidelines are primarily intended to assess the ability

and willingness of the borrower to repay the debt and to evaluate the adequacy

of the mortgaged property as collateral for the mortgage loan.  The Scored

Programs assess the risk of default by using Credit Scores obtained from third

party credit repositories along with, but not limited to, past mortgage payment

history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as

an aid to, not a substitute for, the underwriter's judgment.  All of the mortgage

loans in the mortgage pool were underwritten with a view toward the resale of

the mortgage loans in the secondary mortgage market."  (PS).

c.     "Under the Scored Programs, Fremont requires credit reports for each

borrower, using the Credit Score of the primary borrower (the borrower with

the highest percentage of total income) to determine program eligibility.

Credit Scores must be requested from each national credit repository."  (PS)

    d.    "Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work." (PS)

    e.    "Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error is sent monthly to each loan production office for response. The review findings and branch responses are then reviewed by Fremont's senior management. Adverse findings are tracked monthly. This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies,

FHLT 2006-A

areas of risk to be reduced or eliminated and the need for additional staff

training." (PS)

f.    Defendants' statements concerning underwriting guidelines were untrue and

misleading for the reasons set forth in Section II of the Complaint. The

guidelines were systematically ignored. This is confirmed by a statistical

analysis of the Mortgage Loans at issue here, the rising delinquency rates for

the Mortgage Loans, and other facts referenced in the Complaint.

5.    **Untrue and misleading statements regarding case-by-case underwriting exceptions**

**in the FHLT 2006-A Offering Materials:**

a.    "On a case by case basis, Fremont may determine that, based upon

compensating factors, a prospective mortgagor not strictly qualifying under the

underwriting risk category guidelines described below is nonetheless qualified

to receive a loan, i.e., an underwriting exception. Compensating factors may

include, but are not limited to, low loan-to-value ratio, low debt to income

ratio, substantial liquid assets, good credit history, stable employment and time

in residence at the applicant's current address." (PS)

b.    Defendants' statements concerning the use of exceptions to underwriting

guidelines were untrue and misleading for the reasons set forth in Section II of

the Complaint. The "exceptions" became the rule, and were used without

regard to whether there were "compensating factors." This is supported by a

statistical analysis of the Mortgage Loans at issue here, and other facts

referenced in the Complaint.

6.      **Untrue and misleading statements concerning owner-occupancy statistics in the**

        **FHLT 2006-A Offering Materials:**

      a.      According to the Prospectus Supplement, for the Group 2 Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 2,181 | 93.01% | 90.84% |
| Investor | 193 | 5.97% | 8.04% |
| Second/Vacation | 27 | 1.02% | 0.12% |
| Total Mortgaged Properties | 2,401 | 100% | 100% |

      b.      Based on Prudential's analysis of **12,417** loans originated, acquired, and

          securitized by the same parties at the same time using similar disclosures, on

          information and belief the true rate of owner occupancy for the aggregate loans

          was only approximately **79.32**%, i.e., the Offering Materials overstated the

          amount of owner occupancy by approximately **10.83**%.

7.      **Untrue and misleading statements concerning appraisals in the FHLT 2005-D**

        **Offering Materials:**

      a.      "Fremont's underwriting guidelines are applied in accordance with a procedure

          which complies with applicable federal and state laws and regulations and

          require an appraisal of the mortgaged property, and if appropriate, a review

          appraisal.  Generally, initial appraisals are provided by qualified independent

          appraisers licensed in their respective states.  Review appraisals may only be

          provided by appraisers approved by Fremont.  In some cases, Fremont relies on

          a statistical appraisal methodology provided by a third-party.  Qualified

          independent appraisers must meet minimum standards of licensing and provide

          errors and omissions insurance in states where it is required to become

M-4

approved to do business with Fremont.  Each uniform residential appraisal

report includes a market data analysis based on recent sales of comparable

homes in the area and, where deemed appropriate, replacement cost analysis

based on the current cost of constructing a similar home.  The review appraisal

may be a desk review, field review or an automated valuation report that

confirms or supports the original appraiser's value of the mortgaged premises."

(PS)

b.  Defendants' statements concerning appraisals were untrue and misleading for

the reasons set forth in Section II of the Complaint.  The disclosed appraisal

standards and processes were not actually followed.  Rather, appraisers,

originators, and Defendants all knowingly instead used whatever value was

needed to generate a loan approval.  This is evidenced by a statistical analysis

of the Mortgage Loans at issue here, as described herein, and other facts

referenced in the Complaint.

8.  **Untrue and misleading statements concerning LTV ratios in the FHLT 2005-D**

**Offering Materials:**

a.  The information in the Prospectus Supplement presents the following untrue

and misleading statements regarding LTV ratios for the Group 2 Mortgage

Loans:

i.  The Weighted Average Original LTV ratio is 82.01%;

ii.  43.40% of the Mortgage Loans have an Original LTV ratio greater than

80%;

M-5

      iii.    Only 26.99% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

      iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

  b.    Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

      i.    The weighted average LTV ratio was understated by approximately **3.19**%;

      ii.    The number of loans that had an LTV higher than 80% was understated by approximately **11.67**%;

      iii.    The number of loans that had an LTV higher than 90% was understated by approximately **12.05**%;

      iv.    The number of loans that had an LTV higher than 100% was understated by approximately **27.15**%;

      v.    Approximately **31.63**% of the loans had an LTV that was at least 10% higher than those loans supposedly had; and

      vi.    Approximately **9.03**% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

9.    **Untrue and misleading statements concerning credit ratings in the FHLT 2006-A Offering Materials:**

  a.    "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Moody's Investors Service, Inc. ('Moody's'),

Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P')

and Fitch Ratings ('Fitch')"  (PS)

b. "Any class of securities issued under this prospectus and the accompanying

prospectus supplement will be rated in one of the four highest generic rating

categories of a nationally recognized rating agency."

c. "A securities rating addresses the likelihood of the receipt by a

certificateholder of distributions on the Mortgage Loans.  The rating takes into

consideration the characteristics of the Mortgage Loans and the structural, legal

and tax aspects associated with the certificates."  (PS)

d. The initial ratings given to the Certificates are set forth in the Complaint.

e. Defendants' statements concerning credit ratings were untrue and misleading

for the reasons set forth in Section II of the Complaint.  Unknown to

Prudential, the rating agencies were fed baseless and false statistics regarding

the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue

here, and other facts referenced in the Complaint.  This rendered the ratings

meaningless and misleading.

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage**

**Loans in the FHLT 2006-A Offering Materials:**

f. "On the Closing Date, the Depositor will transfer to the Trust all of its right,

title and interest in and to each Mortgage Loan, the related mortgage note,

Mortgage, assignment of mortgage in recordable form in blank or to the

Trustee and other related documents (collectively, the 'Related Documents'),

including all scheduled payments with respect to each such Mortgage Loan due

M-7

after the Cut-off Date. The Trust Administrator, concurrently with such transfer, will deliver the Certificates to the Depositor."  (PS)

g.     "The Pooling Agreement will require that, within the time period specified therein, the Depositor will deliver or cause to be delivered to the Trustee (or a custodian on behalf of the Trustee) the mortgage notes endorsed to the Trustee on behalf of the Certificateholders and the Related Documents.  In lieu of delivery of original Mortgages or mortgage notes, if such original is not available or is lost, the Depositor may deliver or cause to be delivered true and correct copies thereof, or, with respect to a lost mortgage note, a lost note affidavit executed by the Originator."  (PS)

h.     "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS® System. With respect to mortgage loans registered through the MERS® System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans."  (PS)

i.     "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund: the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument . . . ; in

M-8

the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee . . . and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus)

j.    "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property."  (Prospectus)

k.    Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

   i.    For the loans for which documentation was available, title to **6.38**% of the Mortgage Loans were held by third parties (other than MERS), and title to **28.67**% of the Mortgage Loans were still held by the Originators.  In other words, **35.05**% of the Loans were not properly transferred to the Trust or to MERS, contrary to the representations in the Offering Materials.

   ii.    Of those Mortgage Loans that were assigned to the Trust, **66.18**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

l.    Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

FHLT 2006-A

## Exhibit N:  Misrepresentations in the Offering Materials for FHLT 2006-B

1.  **Collateral type:**  "[O]ne pool of fixed- and adjustable-rate sub-prime mortgage loans secured by first or second lien mortgages or deeds of trust on residential real properties . . . and one pool of fixed-rate sub-prime mortgage loans secured solely by second lien mortgages or deeds of trust on residential real properties."  (Prospectus Supplement Aug. 3, 2006 ("PS") at S-12).

2.  **Initial number of mortgage loans:**  Group 2: 3,296 (PS at S-44; Free Writing Prospectus Jul. 26, 2006 (FWP) at A-20)

3.  **Originators:**  "The mortgage loans in the trust fund were acquired by the depositor from Fremont, who originated or acquired them."  (PS at S-40)

4.  **Untrue and misleading statements concerning underwriting guidelines in the FHLT 2006-B Offering Materials:**

    a.  "All of the Mortgage Loans were originated or acquired by Fremont generally in accordance with the underwriting criteria described in this section.  The following is a general summary of the underwriting guidelines believed by the Depositor to have been applied, with some variation, by Fremont."  (PS at S-50).

    b.  "Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as an aid to, not a substitute for, the underwriter's judgment.  All of the mortgage

loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market."  (PS at S-50).

c.    "Under the Scored Programs, Fremont requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility. Credit Scores must be requested from each national credit repository."  (PS at S-50)

d.    "Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application.  The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work."  (PS at S-51)

e.    "Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is

reviewed.  The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision.  A report detailing review findings and level of error is sent monthly to each loan production office for response.  The review findings and branch responses are then reviewed by Fremont's senior management.  Adverse findings are tracked monthly.  This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training."  (PS at S-51, 52)

f.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.    **Untrue and misleading statements regarding case-by-case underwriting exceptions in the FHLT 2006-B Offering Materials:**

a.    "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address."  (PS at S-51)

      b.      Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The "exceptions" became the rule, and were used without regard to whether there were "compensating factors." This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.     **Untrue and misleading statements concerning owner-occupancy statistics in the FHLT 2006-B Offering Materials:**

      a.      According to the Free Writing Prospectus (at A-23), for the Group 2 Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,172 | 96.41% | 96.24% |
| Investor | 105 | 3.00% | 3.19% |
| Second/Vacation | 19 | 0.59% | 0.57% |
| Total Mortgaged Properties | 3,296 | 100% | 100% |

      b.      Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy for the aggregate loans was only approximately **79.32**%, i.e., the Offering Materials overstated the amount of owner occupancy by approximately **10.83**%.

7.     **Untrue and misleading statements concerning appraisals in the FHLT 2006-B Offering Materials:**

      a.      "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and

require an appraisal of the mortgaged property, and if appropriate, a review appraisal.  Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states.  Review appraisals may only be provided by appraisers approved by Fremont.  In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont.  Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises."  (PS at S-49, 50)

b.  Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8.  **Untrue and misleading statements concerning CLTV ratios in the FHLT 2006-B Offering Materials:**

a.   The information in the Prospectus Supplement and Free Writing Prospectus (at A-22) presents the following untrue and misleading statements regarding CLTV ratios for the Group 2 Mortgage Loans:

i.   The Weighted Average Original CLTV ratio is 81.38%;

ii.   44.90% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

iii.   Only 27.09% of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

iv.   No Mortgage Loans have an Original CLTV ratio greater than 100%.

b.   Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

i.   The weighted average CLTV ratio was understated by approximately **11.69**%;

ii.   The number of loans that had a CLTV higher than 80% was understated by approximately **27.78**%;

iii.   The number of loans that had a CLTV higher than 90% was understated by approximately **32.13**%;

iv.   The number of loans that had a CLTV higher than 100% was understated by approximately **47.79**%;

v.   Approximately **40.56**% of the loans had a CLTV that was at least 10% higher than those loans supposedly had; and

      vi.     Approximately **14.47**% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

9.     **Untrue and misleading statements concerning credit ratings in the FHLT 2006-B Offering Materials:**

    a.     "In order to be issued, the offered certificates must be assigned ratings not lower than the following ratings by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc., Fitch, Inc. and Dominion Bond Rating Service" (FWP at S-13)

    b.     "Any class of securities issued under this prospectus and the accompanying prospectus supplement will be rated in one of the four highest generic rating categories of a nationally recognized rating agency." (PS)

    c.     "It is a condition to the issuance of the securities that they be rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization." (Prospectus at 8)

    d.     "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans. The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates." (PS at S-137)

    e.     The initial ratings given to the Certificates are set forth in the Complaint.

    f.     Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue

here, and other facts referenced in the Complaint.  This rendered the ratings meaningless and misleading.

10.  **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2006-B Offering Materials:**

   a.  "Pursuant to the pooling and servicing agreement dated as of August 1, 2006, among the depositor, the servicer, the master servicer, the trustee and the trust administrator, the depositor will sell, without recourse, to the Issuing Entity, all right, title and interest in and to each mortgage loan, including all principal outstanding as of, and interest due on or after, the close of business on the Cut-off Date."  (PS at S-86)

   b.  "The original Mortgages for the pool I mortgage loans have been recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the originator and its successors and assigns, and subsequent assignments of those mortgages have been, or in the future will be, registered electronically through the MERS® System.  In some other cases, the original Mortgage was recorded in the name of the originator of the mortgage loan, record ownership was later assigned to MERS, solely as nominee for the owner of the mortgage loan, and subsequent assignments of the Mortgage were, or in the future may be, at the sole discretion of the servicer, registered electronically through the MERS® System.  For each of these mortgage loans, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan."  (PS at S-42)

N-8

   c.   "In connection with the sale, transfer, assignment or pledge of the mortgage loans to an issuing entity, the depositor will cause to be delivered to the trustee, or the trust administrator on its behalf, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file: (a) the original mortgage note . . . (b) the original of any guaranty executed in connection with the mortgage note;  (c) the related original mortgage and evidence of its recording . . . (d) except with respect to each MERS Designated Mortgage Loan, the intervening mortgage assignment(s), . . .  (e) except with respect to each MERS Designated Mortgage Loan, a mortgage assignment in recordable form, . . . (f) originals of all assumption, modification, consolidation and extension agreements, . . . (g) an original lender's title insurance policy or attorney's opinion of title and abstract of title; and (h) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided). " (Prospectus at 66, 67)

   d.   "The mortgage is a valid and subsisting first or second lien on the mortgaged property."  (Prospectus at 70)

   e.   Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

      i.   For the loans for which documentation was available, title to **6.38**% of the Mortgage Loans were held by third parties (other than MERS), and title to **28.67**% of the Mortgage Loans were still held by the Originators.  In other

words, **35.05**% of the Loans were not properly transferred to the Trust or to MERS, contrary to the representations in the Offering Materials.

    ii.    Of those Mortgage Loans that were assigned to the Trust, **66.18**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

f.    Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

<u>**Exhibit O: Misrepresentations in the Offering Materials for FHLT 2006-D**</u>

1.    **Collateral type:** "The mortgage loans to be included in the trust fund will consist of

fixed- and adjustable-rate sub-prime mortgage loans secured by first or second lien

mortgages or deeds of trust on residential real properties" (Prospectus Supplement Nov.

1, 2006 ("PS") at 9).

2.    **Initial number of mortgage loans:** Group 2: 3,425 (PS; Free Writing Prospectus Oct.

24, 2006 at 36)

3.    **Originators:** "All of the Mortgage Loans were originated or acquired by Fremont" (PS

at 40; FWP at 40)

4.    **Untrue and misleading statements concerning underwriting guidelines in the FHLT**

**2006-A Offering Materials:**

    a.    "All of the Mortgage Loans were originated or acquired by Fremont generally

       in accordance with the underwriting criteria described in this section. The

       following is a general summary of the underwriting guidelines believed by the

       Depositor to have been applied, with some variation, by Fremont." (PS at 40;

       FWP at 40).

    b.    "Fremont's underwriting guidelines are primarily intended to assess the ability

       and willingness of the borrower to repay the debt and to evaluate the adequacy

       of the mortgaged property as collateral for the mortgage loan. The Scored

       Programs assess the risk of default by using Credit Scores obtained from third

       party credit repositories along with, but not limited to, past mortgage payment

       history, seasoning on bankruptcy and/or foreclosure and loan-to-value ratios as

       an aid to, not a substitute for, the underwriter's judgment. All of the mortgage

       loans in the mortgage pool were underwritten with a view toward the resale of

O-1

FHLT 2006-D

Case 2:12-cv-06622-KM-MAH Document 1-1 Filed 11/02/12 Page 339 of 505 PageID: 355

the mortgage loans in the secondary mortgage market." (PS at 40, 41; FWP at 40, 41).

c.   "Under the Scored Programs, Fremont requires credit reports for each borrower, using the Credit Score of the primary borrower (the borrower with the highest percentage of total income) to determine program eligibility. Credit Scores must be requested from each national credit repository." (PS at 41; FWP at 41)

d.   "Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work." (PS at 41; FWP at 41)

e.   "Fremont conducts a number of quality control procedures, including a post-funding review as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the funding review, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations is

O-2

reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing review findings and level of error is sent monthly to each loan production office for response. The review findings and branch responses are then reviewed by Fremont's senior management. Adverse findings are tracked monthly. This review procedure allows Fremont to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training." (PS at 42; FWP at 42)

f.  Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.  **Untrue and misleading statements regarding case-by-case underwriting exceptions in the FHLT 2006-A Offering Materials:**

a.  "On a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below is nonetheless qualified to receive a loan, i.e., an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt to income ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address." (PS at 41; FWP at 41)

O-3

b.  Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The "exceptions" became the rule, and were used without regard to whether there were "compensating factors." This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.  **Untrue and misleading statements concerning owner-occupancy statistics in the FHLT 2006-A Offering Materials:**

a.  According to the Prospectus Supplement and Free Writing Prospectus, for the Group 2 Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,001 | 91.96% | 87.62% |
| Investor | 388 | 6.93% | 11.33% |
| Second/Vacation | 36 | 1.11% | 1.05% |
| Total Mortgaged Properties | 3,425 | 100% | 100% |

b.  Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy for the aggregate loans was only approximately **79.32**%, i.e., the Offering Materials overstated the amount of owner occupancy by approximately **10.83**%.

7.  **Untrue and misleading statements concerning appraisals in the FHLT 2005-D Offering Materials:**

a.  "Fremont's underwriting guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and

O-4

FHLT 2006-D

require an appraisal of the mortgaged property, and if appropriate, a review appraisal. Generally, initial appraisals are provided by qualified independent appraisers licensed in their respective states. Review appraisals may only be provided by appraisers approved by Fremont. In some cases, Fremont relies on a statistical appraisal methodology provided by a third-party. Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Fremont. Each uniform residential appraisal report includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. The review appraisal may be a desk review, field review or an automated valuation report that confirms or supports the original appraiser's value of the mortgaged premises." (PS at 78; FWP at 78)

b. Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8. **Untrue and misleading statements concerning LTV ratios in the FHLT 2005-D Offering Materials:**

FHLT 2006-D

a.    The information in the Prospectus Supplement and Free Writing Prospectus present the following untrue and misleading statements regarding CLTV ratios for the Group 2 Mortgage Loans:

    i.    The Weighted Average Original CLTV ratio is 83.70%;

    ii.    54.07% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

    iii.    Only 46.04% of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

    iv.    No Mortgage Loans have an Original CLTV ratio greater than 100%.

b.    Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

    i.    The weighted average CLTV ratio was understated by approximately **11.69**%;

    ii.    The number of loans that had a CLTV higher than 80% was understated by approximately **27.78**%;

    iii.    The number of loans that had a CLTV higher than 90% was understated by approximately **32.13**%;

    iv.    The number of loans that had a CLTV higher than 100% was understated by approximately **47.79**%;

    v.    Approximately **40.56**% of the loans had a CLTV that was at least 10% higher than those loans supposedly had; and

FHLT 2006-D

vi.      Approximately **14.47**% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

9.      **Untrue and misleading statements concerning credit ratings in the FHLT 2006-A Offering Materials:**

     a.      "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Moody's Investors Service, Inc. ('Moody's'), Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Fitch Ratings ('Fitch')"  (PS)

     b.      "It is a condition to the issuance of the securities that they be rated in one of the four highest rating categories by at least one nationally recognized statistical rating organization."  (FWP at 8)

     c.      "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates."  (PS; fWP at 183)

     d.      The initial ratings given to the Certificates are set forth in the Complaint.

     e.      Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint.  Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.  This rendered the ratings meaningless and misleading.

O-7

FHLT 2006-D

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the FHLT 2006-A Offering Materials:**

    a.    "Pursuant to the pooling and servicing agreement dated as of November 1, 2006, among the depositor, the servicer, the master servicer, the trustee and the trust administrator, the depositor will sell, without recourse, to the Issuing Entity, all right, title and interest in and to each mortgage loan, including all principal outstanding as of, and interest due on or after, the close of business on the Cut-off Date."  (PS at 65; FWP at 65)

    b.    "In connection with the sale, transfer, assignment or pledge of the mortgage loans to an issuing entity, the depositor will cause to be delivered to the trustee, or the trust administrator on its behalf, on or before the closing date, the following documents with respect to each mortgage loan which constitute the mortgage file: (a) the original mortgage note . . . (b) the original of any guaranty executed in connection with the mortgage note;  (c) the related original mortgage and evidence of its recording . . . (d) except with respect to each MERS Designated Mortgage Loan, the intervening mortgage assignment(s), . . .  (e) except with respect to each MERS Designated Mortgage Loan, a mortgage assignment in recordable form, . . . (f) originals of all assumption, modification, consolidation and extension agreements, . . . (g) an original lender's title insurance policy or attorney's opinion of title and abstract of title; and (h) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the mortgage (if provided). " (Prospectus at 66, 67)

c.    "Fremont Mortgage will deliver or cause to be delivered to your trustee or the
issuer the mortgage note endorsed to the order of the trustee or the issuer,
evidence of recording of the security instrument, an assignment of each
security instrument in recordable form naming the trustee or the issuer as
assignee (unless the mortgage loan is registered on the book-entry system of
the Mortgage Electronic Registration Systems, Inc. (the 'MERS System'), and
certain other original documents evidencing or relating to each mortgage loan.
With respect to mortgage loans registered on the MERS System, Fremont
Mortgage must deliver to MERS the original recorded assignment or
assignments showing a complete claim of assignment. Within one year
following the settlement date, Fremont Mortgage will cause the assignments of
the mortgage loans (other than mortgage loans registered on the MERS
System) to be recorded in the appropriate public office for real property
records wherever necessary to protect the trustee's interest in the mortgage
loans. In lieu of recording the assignments of mortgage loans in a particular
jurisdiction, Fremont Mortgage may deliver or cause to be delivered an opinion
of local counsel to the effect that recording is not required to protect the right,
title and interest of the trustee or the issuer in the mortgage loans. The original
mortgage documents other than the documents required to be held by MERS
with respect to mortgage loans registered on the MERS System will be held by
the trustee, the issuer or a custodian, except to the extent released to a servicer
from time to time in connection with servicing the mortgage loan. The
servicer, on behalf of the securityholders, will hold the original documents and

O-9

copies of other documents not delivered to the trustee or MERS and instruments concerning your trust's assets." (Prospectus at 45)

d.   "The mortgage is a valid and subsisting first or second lien on the mortgaged property." (Prospectus at 70)

e.   Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

    i.   For the loans for which documentation was available, title to **6.38**% of the Mortgage Loans were held by third parties (other than MERS), and title to **28.67**% of the Mortgage Loans were still held by the Originators. In other words, **35.05**% of the Loans were not properly transferred to the Trust or to MERS, contrary to the representations in the Offering Materials.

    ii.   Of those Mortgage Loans that were assigned to the Trust, **66.18**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

f.   Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading. This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

O-10

## Exhibit P:  Misrepresentations in the Offering Materials for MMLT 2005-2

1. **Collateral type:**  "[F]irst lien and second lien, fixed-rate and adjustable-rate residential mortgage loans."  (Prospectus Supplement Jun. 17, 2005 ("PS").)  "[P]rimarily first lien and second lien, fixed rate and hybrid adjustable rate, conforming and non-conforming mortgage loans."  (Preliminary Term Sheet Jun. 2, 2005 ("TS"), at 5.)

2. **Initial number of mortgage loans:**  Aggregate:  3,307 (PS at S-3), 3,327 (TS at 28).

3. **Originators:**  "Meritage Mortgage Corporation, an Oregon corporation, originated the mortgage loans."  (PS at S-2; *see also* TS at 3.)

4. **Untrue and misleading statements concerning underwriting guidelines in the MMLT 2005-2 Offering Materials:**

   a.  "All of the Mortgage Loans were underwritten and originated by Meritage, generally in accordance with the underwriting criteria described herein.  Meritage's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  All of the Mortgage Loans underwriten by Meritage were underwritten with a view toward the resale thereof in the secondary mortgage market.  Meritage considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio ('Debt Ratio'), as well as the value, type and use of the mortgaged property."  (PS at S-52.)

   b.  "[Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application

designed to provide the underwriting officer pertinent credit information.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply or a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.]"  (Registration Statement Dec. 27, 2004 ("RS"), at S-31.)

c.    "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.  Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer.  The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment.  If a prospective borrower is self-employed, the borrower may be required to submit copies of

MMLT 2005-2

signed tax returns.  The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.  Underwriting standards which pertain to the creditworthiness of borrowers seeking Multifamily Loans will be described in the related prospectus supplement."  (Prospectus at 34; RS at 34.)

d.  "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses."  (Prospectus Feb. 22, 2005, at 34-35; RS at 35.)

e.  Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.  **Untrue and misleading statements regarding case-by-case underwriting exceptions in the MMLT 2005-2 Offering Materials:**

a.  "On a case by case basis, Meritage may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an

underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is not expected that a significant portion of the Mortgage Loans would represent such underwriting exceptions."  (PS at S-53.)

b.      "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus at 102; RS at 102.)

c.      Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without regard to whether there were "compensating factors."  This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.      **Untrue and misleading statements concerning owner-occupancy statistics in the MMLT 2005-2 Offering Materials:**

a.      According to the Prospectus Supplement (at S-26), for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,134 | 95.02% | 94.77% |
| Investor | 89 | 2.96% | 2.69% |
| Second/Vacation | 84 | 2.03% | 2.54% |
| Total Mortgaged Properties | 3,307 | 100% | 100% |

b. Similarly, according to the Preliminary Term Sheet (at 33) for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 3,150 | 94.94% | 94.68% |
| Investor | 85 | 2.04% | 2.55% |
| Second/Vacation | 92 | 3.02% | 2.77% |
| Total Mortgaged Properties | 3,327 | 100% | 100% |

c. Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the aggregate collateral pool.

i. Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **68**.

ii. Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the

number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **65**.

iii.    Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **17**.

iv.    Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence: **104**.

v.    Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence: **69**.

vi.    In sum, of the **756** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of

        Prudential's analytical tests:  **92**, or **12.17**% of the allegedly owner-occupied properties in the test sample.

  d.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint.  A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless.  This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the MMLT 2005-2 Offering Materials:**

  a.    "Meritage's guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and generally require an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards; and if appropriate, a review appraisal.  Generally, appraisals are provided by appraisers acceptable to Meritage.  Review appraisals may only be provided by appraisers approved by Meritage.  For review appraisals, Meritage may rely on a statistical appraisal methodology provided by a third party.  Qualified independent appraisers must meet minimum standards of licensing and provide errors and omissions insurance in states where it is required to become approved to do business with Meritage.  Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area and, where

deemed appropriate, replacement cost analysis based on the current cost of
constructing a similar home.  The review appraisal may be an enhanced desk,
field review or an automated valuation report that confirms or supports the
original appraiser's value of the mortgaged premises."  (PS at S-54.)

b.  "In determining the adequacy of the mortgaged property as collateral, an
appraisal is made of each property considered for financing.  The appraiser is
required to inspect the property and verify that it is in good repair and that
construction, if new, has been completed.  The appraisal generally is based on
the market value of comparable homes, the estimated rental income (if
considered applicable by the appraiser) and the cost of replacing the subject
home.  In connection with a Manufactured Housing Contract, the appraisal is
based on recent sales of comparable manufactured homes and, when deemed
applicable, a replacement cost analysis based on the cost of a comparable
manufactured home.  In connection with a Multifamily Loan, the appraisal
must specify whether an income analysis, a market analysis or a cost analysis
was used.  An appraisal employing the income approach to value analyzes a
multifamily project's cashflow, expenses, capitalization and other operational
information in determining the property's value.  The market approach to value
focuses its analysis on the prices paid for the purchase of similar properties in
the multifamily project's area, with adjustments made for variations between
these other properties and the multifamily project being appraised.  The cost
approach calls for the appraiser to make an estimate of land value and then
determine the current cost of reproducing the building less any accrued

P-8

depreciation.  In any case, the value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance." (Prospectus at 34-35; RS at 34-35.)

c.  Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

**8.  Untrue and misleading statements concerning CLTV ratios in the MMLT 2005-2 Offering Materials:**

a.  The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding CLTV ratios for the Mortgage Loans.  For the aggregate loans, the Prospectus Supplement (at S-27) states that:

i.  The Weighted Average Original CLTV ratio is **86.58**%;

ii.  **62.65**% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

iii.  Only **52.56**% of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

iv.  No Mortgage Loans have an Original CLTV ratio greater than 100%.

b.    The Preliminary Term Sheet (at 30) provides almost identical data:

    i.    The Weighted Average Original CLTV ratio is **86.57**%;

    ii.    **61.65**% of the Mortgage Loans have an Original CLTV ratio greater than or equal to 80%;

    iii.    Only **51.58**% of the Mortgage Loans in the pool have an Original CLTV ratio greater than or equal to 90%; and

    iv.    No Mortgage Loans have an Original CLTV ratio greater than 100%.

c.    Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that the CLTV ratios are higher than the Offering Materials represent.  Of the sampled loans that had sufficient data to test:

    i.    the weighted average initial CLTV ratio was **98.82**%;

    ii.    **87.71**% of the loans tested had an CLTV ratio greater than 80%;

    iii.    **78.00**% of the loans tested had an CLTV ratio greater than 90%;

    iv.    **54.86**% of the loans tested had an CLTV ratio greater than 100%;

    v.    **29.43**% of the loans had an actual CLTV ratio that was at least 10% greater than the CLTV ratios they purportedly had; and

    vi.    **8.29**% of the loans had an actual CLTV ratio that was more than 25% greater than the CLTV ratios they purportedly had.

d.    Defendants' statements concerning CLTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  The use of inflated appraisal values to get

more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9. **Untrue and misleading statements concerning credit ratings in the MMLT 2005-2 Offering Materials:**

   a. "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Moody's Investors Service, Inc. ('Moody's'), Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'), Fitch Ratings ('Fitch') and Dominion Bond Ratings Service, Inc. ('DBRS'):" (PS at S-9.)

   b. "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans. The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates." (PS at S-113.)

   c. "The ratings assigned by the rating agencies named above to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued. The rating agencies' ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the

mortgage pool is adequate to make the payments required by such certificates."
(RS at S-66.)

    d.    "The ratings on the offered certificates address the likelihood of the receipt by
the holders of the offered certificates of all distributions on the mortgage loans
to which they are entitled.  The ratings on the offered certificates also address
the structural, legal and issuer-related aspects of the offered certificates,
including the nature of the mortgage loans."  (RS at S-66.)

    e.    The initial ratings given to the Certificates are set forth in the Complaint.

    f.    Defendants' statements concerning credit ratings were untrue and misleading
for the reasons set forth in Section II of the Complaint.  Unknown to
Prudential, the rating agencies were fed baseless and false statistics regarding
the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint.  This rendered the ratings
meaningless and misleading.

**10.**    **Untrue and misleading statements regarding Defendants' assignment of Mortgage**

    **Loans in the MMLT 2005-2 Offering Materials:**

    a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right,
title and interest in and to each Initial Mortgage Loan, the related mortgage
note, Mortgage, assignment of mortgage (in recordable form in blank or to the
Trustee) and other related documents (collectively, the 'Related Documents'),
including all scheduled payments with respect to each such Mortgage Loan due
after the Cut-off Date."  (PS at S-55.)

P-12

b.    "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS at S-34.)

c.    "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off Date Principal Balance, all interest accruing thereon on and after the Cut-off Date and all collections in respect of interest and principal due after the Cut-off Date; (ii) property which secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (MMLT Pooling and Servicing Agreement, Jun. 1, 2005 ("PSA"), at § 2.01.)

MMLT 2005-2

d.  "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus at 62.)

e.  "In connection with such transfer and assignment, the Depositor, does hereby deliver to, and deposit with the Trustee, or its designated agent (the 'Custodian'), the following documents or instruments with respect to each Initial Mortgage Loan so transferred and assigned and shall, in accordance with Section 2.08, deliver or caused to be delivered to the Trustee with respect to each Subsequent Mortgage Loan, the following documents or instruments

Case 2:33-av-00001 Document 16498-1 Filed 11/02/12 Page 362 of 505 PageID: 364673

(with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original
Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage
Loan is registered on the MERS(R) System, an original Assignment, in form
and substance acceptable for recording. . . . ; (iv) an original copy of any
intervening assignment of Mortgage showing a complete chain of assignments
(or to MERS, if the Mortgage Loan is registered on the MERS(R) System and
noting the presence of the MIN); (v) the original or a certified copy of lender's
title  insurance policy; and (vi) the original or copies of each assumption,
modification, written assurance or substitution agreement, if any."  (PSA at §
2.01.)

f.    "Each loan constituted a valid lien on, or a perfected security interest with
respect to, the related mortgaged property, subject only to permissible title
insurance exceptions, if applicable, and certain other exceptions described in
the related servicing agreement."  (Prospectus at 36.)

g.    "If so specified in the related prospectus supplement, and in accordance with
the rules of membership of Merscorp, Inc. and/or Mortgage Electronic
Registration Systems, Inc. (MERS), assignments of the mortgages for some or
all of the mortgage loans in the related trust will be registered electronically
through the MERS(R) System.  With respect to mortgage loans registered
through the MERS(R) System, MERS shall serve as mortgagee of record
solely as a nominee in an administrative capacity on behalf of the trustee and
shall not have any interest in any of those mortgage loans."  (Prospectus at 62.)

MMLT 2005-2

    h.    Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

        i.    For the **588** loans for which documentation was available, title to **4** Mortgage Loans were held by third parties (other than MERS), and title to **14** Mortgage Loans were still held by the Originators.  In other words, **3.06**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

        ii.    Of those Mortgage Loans that were assigned to the Trust, **54.1**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

    i.    Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

## Exhibit Q:  Misrepresentations in the Offering Materials for RBSGC 2005-A

1.   **Collateral type:**  "[P]rimarily of fixed rate, first lien residential mortgage loans." (Prospectus Supplement Sept. 28, 2005 ("PS").)  "Payments of interest and principal on the Class 3-A Certificates will primarily be based on collections from the group 3 mortgage loans."   (PS at S-4.)

2.   **Initial number of mortgage loans:**  Group 3:  564 (PS at S-41).

3.   **Originators:**  "The mortgage loans which were sold to the seller were originated by multiple originators.  Approximately 52.69%, 17.49% and 14.16% of the mortgage loans by aggregate principal balance of the mortgage loans as of the cut-off date were originated by FNBN, PHH, GreenPoint, respectively, and approximately 10.88% of the mortgage loans were originated by various entities and sold to the seller by UBSRES." (PS at S-61.)

4.   **Untrue and misleading statements concerning underwriting guidelines in the RBSGC 2005-A Offering Materials:**

   a.   "Unless otherwise specified in the related prospectus supplement, each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans." (Registration Statement Aug. 31, 2005 ("RS"), at 34.)

   b.   "Each entity from which the seller purchased mortgage loans has represented and warranted that each of the mortgage loans that it sold was underwritten in accordance with standards utilized during the period of origination by it or by

Q-1

RBSGC 2005-A

the applicable originator in originating mortgage loans generally comparable to the mortgage loans sold to the depositor." (RS at S-31.)

c.    "FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a mortgage loan is required to complete an application, which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. FNBN employs or contracts with underwriters to scrutinize the prospective borrower's credit profile. If required by the underwriting guidelines, employment verification is obtained either from the prospective borrower's employer or through analysis of copies of federal withholding (IRS W-2) forms and/or current payroll earnings statements of the prospective borrower. With respect to every prospective borrower, a credit report summarizing the prospective borrower's credit history is obtained." (PS at 62.)

d.    "PHH's underwriting standards have been established based upon its knowledge of the primary and secondary residential mortgage markets. They are intended to result in the origination of investment-quality mortgage loans that are salable in the secondary mortgage market. They are applied in originating or purchasing loans for its own account, and in originating loans for, or purchasing loans from, other lenders under various 'private-label'

Q-2

programs.  The application of the underwriting standards represent a balancing

of several factors that may affect the ultimate recovery of the loan amount,

including but not limited to, the applicant's credit standing and ability to repay

the loan, as well as the value and adequacy of the mortgaged property as

collateral.  PHH may adapt its underwriting guidelines based upon the nature

of a specific private-label relationship."  (PS at S-63-64.)

e.      "PHH's underwriting guidelines are applied to evaluate an applicant's credit

standing, financial condition, and repayment ability, as well as the value and

adequacy of the mortgaged property as collateral for any loan made.  As part of

the loan application process, the applicant is required to provide information

concerning his or her assets, liabilities, income and expenses (except as

described below), along with an authorization to obtain any necessary third

party verifications, including a credit report summarizing the applicant's credit

history.  Unless prohibited by applicable state law, the applicant is typically

required to pay an application fee if application is made directly to PHH."   (PS

at S-64.)

f.      "Generally, the GreenPoint Underwriting Guidelines are applied to evaluate

the prospective borrower's credit standing and repayment ability and the value

and adequacy of the mortgaged property as collateral.  Based on these and

other factors, GreenPoint will determine the level of documentation to be

provided by the prospective borrower.  Exceptions to the GreenPoint

Underwriting Guidelines are permitted where compensating factors are

present."  (PS at S-68.)

Q-3

g.   UBSRES:  "Based on the data provided in the application and certain verification (if required), a determination is made by the original lender that the borrower's monthly income (if required to be stated) will be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the property such as property taxes, utility costs, standard hazard insurance and other fixed obligations other than housing expenses."  (PS at S-69.)

h.   "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer.  The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment.  If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns.

Q-4

The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. Underwriting standards which pertain to the creditworthiness of borrowers seeking Multifamily Loans will be described in the related prospectus supplement." (Prospectus Sept. 26, 2005, at 35-36; RS at 34.)

i.    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses." (Prospectus at 36; RS at 35.)

j.    "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation." (Prospectus at 102; RS at 99-100.)

k.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5. **Untrue and misleading statements regarding case-by-case underwriting exceptions in the RBSGC 2005-A Offering Materials:**

   a. "FNBN's underwriting guidelines are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations. However, the application of FNBN's underwriting guidelines does not imply that each specific criterion was satisfied individually. FNBN will have considered a mortgage loan to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, such mortgage loan is in substantial compliance with such underwriting guidelines. A mortgage loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in such underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or the mortgage loan is considered to be in substantial compliance with the underwriting standards." (PS at 62-63.)

   b. "From time to time, exceptions to PHH's underwriting policies may be made. Such exceptions are made on a loan-by-loan basis only at the discretion of PHH's underwriters and may be made only after careful consideration of certain compensating factors such as borrower capacity, liquidity, employment and residential stability." (PS at 64.)

   c. "Exceptions to the GreenPoint Underwriting Guidelines are permitted where compensating factors are present." (PS at S-68.)

Q-6

d.     UBSRES: "In addition, certain exceptions to the underwriting standards described in this section are made in the event that a prospective borrower demonstrates compensating factors." (PS at S-69.)

e.     "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan." (Prospectus at 104; RS at 100.)

f.     Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The "exceptions" became the rule, and were used without regard to whether there were "compensating factors." This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.     **Untrue and misleading statements concerning owner-occupancy statistics in the RBSGC 2005-A Offering Materials:**

a.     According to the Prospectus Supplement (at S-42), for the Group 3 loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 281 | 61.14% | 49.82% |
| Non-Owner | 86 | 10.28% | 15.25% |

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Investor | 183 | 25.71% | 32.45% |
| Second/Vacation | 14 | 2.87% | 2.48% |
| Total Mortgaged Properties | 564 | 100% | 100% |

b.  Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the Group 3 collateral pool.

 i.  Of **216** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **13**.

 ii.  Of **216** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **22**.

 iii.  Of **216** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the

number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **15**.

iv.    Of **216** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence: **35**.

v.    Of **216** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence: **42**.

vi.    In sum, of the **216** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests: **38**, or **17.59**% of the allegedly owner-occupied properties in the test sample.

c.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint. A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless. This is evidenced by the above statistical

Q-9

analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the RBSGC 2005-A Offering Materials:**

a.    PHH:  "In determining the adequacy of the property as collateral for a first lien mortgage loan, a Fannie Mae/Freddie Mac conforming appraisal of the property is performed by an independent appraiser selected by PHH, except as noted below.  The appraiser is required to inspect the property and verify that it is in good condition and that construction or renovation, if new, has been completed.  The appraisal report indicates a value for the property and provides information concerning marketability, the neighborhood, the property site, interior and exterior improvements, and the condition of the property.  In lieu of an appraisal, alternative collateral assessment products which comply with Fannie Mae/Freddie Mac criteria may be used."  (PS at S-64-65.)

b.    USBRES:  "The adequacy of the mortgaged property as security for repayment of the related UBSRES Loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure standards for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.  Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure standards established by

the originator.  The appraisal procedure standards generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed.  The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on the current cost of constructing or purchasing a similar property."  (PS at S-70; Prospectus at S-70.)

c.  "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed.  The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home.  In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home.  In connection with a Multifamily Loan, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used.  An appraisal employing the income approach to value analyzes a multifamily project's cashflow, expenses, capitalization and other operational information in determining the property's value.  The market approach to value focuses its analysis on the prices paid for the purchase of similar properties in the multifamily project's area, with adjustments made for variations between

Q-11

these other properties and the multifamily project being appraised. The cost

approach calls for the appraiser to make an estimate of land value and then

determine the current cost of reproducing the building less any accrued

depreciation. In any case, the value of the property being financed, as

indicated by the appraisal, must be such that it currently supports, and is

anticipated to support in the future, the outstanding loan balance." (Prospectus

at 36; RS at 34-35.)

d.    Defendants' statements concerning appraisals were untrue and misleading for

the reasons set forth in Section II of the Complaint. The disclosed appraisal

standards and processes were not actually followed. Rather, appraisers,

originators, and Defendants all knowingly instead used whatever value was

needed to generate a loan approval. This is evidenced by a statistical analysis

of the Mortgage Loans at issue here, as described herein, and other facts

referenced in the Complaint.

8.    **Untrue and misleading statements concerning LTV ratios in the RBSGC 2005-A**

**Offering Materials:**

a.    The information in the Prospectus Supplement presents the following untrue

and misleading statements regarding LTV ratios for the Mortgage Loans. For

the Group 3 loans, the Prospectus Supplement (at S-43) states that:

i.    The Weighted Average Original LTV ratio is 75.35%;

ii.    11.88% of the Mortgage Loans have an Original LTV ratio greater than

80%;

Q-12

      iii.    Only 4.26% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

      iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

b.    Prudential's loan-level analysis of the mortgages in the Group 3 collateral pool has determined that the LTV ratios are higher than the Offering Materials represent. Of the sampled loans that had sufficient data to test:

      i.    the weighted average initial LTV ratio was **78.00**%;

      ii.    **50.48**% of the loans tested had an LTV ratio greater than 80%;

      iii.    **25.24**% of the loans tested had an LTV ratio greater than 90%;

      iv.    **10.00**% of the loans tested had an LTV ratio greater than 100%;

      v.    **25.71**% of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had;

      vi.    **6.67**% of the loans had an actual LTV ratio that was more than 25% greater than the LTV ratios they purportedly had.

c.    Defendants' statements concerning LTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.    **Untrue and misleading statements concerning credit ratings in the RBSGC 2005-A Offering Materials:**

    a.    "It is a condition to the issuance of the certificates of each series offered by this prospectus and the accompanying prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (RS at 159.)

    b.    "It is a condition to the issuance of the offered certificates that the certificates initially have the following ratings from Moody's Investors Service, Inc. and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.:"  (PS at S-7.)

    c.    "The ratings assigned by each rating agency named above address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreement pursuant to which the certificates are issued.  The ratings of each rating agency take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream on that mortgage pool is adequate to make payments required by the certificates."  (PS at S-121.)

    d.    "The ratings assigned by the rating agencies named above to mortgage pass-through certificates address the likelihood of the receipt of all distributions by the related certificateholders under the agreements pursuant to which the certificates are issued."  (RS at S-66.)

e.     The initial ratings given to the Certificates are set forth in the Complaint.

f.     Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint.  Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.  This rendered the ratings meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the RBSGC 2005-A Offering Materials:**

a.     "On the closing date, the depositor will transfer to the trust all of its right, title and interest in and to each of the mortgage loans, together with the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (PS at S-78.)

b.     "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS at S-34.)

c.     "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or

Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus at 63, 64.)

d.     "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement."  (Prospectus at 37.)

e.     "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System.  With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record

Q-16

solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans." (Prospectus at 63.)

f.  Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

  i.  For the **393** loans for which documentation was available, title to **38** Mortgage Loans were held by third parties (other than MERS), and title to **27** Mortgage Loans were still held by the Originators. In other words, **16.54**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

  ii.  Of those Mortgage Loans that were assigned to the Trust, **33.33**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

g.  Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading. This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

**Exhibit R: Misrepresentations in the Offering Materials for SVHE 2004-WMC1**

1. **Collateral type:** "[A] pool of first lien and second lien, fixed-rate and adjustable-rate residential mortgage loans." (Prospectus Supplement Dec. 20, 2004 ("PS")); "[P]rimarily first lien and second lien, fixed rate, adjustable rate and hybrid adjustable rate, conforming and non-conforming mortgage loans." (Preliminary Term Sheet Dec. 13, 2004 ("TS"), at 4.)

2. **Initial number of mortgage loans:** Aggregate: 2,970 (PS at S-3, TS at 23).

3. **Originators:** "WMC Mortgage Corp., a California corporation, originated or acquired the mortgage loans." (PS at S-4.)

4. **Untrue and misleading statements concerning underwriting guidelines in the SVHE 2004-WMC1 Offering Materials:**

   a. "All of the Mortgage Loans were originated or acquired by the originator generally in accordance with the WMC Guidelines." (PS at S-46.)

   b. "The WMC Guidelines are primarily intended to (a) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults." (PS at S-46.)

   c. "Under the WMC Guidelines, the originator verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the WMC Guidelines." (PS at S-46, 47.)

R-1

d.    "Each entity from which the seller purchased mortgage loans has represented and warranted that each of the mortgage loans that it sold was underwritten in accordance with standards utilized during the period of origination by it or by the applicable originator in originating mortgage loans generally comparable to the mortgage loans sold to the depositor." (Registration Statement Nov. 24, 2004 ("RS"), at S-31.)

e.    "[Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.]" (RS at S-31.)

f.    "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property. As part of the description of the borrower's

R-2

financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. Generally, an employment verification is obtained from an independent source, which is typically the borrower's employer. The verification reports the borrower's length of employment with its employer, current salary, and expectations of continued employment. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts. Underwriting standards which pertain to the creditworthiness of borrowers seeking Multifamily Loans will be described in the related prospectus supplement." (Prospectus Dec. 13, 2004, at 34.)

g. "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses." (Prospectus at 35; RS at 35.)

R-3

h.     Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.     **Untrue and misleading statements regarding case-by-case underwriting exceptions in the SVHE 2004-WMC1 Offering Materials:**

a.     "On a case-by-case basis the originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt-to-income ratio (the 'Debt Ratio'), good mortgage payment history, an abundance of cash reserves, stable employment and time in residence at the applicant's current address." (PS at S-46.)

b.     "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan" (Prospectus at 102; RS at 102.)

SVHE 2004-WMC1

c.    Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without regard to whether there were "compensating factors."  This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.    **Untrue and misleading statements concerning owner-occupancy statistics in the SVHE 2004-WMC1 Offering Materials:**

a.    According to the Prospectus Supplement (at S-24) and Preliminary Term Sheet (at 28), for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 2,744 | 93.32% | 92.39% |
| Investor | 134 | 4.04% | 4.51% |
| Second/Vacation | 92 | 2.64% | 3.10% |
| Total Mortgaged Properties | 2,970 | 100% | 100% |

b.    Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the aggregate collateral pool.

i.    Of **739** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption:  **45**.

R-5

SVHE 2004-WMC1

ii.    Of **739** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan:  **103**.

iii.    Of **739** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property:  **30**.

iv.    Of **739** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence:  **87**.

v.    Of **739** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence:  **81**.

SVHE 2004-WMC1

      vi.     In sum, of the **739** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests: **85**, or **11.50**% of the allegedly owner-occupied properties in the test sample.

  c.     Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint. A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless. This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the SVHE 2004-WMC1 Offering Materials:**

  a.     "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing. The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home. In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable

manufactured home.  In connection with a Multifamily Loan, the appraisal must specify whether an income analysis, a market analysis or a cost analysis was used.  An appraisal employing the income approach to value analyzes a multifamily project's cashflow, expenses, capitalization and other operational information in determining the property's value.  The market approach to value focuses its analysis on the prices paid for the purchase of similar properties in the multifamily project's area, with adjustments made for variations between these other properties and the multifamily project being appraised.  The cost approach calls for the appraiser to make an estimate of land value and then determine the current cost of reproducing the building less any accrued depreciation.  In any case, the value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance."  (Prospectus at 34-35; RS at 34-35.)

b. "The WMC Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by an originator-approved appraiser or by the originator's in-house collateral auditors (who are typically licensed appraisers), which audit may in certain circumstances consist of a second appraisal, a field review or a desk review."  (PS at S-46, 47.)

R-8

c.   Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8.   **Untrue and misleading statements concerning CLTV ratios in the SVHE 2004-WMC1 Offering Materials:**

a.   The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding CLTV ratios for the Mortgage Loans.  For the aggregate loans, the Prospectus Supplement (at S-25) states that:

i.   The Weighted Average Original CLTV ratio is **81.76**%;

ii.   **46.26**% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

iii.   Only **29.06**% of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

iv.   No Mortgage Loans have an Original CLTV ratio greater than 100%.

b.   The Preliminary Term Sheet (at 25) provides almost identical data:

i.   The Weighted Average Original CLTV ratio is **81.76**%;

ii.   **46.26**% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

R-9

      iii.      Only **36.46**% of the Mortgage Loans in the pool have an Original CLTV ratio greater than or equal to 90%; and

      iv.      No Mortgage Loans have an Original CLTV ratio greater than 100%.

c.      Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that the CLTV ratios are higher than the Offering Materials represent.  Of the sampled loans that had sufficient data to test:

      i.      the weighted average initial CLTV ratio was **93.91**%;

      ii.      **82.17**% of the loans tested had a CLTV ratio greater than 80%;

      iii.      **69.88**% of the loans tested had a CLTV ratio greater than 90%;

      iv.      **44.34**% of the loans tested had a CLTV ratio greater than 100%;

      v.      **36.63**% of the loans had an actual CLTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

      vi.      **12.05**% of the loans had an actual CLTV ratio that was more than 25% greater than the CLTV ratios they purportedly had.

d.      Defendants' statements concerning CLTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

SVHE 2004-WMC1

9. **Untrue and misleading statements concerning credit ratings in the SVHE 2004-WMC1 Offering Materials:**

    a.    "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings by Moody's Investors Service, Inc. ('Moody's') and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'):"  (PS at S-9.)

    b.    "It is a condition to the issuance of the certificates of each series offered by this prospectus and the accompanying prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (RS at 162.)

    c.    "The ratings assigned by the rating agencies named above to mortgage pass-through certificates address the likelihood of the receipt of all distributions on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued.  The rating agencies' ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates."  (RS at S-66.)

    d.    "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into

R-11

consideration the characteristics of the Mortgage Loans and the structural, legal

and tax aspects associated with the certificates." (PS at S-103.)

e. "The ratings on the offered certificates address the likelihood of the receipt by

the holders of the offered certificates of all distributions on the mortgage loans

to which they are entitled." (RS at S-66.)

f. The initial ratings given to the Certificates are set forth in the Complaint.

g. Defendants' statements concerning credit ratings were untrue and misleading

for the reasons set forth in Section II of the Complaint. Unknown to

Prudential, the rating agencies were fed baseless and false statistics regarding

the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue

here, and other facts referenced in the Complaint. This rendered the ratings

meaningless and misleading.

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage**

**Loans in the SVHE 2004-WMC1 Offering Materials:**

a. "On the Closing Date, the Depositor will transfer to the Trust all of its right,

title and interest in and to each Initial Mortgage Loan, the related mortgage

note, Mortgage, assignment of mortgage in recordable form in blank or to the

Trustee and other related documents (collectively, the 'Related Documents'),

including all scheduled payments with respect to each such Mortgage Loan due

after the Cut-off Date." (PS at S-52.)

b. "On the closing date the depositor will transfer to the trust fund all of its right,

title and interest in and to each mortgage loan included in the pool, the related

mortgage notes, mortgages and other related documents, including all

scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS at S-34.)

c. "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off Date Principal Balance, all interest accruing thereon on and after the Cut-off Date and all collections in respect of interest and principal due after the Cut-off Date; (ii) property which secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (SVHE 2004-WMC1 Pooling and Servicing Agreement, Dec. 1, 2004 ("PSA"), at 53.)

d. "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the

SVHE 2004-WMC1

original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus at 62, 63.)

e.    "In connection with such transfer and assignment, the Depositor, does hereby deliver to, and deposit with the Trustee, or its designated agent (the 'Custodian'), the following documents or instruments with respect to each Initial Mortgage Loan so transferred and assigned and shall, in accordance with Section 2.08, deliver or caused to be delivered to the Trustee with respect to each Subsequent Mortgage Loan, the following documents or instruments (with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage

SVHE 2004-WMC1

Loan is registered on the MERS(R) System, an original Assignment, in form and substance acceptable for recording. . . . ; (iv) an original copy of any intervening assignment of Mortgage showing a complete chain of assignments (or to MERS, if the Mortgage Loan is registered on the MERS(R) System and noting the presence of the MIN); (v) the original or a certified copy of lender's title insurance policy; and (vi) the original or copies of each assumption, modification, written assurance or substitution agreement, if any." (PSA at 53, 54.)

f.  "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement." (Prospectus at 36.)

g.  "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System. With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans." (Prospectus at 62.)

h.  Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

R-15

    i.      For the **627** loans for which documentation was available, title to **46** Mortgage Loans were held by third parties (other than MERS), and title to **34** Mortgage Loans were still held by the Originators. In other words, **12.76**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

    ii.     Of those Mortgage Loans that were assigned to the Trust, **87.50**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

i.    Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading. This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

**Exhibit S:  Misrepresentations in the Offering Materials for SVHE 2006-EQ2**

1.  **Collateral type:**  "[F]irst and second lien, fixed-rate and adjustable-rate residential mortgage loans."  (Prospectus Supplement Dec. 20, 2006 ("PS")); "[P]rimarily of fixed and hybrid adjustable rate, fully amortizing and balloon, first and second lien, conforming and non-conforming mortgage loans."  (Preliminary Term Sheet Dec. 14, 2006 ("TS") at 6.)

2.  **Initial number of mortgage loans:**  4,944 (PS), 4,946 (TS at 18).

3.  **Originators:**  "EquiFirst Corporation, a North Carolina corporation and a wholly-owned subsidiary of EFC Holdings Corporation, originated or acquired the mortgage loans."  (PS.)

4.  **Untrue and misleading statements concerning underwriting guidelines in the SVHE 2006-EQ2 Offering Materials:**

    a.  "All of the mortgage loans included in the trust were originated by EquiFirst, generally in accordance with the underwriting criteria described herein.  The information set forth in the following paragraphs has been provided by EquiFirst, and none of the depositor, the master servicer, the trustee, the underwriters or any other party has prepared, provided or approved of such information."  (PS.)

    b.  "EquiFirst's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan.  All of the mortgage loans were underwritten with a view toward the resale thereof in the secondary mortgage market.  EquiFirst considers, among other things, a

mortgagor's credit history, and repayment ability, as well as the value, type and use of the mortgaged property." (PS.)

c.     "EquiFirst conducts a number of quality control procedures, including a post-funding audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the audit, all loans are reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random and targeted selection of each month's originations is reviewed. The loan review confirms the existence and accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is provided to the underwriters and reviewed monthly by senior management. Adverse findings are tracked monthly. This review procedure allows EquiFirst to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training." (PS.)

d.     "All loans acquired by the Sponsor are subject to due diligence. Portfolios are reviewed for issues including, but not limited to, a thorough credit and compliance review with loan level testing." (PS.)

e.     "Unless otherwise specified in the related prospectus supplement, each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders

generally during the period of origination for similar types of loans."

(Registration Statement Jan. 11, 2006 ("RS").)

f.    "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information, including the principal balance and payment history of any senior lien loan on the related mortgaged property."  (RS.)

g.    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses."  (PS; RS.)

h.    "The Originator conducts a number of quality control procedures, including a post-funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality.  Under the compliance audit, all loans are reviewed to verify credit grading, documentation compliance and data accuracy.  Under the asset quality procedure, a random selection of each month's originations is reviewed.  The loan review confirms the existence and

SVHE 2006-EQ2

accuracy of legal documents, credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to each branch for response. The audit findings and branch responses are then reviewed by the Originator's senior management. Adverse findings are tracked monthly and over a rolling six month period. This review procedure allows the Originator to assess programs for potential guideline changes, program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staff training." (RS.)

i. "All loans acquired by the sponsor are subject to due diligence prior to purchase. Portfolios are reviewed for issues including, but not limited to, credit, documentation, litigation, default and servicing related concerns as well as a thorough compliance review with loan level testing. Broker Price Opinions (BPOs) are also obtained on a selective basis." (Prospectus Aug. 10, 2006.)

j. "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation." (Prospectus.)

k. Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

S-4

SVHE 2006-EQ2

5.      **Untrue and misleading statements regarding case-by-case underwriting exceptions in the SVHE 2006-EQ2 Offering Materials:**

a.      "On a case by case basis, EquiFirst may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described within warrants an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.  It is not expected that a substantial portion of the mortgage loans may represent such underwriting exceptions."  (PS.)

b.      "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (PS; RS.)

c.      Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without regard to whether there were "compensating factors."  This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6. **Untrue and misleading statements concerning owner-occupancy statistics in the SVHE 2006-EQ2 Offering Materials:**

    a.    According to the Prospectus Supplement, for the Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,631 | 94.07% | 93.67% |
| Investor | 277 | 4.97% | 5.60% |
| Second/Vacation | 36 | 0.96% | 0.73% |
| Total Mortgaged Properties | 4,944 | 100% | 100% |

    b.    Similarly, according to the Preliminary Term Sheet (at 23), for the Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,633 | 94.07% | 93.67% |
| Investor | 277 | 4.97% | 5.60% |
| Second Home | 36 | 0.96% | 0.73% |
| Total Mortgaged Properties | 4,946 | 100% | 100% |

    c.    Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the collateral pool.

        i.    Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption:  **41**.

ii.     Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **85**.

iii.    Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **17**.

iv.     Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence: **76**.

v.      Of **756** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence: **62**.

      vi.     In sum, of the **756** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests: **68**, or **8.99**% of the allegedly owner-occupied properties in the test sample.

    d.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint.  A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless.  This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the SVHE 2006-EQ2 Offering Materials:**

    a.    "Qualified independent appraisers must meet minimum standards of licensing. Each Uniform Residential Appraisal Report includes a market data analysis based on recent sales of comparable homes in the area.  The appraisal review process includes steps that may require (but are not limited to) an automated valuation report, or a manual review from one of our internal staff appraisers to confirm or support the original appraiser's value of the mortgaged premises.  A second independent appraisal (ordered by EquiFirst) is required in the following circumstances:  For core and Combo programs, second full

appraisals are required for loan amounts > $650,000; For Jumbo program (all

states), second full appraisals are required for loan amounts > $750,000."  (PS.)

b.      "Appraisal quality:  During the mortgage loan underwriting process, appraisals

are generally obtained on each prospective mortgaged property.  The quality of

these appraisals may vary widely in accuracy and consistency.  Because in

most cases the appraiser is selected by the mortgage loan broker or lender, the

appraiser may feel pressure from that broker or lender to provide an appraisal

in the amount necessary to enable the originator to make the loan, whether or

not the value of the property justifies such an appraised value.  Inaccurate or

inflated appraisals may result in an increase in the number and severity of

losses on the mortgage loans."  (Prospectus.)

c.      "Qualified independent appraisers must meet minimum standards of licensing

and provide errors and omissions insurance in states where it is required to

become approved to do business with the Originator.  Each Uniform

Residential Appraisal Report includes a market data analysis based on recent

sales of comparable homes in the area and, where deemed appropriate,

replacement cost analysis based on the current cost of constructing a similar

home.  The review appraisal may be an enhanced desk, field review or an

automated valuation report that confirms or supports the original appraiser's

value of the mortgaged premises.  The review appraisal may be waived by a

Standard Plus Delegated Underwriter."  (RS.)

d.      Defendants' statements concerning appraisals were untrue and misleading for

the reasons set forth in Section II of the Complaint.  The disclosed appraisal

standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8. **Untrue and misleading statements concerning LTV ratios in the SVHE 2006-EQ2 Offering Materials:**

    a.    The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding LTV ratios for the Mortgage Loans. For the Mortgage loans, the Prospectus Supplement states that:

        i.    The Weighted Average Original LTV ratio is **84.25**%;

        ii.    **57.06**% of the Mortgage Loans have an Original LTV ratio greater than 80%;

        iii.    Only **46.46**% of the Mortgage Loans in the pool have an Original LTV ratio greater than 90%; and

        iv.    No Mortgage Loans have an Original LTV ratio greater than 100%.

    b.    The Preliminary Term Sheet (at 18, 20) provides almost identical data:

        i.    The Weighted Average Original LTV ratio is **84.25%**;

        ii.    **57.06%** of the Mortgage Loans have an Original LTV ratio greater than 80%;

        iii.    Only **46.46%** of the Mortgage Loans in the pool have an Original LTV ratio greater than or equal to 90%; and

        iv.     No Mortgage Loans have an Original LTV ratio greater than 100%.

    c.     Prudential's loan-level analysis of the mortgages in the collateral pool has determined that the LTV ratios are higher than the Offering Materials represent. Of the sampled loans that had sufficient data to test:

        i.     the weighted average initial LTV ratio was **87.46**%;

        ii.     **65.70**% of the loans tested had an LTV ratio greater than 80%;

        iii.     **48.11**% of the loans tested had an LTV ratio greater than 90%;

        iv.     **30.51**% of the loans tested had an LTV ratio greater than 100%;

        v.     **38.98**% of the loans had an actual LTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

        vi.     **9.80**% of the loans had an actual LTV ratio that was more than 25% greater than the LTV ratios they purportedly had.

    d.     Defendants' statements concerning LTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.     **Untrue and misleading statements concerning credit ratings in the SVHE 2006-EQ2 Offering Materials:**

a. "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Moody's Investors Service, Inc. ('Moody's'), Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P') and Fitch Ratings ('Fitch'):" (PS.)

b. "It is a condition to the issuance of the certificates of each series offered by this prospectus and the accompanying prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement." (RS.)

c. "Ratings on mortgage pass-through certificates address the likelihood of receipt by securityholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with such certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any." (RS.)

d. "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans. The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates." (PS; RS.)

e. The initial ratings given to the Certificates are set forth in the Complaint.

f. Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue

SVHE 2006-EQ2

here, and other facts referenced in the Complaint.  This rendered the ratings
meaningless and misleading.

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the SVHE 2006-EQ2 Offering Materials:**

    a.  "On the Closing Date, the Depositor will transfer to the Trust all of its right,
        title and interest in and to each Initial Mortgage Loan, the related mortgage
        note, Mortgage, assignment of mortgage in recordable form in blank or to the
        Trustee and other related documents (collectively, the 'Related Documents'),
        including all scheduled payments with respect to each such Mortgage Loan due
        after the Cut-off Date."  (PS.)

    b.  "On the closing date the depositor will transfer to the trust fund all of its right,
        title and interest in and to each mortgage loan included in the pool, the related
        mortgage notes, mortgages and other related documents, including all
        scheduled payments with respect to each mortgage loan due after the cut-off
        date."  (RS.)

    c.  "The Depositor, concurrently with the execution and delivery hereof, does
        hereby transfer, assign, set over and otherwise convey in trust to the Trustee
        without recourse for the benefit of the Certificateholders all the right, title and
        interest of the Depositor, including any security interest therein for the benefit
        of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage
        Loan Schedule, including the related Cut-off Date Principal Balance, all
        interest accruing thereon on and after the Cut-off Date and all collections in
        respect of interest and principal due after the Cut-off Date; (ii) property which

S-13

SVHE 2006-EQ2

secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (SVHE 2006-EQ2 Pooling and Servicing Agreement, Dec. 1, 2006 ("PSA"), at § 2.01.)

d.    "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the

mortgage is held for the trustee through the MERS(R) System; and any other

security documents as may be specified in the related prospectus supplement,

including those relating to any senior lienholder interests in the related

mortgaged property."  (Prospectus.)

e.  "In connection with such transfer and assignment, the Depositor, does hereby

deliver to, and deposit with the Trustee, or its designated agent (the

'Custodian'), the following documents or instruments with respect to each

Initial Mortgage Loan so transferred and assigned and shall, in accordance with

Section 2.08, deliver or caused to be delivered to the Trustee with respect to

each Subsequent Mortgage Loan, the following documents or instruments

(with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original

Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage

Loan is registered on the MERS(R) System, an original Assignment, in form

and substance acceptable for recording. . . . ; (iv) an original copy of any

intervening assignment of Mortgage showing a complete chain of assignments

(or to MERS, if the Mortgage Loan is registered on the MERS(R) System and

noting the presence of the MIN); (v) the original or a certified copy of lender's

title  insurance policy; and (vi) the original or copies of each assumption,

modification, written assurance or substitution agreement, if any."  (PSA at at §

2.01.)

f.  "Each loan constituted a valid lien on, or a perfected security interest with

respect to, the related mortgaged property, subject only to permissible title

SVHE 2006-EQ2

insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement." (Prospectus.)

g.  "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System. With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans." (Prospectus.)

h.  Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

   i.  For the **625** loans for which documentation was available, title to **214** Mortgage Loans were held by third parties (other than MERS), and title to **20** Mortgage Loans were still held by the Originators. In other words, **37.44**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

i.  Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading. This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

SVHE 2006-EQ2

**Exhibit T:  Misrepresentations in the Offering Materials for SVHE 2006-NLC1**

1.  **Collateral type:**  "[F]irst and second lien, fixed-rate and adjustable-rate residential mortgage loans."  (Offering Circular Nov. 10, 2006 ("OC")); "[F]ixed and hybrid adjustable rate, fully amortizing and balloon, first and second lien, conforming and non-conforming mortgage loans."  (Preliminary Term Sheet Oct. 11, 2006 ("TS"), at 6.)

2.  **Initial number of mortgage loans:**  4,540 (OC at 8; TS at 14).

3.  **Originators:**  "First NLC Financial Services, LLC originated or acquired the mortgage loans."  (OC at 7; *see also* TS at 5.)

4.  **Untrue and misleading statements concerning underwriting guidelines in the SVHE 2006-NLC1 Offering Materials:**

    a.  "First NLC's underwriting guidelines are designed to evaluate a borrower's credit history, his or her capacity, willingness and ability to repay the loan and the value and adequacy of the collateral."  (OC at 39.)

    b.  "All underwriting is performed by internal underwriting personnel, who are a part of the underwriting and processing teams.  First NLC does not delegate underwriting authority to any broker or sales staff.  Underwriters review and underwrite each loan package and then either grant a conditional approval on the terms requested, provide a counteroffer approval on the best terms First NLC is willing to offer the borrower, or deny the application.  Once a loan is conditionally approved, processors process the loan in accordance with the terms and conditions of the conditional approval.  Before closing, each conditionally approved loan is reviewed a second time by an underwriter to determine that the conditions specified in the conditional approval have all been met."  (OC at 39.)

c.  "First NLC's underwriting guidelines require verification of the borrower's income.  First NLC has two primary levels of income documentation requirements, referred to as 'full documentation' and 'stated income documentation' programs.  Under each of these programs, First NLC reviews the loan applicant's source of income, calculate the amount of income from sources indicated on the loan application or similar documentation and calculate debt-to-income ratios to determine the applicant's ability to repay the loan."  (OC at 41.)

d.  "In addition to the above referenced file review, First NLC employees a traditional independent quality control review, a random sample of 5 to 10% of its production.  These loans are re-verified for accuracy of income, assets and adherence to underwriting and appraisal guidelines.  Monthly findings are provided to the Operations Managers and Assistant Chief Credit Officers in each center as well as senior management.  Any significant findings are quickly addressed and appropriate actions are taken."  (OC at 41.)

e.  "All loans acquired by the Sponsor are subject to due diligence.  Portfolios are reviewed for issues including, but not limited to, a thorough credit and compliance review with loan level testing."  (OC at 51-52.)

f.  "In addition to the above referenced file review, First NLC employees a traditional independent quality control review, a random sample of 5 to 10% of its production.  These loans are re-verified for accuracy of income, assets and adherence to underwriting and appraisal guidelines.  Monthly findings are provided to the Operations Managers and Assistant Chief Credit Officers in

T-2

each center as well as senior management.  Any significant findings are quickly addressed and appropriate actions are taken."  (OC at 41.)

g.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.    **Untrue and misleading statements regarding case-by-case underwriting exceptions in the SVHE 2006-NLC1 Offering Materials:**

a.    "First NLC may make exceptions and upgrades to its underwriting guidelines on a case-by-case basis where compensating factors exist.  For example, it may determine that an applicant warrants one of the following exceptions: a debt-to-income ratio exception; a pricing exception; a loan-to-ratio exception; or an exception from certain requirements of a particular category."  (OC at 40.)

b.    "An exception may be allowed if the application reflects certain factors, including:  a low loan-to-value ratio; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; ownership of the current residence of five or more years"  (OC at 40.)

c.    Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without regard to whether there were "compensating factors."  This is supported by a

statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6. **Untrue and misleading statements concerning owner-occupancy statistics in the SVHE 2006-NLC1 Offering Materials:**

   a.   According to the Offering Circular (at 32) and Preliminary Term Sheet (at 20), for the Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,217 | 93.01% | 92.89% |
| Investor | 311 | 6.65% | 6.85% |
| Second/Vacation | 12 | 0.33% | 0.26% |
| Total Mortgaged Properties | 4,540 | 100% | 100% |

   b.   Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy for the aggregate loans was only approximately **79.32**%, i.e., the Offering Materials overstated the amount of owner occupancy by approximately **10.83**%.

7. **Untrue and misleading statements concerning appraisals in the SVHE 2006-NLC1 Offering Materials:**

   a.   "Appraisals are performed by licensed, third-party, fee-based appraisers who are hired by First NLC or the broker and include, among other things, an inspection of the exterior and interior of the subject property.  Appraisals are also required to address neighborhood conditions, site and zoning status and the condition and value of improvements.  First NLC does not require its borrowers to use any particular appraiser; however, it maintains a list of

appraisers whose appraisals it will not accept. An appraisal may not be more than 120 days old on the day the loan is funded." (OC at 40.)

b.  "First NLC requires its underwriters to review all third-party appraisals against an appraisal checklist of qualitative standards, such as square footage, zoning status, comparable property information and improvements. If the underwriters are not satisfied with the accuracy of the third-party appraisal, they will request that a senior credit officer review the appraisal. In addition, First NLC employs in-house state-certified appraisers who review each third-party appraisal that the underwriters are not able to approve because of a failure to meet the qualitative standards. Staff appraisers may require a field review of the property, review additional comparable properties or order a complete second appraisal to verify the accuracy of the original appraisal. In addition to utilizing automated appraisal tools, staff appraisers may work with independent, third-party appraisers to ensure that the appraisals meet First NLC's qualitative standards." (OC at 40.)

c.  Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

SVHE 2006-NLC1

8.  **Untrue and misleading statements concerning LTV ratios in the SVHE 2006-NLC1 Offering Materials:**

   a.   The information in the Offering Circular (at 29, 33) and the Preliminary Term Sheet (at 14, 17) present the following untrue and misleading statements regarding LTV ratios for the Mortgage Loans:

      i.   The Weighted Average Original LTV ratio is **81.90%**;

      ii.   **46.12**% of the Mortgage Loans have an Original LTV ratio greater than 80%;

      iii.   Only **37.38**% of the Mortgage Loans in the pool have an Original LTV ratio greater than or equal to 90%; and

      iv.   No Mortgage Loans have an Original LTV ratio greater than 100%.

   b.   Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

      i.   The weighted average LTV ratio was understated by approximately **3.19**%;

      ii.   The number of loans that had an LTV higher than 80% was understated by approximately **11.67**%;

      iii.   The number of loans that had an LTV higher than 90% was understated by approximately **12.05**%;

      iv.   The number of loans that had an LTV higher than 100% was understated by approximately **27.15**%;

v.      Approximately **31.63**% of the loans had an LTV that was at least 10% higher than those loans supposedly had; and

vi.     Approximately **9.03**% of the loans had an LTV that was at least 25% higher than those loans supposedly had.

9.     **Untrue and misleading statements concerning credit ratings in the SVHE 2006-NLC1 Offering Materials:**

a.     "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Moody's Investors Service, Inc. ('Moody's') and Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'):" (OC at 13.)

b.     "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans. The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates." (OC at 138.)

c.     The initial ratings given to the Certificates are set forth in the Complaint.

d.     Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint. Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint. This rendered the ratings meaningless and misleading.

10.     **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the SVHE 2006-NLC1 Offering Materials:**

T-7

a. "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the Trustee and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date." (OC at 53.)

b. "The Pooling Agreement will require that, within the time period specified therein, the Depositor will deliver or cause to be delivered to the Trustee (or a custodian on behalf of the Trustee) the mortgage notes endorsed to the Trustee on behalf of the Certificateholders and the Related Documents." (OC at 54.)

c. Based on Prudential's analysis of **12,417** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

    i. For the loans for which documentation was available, title to **6.38**% of the Mortgage Loans were held by third parties (other than MERS), and title to **28.67**% of the Mortgage Loans were still held by the Originators. In other words, **35.05**% of the Loans were not properly transferred to the Trust or to MERS, contrary to the representations in the Offering Materials.

    ii. Of those Mortgage Loans that were assigned to the Trust, **66.18**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

SVHE 2006-NLC1

    d.    Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

SVHE 2006-NLC1

**Exhibit U:  Misrepresentations in the Offering Materials for SVHE 2006-OPT1**

1.     **Collateral type:**  "[F]irst lien and second lien, fixed-rate and adjustable-rate mortgage loans" (Prospectus Supplement Mar. 7, 2006 ("PS")); "[F]ixed and hybrid adjustable rate, fully amortizing and balloon, first and second lien, conforming and non-conforming mortgage loans."  (Preliminary Term Sheet Feb. 28, 2006 ("TS"), at 6.)  "Group II Certificates . . . Class II-A-4 Certificates . . . the Group II Certificates will receive their distributions from Loan Group II."  (PS.)

2.     **Initial number of mortgage loans:**  Group II:  2,075 (PS), 2,034 (TS at 36).

3.     **Originators:**  "Option One, a California corporation headquartered in Irvine, California, is the originator of the Mortgage Loans"  (PS.)

4.     **Untrue and misleading statements concerning underwriting guidelines in the SVHE 2006-OPT1 Offering Materials:**

   a.     "Each entity from which the seller purchased mortgage loans has represented and warranted that each of the mortgage loans that it sold was underwritten in accordance with standards utilized during the period of origination by it or by the applicable originator in originating mortgage loans generally comparable to the mortgage loans sold to the depositor."  (Registration Statement Aug. 9, 2005 ("RS") at S-31.)

   b.     "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer pertinent credit information.  As part of the description of the borrower's financial condition, the borrower

generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy."  (Prospectus Sept. 26, 2005.)

c. "[Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral.  In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer pertinent credit information.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy.]"  (RS at S-31.)

d. "The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines (the 'Option One Underwriting Guidelines').  The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan."  (PS.)

e. "Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan.  Such determination is based on a review

U-2

of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed." (PS.)

f.   "Unless otherwise specified in the related prospectus supplement, each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans. As to any loan insured by the FHA or partially guaranteed by the VA, the related seller will represent that it has complied with the underwriting policies of the FHA or the VA, as the case may be." (Prospectus.)

g.   "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses."   (Prospectus; RS at 32.)

h.   "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation. The

lender's credit application and review must determine whether the borrower's

income will be adequate to meet the periodic payments required by the loan, as

well as the borrower's other housing and recurring expenses, which

determination must be made in accordance with the expense-to-income ratios

published by the Secretary of HUD unless the lender determines and

documents in the loan file the existence of compensating factors concerning the

borrower's creditworthiness which support approval of the loan."  (Prospectus;

RS at 99-100.)

    i.    Defendants' statements concerning underwriting guidelines were untrue and

misleading for the reasons set forth in Section II of the Complaint.  The

guidelines were systematically ignored.  This is confirmed by a statistical

analysis of the Mortgage Loans at issue here, the rising delinquency rates for

the Mortgage Loans, and other facts referenced in the Complaint.

**5.**    **Untrue and misleading statements regarding case-by-case underwriting exceptions**

**in the SVHE 2006-OPT1 Offering Materials:**

    a.    "On a case-by-case basis, exceptions to the Option One Underwriting

Guidelines are made where compensating factors exist."  (PS.)

    b.    "As described above, the foregoing risk categories and criteria are

Underwriting Guidelines only.  On a case-by-case basis, it may be determined

that an applicant warrants a debt-to-income ratio exception, a pricing

exception, a loan-to-value exception, a credit score exception or an exception

from certain requirements of a particular risk category.  An upgrade will be

granted if the application reflects certain compensating factors, among others: a

relatively lower LTV; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; a fixed source of income that is greater than 50% of all income; ownership of current residence of four or more years; or cash reserves equal to or in excess of three monthly payments of principal, interest, taxes and insurance.  An upgrade or exception may also be allowed if the applicant places a down payment through escrow of at least 10% of the purchase price of the mortgaged property, or if the new loan reduces the applicant's monthly aggregate mortgage payment by 20% or more. Accordingly, certain mortgagors may qualify for a more favorable risk category or for a higher maximum LTV that, in the absence of such compensating factors, would satisfy only the criteria of a less favorable risk category or maximum LTV."  (PS.)

c.  "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus; RS at 99-100.)

d.  Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without

SVHE 2006-OPT1

regard to whether there were "compensating factors." This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6. **Untrue and misleading statements concerning owner-occupancy statistics in the SVHE 2006-OPT1 Offering Materials:**

   a. According to the Prospectus Supplement, for the Group II loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 1,814 | 88.42% | 87.42% |
| Investor | 203 | 8.36% | 9.78% |
| Second/Vacation | 58 | 3.23% | 2.80% |
| Total Mortgaged Properties | 2,075 | 100% | 100% |

   b. Similarly, according to the Preliminary Term Sheet (at 42), for the Group II loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 1,774 | 88.47% | 85.12% |
| Non-Owner | 203 | 8.36% | 9.74% |
| Second Home | 57 | 3.18% | 2.74% |
| Total Mortgaged Properties | 2,084 | 100% | 100% |

   c. Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the Group II collateral pool.

   i. Of **714** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the

Case 2:53-cv-00001-KM Document 16498-1 Filed 11/02/12 Page 426 of 805 PageID: 46491

number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **44**.

ii.    Of **714** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **69**.

iii.    Of **714** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **32**.

iv.    Of **714** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence: **100**.

v.    Of **714** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens

SVHE 2006-OPT1

that did not list the securitized property as the owner's primary residence:
**68**.

     vi.     In sum, of the **714** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests: **82**, or **11.48**% of the allegedly owner-occupied properties in the test sample.

    d.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint. A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless. This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

**7.    Untrue and misleading statements concerning appraisals in the SVHE 2006-OPT1 Offering Materials:**

    a.    "Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to

conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac."  (PS.)

b.  "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed.  The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home.  In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home."  (Prospectus; RS.)

c.  Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8.  **Untrue and misleading statements concerning CLTV ratios in the SVHE 2006-OPT1 Offering Materials:**

a.  The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding CLTV ratios for the Mortgage Loans.  For the Group II loans, the Prospectus Supplement states that:

    i.  The Weighted Average Original CLTV ratio is **82.03%**;

    ii.  **62.27%** of the Mortgage Loans have an Original CLTV ratio greater than 80%;

    iii.  Only **42.51%** of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

    iv.  No Mortgage Loans have an Original CLTV ratio greater than 100%.

b.  The Preliminary Term Sheet (at 36, 39) provides almost identical data for the Group II loans:

    i.  The Weighted Average Original CLTV ratio is **82.14%**;

    ii.  **63.42%** of the Mortgage Loans have an Original CLTV ratio greater than 80%;

    iii.  Only **52.85%** of the Mortgage Loans in the pool have an Original CLTV ratio greater than or equal to 90%; and

    iv.  No Mortgage Loans have an Original CLTV ratio greater than 100%.

c.  Prudential's loan-level analysis of the mortgages in the Group II collateral pool has determined that the CLTV ratios are higher than the Offering Materials represent.  Of the sampled loans that had sufficient data to test:

    i.  the weighted average initial CLTV ratio was **94.03**%;

    ii.  **81.47**% of the loans tested had a CLTV ratio greater than 80%;

SVHE 2006-OPT1

iii.     **69.12**% of the loans tested had a CLTV ratio greater than 90%;

iv.     **48.69**% of the loans tested had a CLTV ratio greater than 100%;

v.     **45.13**% of the loans had an actual CLTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

vi.     **17.10**% of the loans had an actual CLTV ratio that was more than 25% greater than the CLTV ratios they purportedly had.

d.     Defendants' statements concerning CLTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.     **Untrue and misleading statements concerning credit ratings in the SVHE 2006-OPT1 Offering Materials:**

a.     "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'), Moody's Investors Service, Inc. ('Moody's') and Fitch Ratings ('Fitch'):" (PS.)

b.     "It is a condition to the issuance of the certificates of each series offered by this prospectus and the accompanying prospectus supplement that they shall have

been rated in one of the four highest rating categories by the nationally

recognized statistical rating agency or agencies specified in the related

prospectus supplement."  (RS at 159.)

c.     "A securities rating addresses the likelihood of the receipt by a

certificateholder of distributions on the Mortgage Loans.  The rating takes into

consideration the characteristics of the Mortgage Loans and the structural, legal

and tax aspects associated with the certificates."  (Prospectus.)

d.     "The ratings assigned by the rating agencies named above to mortgage pass-

through certificates address the likelihood of the receipt of all distributions by

the related certificateholders under the agreements pursuant to which the

certificates are issued.  The ratings by the rating agencies take into

consideration the credit quality of the related mortgage pool, including any

credit support providers, structural and legal aspects associated with the

certificates, and the extent to which the payment stream on the mortgage pool

is adequate to make the payments required by the certificates."  (RS at S-52.)

e.     The initial ratings given to the Certificates are set forth in the Complaint.

f.     Defendants' statements concerning credit ratings were untrue and misleading

for the reasons set forth in Section II of the Complaint.  Unknown to

Prudential, the rating agencies were fed baseless and false statistics regarding

the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue

here, and other facts referenced in the Complaint.  This rendered the ratings

meaningless and misleading.

SVHE 2006-OPT1

10. **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the SVHE 2006-OPT1 Offering Materials:**

a.  "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the Trustee and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date."  (PS.)

b.  "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS at S-34.)

c.  "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off Date Principal Balance, all interest accruing thereon on and after the Cut-off Date and all collections in respect of interest and principal due after the Cut-off Date; (ii) property which secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in

respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing. Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans." (SVHE 2006-OPT1 Pooling and Servicing Agreement, Mar. 1, 2006 ("PSA"), at § 2.01.)

d.  "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund: the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement,

U-14

including those relating to any senior lienholder interests in the related

mortgaged property." (Prospectus.)

e. "In connection with such transfer and assignment, the Depositor, does hereby

deliver to, and deposit with the Trustee, or its designated agent (the

'Custodian'), the following documents or instruments with respect to each

Initial Mortgage Loan so transferred and assigned and shall, in accordance with

Section 2.08, deliver or caused to be delivered to the Trustee with respect to

each Subsequent Mortgage Loan, the following documents or instruments

(with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original

Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage

Loan is registered on the MERS(R) System, an original Assignment, in form

and substance acceptable for recording. . . . ; (iv) an original copy of any

intervening assignment of Mortgage showing a complete chain of assignments

(or to MERS, if the Mortgage Loan is registered on the MERS(R) System and

noting the presence of the MIN); (v) the original or a certified copy of lender's

title  insurance policy; and (vi) the original or copies of each assumption,

modification, written assurance or substitution agreement, if any." (PSA at §

2.01.)

f. "Each loan constituted a valid lien on, or a perfected security interest with

respect to, the related mortgaged property, subject only to permissible title

insurance exceptions, if applicable, and certain other exceptions described in

the related servicing agreement." (Prospectus.)

SVHE 2006-OPT1

g.  "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System.  With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans."  (Prospectus.)

h.  Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

i.  For the **473** loans for which documentation was available, title to **33** Mortgage Loans were held by third parties (other than MERS), and title to **332** Mortgage Loans were still held by the Originators.  In other words, **77.17**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

ii.  Of those Mortgage Loans that were assigned to the Trust, **48.54**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

i.  Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

U-16

## **Exhibit V: Misrepresentations in the Offering Materials for SVHE 2006-OPT2**

1.  **Collateral type:** "[F]irst lien and second lien, fixed-rate and adjustable-rate residential mortgage loans." (Prospectus Supplement Mar. 14, 2006 ("PS").)

2.  **Initial number of mortgage loans:** 7,459 (PS), 7,372 (Preliminary Term Sheet Mar. 8, 2006 ("TS"), at 19).

3.  **Originators:** "Option One, a California corporation headquartered in Irvine, California, is the originator of the Mortgage Loans." (PS; *see also* TS.)

4.  **Untrue and misleading statements concerning underwriting guidelines in the SVHE 2006-OPT2 Offering Materials:**

    a.  "Each entity from which the seller purchased mortgage loans has represented and warranted that each of the mortgage loans that it sold was underwritten in accordance with standards utilized during the period of origination by it or by the applicable originator in originating mortgage loans generally comparable to the mortgage loans sold to the depositor." (RS at S-31.)

    b.  "The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines (the 'Option One Underwriting Guidelines'). The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan. The Mortgage Loans were also generally underwritten with a view toward resale in the secondary market. The Mortgage Loans generally bear higher rates of interest than mortgage loans that are originated in accordance with customary Fannie Mae and Freddie Mac standards." (PS.)

c.    "Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed." (PS.)

d.    "Unless otherwise specified in the related prospectus supplement, each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans. As to any loan insured by the FHA or partially guaranteed by the VA, the related seller will represent that it has complied with the underwriting policies of the FHA or the VA, as the case may be." (Prospectus.)

e.    "Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related mortgaged property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expense, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local

SVHE 2006-OPT2

merchants and lenders and any record of bankruptcy." (Prospectus; RS at S-31.)

    f.    "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses." (Prospectus; RS at 32.)

    g.    "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation." (Prospectus; RS at 99, 100.)

    h.    Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

**5.    Untrue and misleading statements regarding case-by-case underwriting exceptions in the SVHE 2006-OPT2 Offering Materials:**

"On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist." (PS.)

a.    "As described above, the foregoing risk categories and criteria are Underwriting Guidelines only.  On a case-by-case basis, it may be determined that an applicant warrants a debt-to-income ratio exception, a pricing exception, a loan-to-value exception, a credit score exception or an exception from certain requirements of a particular risk category.  An upgrade will be granted if the application reflects certain compensating factors, among others: a relatively lower LTV; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; a fixed source of income that is greater than 50% of all income; ownership of current residence of four or more years; or cash reserves equal to or in excess of three monthly payments of principal, interest, taxes and insurance.  An upgrade or exception may also be allowed if the applicant places a down payment through escrow of at least 10% of the purchase price of the mortgaged property, or if the new loan reduces the applicant's monthly aggregate mortgage payment by 20% or more.  Accordingly, certain mortgagors may qualify for a more favorable risk category or for a higher maximum LTV that, in the absence of such compensating factors, would satisfy only the criteria of a less favorable risk category or maximum LTV."  (PS.)

b.    "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and

SVHE 2006-OPT2

documents in the loan file the existence of compensating factors concerning the

borrower's creditworthiness which support approval of the loan." (Prospectus;

RS at 99-100.)

    c.    Defendants' statements concerning the use of exceptions to underwriting

guidelines were untrue and misleading for the reasons set forth in Section II of

the Complaint. The "exceptions" became the rule, and were used without

regard to whether there were "compensating factors." This is supported by a

statistical analysis of the Mortgage Loans at issue here, and other facts

referenced in the Complaint.

**6.** **Untrue and misleading statements concerning owner-occupancy statistics in the**

**SVHE 2006-OPT2 Offering Materials:**

    a.    According to the Prospectus Supplement, for the Mortgage Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 6,629 | 89.00% | 88.87% |
| Investor | 705 | 8.62% | 9.45% |
| Second/Vacation | 125 | 2.38% | 1.68% |
| Total Mortgaged Properties | 7,459 | 100% | 100% |

    b.    Similarly, according to the Preliminary Term Sheet (at 19), for the Mortgage

Loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 6,559 | 89.22% | 88.97% |
| Investor | 689 | 8.45% | 9.35% |
| Second/Vacation | 124 | 2.33% | 1.68% |
| Total Mortgaged Properties | 7,372 | 100% | 100% |

c.     Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the collateral pool.

     i.     Of **729** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **46**.

     ii.     Of **729** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **74**.

     iii.     Of **729** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **28**.

     iv.     Of **729** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the

SVHE 2006-OPT2

number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence:  **98**.

  v.  Of **729** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence: **52**.

  vi.  In sum, of the **729** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests:  **83**, or **11.39**% of the allegedly owner-occupied properties in the test sample.

 d. Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint.  A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless.  This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7. **Untrue and misleading statements concerning appraisals in the SVHE 2006-OPT2 Offering Materials:**

a. "Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac."  (PS.)

b. "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed.  The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home.  In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home."  (Prospectus; RS at 31-32.)

c. Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers,

V-8

originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8. **Untrue and misleading statements concerning CLTV ratios in the SVHE 2006-OPT2 Offering Materials:**

    a.    The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding CLTV ratios for the Mortgage Loans. For the Mortgage Loans, the Prospectus Supplement states that:

        i.    The Weighted Average Original CLTV ratio is **77.70%**;

        ii.    **32.00%** of the Mortgage Loans have an Original CLTV ratio greater than 80%;

        iii.    Only **17.75%** of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

        iv.    No Mortgage Loans have an Original CLTV ratio greater than 100%.

    b.    The Preliminary Term Sheet (at 13, 15) provides almost identical data:

        i.    The Weighted Average Original CLTV ratio is **77.60**%;

        ii.    **31.61%** of the Mortgage Loans have an Original CLTV ratio greater than 80%;

        iii.    Only **20.73%** of the Mortgage Loans in the pool have an Original CLTV ratio greater than or equal to 90%; and

        iv.    No Mortgage Loans have an Original CLTV ratio greater than 100%.

    c.      Prudential's loan-level analysis of the mortgages in the collateral pool has determined that the CLTV ratios are higher than the Offering Materials represent. Of the sampled loans that had sufficient data to test:

        i.     the weighted average initial CLTV ratio was **90.74**%;

        ii.    **71.17**% of the loans tested had a CLTV ratio greater than 80%;

        iii.   **55.89**% of the loans tested had a CLTV ratio greater than 90%;

        iv.   **38.85**% of the loans tested had a CLTV ratio greater than 100%;

        v.    **46.12**% of the loans had an actual CLTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

        vi.   **15.04**% of the loans had an actual CLTV ratio that was more than 25% greater than the CLTV ratios they purportedly had.

    d.      Defendants' statements concerning CLTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.     **Untrue and misleading statements concerning credit ratings in the SVHE 2006-OPT2 Offering Materials:**

a. "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'), Moody's Investors Service, Inc. ('Moody's') and Fitch Ratings ('Fitch'):"  (PS.)

b. "It is a condition to the issuance of the certificates of each series offered by this prospectus and the accompanying prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement."  (RS at 159.)

c. "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates."  (Prospectus.)

d. "Ratings on mortgage pass-through certificates address the likelihood of receipt by securityholders of all distributions on the underlying mortgage loans. These ratings address the structural, legal and issuer-related aspects associated with such certificates, the nature of the underlying mortgage loans and the credit quality of the credit enhancer or guarantor, if any."  (RS at 159, 160.)

e. The initial ratings given to the Certificates are set forth in the Complaint.

f. Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint.  Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue

here, and other facts referenced in the Complaint.  This rendered the ratings
meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage
Loans in the SVHE 2006-OPT2 Offering Materials:**

    a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right,
title and interest in and to each Initial Mortgage Loan, the related mortgage
note, Mortgage, assignment of mortgage in recordable form in blank or to the
Trustee and other related documents (collectively, the 'Related Documents'),
including all scheduled payments with respect to each such Mortgage Loan due
after the Cut-off Date."  (PS.)

    b.    "On the closing date the depositor will transfer to the trust fund all of its right,
title and interest in and to each mortgage loan included in the pool, the related
mortgage notes, mortgages and other related documents, including all
scheduled payments with respect to each mortgage loan due after the cut-off
date."  (RS at S-34.)

    c.    "The Depositor, concurrently with the execution and delivery hereof, does
hereby transfer, assign, set over and otherwise convey in trust to the Trustee
without recourse for the benefit of the Certificateholders all the right, title and
interest of the Depositor, including any security interest therein for the benefit
of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage
Loan Schedule, including the related Cut-off Date Principal Balance, all
interest accruing thereon on and after the Cut-off Date and all collections in
respect of interest and principal due after the Cut-off Date; (ii) property which

secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (SVHE 2006-OPT2 Pooling and Servicing Agreement, Apr. 1, 2006 ("PSA"), at § 2.01.)

d.    "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the

mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property." (Prospectus.)

e.  "In connection with such transfer and assignment, the Depositor, does hereby deliver to, and deposit with the Trustee, or its designated agent (the 'Custodian'), the following documents or instruments with respect to each Initial Mortgage Loan so transferred and assigned and shall, in accordance with Section 2.08, deliver or caused to be delivered to the Trustee with respect to each Subsequent Mortgage Loan, the following documents or instruments (with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage Loan is registered on the MERS(R) System, an original Assignment, in form and substance acceptable for recording. . . . ; (iv) an original copy of any intervening assignment of Mortgage showing a complete chain of assignments (or to MERS, if the Mortgage Loan is registered on the MERS(R) System and noting the presence of the MIN); (v) the original or a certified copy of lender's title  insurance policy; and (vi) the original or copies of each assumption, modification, written assurance or substitution agreement, if any." (PSA at § 2.01.)

f.  "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title

SVHE 2006-OPT2

insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement."  (Prospectus.)

g.  "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System.  With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans."  (Prospectus.)

h.  Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

i.  For the **413** loans for which documentation was available, title to **38** Mortgage Loans were held by third parties (other than MERS), and title to **227** Mortgage Loans were still held by the Originators.  In other words, **64.16**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

ii.  Of those Mortgage Loans that were assigned to the Trust, **62.41**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

SVHE 2006-OPT2

i.      Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

SVHE 2006-OPT2

**Exhibit W:  Misrepresentations in the Offering Materials for SVHE 2006-OPT3**

1.     **Collateral type:**  "[F]irst lien and second lien, fixed-rate and adjustable-rate residential mortgage loans."  (Prospectus Supplement Apr. 13, 2006 ("PS").)  "Group II Certificates . . . Class II-A-4 Certificates. . . . the Group II Certificates will receive their distributions from Loan Group II."  (PS.)

2.     **Initial number of mortgage loans:**  Group II:  5,105 (PS), 4,782 (TS at 37).

3.     **Originators:**  "Option One, a California corporation headquartered in Irvine, California, is the originator of the Mortgage Loans."  (PS; *see also* TS.)

4.     **Untrue and misleading statements concerning underwriting guidelines in the SVHE 2006-OPT3 Offering Materials:**

     a.     "The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines (the 'Option One Underwriting Guidelines').  The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan."  (PS.)

     b.     "Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan.  Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed."  (PS.)

     c.     "Each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been

W-1

SVHE 2006-OPT3

underwritten in accordance with standards consistent with those utilized by
institutional lenders generally during the period of origination for similar types
of loans.  As to any loan insured by the FHA or partially guaranteed by the
VA, the related seller will represent that it has complied with the underwriting
policies of the FHA or the VA, as the case may be."  (Prospectus Apr. 26,
2006.)

d.      "Unless otherwise specified in the related prospectus supplement, each seller
will represent and warrant that all the loans that it originated and/or sold to the
depositor or one of the depositor's affiliates will have been uderwritten in
accordance with standards consistent with those utilized by institutional lenders
generally during the period of origination for similar types of loans.  As to any
loan insured by the FHA or partially guaranteed by the VA, the related seller
will represent that it has complied with the underwriting policies of the FHA or
the VA, as the case may be."  (Registration Statement Jan. 11, 2006 ("RS").)

e.      "Underwriting standards are applied by or on behalf of a lender to evaluate a
prospective borrower's credit standing and repayment ability, and the value
and adequacy of the mortgaged property as collateral."  (Prospectus; RS.)

f.      "Once all applicable employment, credit and property information is received,
a determination generally is made as to whether the prospective borrower has
sufficient monthly income available to meet the borrower's monthly
obligations on the proposed loan, generally determined on the basis of the
monthly payments due in the year of origination, and other expenses related to
the mortgaged property such as property taxes and hazard insurance, and to

W-2

meet monthly housing expenses and other financial obligations and monthly living expenses."  (Prospectus; RS.)

g.   "All loans acquired by the sponsor are subject to due diligence prior to purchase.  Portfolios are reviewed for issues including, but not limited to, credit, documentation, litigation, default and servicing related concerns as well as a thorough compliance review with loan level testing."  (Prospectus.)

h.   "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation."  (Prospectus; RS.)

i.   Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.   **Untrue and misleading statements regarding case-by-case underwriting exceptions in the SVHE 2006-OPT3 Offering Materials:**

a.   "On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist."  (PS.)

b.   "As described above, the foregoing risk categories and criteria are Underwriting Guidelines only.  On a case-by-case basis, it may be determined that an applicant warrants a debt-to-income ratio exception, a pricing exception, a loan-to-value exception, a credit score exception or an exception

from certain requirements of a particular risk category.  An upgrade will be granted if the application reflects certain compensating factors, among others: a relatively lower LTV; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; a fixed source of income that is greater than 50% of all income; ownership of current residence of four or more years; or cash reserves equal to or in excess of three monthly payments of principal, interest, taxes and insurance.  An upgrade or exception may also be allowed if the applicant places a down payment through escrow of at least 10% of the purchase price of the mortgaged property, or if the new loan reduces the applicant's monthly aggregate mortgage payment by 20% or more. Accordingly, certain mortgagors may qualify for a more favorable risk category or for a higher maximum LTV that, in the absence of such compensating factors, would satisfy only the criteria of a less favorable risk category or maximum LTV."  (PS.)

c.   "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the borrower's creditworthiness which support approval of the loan."  (Prospectus; RS.)

W-4

    d.     Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The "exceptions" became the rule, and were used without regard to whether there were "compensating factors." This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.    **Untrue and misleading statements concerning owner-occupancy statistics in the SVHE 2006-OPT3 Offering Materials:**

    a.     According to the Prospectus Supplement, for the Group II loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,746 | 92.59% | 92.97% |
| Investor | 254 | 4.47% | 4.98% |
| Second/Vacation | 105 | 2.94% | 2.06% |
| Total Mortgaged Properties | 5,105 | 100% | 100% |

    b.     Similarly, according to the Preliminary Term Sheet (at 44) for the Group II loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 4,423 | 92.50% | 92.49% |
| Investor | 254 | 4.52% | 5.31% |
| Second/Vacation | 105 | 2.98% | 2.20% |
| Total Mortgaged Properties | 4,782 | 100% | 100% |

    c.     Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the Group II collateral pool.

i.  Of **749** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **40**.

ii.  Of **749** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **66**.

iii.  Of **749** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **38**.

iv.  Of **749** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence: **91**.

W-6

v.      Of **749** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens that did not list the securitized property as the owner's primary residence: **62**.

vi.     In sum, of the **749** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests: **80**, or **10.68**% of the allegedly owner-occupied properties in the test sample.

d.     Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint. A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless. This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.     **Untrue and misleading statements concerning appraisals in the SVHE 2006-OPT3 Offering Materials:**

a.     "Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable

W-7

condition.  Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac."  (PS.)

b.　"In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal generally is based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replacing the subject home.  In connection with a Manufactured Housing Contract, the appraisal is based on recent sales of comparable manufactured homes and, when deemed applicable, a replacement cost analysis based on the cost of a comparable manufactured home."  (Prospectus; RS.)

c.　Defendants' statements concerning appraisals were untrue and misleading for the reasons set forth in Section II of the Complaint.  The disclosed appraisal standards and processes were not actually followed.  Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval.  This is evidenced by a statistical analysis

SVHE 2006-OPT3

of the Mortgage Loans at issue here, as described herein, and other facts referenced in the Complaint.

8.   **Untrue and misleading statements concerning CLTV ratios in the SVHE 2006-OPT3 Offering Materials:**

   a.   The information in the Prospectus Supplement and the Preliminary Term Sheet present the following untrue and misleading statements regarding CLTV ratios for the Mortgage Loans.  For the Group II loans, the Prospectus Supplement states that:

      i.   The Weighted Average Original CLTV ratio is **82.79%**;

      ii.   **63.23%** of the Mortgage Loans have an Original CLTV ratio greater than 80%;

      iii.   Only **44.04%** of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

      iv.   No Mortgage Loans have an Original CLTV ratio greater than 100%.

   b.   The Preliminary Term Sheet (at 37, 40) provides almost identical data:

      i.   The Weighted Average Original CLTV ratio is **82.68**%;

      ii.   **61.50**% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

      iii.   Only **54.06**% of the Mortgage Loans in the pool have an Original CLTV ratio greater than or equal to 90%; and

      iv.   No Mortgage Loans have an Original CLTV ratio greater than 100%.

    c.      Prudential's loan-level analysis of the mortgages in the Group II collateral pool has determined that the CLTV ratios are higher than the Offering Materials represent. Of the sampled loans that had sufficient data to test:

        i.      the weighted average initial CLTV ratio was **94.00**%;

        ii.      **83.72**% of the loans tested had a CLTV ratio greater than 80%;

        iii.      **71.83**% of the loans tested had a CLTV ratio greater than 90%;

        iv.      **49.87**% of the loans tested had a CLTV ratio greater than 100%;

        v.      **42.12**% of the loans had an actual CLTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

        vi.      **16.02**% of the loans had an actual CLTV ratio that was more than 25% greater than the CLTV ratios they purportedly had.

    d.      Defendants' statements concerning CLTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.     **Untrue and misleading statements concerning credit ratings in the SVHE 2006-OPT3 Offering Materials:**

a.   "It is a condition of the issuance of the Offered Certificates that they be
assigned ratings at least as high as the following ratings by Standard & Poor's,
a division of The McGraw-Hill Companies, Inc. ('S&P'), Moody's Investors
Service, Inc. ('Moody's') and Fitch Ratings ('Fitch'):"  (PS.)

b.   "It is a condition of the issuance of the Offered Notes that they be assigned the
following ratings by Moody's Investors Service, Inc. ('Moody's'), Standard &
Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'), Fitch Ratings
('Fitch') and Dominion Bond Ratings Service, Inc. ('DBRS'):"  (RS.)

c.   "It is a condition to the issuance of the certificates of each series offered by this
prospectus and the accompanying prospectus supplement that they shall have
been rated in one of the four highest rating categories by the nationally
recognized statistical rating agency or agencies specified in the related
prospectus supplement."  (RS.)

d.   "A securities rating addresses the likelihood of the receipt by a
certificateholder of distributions on the Mortgage Loans.  The rating takes into
consideration the characteristics of the Mortgage Loans and the structural, legal
and tax aspects associated with the certificates."  (PS.)

e.   "A securities rating addresses the likelihood of the receipt by a Noteholder of
payments on the Mortgage Loans.  The rating takes into consideration the
characteristics of the Mortgage Loans and the structural, legal and tax aspects
associated with the Offered Notes."  (RS.)

f.   The initial ratings given to the Certificates are set forth in the Complaint.

SVHE 2006-OPT3

g.    Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint.  Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.  This rendered the ratings meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the SVHE 2006-OPT3 Offering Materials:**

a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the Trustee and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date."  (PS.)

b.    "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS.)

c.    "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit

Case 2:53-cv-00001-KM Document 16498-1 Filed 11/02/12 Page 466 of 505 PageID: 64729

of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off Date Principal Balance, all interest accruing thereon on and after the Cut-off Date and all collections in respect of interest and principal due after the Cut-off Date; (ii) property which secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (SVHE 2006-OPT3 Pooling and Servicing Agreement, May 1, 2006 ("PSA"), at § 2.01.)

d.    "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the

recording office; in the case of a contract, other than an unsecured contract, the

security interest in the mortgaged property securing the contract; an assignment

of the mortgage or contract to the trustee, which assignment will be in

recordable form in the case of a mortgage assignment or evidence that the

mortgage is held for the trustee through the MERS(R) System; and any other

security documents as may be specified in the related prospectus supplement,

including those relating to any senior lienholder interests in the related

mortgaged property." (Prospectus.)

e.  "In connection with such transfer and assignment, the Depositor, does hereby

deliver to, and deposit with the Trustee, or its designated agent (the

'Custodian'), the following documents or instruments with respect to each

Initial Mortgage Loan so transferred and assigned and shall, in accordance with

Section 2.08, deliver or caused to be delivered to the Trustee with respect to

each Subsequent Mortgage Loan, the following documents or instruments

(with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original

Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage

Loan is registered on the MERS(R) System, an original Assignment, in form

and substance acceptable for recording. . . . ; (iv) an original copy of any

intervening assignment of Mortgage showing a complete chain of assignments

(or to MERS, if the Mortgage Loan is registered on the MERS(R) System and

noting the presence of the MIN); (v) the original or a certified copy of lender's

title  insurance policy; and (vi) the original or copies of each assumption,

SVHE 2006-OPT3

modification, written assurance or substitution agreement, if any." (PSA at §
2.01.)

f.   "Each loan constituted a valid lien on, or a perfected security interest with

respect to, the related mortgaged property, subject only to permissible title

insurance exceptions, if applicable, and certain other exceptions described in

the related servicing agreement." (Prospectus.)

g.   "If so specified in the related prospectus supplement, and in accordance with

the rules of membership of Merscorp, Inc. and/or Mortgage Electronic

Registration Systems, Inc. (MERS), assignments of the mortgages for some or

all of the mortgage loans in the related trust will be registered electronically

through the MERS(R) System.  With respect to mortgage loans registered

through the MERS(R) System, MERS shall serve as mortgagee of record

solely as a nominee in an administrative capacity on behalf of the trustee and

shall not have any interest in any of those mortgage loans." (Prospectus.)

h.   Prudential's loan-level analysis of the mortgages in the aggregate collateral

pool has determined that a large percentage of Mortgage Loans were not in fact

transferred as represented in the Offering Materials:

i.   For the **497** loans for which documentation was available, title to **39**

Mortgage Loans were held by third parties (other than MERS), and title to

**298** Mortgage Loans were still held by the Originators.  In other words,

**67.81**% of the Loans sampled were not transferred to the Trust or to

MERS at all, contrary to the representations in the Offering Materials.

W-15

    ii.    Of those Mortgage Loans that were assigned to the Trust, **60.13**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

  i.    Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

SVHE 2006-OPT3

## Exhibit X:  Misrepresentations in the Offering Materials for SVHE 2006-OPT4

1.  **Collateral type:**  "[A] pool of first lien and second lien, fixed-rate and adjustable-rate residential mortgatge loans."  (Prospectus Supplement May 16, 2006 ("PS").)  "[F]irst lien and second lien, fixed-rate and adjustable-rate residential mortgage loans."  (Preliminary Term Sheet May 12, 2006 ("TS").)  "Group II Certificates . . . Class II-A-4 Certificates. . . . the Group II Certificates will receive their distributions from Loan Group II."  (PS.)  "Mezzanine Certificates . . . funds available for distribution from payments and other amounts received on the Group I Mortgage Loans and the Group II Mortgage Loans."  (PS.)

2.  **Initial number of mortgage loans:**  Aggregate:  5,535 (PS; TS at 13).  Group II:  3,142 (PS; TS at 37).

3.  **Originators**:  "Option One, a California corporation headquartered in Irvine, California, is the originator of the Mortgage Loans."  (PS; *see also* TS.)

4.  **Untrue and misleading statements concerning underwriting guidelines in the SVHE 2006-OPT4 Offering Materials:**

    a.  "The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines (the 'Option One Underwriting Guidelines').  The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan."  (PS.)

    b.  "Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan.  Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income

X-1

ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed."  (PS.)

c.     "Each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans.  As to any loan insured by the FHA or partially guaranteed by the VA, the related seller will represent that it has complied with the underwriting policies of the FHA or the VA, as the case may be."  (Prospectus Apr. 26, 2006.)

d.     "Unless otherwise specified in the related prospectus supplement, each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans.  As to any loan insured by the FHA or partially guaranteed by the VA, the related seller will represent that it has complied with the underwriting policies of the FHA or the VA, as the case may be."  (Registration Statement Jan. 11, 2006 ("RS").)

e.     "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral."  (Prospectus; RS.)

f.   "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses."  (Prospectus; RS.)

g.   "All loans acquired by the sponsor are subject to due diligence prior to purchase.  Portfolios are reviewed for issues including, but not limited to, credit, documentation, litigation, default and servicing related concerns as well as a thorough compliance review with loan level testing."  (Prospectus.)

h.   "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation." (Prospectus; RS.)

i.   Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The guidelines were systematically ignored.  This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5.   **Untrue and misleading statements regarding case-by-case underwriting exceptions in the SVHE 2006-OPT4 Offering Materials:**

a. "On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist."  (PS.)

b. "As described above, the foregoing risk categories and criteria are Underwriting Guidelines only.  On a case-by-case basis, it may be determined that an applicant warrants a debt-to-income ratio exception, a pricing exception, a loan-to-value exception, a credit score exception or an exception from certain requirements of a particular risk category.  An upgrade will be granted if the application reflects certain compensating factors, among others: a relatively lower LTV; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; a fixed source of income that is greater than 50% of all income; ownership of current residence of four or more years; or cash reserves equal to or in excess of three monthly payments of principal, interest, taxes and insurance.  An upgrade or exception may also be allowed if the applicant places a down payment through escrow of at least 10% of the purchase price of the mortgaged property, or if the new loan reduces the applicant's monthly aggregate mortgage payment by 20% or more.  Accordingly, certain mortgagors may qualify for a more favorable risk category or for a higher maximum LTV that, in the absence of such compensating factors, would satisfy only the criteria of a less favorable risk category or maximum LTV."  (PS.)

c. "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which

X-4

determination must be made in accordance with the expense-to-income ratios

published by the Secretary of HUD unless the lender determines and

documents in the loan file the existence of compensating factors concerning the

borrower's creditworthiness which support approval of the loan." (Prospectus;

RS.)

    d.     Defendants' statements concerning the use of exceptions to underwriting

guidelines were untrue and misleading for the reasons set forth in Section II of

the Complaint. The "exceptions" became the rule, and were used without

regard to whether there were "compensating factors." This is supported by a

statistical analysis of the Mortgage Loans at issue here, and other facts

referenced in the Complaint.

**6.     Untrue and misleading statements concerning owner-occupancy statistics in the**

**SVHE 2006-OPT4 Offering Materials:**

    a.     According to the Prospectus Supplement and Preliminary Term Sheet (at 44),

for the Group II loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 2,904 | 91.55% | 92.43% |
| Investor | 167 | 5.23% | 5.32% |
| Second/Vacation | 71 | 3.22% | 2.26% |
| Total Mortgaged Properties | 3,142 | 100% | 100% |

    b.     According to the Prospectus Supplement and Preliminary Term Sheet (at 20),

for the aggregate loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 5,166 | 92.70% | 93.33% |
| Investor | 280 | 4.97% | 5.06% |
| Second/Vacation | 89 | 2.32% | 1.61% |
| Total Mortgaged Properties | 5,535 | 100% | 100% |

    c.    Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the Group II collateral pool.

    i.    Of **740** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **54**.

    ii.    Of **740** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **69**.

    iii.    Of **740** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the

SVHE 2006-OPT4

number of loans on which the borrower owned other properties during the
same time period as ownership of the securitized property: **24**.

iv.    Of **740** sampled mortgage loans allegedly secured by owner-occupied
properties, and for which recently available analytical procedures allowed
Prudential to gather data sufficient to perform this particular test, the
number of loans on other properties owned by the borrower that did not
list the securitized property as the owner's primary residence: **99**.

v.    Of **740** sampled mortgage loans allegedly secured by owner-occupied
properties, and for which recently available analytical procedures allowed
Prudential to gather data sufficient to perform this particular test, the
number of loans on other properties owned by the borrower that had liens
that did not list the securitized property as the owner's primary residence:
**63**.

vi.    In sum, of the **740** mortgage loans sampled that were allegedly secured by
owner-occupied properties, the non-duplicative number of loans that
appear not to be owner-occupied, based on their failure of at least two of
Prudential's analytical tests: **85**, or **11.49**% of the allegedly owner-
occupied properties in the test sample.

vii.    Defendants' statements concerning owner-occupancy statistics for the
Group II loans were untrue and misleading for the reasons set forth in
Section II of the Complaint. A material amount of the mortgaged
properties were not in fact owner-occupied, and Defendants omitted that
the given statistics were (due to the abandonment of the underwriting

X-7

standards) baseless.  This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

d.  For the aggregate loans, based on Prudential's analysis of **10,817** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief the true rate of owner occupancy for the loans was only **82.89**%, i.e., the Offering Materials overstated the amount of owner occupancy by **10.44**%.

7.  **Untrue and misleading statements concerning appraisals in the SVHE 2006-OPT4 Offering Materials:**

a.  "Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac."  (PS.)

b.  "In determining the adequacy of the mortgaged property as collateral, an appraisal is made of each property considered for financing.  The appraiser is required to inspect the property and verify that it is in good repair and that

construction, if new, has been completed.  The appraisal generally is based on

the market value of comparable homes, the estimated rental income (if

considered applicable by the appraiser) and the cost of replacing the subject

home. In connection with a Manufactured Housing Contract, the appraisal is

based on recent sales of comparable manufactured homes and, when deemed

applicable, a replacement cost analysis based on the cost of a comparable

manufactured home."  (Prospectus; RS.)

   c.   Defendants' statements concerning appraisals were untrue and misleading for

the reasons set forth in Section II of the Complaint.  The disclosed appraisal

standards and processes were not actually followed.  Rather, appraisers,

originators, and Defendants all knowingly instead used whatever value was

needed to generate a loan approval.  This is evidenced by a statistical analysis

of the Mortgage Loans at issue here, as described herein, and other facts

referenced in the Complaint.

8.   **Untrue and misleading statements concerning CLTV ratios in the SVHE 2006-
     OPT4 Offering Materials:**

   a.   The information in the Prospectus Supplement and the Preliminary Term Sheet

present the following untrue and misleading statements regarding CLTV ratios

for the Mortgage Loans.  For the Group II loans, the Prospectus Supplement

states that:

     i.   The Weighted Average Original CLTV ratio is **82.71%**;

     ii.   **60.41%** of the Mortgage Loans have an Original CLTV ratio greater than

80%;

X-9

        iii.     Only **44.14%** of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

        iv.     Only **9.13%** of the Mortgage Loans have an Original CLTV ratio greater than 100%.

b.     The Preliminary Term Sheet (at 37, 40) provides almost identical data for the Group II loans:

        i.     The Weighted Average Original CLTV ratio is **82.71**%;

        ii.     **60.41**% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

        iii.     Only **52.51**% of the Mortgage Loans in the pool have an Original CLTV ratio greater than or equal to 90%; and

        iv.     Only **9.13**% of the Mortgage Loans have an Original CLTV ratio greater than 100%.

c.     For the aggregate loans, the Prospectus Supplement states that:

        i.     The Weighted Average Original CLTV ratio is **81.06%**;

        ii.     **52.00**% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

        iii.     Only **33.98**% of the Mortgage Loans in the pool have an Original CLTV ratio greater than 90%; and

        iv.     Only **5.19%** of the Mortgage Loans have an Original CLTV ratio greater than 100%.

d.     The Preliminary Term Sheet (at 16) provides almost identical data:

        i.     The Weighted Average Original CLTV ratio is **81.06**%;

SVHE 2006-OPT4

    ii.    **52.00**% of the Mortgage Loans have an Original CLTV ratio greater than 80%;

    iii.    Only **42.78**% of the Mortgage Loans in the pool have an Original CLTV ratio greater than or equal to 90%; and

    iv.    Only **5.19%** of the Mortgage Loans have an Original CLTV ratio greater than 100%.

e.    Prudential's loan-level analysis of the mortgages in the Group II collateral pool has determined that the CLTV ratios are higher than the Offering Materials represent.  Of the sampled loans that had sufficient data to test:

    i.    the weighted average initial CLTV ratio was **93.39**%;

    ii.    **87.91**% of the loans tested had a CLTV ratio greater than 80%;

    iii.    **78.30**% of the loans tested had a CLTV ratio greater than 90%;

    iv.    **56.59**% of the loans tested had a CLTV ratio greater than 100%;

    v.    **45.33**% of the loans had an actual CLTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

    vi.    **17.31**% of the loans had an actual CLTV ratio that was more than 25% greater than the CLTV ratios they purportedly had.

f.    For the aggregate loans, based on Prudential's analysis of **10,817** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

    i.    The weighted average CLTV ratio was understated by **6.89**%;

    ii.    The number of loans that had a CLTV higher than 100% was understated by **38.77**%;

SVHE 2006-OPT4

    iii.    **34.31**% of the loans had a CLTV that was at least 10% higher than those loans supposedly had; and

    iv.    **8.79**% of the loans had a CLTV that was at least 25% higher than those loans supposedly had.

g.    Defendants' statements concerning CLTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.    **Untrue and misleading statements concerning credit ratings in the SVHE 2006-OPT4 Offering Materials:**

a.    "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'), Moody's Investors Service, Inc. ('Moody's') and Fitch Ratings ('Fitch'):" (PS.)

b.    "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Fitch Ratings ('Fitch'), Standard & Poor's, a division of the McGraw-Hill Companies, Inc. ('S&P') and Moody's Investors Services, Inc. ('Moody's'):" (RS.)

c.  "It is a condition of the issuance of the Offered Notes that they be assigned the following ratings by Moody's Investors Service, Inc. ('Moody's'), Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'), Fitch Ratings ('Fitch') and Dominion Bond Ratings Service, Inc. ('DBRS'):"  (RS.)

d.  "A securities rating addresses the likelihood of the receipt by a certificateholder of distributions on the Mortgage Loans.  The rating takes into consideration the characteristics of the Mortgage Loans and the structural, legal and tax aspects associated with the certificates."  (PS; RS.)

e.  The initial ratings given to the Certificates are set forth in the Complaint.

f.  Defendants' statements concerning credit ratings were untrue and misleading for the reasons set forth in Section II of the Complaint.  Unknown to Prudential, the rating agencies were fed baseless and false statistics regarding the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.  This rendered the ratings meaningless and misleading.

10.  **Untrue and misleading statements regarding Defendants' assignment of Mortgage Loans in the SVHE 2006-OPT4 Offering Materials:**

a.  "On the Closing Date, the Depositor will transfer to the Trust all of its right, title and interest in and to each Initial Mortgage Loan, the related mortgage note, Mortgage, assignment of mortgage in recordable form in blank or to the Trustee and other related documents (collectively, the 'Related Documents'), including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date."  (PS.)

X-13

b.     "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS.)

c.     "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off Date Principal Balance, all interest accruing thereon on and after the Cut-off Date and all collections in respect of interest and principal due after the Cut-off Date; (ii) property which secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage Loans."  (SVHE 2006-OPT4 Pooling and Servicing Agreement, May 1, 2006 ("PSA"), at § 2.01.)

d.    "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund: the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus.)

e.    "In connection with such transfer and assignment, the Depositor, does hereby deliver to, and deposit with the Trustee, or its designated agent (the 'Custodian'), the following documents or instruments with respect to each Initial Mortgage Loan so transferred and assigned and shall, in accordance with Section 2.08, deliver or caused to be delivered to the Trustee with respect to each Subsequent Mortgage Loan, the following documents or instruments

SVHE 2006-OPT4

(with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original

Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage

Loan is registered on the MERS(R) System, an original Assignment, in form

and substance acceptable for recording. . . . ; (iv) an original copy of any

intervening assignment of Mortgage showing a complete chain of assignments

(or to MERS, if the Mortgage Loan is registered on the MERS(R) System and

noting the presence of the MIN); (v) the original or a certified copy of lender's

title  insurance policy; and (vi) the original or copies of each assumption,

modification, written assurance or substitution agreement, if any."  (PSA at §

2.01.)

f.      "Each loan constituted a valid lien on, or a perfected security interest with

respect to, the related mortgaged property, subject only to permissible title

insurance exceptions, if applicable, and certain other exceptions described in

the related servicing agreement."  (Prospectus.)

g.      "If so specified in the related prospectus supplement, and in accordance with

the rules of membership of Merscorp, Inc. and/or Mortgage Electronic

Registration Systems, Inc. (MERS), assignments of the mortgages for some or

all of the mortgage loans in the related trust will be registered electronically

through the MERS(R) System.  With respect to mortgage loans registered

through the MERS(R) System, MERS shall serve as mortgagee of record

solely as a nominee in an administrative capacity on behalf of the trustee and

shall not have any interest in any of those mortgage loans."  (Prospectus.)

SVHE 2006-OPT4

h.  Prudential's loan-level analysis of the mortgages in the Group II collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

i.  For the **508** loans for which documentation was available, title to **33** Mortgage Loans were held by third parties (other than MERS), and title to **317** Mortgage Loans were still held by the Originators.  In other words, **68.9**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

ii.  Of those Mortgage Loans that were assigned to the Trust, **61.04**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

i.  For the aggregate loans, based on Prudential's analysis of **10,817** loans originated, acquired, and securitized by the same parties at the same time using similar disclosures, on information and belief:

i.  For the loans for which documentation was available, title to **7.26**% of the Mortgage Loans were held by third parties (other than MERS), and title to **29.32**% of the Mortgage Loans were still held by the Originators.  In other words, **41.09**% of the Loans were not properly transferred to the Trust or to MERS, contrary to the representations in the Offering Materials.

ii.  Of those Mortgage Loans that were assigned to the Trust, **60.13**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

X-17

SVHE 2006-OPT4

Case 2:53-cv-00001-KM-MAH Document 16498-1 Filed 11/02/12 Page 487 of 505 PageID: 504750

j.   Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

SVHE 2006-OPT4

**Exhibit Y:  Misrepresentations in the Offering Materials for SVHE 2006-OPT5**

1.    **Collateral type:**  "[F]irst lien and second lien, fixed-rate and adjustable-rate residential mortgage loans."  (Prospectus Supplement May 24, 2006 ("PS").)  "[A] pool of conforming and non-confirming blance fixed-rate and adjustable-rate mortgagel loans."  (Preliminary Term Sheet, May 22, 2006 ("TS").)  "Group II Certificates . . . Class II-A-4 Certificates. . . . the Group II Certificates will receive their distributions from Loan Group II."  (PS.)

2.    **Initial number of mortgage loans:**   Group II:  6,743 (PS; TS.)

3.    **Originators:**  "Option One, a California corporation headquartered in Irvine, California, is the originator of the Mortgage Loans."  (PS; *see also* TS.)

4.    **Untrue and misleading statements concerning underwriting guidelines in the SVHE 2006-OPT5 Offering Materials:**

    a.    "The Mortgage Loans will have been originated generally in accordance with Option One's Guidelines (the 'Option One Underwriting Guidelines').  The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan."  (PS.)

    b.    "Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan.  Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed."  (PS.)

c.     "Each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans.  As to any loan insured by the FHA or partially guaranteed by the VA, the related seller will represent that it has complied with the underwriting policies of the FHA or the VA, as the case may be."  (Prospectus Apr. 26, 2006.)

d.     "Unless otherwise specified in the related prospectus supplement, each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans.  As to any loan insured by the FHA or partially guaranteed by the VA, the related seller will represent that it has complied with the underwriting policies of the FHA or the VA, as the case may be."  (Registration Statement Jan. 11, 2006 ("RS").)

e.     "Underwriting standards are applied by or on behalf of a lender to evaluate a prospective borrower's credit standing and repayment ability, and the value and adequacy of the mortgaged property as collateral."  (Prospectus; RS.)

f.     "Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed loan, generally determined on the basis of the

SVHE 2006-OPT5

monthly payments due in the year of origination, and other expenses related to the mortgaged property such as property taxes and hazard insurance, and to meet monthly housing expenses and other financial obligations and monthly living expenses." (Prospectus; RS.)

g. "All loans acquired by the sponsor are subject to due diligence prior to purchase. Portfolios are reviewed for issues including, but not limited to, credit, documentation, litigation, default and servicing related concerns as well as a thorough compliance review with loan level testing." (Prospectus.)

h. "Generally, the lender must exercise prudence and diligence to determine whether the borrower and any co-maker is solvent and an acceptable credit risk, with a reasonable ability to make payments on the loan obligation." (Prospectus; RS.)

i. Defendants' statements concerning underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint. The guidelines were systematically ignored. This is confirmed by a statistical analysis of the Mortgage Loans at issue here, the rising delinquency rates for the Mortgage Loans, and other facts referenced in the Complaint.

5. **Untrue and misleading statements regarding case-by-case underwriting exceptions in the SVHE 2006-OPT5 Offering Materials:**

a. "On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist." (PS.)

b. "As described above, the foregoing risk categories and criteria are Underwriting Guidelines only. On a case-by-case basis, it may be determined

Y-3

that an applicant warrants a debt-to-income ratio exception, a pricing exception, a loan-to-value exception, a credit score exception or an exception from certain requirements of a particular risk category. An upgrade will be granted if the application reflects certain compensating factors, among others: a relatively lower LTV; a maximum of one 30-day late payment on all mortgage loans during the last 12 months; stable employment; a fixed source of income that is greater than 50% of all income; ownership of current residence of four or more years; or cash reserves equal to or in excess of three monthly payments of principal, interest, taxes and insurance. An upgrade or exception may also be allowed if the applicant places a down payment through escrow of at least 10% of the purchase price of the mortgaged property, or if the new loan reduces the applicant's monthly aggregate mortgage payment by 20% or more. Accordingly, certain mortgagors may qualify for a more favorable risk category or for a higher maximum LTV that, in the absence of such compensating factors, would satisfy only the criteria of a less favorable risk category or maximum LTV." (PS.)

c. "The lender's credit application and review must determine whether the borrower's income will be adequate to meet the periodic payments required by the loan, as well as the borrower's other housing and recurring expenses, which determination must be made in accordance with the expense-to-income ratios published by the Secretary of HUD unless the lender determines and documents in the loan file the existence of compensating factors concerning the

SVHE 2006-OPT5

borrower's creditworthiness which support approval of the loan." (Prospectus; RS.)

d.  Defendants' statements concerning the use of exceptions to underwriting guidelines were untrue and misleading for the reasons set forth in Section II of the Complaint.  The "exceptions" became the rule, and were used without regard to whether there were "compensating factors."  This is supported by a statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

6.  **Untrue and misleading statements concerning owner-occupancy statistics in the SVHE 2006-OPT5 Offering Materials:**

a.  According to the Prospectus Supplement and Preliminary Term Sheet, for the Group II loans:

| Occupancy Type | Number of Mortgage Loans | Percentage Based on Outstanding Principal Balance of Mortgages in Pool | Percentage Based on Number of Loans in Pool |
|---|---|---|---|
| Primary Residence | 6,159 | 92.68% | 91.88% |
| Investor | 440 | 5.37% | 6.56% |
| Second/Vacation | 104 | 1.95% | 1.55% |
| Total Mortgaged Properties | 6,703 | 100% | 100% |

b.  Prudential's subsequent loan-level analysis has determined that Defendants drastically overstated the percentage of owner-occupied properties securing mortgage loans in the Group II collateral pool.

i.  Of **742** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the owner of the property instructed tax

authorities to send property tax bills to a different address, or listed a different address for the property owner's property tax exemption: **47**.

ii.    Of **742** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which creditors reported a different property address as the borrower's mailing address six months after the origination of the securitized loan: **66**.

iii.    Of **742** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on which the borrower owned other properties during the same time period as ownership of the securitized property: **23**.

iv.    Of **742** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that did not list the securitized property as the owner's primary residence: **86**.

v.    Of **742** sampled mortgage loans allegedly secured by owner-occupied properties, and for which recently available analytical procedures allowed Prudential to gather data sufficient to perform this particular test, the number of loans on other properties owned by the borrower that had liens

Y-6

that did not list the securitized property as the owner's primary residence: **57**.

    vi.    In sum, of the **742** mortgage loans sampled that were allegedly secured by owner-occupied properties, the non-duplicative number of loans that appear not to be owner-occupied, based on their failure of at least two of Prudential's analytical tests: **76**, or **10.24**% of the allegedly owner-occupied properties in the test sample.

    c.    Defendants' statements concerning owner-occupancy statistics were untrue and misleading for the reasons set forth in Section II of the Complaint.  A material amount of the mortgaged properties were not in fact owner-occupied, and Defendants omitted that the given statistics were (due to the abandonment of the underwriting standards) baseless.  This is evidenced by the above statistical analysis of the Mortgage Loans at issue here, and other facts referenced in the Complaint.

7.    **Untrue and misleading statements concerning appraisals in the SVHE 2006-OPT5 Offering Materials:**

    a.    "Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers.  Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to

conform to the Uniform Standards of Professional Appraisal Practice adopted

by the Appraisal Standards Board of the Appraisal Foundation and are

generally on forms acceptable to Fannie Mae and Freddie Mac." (PS.)

b.  "In determining the adequacy of the mortgaged property as collateral, an

appraisal is made of each property considered for financing. The appraiser is

required to inspect the property and verify that it is in good repair and that

construction, if new, has been completed. The appraisal generally is based on

the market value of comparable homes, the estimated rental income (if

considered applicable by the appraiser) and the cost of replacing the subject

home. In connection with a Manufactured Housing Contract, the appraisal is

based on recent sales of comparable manufactured homes and, when deemed

applicable, a replacement cost analysis based on the cost of a comparable

manufactured home." (Prospectus; RS.)

c.  Defendants' statements concerning appraisals were untrue and misleading for

the reasons set forth in Section II of the Complaint. The disclosed appraisal

standards and processes were not actually followed. Rather, appraisers,

originators, and Defendants all knowingly instead used whatever value was

needed to generate a loan approval. This is evidenced by a statistical analysis

of the Mortgage Loans at issue here, as described herein, and other facts

referenced in the Complaint.

8.  **Untrue and misleading statements concerning CLTV ratios in the SVHE 2006-**

**OPT5 Offering Materials:**

Y-8

a.  The information in the Prospectus Supplement and the Preliminary Term Sheet
present the following untrue and misleading statements regarding CLTV ratios
for the Mortgage Loans.  For the Group II loans, the Prospectus Supplement
states that:

 i.  The Weighted Average Original CLTV ratio is **82.48%**;

 ii.  **56.62%** of the Mortgage Loans have an Original CLTV ratio greater than
80%;

 iii.  Only **42.18%** of the Mortgage Loans in the pool have an Original CLTV
ratio greater than 90%; and

 iv.  No Mortgage Loans have an Original CLTV ratio greater than 100%.

b.  The Preliminary Term Sheet provides almost identical data:

 i.  The Weighted Average Original CLTV ratio is **82.48%**;

 ii.  **56.62%** of the Mortgage Loans have an Original CLTV ratio greater than
80%;

 iii.  Only **50.75%** of the Mortgage Loans in the pool have an Original CLTV
ratio greater than or equal to 90%; and

 iv.  No Mortgage Loans have an Original CLTV ratio greater than 100%.

c.  Prudential's loan-level analysis of the mortgages in the Group II collateral pool
has determined that the CLTV ratios are higher than the Offering Materials
represent.  Of the sampled loans that had sufficient data to test:

 i.  the weighted average initial CLTV ratio was **93.02**%;

 ii.  **83.74**% of the loans tested had a CLTV ratio greater than 80%;

 iii.  **74.14**% of the loans tested had a CLTV ratio greater than 90%;

Y-9

iv.    **50.49**% of the loans tested had a CLTV ratio greater than 100%;

v.    **39.16**% of the loans had an actual CLTV ratio that was at least 10% greater than the LTV ratios they purportedly had; and

vi.    **15.52**% of the loans had an actual CLTV ratio that was more than 25% greater than the CLTV ratios they purportedly had.

d.    Defendants' statements concerning CLTV ratios were untrue and misleading for the reasons set forth in Section II of the Complaint. The disclosed appraisal standards and processes were not actually followed. Rather, appraisers, originators, and Defendants all knowingly instead used whatever value was needed to generate a loan approval. The use of inflated appraisal values to get more loans approved meant Defendants knew the statistical descriptions above were baseless, false, and misleading. This is evidenced by a statistical analysis of the Mortgage Loans at issue here, as described above, and other facts referenced in the Complaint.

9.    **Untrue and misleading statements concerning credit ratings in the SVHE 2006-OPT5 Offering Materials:**

a.    "It is a condition of the issuance of the Offered Certificates that they be assigned ratings at least as high as the following ratings by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'), Moody's Investors Service, Inc. ('Moody's') and Fitch Ratings ('Fitch'):" (PS.)

b.    "It is a condition of the issuance of the Offered Certificates that they be assigned the following ratings by Fitch Ratings ('Fitch'), Standard & Poor's, a

division of the McGraw-Hill Companies, Inc.('S&P') and Moody's Investors
Services, Inc. ('Moody's'):" (RS.)

c.    "It is a condition of the issuance of the Offered Notes that they be assigned the
following ratings by Moody's Investors Service, Inc. ('Moody's'), Standard &
Poor's, a division of The McGraw-Hill Companies, Inc. ('S&P'), Fitch Ratings
('Fitch') and Dominion Bond Ratings Service, Inc. ('DBRS'):" (RS.)

d.    "A securities rating addresses the likelihood of the receipt by a
certificateholder of distributions on the Mortgage Loans. The rating takes into
consideration the characteristics of the Mortgage Loans and the structural, legal
and tax aspects associated with the certificates." (PS; RS.)

e.    The initial ratings given to the Certificates are set forth in the Complaint.

f.    Defendants' statements concerning credit ratings were untrue and misleading
for the reasons set forth in Section II of the Complaint. Unknown to
Prudential, the rating agencies were fed baseless and false statistics regarding
the loans, as evidenced by a statistical analysis of the Mortgage Loans at issue
here, and other facts referenced in the Complaint. This rendered the ratings
meaningless and misleading.

10.    **Untrue and misleading statements regarding Defendants' assignment of Mortgage
Loans in the SVHE 2006-OPT5 Offering Materials:**

a.    "On the Closing Date, the Depositor will transfer to the Trust all of its right,
title and interest in and to each Initial Mortgage Loan, the related mortgage
note, Mortgage, assignment of mortgage in recordable form in blank or to the
Trustee and other related documents (collectively, the 'Related Documents'),

Y-11

including all scheduled payments with respect to each such Mortgage Loan due after the Cut-off Date."  (PS.)

b.    "On the closing date the depositor will transfer to the trust fund all of its right, title and interest in and to each mortgage loan included in the pool, the related mortgage notes, mortgages and other related documents, including all scheduled payments with respect to each mortgage loan due after the cut-off date."  (RS.)

c.    "The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule, including the related Cut-off Date Principal Balance, all interest accruing thereon on and after the Cut-off Date and all collections in respect of interest and principal due after the Cut-off Date; (ii) property which secured each such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans; (iv) the rights of the Depositor under the Mortgage Loan Purchase Agreement; (v) the right to receive any amounts payable under the Cap Contract; (vi) all other assets included or to be included in the Trust Fund; and (vii) all proceeds of any of the foregoing.  Such assignment includes all interest and principal due and collected by the Depositor or the Servicer after the Cut-off Date with respect to the Mortgage

SVHE 2006-OPT5

Loans."  (SVHE 2006-OPT5 Pooling and Servicing Agreement, Jun. 1, 2006 ("PSA"), at § 2.01.)

d.    "In addition, the depositor will deliver to the trustee or a custodian the following items in connection with each loan in the related trust fund:  the original mortgage note or contract, endorsed without recourse in blank or to the order of the trustee; in the case of Single Family Loans, Home Equity Loans or Multifamily Loans, the mortgage, deed of trust or similar instrument (each, a 'mortgage') with evidence of recording indicated on the mortgage; however, in the case of any mortgage not returned from the public recording office, the depositor will deliver or cause to be delivered a copy of the mortgage together with a certificate stating that the original mortgage was delivered to the recording office; in the case of a contract, other than an unsecured contract, the security interest in the mortgaged property securing the contract; an assignment of the mortgage or contract to the trustee, which assignment will be in recordable form in the case of a mortgage assignment or evidence that the mortgage is held for the trustee through the MERS(R) System; and any other security documents as may be specified in the related prospectus supplement, including those relating to any senior lienholder interests in the related mortgaged property."  (Prospectus.)

e.    "In connection with such transfer and assignment, the Depositor, does hereby deliver to, and deposit with the Trustee, or its designated agent (the 'Custodian'), the following documents or instruments with respect to each Initial Mortgage Loan so transferred and assigned and shall, in accordance with

Y-13

Section 2.08, deliver or caused to be delivered to the Trustee with respect to each Subsequent Mortgage Loan, the following documents or instruments (with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original Mortgage Note, . . . (ii) the original Mortgage, . . . ; (iii) unless the Mortgage Loan is registered on the MERS(R) System, an original Assignment, in form and substance acceptable for recording. . . . ; (iv) an original copy of any intervening assignment of Mortgage showing a complete chain of assignments (or to MERS, if the Mortgage Loan is registered on the MERS(R) System and noting the presence of the MIN); (v) the original or a certified copy of lender's title  insurance policy; and (vi) the original or copies of each assumption, modification, written assurance or substitution agreement, if any."  (PSA at § 2.01.)

f.  "Each loan constituted a valid lien on, or a perfected security interest with respect to, the related mortgaged property, subject only to permissible title insurance exceptions, if applicable, and certain other exceptions described in the related servicing agreement."  (Prospectus.)

g.  "If so specified in the related prospectus supplement, and in accordance with the rules of membership of Merscorp, Inc. and/or Mortgage Electronic Registration Systems, Inc. (MERS), assignments of the mortgages for some or all of the mortgage loans in the related trust will be registered electronically through the MERS(R) System.  With respect to mortgage loans registered through the MERS(R) System, MERS shall serve as mortgagee of record

SVHE 2006-OPT5

solely as a nominee in an administrative capacity on behalf of the trustee and shall not have any interest in any of those mortgage loans." (Prospectus.)

h.  Prudential's loan-level analysis of the mortgages in the aggregate collateral pool has determined that a large percentage of Mortgage Loans were not in fact transferred as represented in the Offering Materials:

   i.  For the **539** loans for which documentation was available, title to **51** Mortgage Loans were held by third parties (other than MERS), and title to **320** Mortgage Loans were still held by the Originators.  In other words, **68.83**% of the Loans sampled were not transferred to the Trust or to MERS at all, contrary to the representations in the Offering Materials.

   ii.  Of those Mortgage Loans that were assigned to the Trust, **70.3**% were missing intervening assignments, rendering the transfer of the loans to the Trust incomplete, contrary to the representations in the Offering Materials.

i.  Defendants' statements concerning the assignment of Mortgage Loans were untrue and misleading.  This is evidenced by the above loan-level analysis, and other facts referenced in the Complaint.

SVHE 2006-OPT5

**Appendix XII-B1**

| | CIVIL CASE INFORMATION STATEMENT (CIS) | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|---|



**CIVIL CASE INFORMATION STATEMENT (CIS)**

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed

**FOR USE BY CLERK'S OFFICE ONLY**
PAYMENT TYPE: ☐ CK ☐ CG ☐ CA
CHG/CK NO.
AMOUNT:
OVERPAYMENT:
BATCH NUMBER:

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| KIRSTEN MCCAW GROSSMAN, ESQ. | (973) 564-9100 | Essex |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
|---|---|
| NUKK-FREEMAN & CERRA, P.C. | |

| OFFICE ADDRESS | DOCUMENT TYPE |
|---|---|
| 636 MORRIS TURNPIKE, SUITE 2F SHORT HILLS, NEW JERSEY 07078 | COMPLAINT |
| | JURY DEMAND ■ YES ☐ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al., Plaintiffs | THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, et al. v. RBS FINANCIAL PRODUCTS, INC., et al. |

| CASE TYPE NUMBER (See reverse side for listing) | IS THIS A PROFESSIONAL MALPRACTICE CASE? ☐ YES ■ NO |
|---|---|
| 508 | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? ☐ YES ■ No | IF YES, LIST DOCKET NUMBERS |
|---|---|

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? ☐ YES ■ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known) ☐ NONE ■ UNKNOWN |
|---|---|

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ■ YES ☐ No | IF YES, IS THAT RELATIONSHIP: ☐ EMPLOYER/EMPLOYEE ☐ FAMILIAL | ☐ FRIEND/NEIGHBOR ■ BUSINESS | ☐ OTHER (explain) |
|---|---|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? ■ YES ☐ No |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ YES ■ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED? ☐ YES ■ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE: *Kirsten McCaw Grossman*

**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule 4:5-1*

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

### Track I - 150 days' discovery
| | |
|---|---|
| 151 | NAME CHANGE |
| 175 | FORFEITURE |
| 302 | TENANCY |
| 399 | REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction) |
| 502 | BOOK ACCOUNT (debt collection matters only) |
| 505 | OTHER INSURANCE CLAIM (including declaratory judgment actions) |
| 506 | PIP COVERAGE |
| 510 | UM or UIM CLAIM (coverage issues only) |
| 511 | ACTION ON NEGOTIABLE INSTRUMENT |
| 512 | LEMON LAW |
| 801 | SUMMARY ACTION |
| 802 | OPEN PUBLIC RECORDS ACT (summary action) |
| 999 | OTHER (briefly describe nature of action) |

### Track II - 300 days' discovery
| | |
|---|---|
| 305 | CONSTRUCTION |
| 509 | EMPLOYMENT (other than CEPA or LAD) |
| 599 | CONTRACT/COMMERCIAL TRANSACTION |
| 603N | AUTO NEGLIGENCE -- PERSONAL INJURY (non-verbal threshold) |
| 603Y | AUTO NEGLIGENCE -- PERSONAL INJURY (verbal threshold) |
| 605 | PERSONAL INJURY |
| 610 | AUTO NEGLIGENCE -- PROPERTY DAMAGE |
| 621 | UM or UIM CLAIM (includes bodily injury) |
| 699 | TORT -- OTHER |

### Track III - 450 days' discovery
| | |
|---|---|
| 005 | CIVIL RIGHTS |
| 301 | CONDEMNATION |
| 602 | ASSAULT AND BATTERY |
| 604 | MEDICAL MALPRACTICE |
| 606 | PRODUCT LIABILITY |
| 607 | PROFESSIONAL MALPRACTICE |
| 608 | TOXIC TORT |
| 609 | DEFAMATION |
| 616 | WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES |
| 617 | INVERSE CONDEMNATION |
| 618 | LAW AGAINST DISCRIMINATION (LAD) CASES |

### Track IV - Active Case Management by Individual Judge / 450 days' discovery
| | |
|---|---|
| 156 | ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION |
| 303 | MT. LAUREL |
| 508 | COMPLEX COMMERCIAL |
| 513 | COMPLEX CONSTRUCTION |
| 514 | INSURANCE FRAUD |
| 620 | FALSE CLAIMS ACT |
| 701 | ACTIONS IN LIEU OF PREROGATIVE WRITS |

### Centrally Managed Litigation (Track IV)
| | | | |
|---|---|---|---|
| 280 | ZELNORM | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 291 | PELVIC MESH/GYNECARE |
| 288 | PRUDENTIAL TORT LITIGATION | 292 | PELVIC MESH/BARD |
| 289 | REGLAN | 293 | DEPUY ASR HIP IMPLANT LITIGATION |

### Mass Tort (Track IV)
| | | | |
|---|---|---|---|
| 248 | CIBA GEIGY | 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL |
| 266 | HORMONE REPLACEMENT THERAPY (HRT) | 282 | FOSAMAX |
| 271 | ACCUTANE/ISOTRETINOIN | 284 | NUVARING |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 286 | LEVAQUIN |
| 278 | ZOMETA/AREDIA | 287 | YAZ/YASMIN/OCELLA |
| 279 | GADOLINIUM | 601 | ASBESTOS |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics.

**Please check off each applicable category**   ☐ Putative Class Action   ☐ Title 59

ESSEX COUNTY - CIVIL DIVISION
SUPERIOR COURT OF NJ
465 MARTIN LUTHER KING JR BLVD
NEWARK        NJ 07102

TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (973) 693-5529
COURT HOURS

DATE:    AUGUST 22, 2012
RE:      THE PRUDENTIAL INSURANCE COMPANY VS RBS FINANCIAL
DOCKET:  ESX L -006206 12

THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.

THE MANAGING JUDGE ASSIGNED IS:  HON PAUL J. VICHNESS

IF YOU HAVE ANY QUESTIONS, CONTACT TEAM        002
AT:  (973) 693-6443 EXT 6431.

IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
ATTENTION:

NUKK FREEMAN & CERRA
636 MORRIS TURNPIKE
SUITE 2F
SHORT HILLS      NJ 07078

JUGWIL3